UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CAROL BARTON               )
                           )
vs                         )        Case No. 3:20-cv-00118
                           )
THE METROPOLITAN GOVERNMENT )
OF NASHVILLE AND DAVIDSON   )
COUNTY, TENNESSEE           )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

WILLIAM L. CAMPBELL, JR., DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

November 8, 2022

Volume 1-A

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Patricia A. Jennings, RMR, CRR
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
patty_jennings@tnmd.uscourts.gov

APPEARANCES:

For the Plaintiff:          Heather M. Collins
                            Ashley S. Walter
                            HMC Civil Rights Law, PLLC
                            7000 Executive Center Drive
                            Suite 320
                            Brentwood, TN  37027

For the Defendant:          J. Brooks Fox
                            Kelli F. Woodward
                            Benjamin Andrew Puckett
                            Metropolitan Legal Department
                            P.O. Box 196300
                            Nashville, TN  37219

I N D E X

                                                            Page

Jury Selection (See Volume 1-B) ...................    6


                    PLAINTIFF'S PROOF

**CAROL BARTON**
     Direct Examination by Ms. Collins...............    32
     Cross-Examination by Mr. Fox...................    69
**LISA FEW**
     Direct Examination by Ms. Collins...............    73
     Cross-Examination by Mr. Fox...................    94
     Redirect Examination by Ms. Collins............    98
**GEORGE TUCKER**
     Direct Examination by Ms. Walter...............   100
**SELINA HARRIS**
     Direct Examination by Ms. Collins...............   108
     Cross-Examination by Mr. Fox...................   139

1

## PLAINTIFF'S EXHIBITS

2

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Job Description | 109 |
| 2 | MNPS Support Handbook | 81 |
| 3 | Time-off requests | 119 |
| 4 | List of time-off requests | 129 |
| 6 | Email from Lisa Few, 1/5/2017 | 75 |
| 9 | Email chain from Carol Barton, 4/18/2018 | 143 |
| 10 | Email chain from PL, 4/18/2018 | 44 |
| 11 | Letter from PL to Selina Harris, 6/7/2018 | 50 |
| 12 | Email chain from Selina Harris re: Hiring Freeze | 125 |
| 13 | Email chain from PL | 54 |
| 15 | Email chain from PL, 8/14/2018 re: Time Away | 62 |
| 18 | Responses to Requests for Admission | 134 |
| 22 | EEOC Charge | 61 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          The above-styled cause came to be heard on

2    November 8, 2022, at 9:10 a.m., before the Honorable William

3    L. Campbell, Jr., District Judge, when the following

4    proceedings were had, to-wit:

5

6          THE COURT:  All right, good morning.  We're here

7    for a jury trial in Barton versus Metro Government of

8    Nashville and Davidson County, Case No. 3:20-cv-118.

9          If counsel will introduce yourselves for the

10   record, please.

11          MS. COLLINS:  Heather Collins for the plaintiff.

12          MS. WALTER:  Ashley Walter for the plaintiff.

13          MR. FOX:  Brook Fox for the defendant.

14          MR. PUCKETT:  Benjamin Puckett for the defendant.

15          MS. WOODWARD:  Kelli Woodward for the defendant.

16          THE COURT:  Okay.  And I gather we've got

17   Ms. Barton --

18          MS. COLLINS:  Yes.

19          THE COURT:  -- at the chair.  And then who do we

20   have representing Metro?

21          MS. FEW:  Lisa Few.

22          THE COURT:  I'm sorry?

23          MS. FEW:  Lisa Few.

24          THE COURT:  Few?  Okay.  All right.  Before we

25   bring our potential jurors in, there was some briefing

submitted on a few exhibits relating to the EEOC file.  I
think that Metro has raised some legitimate concerns about
the admissibility of those, but if and when they're offered,
I'll hear any objections that you might have, and we'll sort
it out then.  But just please stay away from mentioning,
reading from, talking about those documents until we've had a
chance to rule on their admissibility.  That would include in
voir dire and openings.

All right, anything else on your minds before we
bring our folks in?  No?

MS. COLLINS:  No, Your Honor.

THE COURT:  All right.

(The trial continued with jury selection.  See
Volume 1-B.)

THE COURT:  All right, members of the jury, if you
will please stand, Ms. Brewer will administer an oath.

COURTROOM DEPUTY:  Raise your right hand, please.

(Jury sworn.)

THE COURT:  Okay, be seated, please.

All right, members of the jury, I've got just a
few more instructions to give you, then we're going to take a
break, unless somebody has a pressing need for a break right
now, we can certainly break.  Anybody have an urgent need for
a break, instead of taking about ten more minutes?

(No response.)

THE COURT:  Okay.  All right, now that you've been sworn, I'll give you some preliminary instructions to guide you in your participation in the trial.  It will be your duty to find from the evidence what the facts are.  You, and you alone, will be the judges of the facts.  You will then have to apply to those facts the law as the Court will give it to you.  You must follow that law whether you agree with it or not.  Nothing the Court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits and any facts that the lawyers agree to or stipulate to and that the Court may instruct you to find.  Certain things are not evidence and must not be considered by you.  I will list them for you now.

Statements, arguments and questions by lawyers are not evidence.  Objections to questions are not evidence.  Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.  If you're instructed that some item of evidence is received for a limited purpose only, you

must follow that instruction.  Testimony that the Court has
excluded or told you to disregard is not evidence and must
not be considered.  Anything you may have seen or heard
outside the courtroom is not evidence and must be
disregarded.  You are to decide the case solely on the
evidence presented here in the courtroom.

There are two kinds of evidence, direct and
circumstantial.  Direct evidence is direct proof of a fact,
such as the testimony of an eyewitness.  Circumstantial
evidence is proof of facts from which you may infer or
conclude that other facts exist.  I will give you further
instructions on these, as well as other matters, at the end
of the case, but keep in mind that you may consider both
kinds of evidence.

During the trial, you may hear the terms
"deposition" and "interrogatory."  A deposition is testimony
from a witness taken under oath at a previous time.  Certain
deposition testimony may be admitted into evidence and read
to you or played on video.  Interrogatories are written
questions asked by one party that are answered by another
party under oath.  Certain interrogatory answers may be
admitted into evidence.

It will be up to you to decide which witnesses to
believe, which witnesses not to believe, and how much of any
witness's testimony to accept or reject.  I will give you

1 some guidelines for determining the credibility of witnesses

2 at the end of the case.

3 This is a civil case. The plaintiff has the

4 burden of proving her case by what is called "preponderance

5 of the evidence." This means the plaintiff has to produce

6 evidence, which considered in light of all the facts leads

7 you to believe that what the plaintiff claims is more likely

8 true than not. To put it differently, if you were to put the

9 plaintiff's and the defendant's evidence on opposite sides of

10 a set of scales, the plaintiff must have -- would have to

11 make the scales tip somewhat on her side. If the plaintiff

12 fails to meet this burden, the verdict must be for the

13 defendant.

14 Those of you who have sat on criminal cases will

15 have heard of prove beyond a reasonable doubt. That

16 requirement does not apply to a civil case, therefore, you

17 should put it out of your mind.

18 Now, a few words about your conduct as jurors.

19 First, I instruct you that during the trial, you're not to

20 discuss the case with anyone or permit anyone to discuss it

21 with you. Until you retire to the jury room at the end of

22 the case to deliberate on your verdict, you simply are not to

23 talk about the case. Do not discuss the case in any manner

24 with other jurors, the parties, the lawyers, witnesses, news

25 media, or anyone else. Do not think it rude, for instance,

1    if the lawyers or the parties do not speak to you if you see

2    them outside the courtroom.  They have been instructed by the

3    Court not to talk to you.

4              If anyone should try to talk to you about the

5    case, bring it to the Court's attention promptly, but do not

6    discuss it with other jurors.  Second, do not read, listen to

7    or watch anything touching on this case in any way in the

8    news media, newspapers, television, radio, magazines or the

9    internet.  Ignore it.  If you inadvertently see or hear

10   something, put it out of your mind.  You must decide the case

11   only on the evidence presented and the law given to you in

12   this courtroom.  Third, do not try to do any research or make

13   any investigation about the case on your own.  You, as

14   jurors, must decide the case based only on the evidence

15   presented here within the four walls of this courtroom.  This

16   means that during the trial you must not conduct any

17   independent research about this case, the matters in the case

18   or the individuals or parties involved in the case.  In other

19   words, you should not consult dictionaries or reference

20   materials, search the internet, websites, blogs, or use any

21   other electronic tools to obtain information about this case

22   or to help you decide the case.  Do not try to find out

23   information from any source outside the confines of this

24   courtroom.

25             Until you retire to deliberate, you must not

discuss the case with anyone, even your fellow jurors.  After

you retire to deliberate, you may begin discussing the case

with your fellow jurors, but you cannot discuss the case with

anyone else until you have returned a verdict and the case is

at an end.

I know that many of you use smartphones, the

internet and other tools of technology.  You must not talk to

anyone about this case or use those tools to communicate

electronically with anyone about the case.  This includes

your family and friends.  You may not communicate with anyone

about the case by smartphone, email, text, Twitter, Facebook,

YouTube, or any other social media blog or website.

Finally, do not form any opinion until all the

evidence is in.  Keep an open mind until you start your

deliberations at the end of the case.  If you want, you may

take notes.  Notebooks and a folder will be provided for you.

At night, please place your notes and any exhibits given to

you in the folder and put them in the jury room when you

leave.  And remember your notes are only for your own

personal use.

If you're unable to hear or see a witness, please

pass a note to the court security officer, who will then

bring it to my attention.  The trial will begin shortly.

First, each party may make an opening statement.  An opening

statement is neither evidence, nor argument.  It is an

outline of what the party intends to prove.  Next, the plaintiff will present her witnesses, and the defendant may cross-examine them.  Then the defendant may present its witnesses, and the plaintiff may cross-examine them. Rebuttal witnesses might be called.  After that, the attorneys will make their closing arguments to summarize and interpret the evidence for you, and the Court will give you instructions on the law.  You will then retire to deliberate on your verdict.

Finally, we'll keep the following schedule:  We'll plan on starting promptly at 9 each morning.  We'll end at approximately 4:30 each day.  There's a little bit of flexibility in there.  For instance, today we're going to end at 4.  I have another commitment.  So just for planning purposes, we're probably not going to go much past 4:30.  On certain days, we may end a little early.  We'll take a lunch break around noon and then a midmorning break that we're about to take and a mid-afternoon break for comfort, but please be ready to start when the Court is ready to start and do not be late.  If you have an urgent need for a break, please pass a note to the court security officer, and we will try to take a break as soon as we can.

Again, I want to thank you for your service.  At this time, we're going to take our midmorning break.  It's a little bit past midmorning, but we will take a -- we'll give

you a -- we've gone a little long here.  So I'll give you a
15-minute break, allow you to stretch your legs, use the
restroom, get a snack, or whatever, and then we'll come back
at top of the hour at 11 to hear opening statements from the
attorneys.

You haven't heard any evidence yet.  And as I just
told you instructions, don't discuss the case of what you've
heard so far with each other.  You're going to hear me say
that a bunch over the next four or five days and just -- but
it is important.  When I say that, I don't mean you can't
talk to each other about other things, just not the case.  I
had one jury that took that very literally, and they did not
talk to each other the entire trial.  It's perfectly okay for
you-all to get to know one another, you're going to spend
some time together, but just don't talk about the case.
There's plenty of other things I'm sure in life you can
discuss outside this case.

So we'll go ahead and take our break.  We'll have
you go back to our jury room.  Hopefully, it's comfortable.
We've got snacks and things like that for you.  And then
we'll have you back in at the top of the hour.

(The jury was excused from the courtroom at
10:45 a.m.)

THE COURT:  All right, we'll take 15 minutes.
I'll let you-all reset and get ready for openings, and then

 1  we'll hopefully get the openings done and then take our lunch

 2  break.

 3          (Recess taken from 10:45 a.m. to 11:02 a.m.)

 4          THE COURT:  All right, are we ready for opening

 5  statements?

 6          MS. COLLINS:  Yes.  Your Honor, we didn't invoke

 7  the rule.

 8          THE COURT:  Thank you for reminding me.  We're

 9  going to invoke the rule.  Please -- you-all know the

10  witnesses better than I do.  So please instruct them to stay

11  outside the courtroom.  If one of them happens to wander in,

12  and you notice it, please get my attention, and we will have

13  that person step out, but we will invoke the witness

14  sequestration rule.  Thank you for reminding me.  We usually

15  give out notepads and pens after openings.  And I think we're

16  ready.

17          (The jury returned to the courtroom at 10:04 a.m.)

18          THE COURT:  Be seated, please.  All right, as I

19  mentioned before the break, members of the jury, we'll first

20  have opening statements from counsel.  We'll begin with the

21  plaintiff.

22          MS. COLLINS:  It's been nice working with you.

23  We'll hate to see you go.  Those were the words that Carol

24  Barton heard from her supervisor, Selina Harris, when she

25  effectively ended Carol's 12-year full-time career with Metro

1  that she loved so much.

2  So what is this case about?  You've heard a little

3  bit in the beginning.  Carol was given an impossible choice.

4  She had to choose between her faith and her employment.  And

5  in reality for Carol, that was no choice at all.  She

6  couldn't make that choice because it was always going to be

7  her faith.  And what happened was, rather than her employers,

8  who by the way worked in Human Resources and should have

9  known better, rather than them thoughtfully considering her

10  request, rather than them thoughtfully looking at the

11  calendar, rather than them thoughtfully considering all of

12  the facts, rather than them talking to Carol and saying, hey,

13  can you shorten your trip?  Can you do this, can you do that,

14  they just said no.  They said no once.  They said it twice.

15  And finally Carol, when faced with this impossible choice,

16  said "I have to live up to my faith."  And she should be able

17  to do that.  Carol knew that she should be able to do that

18  because she works in Human Resources too, and she knows the

19  laws.

20  So, ladies and gentlemen, you're here today to

21  determine just a few things.  One, whether Metro could have

22  accommodated Carol's request for accommodation; two, whether

23  they discriminated against her when they ended her career

24  because they refused to accommodate her; and three, whether

25  or not they retaliated against her because she made this

1  request, because she went to them and asked for help.

2  Now, to give you a little bit of background, every

3  year Carol had worked for Metro, she used her earned paid

4  time off to go to conventions associated with her faith as a

5  Jehovah's Witness.  They were typically three times a year,

6  and they would last a couple of days.  She didn't miss a

7  single one in 12 years.  She always went to the semi-annual

8  conventions.  And she's practiced being a Jehovah's Witness

9  her entire life.  That was the faith that she was born into.

10 She started with her parents at a very young age going out

11 and being a disciple, is what they call it, spreading the

12 word.  And so it had been a centerpiece of her life always.

13 It's where she met her husband, Kenn.  They even got baptized

14 together.

15 So with that background, it sort of culminated.

16 She had always been very, very, very active in her local

17 Kingdom Hall.  And in 2008, something wonderful happened to

18 Carol.  She was selected as a delegate to go to an

19 international convention.  Now, these international

20 conventions are special because they only happen once every

21 five years, and they happen all over the world.  And a lot of

22 times they go places where the Jehovah's Witnesses have not

23 been before.  And so they serve a lot of different purposes.

24 They go out into the community for outreach.  They

25 bring their faith to an area sometimes that has not

experienced that.  And then after someone's selected as a delegate, which is a very special thing, that delegate comes back and shares what they learned at this convention with not just their local congregation, but people that they're going to meet, you know, through her ministry that she takes care of every day.

So for Carol, when she got selected for this privilege, she couldn't say no.  It was not an option to say no.  And it shouldn't have been a surprise to Metro that she wasn't going to say no.  She made it very clear what an honor it was.  So she initially approached her supervisor about the obligation, and her supervisor, whose name is Selina Harris, said, no, can't happen.  And the reason why she said that is because just the year before, they had said there was a freeze in place for really the entire summer.  They said from April until the end of August, which is a pretty long period of time, they didn't want anybody taking off because they had a lot of work to do.  They were the Human Resources Department.  They did process a lot of transfers, hiring, people who left.  So there was a lot of work.  That is not really in dispute.

What is in dispute and what we need you to determine is what the facts are going to show.  The facts are going to show that the work got done.  The facts are going to show that Carol, who was a dedicated hard worker, was going

to have everything done before she left.  She was going to catch up and do everything the minute she got back because she had a work history that showed she was going to do that. It also will show that there were other people that did the work.  It will show that there was a substitute worker that could have done the work.  It will show that -- we'll have testimony from co-workers who said they didn't work anymore overtime than in any other year in 2018, when this happened.

So really that begs the question why did they make the decision they made.  Well, they made the decision they made because they denied Carol's request for accommodation. And that's really the problem.  Because she -- when she brought all these things up, they said sorry, and she had to choose.  And Carol, being the ever hopeful person that she is and that you'll get to know, she kept trying.  She kept sending emails.  She kept going to talk to them.  They would not engage with her.  If they had engaged with her and spoken with her about what she needed, she probably could have shortened her trip, but they didn't even talk to her.  They didn't present that as an option.  It was just no, no, no. And so Carol chose her faith.  And that's what's gotten her through it today.

So there are a few basic principles at play here. One, an employer has a duty to be fair and to not discriminate.  You'll hear evidence that they did allow

employees to take off during the freeze.  Even her
supervisor, Selina Harris -- and you'll be provided the
records.  Even her supervisor, Selina Harris, took a couple
days off here and there, is what she says.  Her co-workers
took time off.  The person who replaced her took off more
time the next year than had been seen before during a freeze
period, which by the way the person who replaced her, they
knew when they didn't discuss things with Carol and wouldn't
consider accommodating her -- they knew that it would take
them six to eight weeks to get another employee up to speed,
and, in fact, the person that replaced Carol didn't start
work until after Carol was back in the country.

She could have come back to her job.  And instead
they chose to put another person in her position that did not
have the training, still had to be trained, still had to get
up to speed, but they could have put Carol back in her job.
She would have worked as hard as ever, likely been very
energized from her convention, and just gotten back to work.
So that begs the question, and the evidence will show, why?
It's because they were discriminating against her because
they failed to accommodate her when they easily could have.
So that's one of the principles that's at play.

Number two, an employer, they should know better.
This is the HR department.  HR departments should know more,
should know better.  And instead they didn't do the right

thing. They didn't follow their own rules. Instead, they relied on this unwritten policy to say Carol couldn't work anymore. So it makes sense if you can do something for one employee, you can do it for another employee. Like I said, other employees were allowed vacation time, and you'll see those records. Other employees were allowed to take multiple days off at a time. You'll see those records. Other employees took medical leave because there are certain things you can't predict. I mean -- and Carol, she had to attend this. It was not a question.

And so as soon as it came up that she was going to be -- that she had applied for this and that she had been selected as a delegate, she let them know back in January. And the minute she knew the specific dates that she was going to be gone, she let them know. They didn't treat her fairly. As a matter of fact, you'll also hear evidence that when Carol came back to the country after she had been forced to transfer out of her position, her full-time position with all the benefits that come with a full-time position when you work for the government, when she came back, guess who they recruited to fill in for someone who was on FMLA? Carol. For three months, she filled in for another employee who worked in the HR department because that's the kind of person she is. Even though she had just been shoved out, she still did that.

1          You'll also -- one of the other basic principles
2   that's at play is that it's important not to retaliate
3   against employees who make requests for accommodation.  And
4   that's what happened here.  They made -- Carol made the
5   request.  They retaliated against her.  They wouldn't let her
6   back.  She tried.  You'll hear testimony that she wanted to
7   come back.  She kept holding out hope.  It's partly why she
8   came back and worked in that position for three months for a
9   co-worker, filling in for the co-worker.  She wanted to come
10  back.  She kept holding out hope that they were going to
11  bring her back, but they wouldn't.

12          So the evidence is going to show Metro just got it
13  wrong.  They knew they got it wrong.  Like I said, they hired
14  a person to replace her who had to be trained six to eight
15  weeks.  She didn't even start until Carol was set to come
16  back.  And so even though they're going to rely on this
17  vacation freeze, the unwritten policy that they used to push
18  Carol out of the department, it really doesn't look like that
19  was an essential part of her job.

20          So the hardest part of this case are frankly the
21  witnesses.  I mean, everybody's pretty nice.  This is not
22  like some cases where, you know, you have a bad guy, the
23  minute they come up on the stand you don't like them.
24  Everyone is going to come to that witness stand and tell
25  their story, tell their version of events, and you're going

to be the credibility judges.  For Carol, some of the things that were said to her and what she experienced are seared into her memory.  And she's going to tell her story and you'll hear from her, and you'll also hear from the other people in HR.

So what does the defendant say?  The defendant says, well, we had this policy, this freeze policy that was not written anywhere, and the only evidence of the freeze policy was from 2017, where they instituted the freeze policy because they were starting some new, you know, policy -- well, they were starting some new programs and things.  And so they had some staff that was off learning these new programs.  And so they started this vacation freeze policy in 2017, and they decided to carry it over into 2018.  But you'll hear testimony that there were exceptions.  There were exceptions to the vacation freeze policy, except for Carol.

They're also going to say that her choice to adhere to her faith to attend this special convention where she was selected as a delegate was voluntary, and that it was social.  And that really this part of her religion, this religious observance to her didn't matter.  Carol will tell you it did matter.  It was one of the most important things in her life.  And they'll show you pictures where Carol is smiling.  They pulled it off her Facebook page because she was proud.  I mean, she posted pictures of her at this

convention as if you can't go to a convention and attend a
religious function and be happy and be joyful. We don't
dispute. You can see the pictures. Carol is very joyful.
And that comes through in the pictures. But the fact that
there were social aspects or that she was happy and joyful at
the convention doesn't mean that it wasn't a requirement of
her faith, because it was.

They'll also say, well, she resigned. She just
left. That was her choice, that's her problem. But that's
the issue for you to determine. Should it have been her
choice? We don't think so. That's not what the law says.
The law says that you can't discriminate against people
because of their religion. And that's what you're going to
examine.

So we're also going to hear evidence about the
harms and losses that Carol suffered, and they were
significant. At the time that she had to move jobs, her last
hourly rate was $22. It was significant. She moved from a
full-time position with government that had all of the
benefits, that had short-term, long-term, health insurance,
dental, vision, retirement planning, all the things. She
lost all that. She moved into a part-time position, and no
matter how many hours she worked as a substitute teacher
making $12 an hour, she would not be eligible for benefits.
So her pay was effectively cut in half, and she lost all

1  those benefits.

2        You will also hear evidence about the intangible

3  things, the nonmonetary things, the suffering and the

4  inconvenience.  Those include -- Carol will tell you and her

5  husband will also tell you -- the crying spells that she

6  experienced, the loss of sleep.  She had to for the first

7  time in her life get on blood pressure medication.  The loss

8  of pride, because she loved her job.  She was proud of her

9  job.  She was proud to be a Metro employee.  And just the

10  stress about what the future holds.  And also that, you know,

11  she kept trying to come back to Metro and experiencing

12  roadblocks.

13        Carol felt like she was blackballed.  So she'll

14  testify about that, how discouraging that was when she tried

15  to come back to work.  So she still has stayed around.  She's

16  still a substitute teacher.  And she'll tell -- being a

17  substitute teacher working for $12 an hour with kids

18  post-COVID, it's no easy thing, but she's doing it.  And

19  she's also started a business.  She's selling Mary Kay, and

20  she's going to tell about that.

21        Members of the jury, this is what the evidence

22  will show.  At the close of the evidence, the Court will give

23  you instructions, and we'll ask you to award all of Carol

24  Barton's lost wages and benefits to trial.  And our expert

25  economist, Dr. Baum, who can do math, he will testify what

those damages are that she's lost today.  And they'll total over $200,000.  And we're going to ask you to award a fair and reasonable amount for the lost wages that she suffered because of the discrimination that she's experienced due to the loss of her career.

We're also going to ask you to award a sum of no less than $350,000 for Carol's emotional distress, the inconvenience, and the stress that she suffered as a result of the loss of her job.  Because the bottom line is that large employers, especially big cities like Metro Nashville, are responsible for so many people's lives and livelihoods. They have a responsibility.  They have a responsibility when you employee that many people to know the law, to apply the law, and to administer it fairly.  And they didn't do that.

And when people like Carol Barton come to you and make a request to adhere to her faith, to her religion, you have a responsibility to at least talk to them, to find out the facts, not just out of hand say no.  And not put someone in a position of making an impossible choice.

Thank you.

MR. FOX:  Ladies and gentlemen of the jury, my name is Brook Fox again.  I was introduced earlier.  I'm lead counsel on this case, and I represent the Metropolitan Government.  And you'll hear us talk about Metro or Metro Nashville, the Metropolitan Government.  I'm an employee of

Metro. I work in the Department of Law. And the same with
Mr. Puckett and Ms. Woodward. We're all from the Department
of Law. And you'll also hear that this is a matter involving
schools. So it's a school system. So if you hear us talk
about Metro Nashville School System, or MNPS, or in this
particular instance, this particular office was the
Employment Resource Center under schools. But for your
purposes, it's all the same. Whether it's Nashville, Metro,
school system, or the ERC, it's all the same employer. So
it's an employee-employer dispute.

If you wait and hear all the proof -- like the
judge instructed you just a few minutes ago, wait and hear
all the proof in this case. Don't start making up your mind
at all, just when the plaintiff is putting on their proof
because the plaintiff -- the way it works is the plaintiff
gets to put on her proof first, and then after that,
Nashville gets to put on its proof next, the school system
puts on its proof after that. So wait and hear -- and I know
you will -- wait and hear all the proof. And when you wait
and hear all the proof, you'll understand that what
Ms. Collins just explained is not how these series of events
went down. That's not what happened.

Instead, the ERC has a season. The busiest time
of the year, the busiest season is the summer. Like,
teachers and people in the classroom, their busy time of the

year is during the school year.  So they can't take extended
12-day periods of time, vacations, during the school year,
and then their offseason is during the summer.  That's for
people in the classroom.  Well, the ERC is the exact
opposite.  You know, have you ever wondered who hires these
teachers?  Who handles the transfers?  Who brings them in for
onboarding and whatnot?  That's the Employment Resource
Center, the ERC.

So their on season are the summer months.  So
that's when they have to transfer or handle new hires for
well over 1,000 teachers and other professionals that will
come into the classroom.  And the stakes are high.  That
summer season is so busy, they have to have everything --
everybody -- all the payroll information, everything -- all
the background checks, everything done by the beginning of
the school year, otherwise, what happens?  Teachers won't get
paid, and they have to get paid come the start of the school
year.  So the stakes are high.

Ms. Collins, respectfully, has it the other way
around.  She has it the wrong way around.  What happened
here, and you'll hear the proof, is that Ms. Barton, she
presented this ultimatum to the school system, or to the ERC.
I need to go on this 12-day trip to Sri Lanka, which if you
don't know is the island nation, just the southern tip of
India, halfway around the world for this special convention.

1　And if you don't let me go, I'm going to quit my job.  That's

2　how she presented it.  And you'll hear that proof come out.

3　　　　Now, imagine if we -- during this busy time of the

4　year, where there's a vacation freeze in place -- you know,

5　they acknowledge there was a vacation freeze in place,

6　started the year before.  Ms. Barton had been there for

7　12 years, so she was well aware of it.  In the aggregate,

8　what if we had allowed all six to eight, ten employees in the

9　ERC take 12-day vacations for whatever purpose, it just

10　couldn't be done.  That's why the policy was in place, so

11　that people could be there and get the work done.

12　　　　One to two business days, sure, that's fine,

13　that's part of the vacation freeze, yes.  It's one to two

14　business days, and especially if you combine it with a

15　weekend, that would give everybody in the office a time for a

16　break during the summer, but this is the busiest time of the

17　year for the ERC.

18　　　　And Ms. Barton, the plaintiff, wants to say, well,

19　really there wasn't an impact on ERC when she decided to quit

20　her job with the ERC and go on this trip.  Well, there was.

21　Indeed, there was.  You'll hear the proof that the two

22　managers, who are salaried employees, her immediate

23　supervisor, Ms. Harris, Selina Harris, you'll probably hear

24　that name a lot, and then the director over that department,

25　that office, Ms. Few, you'll hear Lisa Few's name a lot too,

they had to work nights and weekends to make up for that lost work because the reason is, it had to get done. So they are the ones that did it. They had to step up and do things like some of the data entry that they wouldn't normally do. They had to do Carol Barton's data entry. And maybe she -- maybe some of the other co-workers didn't know what happened. That's what happened. And they'll testify to that. And they'll explain we had to step up, it was a crazy busy summer.

      Ms. Collins just a few minutes ago, Ms. Barton's attorney, was using phrases like "she was terminated, she was shoved out." She wasn't. She's still a Metro employee. She's always been an MNPS -- a school system employee. She worked it out -- she voluntarily worked it out on her own that if she couldn't be allowed to go on this trip, she was going to quit ERC and then transfer over into the substitute office. So that's what she did. So ever since then, she's worked in the substitute office because, what, it's lighter work, it's easier, or for whatever personal reasons she had, that's what happened.

      She was never fired. She was never terminated. We wanted her there. Like we said, we're all -- you know, otherwise, I think we all like each other. She's a good employee. We didn't want her to leave. She voluntarily left. And good for her. She wanted to have this moment in

1  her life where she could voluntarily quit her job because she

2  had been selected as a delegate and go halfway around the

3  world for this special convention.  That's fantastic.  But it

4  doesn't mean she can turn right around and sue her employer

5  for failing to accommodate her religious beliefs.  That's

6  what this case is about.  And we just couldn't do that.

7        This case is very simple.  She asked for

8  12 days -- 12 consecutive days off, 17 calendar days -- and

9  that matters because sometimes people are called upon to work

10  weekends -- 17 calendar days during the busiest time of the

11  year.  It was presented to us like that.  We said, no, you

12  can't do that.  You know there's a vacation freeze in place,

13  Ms. Barton.  No.  She wasn't terminated.  When she received

14  that answer from that level and then the next level up, when

15  she received that answer each time, she then voluntarily quit

16  the ERC and transferred over to the substitute and went on

17  her trip.  That's what happened.

18        That's not a violation of federal law.  We did not

19  do anything that trampled on her religious rights.  And we

20  didn't do any -- you'll see that there's nothing here that

21  amounts to retaliation at all.  Thank you.

22        THE COURT:  Ms. Collins, would you prefer to --

23  it's only 11:30.  Would you prefer to go ahead and begin with

24  the first witness, or do we want to take an early lunch break

25  and start the afternoon early?

1        MS. COLLINS:  Your Honor, I think an early lunch

2   break sounds nice.

3        THE COURT:  Okay.

4        MS. COLLINS:  I think that makes sense.

5        THE COURT:  All right.  Well, we'll do that,

6   members of the jury.  We're going to go ahead and take our

7   lunch break.  I told you around noon.  Sometimes it's going

8   to be earlier than that, sometimes it's going to be later

9   than that, just that's the way trials go.  They're a little

10  bit fluid.  We'll go ahead and take our lunch break.  We'll

11  take an hour and come back at 12:30.  That should give us a

12  good bit of time this afternoon to hear testimony before we

13  wrap up around 4:00.

14        Again, you haven't heard any evidence yet.  All

15  you've heard is opening statements.  But please don't discuss

16  even what you've heard or what you think about this so far

17  with each other or anyone else while you're on the break,

18  just put it out of your mind.  We'll take an hour and come

19  back around 12:30 for our first witness.  Everybody have a

20  good lunch.

21        (The jury was excused from the courtroom at

22         11:33 a.m.)

23        THE COURT:  All right, we'll be back at 12:30.

24        (Recess taken from 11:33 a.m. to 12:32 p.m.)

25        THE COURT:  We ready with our first witness?

1     MS. COLLINS:  Yes.

2     (The jury returned to the courtroom at 12:35 p.m.)

3     THE COURT:  Okay, be seated, please.  All right,

4 first witness for the plaintiff.

5     MS. COLLINS:  We call Carol Barton.

6     COURTROOM DEPUTY:  Raise your right hand, please.

7        CAROL BARTON,

8 called as a witness, having been duly sworn, was examined and

9 testified as follows:

10     THE WITNESS:  I do.

11     COURTROOM DEPUTY:  State your full name for the

12 record, please, and spell your last.

13     THE WITNESS:  Carol Annette Barton, B-A-R-T-O-N.

14       DIRECT EXAMINATION

15 BY MS. COLLINS:

16 Q. Good afternoon, Ms. Barton.  I'm going to read a brief

17 background.  Just let me know if it sounds accurate.  Okay?

18 A. Okay.

19 Q. Ms. Barton, you are employed by Metro over 12 years as a

20 full-time employee in the Employment Resource Center

21 Department from 2006 to 2018 as an HR Information Specialist.

22 Prior to that, you worked part-time for three years from 2003

23 to 2006, and you continue to work for Metro today in a

24 part-time position as a substitute teacher; is that correct?

25 A. That's correct.

Q.    Okay, thank you.  Ms. Barton, tell us a little bit about
yourself.
A.    Well, I was born and raised here in Nashville,
Tennessee.  I attended -- I graduated from Whites Creek High
School.  And upon leaving Whites Creek High School, I got a
job at the state Board of Regents and furthered my education
at Nashville State and received a degree in computer science.
Q.    Okay.  Do you have any family here?
A.    Yes.  My father is still here.  I'm happily married for
38 years to Kenn.  We have two children.  My daughter is 34,
been married 12 years, and my son is 29.  No grandchildren,
but I do have a granddog named June.
Q.    Okay.  What do you do in your spare time?
A.    In my spare time, I -- well, one of the things I like to
do is roller skating, dancing on skates, having fun with my
friends and my family, as well as being involved in my
ministry.
Q.    Okay.  And you mentioned briefly you and your husband,
Kenn.  I think you said you've been married for how long?
A.    38 years.
Q.    Okay.  How did you meet Kenn?
A.    At the Kingdom Hall, local Kingdom Hall.  He came to
visit and, of course, you know, likes ensued, dating and
whatnot from there.  As a matter of fact, our first date was
roller skating.

1  Q.   Okay.  Have you experienced most things with Kenn

2  together at the -- through church?

3  A.   Yes.  As a matter of fact, in June 1978, both of us

4  symbolized our dedication to our Father, Jehovah, by water

5  baptism at the same time.

6  Q.   Okay.  You mentioned your educational background from

7  high school.

8  A.   Uh-huh.

9  Q.   Did you also mention -- I'm sorry if I might have missed

10  it -- beyond high school?

11  A.   Beyond high school, did I pursue further education?

12  Q.   Yes.

13  A.   No, because I went on to work.  So nothing beyond my

14  degree in computer science.

15  Q.   Okay.  And your computer science degree, where was that?

16  A.   Nashville State.

17  Q.   Okay.

18  A.   And then I worked at the state Board of Regents while I

19  was pursuing my career as a computer operator.

20  Q.   Okay.  Now, you touched on it briefly that one of your

21  things that you do in your spare time is your ministry.  Tell

22  us a little bit about your faith, your faith background.

23  A.   Yes.  I'm one of Jehovah's Witnesses.  I was raised -- I

24  was raised as one of Jehovah's Witnesses, pretty much all my

25  family.  And at the age of 16, as I stated, I formally

1   symbolized that by water dedication, which is baptism.  And

2   in my faith, you are a publisher, something that is an active

3   duty you do.  And then from that, I was able to auxiliary

4   pioneer.  And as of today, I'm a regular full-time pioneer in

5   my congregation.

6   Q.   Okay.  And what does that mean that you're a regular

7   full-time pioneer in your congregation?

8   A.   That means, first of all, you have to reach a certain

9   level of conduct to be qualified for that position, and it

10  means that our hourly requirement is 840 hours a year,

11  70 hours a month that we dedicate to our full-time ministry.

12  And that's either doing door to door, or as you saw down the

13  street, which is one of my spots, is doing the cart ministry.

14  Q.   Can you still work in another job when you're one of

15  those full-time pioneers?

16  A.   Oh, yes.  Some people choose to do it full-time and work

17  part-time, but there are some that do engage in their

18  full-time pioneering being a full-time worker.  They just

19  have to really work their schedule in order to get it done,

20  but they do.

21  Q.   Okay.  Now, how many times a week do you practice your

22  faith?

23  A.   Practice in my faith is an everyday thing.  You know,

24  it's something you practice 365 days a year.  It's not like a

25  dress you put on and take off.  So I am an active member in

1  my congregation.  And as far as meeting together, we meet
2  together two times a week, on Wednesday and Sunday.  It used
3  to be three times, but now one day a week is devoted to
4  family worship.  So I go to the Kingdom Hall on Wednesday and
5  Sunday, and then we have our disciple ministry, what you
6  would call it.  We have that -- some do it every day.  It
7  just depends on the schedule of what you have going on with
8  you.
9  Q.    Okay.  And are there certain things that you do outside
10 of those weekly meetings that are less regular?
11 A.    Less regular?  That will be our conventions that we
12 have.  We have one in the summer, one in the fall, and one --
13 one in the fall, summer and spring.  And even since COVID,
14 we've still been active having all of our meetings and
15 everything.  It might be on Zoom, but we've been having them.
16 Q.    Okay.  Do you attend those summer, fall and spring
17 meetings?
18 A.    Yes, I do.
19 Q.    Have you always attended those?
20 A.    All my life.
21 Q.    Okay.  Have you ever skipped one?
22 A.    Never.
23 Q.    Okay.  Can you tell us just a little bit about who the
24 Jehovah's Witnesses are?
25 A.    Jehovah's Witnesses are an active faith-based Christian

organization. We follow the mandates in the scriptures by

Jesus Christ, and we're called witnesses because we're

witness for His Father Jehovah. That's where the names

Jehovah's Witnesses come from. We try to encourage people

from the Bible with positive information. And, again, we are

footstep followers of Christ. We're not perfect, but we

follow the scripture guidelines to the best of our ability.

Q. Okay, thanks. Now, I'm going to skip topics just a

little bit. I'm going to jump to your employment with Metro,

specifically in the ERC. Tell me just a little bit about

what you did in the ERC.

A. In the ERC, which again is the Employment Resource

Center, we helped employees from the beginning to the end

with their employment, whether it's processing applications,

helping them. It could be letter writing that they needed

for housing or things of that nature. It's pretty much

hands-on from the beginning to the end as to whatever they

may need.

Q. Okay. Did you enjoy your job?

A. I loved my job. I'm a people person, so I love helping

people. So I guess it carries on from my ministry because I

love people and what I do. So I enjoyed that job too.

Q. Okay. Well, I was going to ask you what you liked most

about your job. Did that answer that question?

A. Kind of, sort of, yeah. Just helping people.

1  Q.    Okay.  Now, in your job in HR, by 2018, how much
2  vacation time could you use in a year?
3  A.    I had quite a bit.  And basically your vacation can be
4  used however you deem you would like for it to be used.  And
5  there's a thing that we have in our system that people will
6  call burning days.  It used to be 40 days, then it went up to
7  50 because people were accumulating so many days.  So when it
8  got to a certain point by June 30th, everybody knew they had
9  so many days that they need to burn.  So people will start
10 taking those.  So as long as the period of time that you were
11 there, you could accumulate a lot of days.
12 Q.    Okay.  And did you do that?
13 A.    I had several days.
14 Q.    By several days, about how many did you have accumulated
15 by 2018?
16 A.    2018?  Several weeks.  I can't remember exactly right
17 now, but I had several weeks, that way if I needed to take
18 off for something, I had it, plus I had personal days, sick
19 days, all of that.
20 Q.    Okay.  Now I'm going to skip again to 2018.
21 A.    Okay.
22 Q.    And tell me about what happened in 2018 as it pertained
23 to your religion and work.
24 A.    Well, every five years there's a special opportunity to
25 attend a special or international convention.  This time I

1  wanted to sign up for that.  Now, when you sign up for it,
2  you don't necessarily know right away where you're going.
3  You may put down five different locations, and then it's
4  up -- the elders in the congregation, they review it, make
5  sure you're at a certain level to qualify to go, and then
6  from that point, it's sent on to New York to headquarters.
7         And when headquarters reviews everyone's
8  application, then they send it back to the local
9  congregations, and they let you know -- well, they let them
10 know first if you've been chosen or not.  And then once
11 you've been chosen, it will kind of give you an idea of the
12 dates, but you still have to make your plans and whatnot to
13 go.
14        So when I knew that I was chosen, I was very
15 excited about it.  It's a once in a lifetime opportunity.  So
16 natural thing to do is to let your supervisors know.  And I
17 considered myself letting them know enough in advance because
18 it wasn't to be till June that I was initially going to take
19 off, and I figured, okay, I let them know ahead of time what
20 I needed going to them, then we could work together.  That
21 was my hope.
22 Q.    Okay.  What was the first time you went to one of your
23 supervisors about this special convention?
24 A.    It was in January.
25 Q.    Okay.

1  A.    That I went to Selina to let her know what I needed.

2  Q.    Okay.  Tell us what you talked with -- what happened at

3  that meeting.

4  A.    I told Selina, or should I say I asked or mentioned to

5  Selina, that I was chosen for this special occasion.  And,

6  yes, I know our summers are busy, but I was hoping and

7  praying that they will work with me to accommodate this

8  request.  It's not like it was a vacation, and it's not like

9  I asked to do something like this every summer.  So that's

10  why I was hoping that accommodations will be made for this

11  once in a lifetime event.

12  Q.    Okay.  And you mentioned the selection process, and I

13  just want to circle back to that.  Is everyone who submits

14  for that selected?

15  A.    No, everybody is not selected.  I mean, you may want to

16  apply.  And even before you get to that point, the elders in

17  the congregation will kind of let you know whether or not

18  you'll be a candidate for that or not because they have to go

19  by certain requirements.  So it's not like Joe Blow that

20  comes every now and then to the meeting or whatnot, and they

21  say they want to go.  You have to be an active member.  And

22  so that's just some of the qualifications.  There's more, but

23  that's just basic.

24  Q.    Okay.  And for you to come to the elders in your

25  congregation that -- was it that you had to be ready for it?

1  Was it that you had reached that point too?

2  A.    Uh-huh.

3  Q.    Okay.  Now, going back to the conversation with Selina,

4  you told her that you were selected as a delegate, and that

5  it was important to you and your faith, a once in a lifetime

6  opportunity.

7  A.    Uh-huh.

8  Q.    What was her response?

9  A.    Selina put her head down on the desk, and she was like,

10  "Oh, no," because we knew the time frame that, you know, that

11  it would be.  And basically she didn't tell me a definite

12  really no.  She was just like "I don't know about that,

13  Carol."  She said, "I'll have to get back with you."  And so

14  I waited, continued to work.  And then later on, that's when

15  we had another conversation to speak to Lisa.

16  Q.    Okay.  Well, tell me about that other conversation.

17  A.    I was so excited when I went to Lisa so I could tell her

18  because Lisa and I have always had good comradery working

19  together.  So when I went in the office to talk to Lisa, the

20  first thing I saw was this (indicating).  She had her arms

21  crossed.  I was like, oh, no, that's not a good sign.  And I

22  went over to hug her and say, Hey, Lisa," like we normally

23  talk or whatnot, and I went to sit down.  And she just

24  basically let me know that in no uncertain terms that it

25  would not be approved, and that it fell during a time when we

were busy.

Now, keep in mind, there was an email for 2017, but there was not one for 2018 stating that. And everybody at that time that were there -- if I remember correctly, we had new talent acquisition people and whatnot, but we had people there that were already versed in the job. So Lisa pretty much told me in un -- I cannot say that word, but what I'm trying to say is, she basically told me, "Carol, you know we have new people up there. I need you here."

And I understood -- I had been there 12 years. I understood that, but this was a once in a lifetime event that I was trying to explain to her. And basically she said "Perhaps you need to find a job in another department where it won't conflict with the summer." I said, "Lisa, are you telling me I need to find another job?" She was like, "No, that's not what I'm really trying to say, but if this is going to cause a conflict, then perhaps that's what you need to do."

So at the end of our conversation, I shook her hand. I said, "Thank you for taking the time" -- because I know she's busy -- "take the time to talk to me," and I went on back to the office. And then once I went back, Selina said "So what did you decide to do?" I said, "I'm going to continue to work." You know, I didn't know what else to do at that time because I just figured I'm just going to keep

1  praying about it.  I know they're going to work with me.  I

2  know they're going to work with me.  So I continued to work

3  like I always did.

4  Q.   Okay.  And then what happened after that?

5  A.   After that, I took it upon what Lisa said.  I tried -- I

6  did try to find another job.  I even went and interviewed

7  with another principal and explained why I needed to switch

8  to a school-based position, but she had just hired somebody

9  for that job, so I didn't get that.  So I said I'm just going

10 to keep on working.  I don't know what else I can do but just

11 keep working.  So that's what I did.

12        And then April, I said, okay, perhaps if I just

13 write it all out, so they can visually see what I'm saying,

14 then maybe that will make a difference.  I tried everything I

15 could, but they never really asked me about what all was

16 involved or whatnot.  It was just like "No.  No."

17 Q.   You mentioned that in April you wrote to them, so they

18 could visually see what you did.

19 A.   Uh-huh.

20 Q.   If you could turn to Exhibit No. 10 in your binder.

21        MS. COLLINS:  I'd like to go ahead and enter it

22 into evidence.  It's been stipulated to, Your Honor.

23        THE WITNESS:  Is it the plaintiff or the

24 defendant?

25        MS. COLLINS:  Yes, plaintiff.

1          MR. FOX:  No objection.

2          THE COURT:  All right.  Without objection then,

3 Plaintiff's Exhibit 10 is admitted.

4          (Plaintiff's Exhibit 10 received in evidence.)

5 BY MS. COLLINS:

6 Q.   Okay.  Carol, this document that's been marked as

7 Exhibit No. 10, is this what you sent to them in April, on

8 April 18, 2018?

9 A.   Yes.

10 Q.   Okay.  And you sent it to both Selina and Lisa?

11 A.   Yes.

12 Q.   And just tell us briefly, you know, what you did here,

13 what you're explaining.

14 A.   What I wanted them to see is this included the days that

15 I would need off, which was travel time and the time of my

16 convention.  And I also included a calendar, so they could

17 visually see that I understood the start of school and the

18 first payroll check.  It's always been that important from

19 the time that I've worked there.  So I was hoping if they

20 visually saw this that they could see, okay, we see when

21 Carol's leaving, the beginning -- the ending of a fiscal

22 year, starting of a fiscal year, we can work with this.

23          And I was kind of happy when it was this time

24 because I figured, you know, it's not in May, when we're

25 doing a lot of resignations and whatnot, and it was right

1  before the start of school, but it was still enough in the
2  summertime where I would be there to help.
3  Q.    Okay.  So you would have been back by the 12th; is that
4  right?
5  A.    Uh-huh.
6  Q.    Back to work?
7  A.    Right.
8  Q.    And these two that are circled in August, what's that to
9  signify?
10  A.    The first day that the teachers or staff was going back,
11  and then the 10th is the payday.  And that's very crucial,
12  the payday, because you need to make sure everybody's on the
13  rosters in the right places so people will be paid.
14  Q.    Okay.  So you would have been back -- what you were
15  trying to tell them is you would have been back from the 12th
16  all the way to that crucial payday and through that first
17  paycheck?
18  A.    Uh-huh.
19  Q.    Okay.
20  A.    And a lot of times we did more work at that time than
21  approximately before that because we have this one thing
22  that's always been established called a 12-month pay op,
23  where teachers -- they didn't want to resign before that
24  time.  So we would get a lot toward the end like that, where
25  people are resigning or terminated or whatever.  So we had to

1  do a lot of flipping.  And all that was prior to school
2  starting.
3  Q.    At the end of July?
4  A.    Uh-huh.
5  Q.    Okay.  Is that what you're referring to, this first --
6  the first week request is in the fiscal year, and the second
7  week is in the next fiscal year?
8  A.    Uh-huh.
9  Q.    Okay.
10 A.    Because in each fiscal year, you get so many vacation
11 days, sick time, and then when it starts a new fiscal year,
12 you start accruing more time again.
13 Q.    Okay.  And you put that in your email here at the
14 bottom?
15 A.    Uh-huh.
16 Q.    "I'll be in the office before 8/1 and the first payroll
17 check on 8/10"; right?
18 A.    Right.
19 Q.    Okay.  Now, tell us a little bit about -- you wrote some
20 information in here about the balance.  What is this?
21 A.    That was letting them know how much personal leave that
22 I would have, and that I had not used the two paid religious
23 days, letting them know that, and then at the start of the
24 new fiscal year, which was July 1, I would have new three
25 personal days and two paid religious days.  So I was taking

1  into consideration all of that, not counting what I already
2  had built up.
3  Q.    Okay.  And when you're talking about the religious days,
4  that's because Metro gives its employees two paid religious
5  days?
6  A.    Uh-huh.
7  Q.    And because the time that you're requesting off was --
8  part of it was in one fiscal year, part of it was in another
9  fiscal year, you would have gotten four of those religious
10  holidays in that window when you were going to be at your
11  convention?
12  A.    Uh-huh.
13  Q.    Okay.  And down at the bottom, can you read for us what
14  you wrote?
15  A.    I said (as read):  Thank you both in advance for
16  accommodating my needs for this special religious convention
17  in Asia.  This was a blessing for me, and I am truly looking
18  forward to it.
19  Q.    Okay.  Was there a reason why you used that word
20  "accommodating"?
21  A.    Because to me accommodating meant you're going to work
22  with me, not just, no, Carol we're not doing it.  We're going
23  to try to work it out.
24  Q.    Okay.  Carol, did you also put in a formal request in a
25  timekeeping system?

1    A.    Yes.  Whenever you need to have time off, you have to

2    put your days in, so your supervisor can approve it.  We

3    discontinued with the handwriting things.  Everything is done

4    in KRONOS.

5    Q.    And after you submitted this email, what happened?

6    A.    I think it's the same time I was --

7    Q.    And this is back on Exhibit No. 10.

8    A.    Okay.  I have the email, but I'm sure it's stating the

9    same thing, that it would not be approved.

10   Q.    Was this the response at the top from Selina Harris?

11   A.    Uh-huh.

12   Q.    Where she says "the dates are within the vacation

13   freeze"?

14   A.    Right.  And I understand her using the term "vacation,"

15   even though it was not a vacation for me.

16   Q.    Was there a discussion with Ms. Harris?

17   A.    No, there was no -- no other discussion, whatsoever, the

18   time I went to her in January, then she asked me to go speak

19   with Lisa, which I thought all three of us would have met

20   together, but she asked me to go directly and speak to Lisa.

21   And it was just basically stated no.  So I wasn't given an

22   opportunity to explain the significance of it, why I needed

23   to do it or even ask could you shorten it, you know, to try

24   to work with me, but nothing was asked.

25   Q.    Okay.  Did there come a point in time where you just had

1    to make a decision?  You mentioned that you just kept going
2    into work.  Did there come a point in time where --
3    A.    I actually thought the way I -- well, I thought our
4    working relationship was that they would work with me.  I
5    honestly had more faith in them than they did in me, that I
6    could come back and get the job done because previously I had
7    worked in the department -- sometimes maybe two or
8    three weeks in close to the time of school, I may have been
9    there 12- or 15-hour days to ensure someone got paid, to
10   ensure my work was processed.  That's the type of person I
11   was about my job.
12            Even the last day before I left, I told them, I
13   said, "Hey, I'll handle the phones, the emails, or whatnot,
14   so you guys can work on whatever you needed to do" because I
15   understood the sensitivity and the pertinence of the work.  I
16   had been there 12 years.  So it wasn't like I wasn't a team
17   player and wouldn't have helped.
18   Q.    Did there come a point in time when you had to make a
19   choice?
20   A.    Yes.  The rule when you are leaving, transferring or
21   whatnot, there's a two-week window.  So at that point I was
22   like I'm just going to go ask Selina again.  I said, "Selina,
23   are you guys going to work with me?"  And I never will forget
24   those words.  I sat down beside her in her cubicle, and she
25   looked at me, and she said, "Carol, it's been nice working

1  with you, but I hate to see you go."

2          I almost fell out of the chair.  I was like

3  "What?"  She said, "Carol, sorry, we can't do it."  So I had

4  something just in case because everybody knows in HR, the

5  rule is, if you do not turn in a notice, transfer or

6  something a certain time, fashion, it looks bad on you.  So I

7  wanted to keep my good standing within Metro, so I followed

8  the protocol of what you were supposed to do.

9  Q.    Okay.  And what was that protocol?

10 A.    To turn in your notice whether you're going to transfer,

11 resign or whatever you were going to do, to let them know.

12          THE COURT:  Has this been admitted yet?

13          MS. COLLINS:  Oh, no.

14          MR. FOX:  No objection.

15          MS. COLLINS:  But it's been stipulated to,

16 Your Honor.  I'm sorry about that.

17          THE COURT:  Let's give it a number, so the record

18 is clear.

19          MS. COLLINS:  Thank you, Your Honor.  It's Exhibit

20 No. 11.  Plaintiff moves to enter it into evidence.  It's

21 stipulated to.

22          MR. FOX:  No objection.

23          THE COURT:  Without objection, Plaintiff's

24 Exhibit 11 is admitted.

25          (Plaintiff's Exhibit 11 received in evidence.)

1      THE COURT:  Now you may publish it.

2      MS. COLLINS:  Thank you, Your Honor.

3 BY MS. COLLINS:

4 Q.   Okay, Carol, is this the letter that you sent?

5 A.   Yes, that's what I submitted to Selina.

6 Q.   Okay.  And can you just read for the jury what you wrote

7 in that first paragraph?

8 A.   (As read:)  It is with a heavy heart that I submit this

9 letter of transfer from the Human Resources Department to the

10 Substitute Department.  This decision was not taken lightly,

11 as I totally understand the ERC workload during the summer

12 break, as I have worked it for the past 12 years.  I was

13 selected over six months ago for this once in a lifetime

14 special convention as a delegate for the United States and my

15 Inglewood congregation.  The location for the special

16 convention is in Asia.  My request for international travel

17 was not approved, therefore, led me to this decision.  I will

18 seek other MNPS employment opportunities as they become

19 available.

20      Shall I continue?

21 Q.   Sure.

22 A.   (As read:)  My last day in the Human Resources

23 Department will be noon on Wednesday, June 20th.  I have a

24 day and a half of personal days to use, therefore, using

25 Thursday, June 21st, as my last personal day.  I will be

1  transitioning to the Substitute Department on Friday, the
2  22nd, or first day available.  I will be happy to meet with
3  you regarding my final duties to make the transition easy.  I
4  wish the company and all the employees much success in years
5  to come.
6  Q.   Carol, was the only reason why you submitted this letter
7  because your leave was not approved?
8  A.   It was not approved, and if I had of just upped and
9  left, three days of not being on the job is considered job
10  abandonment.  So I didn't want my work record tarnished.  So
11  the only other recourse I had was to do the transfer to the
12  Substitute Department.
13  Q.   And this was the email that you attached this letter to
14  sending it to Ms. Harris; right?
15  A.   Right.
16  Q.   And then her response that same day.  How did you feel
17  when you received that response?
18  A.   I felt let down because I felt as though I tried every
19  way possible to work with them.  And, again, it's not that I
20  did not understand that we were busy, but this was a once in
21  a lifetime opportunity.  And I relate it for you guys to say
22  you got an academy award or an Emmy or something like that
23  being chosen to go and do this.  So this was a big deal for
24  me.  And I had never asked a favor or anything special
25  before.

1          So, again, I say for me, my faith, how important
2   it was to me, that's why I tried to, you know, let them know
3   in advance.  I didn't want to wait till the last minute and
4   say, "Oh, I can't be here.  I don't want to do this."  That's
5   not me.  I wanted to work with my team, for us to work
6   together.
7   Q.   When it says on this letter "I accept your resignation,"
8   that's what Ms. Harris wrote, did you feel like you were
9   resigning?
10  A.   I didn't feel like I was resigning.  I feel like I was
11  temporarily moving to another assignment because I just knew
12  in my mind they're going to change their mind, they're going
13  to call me back.  But it didn't turn out that way.  So a
14  resignation to me is severing your ties with a company, but I
15  wasn't doing that.  So that's why I went to Amber, and I
16  said, "Amber, for right now, can I just transfer to the
17  Substitute Department till I can figure out what we're doing,
18  so I can go on my convention and come back," and she said,
19  "Sure."
20  Q.   Okay.  And that's generally the substance of your
21  response to Ms. Harris; right?
22  A.    Right.
23  Q.    Okay.  Now, do you remember notifying other people
24  within Metro Government?
25  A.    Yes.  We work a lot with Metro Government when it comes

1  to employees that they need or either we need their records

2  for employment with us, and I worked a lot with Melissa and

3  Terra Stewart.  So I wanted to let them know.  If Carol's not

4  there, what's -- what's going on.  So I let them know ahead

5  of time that I wouldn't be there to assist in the capacity of

6  what I was doing before.

7  Q.    Okay.  If you could turn to tab No. 13, Exhibit 13, in

8  your binder.

9         MS. COLLINS:  Your Honor, I'd like to move to

10  enter it into evidence.  It's been stipulated to.

11         MR. FOX:  No objection.

12         THE COURT:  Without objection, Plaintiff's

13  Exhibit 13 is admitted.

14         (Plaintiff's Exhibit 13 received in evidence.)

15  BY MS. COLLINS:

16  Q.    Was this the email you sent to Ms. Wallace and

17  Ms. Stewart?

18  A.    Yes, it was.

19  Q.    And did you feel like it was important to communicate

20  with other people about what was happening?

21  A.    I did because I had a good working relationship with a

22  lot of different departments that I helped, and oftentimes

23  they would call on me or count on me because they knew they

24  could get a response and that I would help.  So, again, to me

25  my name meant everything.  So I wanted to let everybody know

1  that I worked with -- know why I was leaving, and it wasn't
2  anything that I chose to just up and do.
3  Q.    Okay.
4  A.    So everybody, you know, they hated to see me leave as
5  well because they enjoyed working with me.
6  Q.    Okay.
7              MS. COLLINS:  Your Honor, may we approach?
8              THE COURT:  Yes.
9              (Bench conference outside the hearing of the
10              jury:)
11             MS. COLLINS:  I was about to get into the EEOC
12  stuff.  I'm trying to just head that off at the pass and
13  figure out what his objections are.
14             THE COURT:  And these are --
15             MS. COLLINS:  I was offering Exhibit No. 8, which
16  is her statement to the EEOC, and Exhibit 22, which was her
17  EEOC charge, and then Exhibit 17, which was the
18  determination.
19             THE COURT:  Okay.  So it's -- 8 is the statement
20  that she wrote out to the EEOC.  And I gather that the
21  defendant objects to the admission of that exhibit?
22             MR. FOX:  Yes.
23             THE COURT:  And the basis for that objection is?
24             MR. FOX:  It's an out-of-court statement they're
25  trying to use to prove the truth of the matter asserted, and

it doesn't fall within any exception, and it's -- whatever

statements that are in here are going to be more prejudicial

than probative.  I mean, the witness is right here.  She

could ask her in substance if she wants to get into it.

THE COURT:  Your response?

MS. COLLINS:  Well, I think it's important,

Your Honor, because, you know, we have a retaliation claim

here, and she's going to talk about other jobs that she

didn't get.  And she gave a pretty detailed statement to the

EEOC, and it's a recollection -- it's a recorded recollection

that she made close in time to the events in question.

THE COURT:  Are you saying she can't remember what

she said?

MS. COLLINS:  No --

THE COURT:  Because that's --

MS. COLLINS:  -- I'm not saying that.

THE COURT:  Right.  I think this was briefed a

bit.  I think -- the recorded recollection, the problem with

that is if she can recall it, that doesn't fall under that

exception.  I mean, it is an out-of-court statement, and

presumably it is offered to prove the truth of the matter

asserted.  So what other basis would there be for not

excluding this under the grounds of hearsay?

I mean, I think Mr. Fox's point is a good one.

You have a witness on the stand.  You can ask her the

1 questions and elicit the same testimony without getting a

2 hearsay document in. I don't think it prejudices your proof

3 in any way. If the testimony comes in, it comes in.

4 MS. COLLINS: Okay. Well, I guess I'm trying to

5 figure out -- can we ask that she went to the EEOC and

6 cooperated with the investigator and provided a statement and

7 all that sort of stuff?

8 MR. FOX: I suppose, Your Honor, if it's limited

9 to certain procedural steps such as that, it could be fine.

10 The problem is, it opens the door to, well, what did the EEOC

11 officially determine, if anything, and I certainly don't want

12 any kind of statement that came from the EEOC to come in.

13 THE COURT: What's the point of -- why is the fact

14 that she went to the EEOC relevant? I mean, there's an

15 administrative process that she had to satisfy in order to be

16 here and get her right to sue letter, but that's a bit

17 transparent to the jury. They just know she's here, and

18 she's got a lawsuit. Why do you need to get into her going

19 to the EEOC?

20 MS. COLLINS: Well, we're going to ask other

21 witnesses, like Ms. Few and Ms. Harris, why she hasn't been

22 returned. And so, you know, this is a continuing ongoing

23 thing where she kept trying to come back to work. She even

24 went back after and worked in the HR department for a period

25 of time, but still wasn't brought back. By that time, she

1  already filed her EEOC charge, and so it goes to the

2  retaliation claim, protected conduct.

3          MR. FOX:  I think those are things that Your Honor

4  said opposing counsel could ask -- just ask her.

5          THE COURT:  Right.

6          MR. FOX:  We're not raising a failure to exhaust

7  administrative remedies defense.

8          THE COURT:  I mean, I think her point is, if

9  there's an ongoing issue with the EEOC that presumably

10  Metro's aware of and is dealing with, and there's still --

11  because she's still employed -- maneuverings going on with

12  job assignments and so forth, then I think as to the

13  retaliation claim -- but I am concerned that we go down the

14  road of what the EEOC did or didn't do because that does

15  carry a certain amount of -- could carry a certain amount of

16  weight in the jurors' minds, well, the EEOC did -- it can cut

17  both ways.  I mean, if the EEOC said "We don't find any merit

18  to it," I'm sure you would be jumping up and down

19  saying "Don't let that in."

20          MS. COLLINS:  Yes.

21          THE COURT:  I think what's sauce for the goose is

22  sauce for the gander.  As far as just the fact that she went

23  through the process, it doesn't sound like there's much

24  objection to that, as long as you don't cross that line.

25          MR. FOX:  In fact, we agreed to allow the charge

1    to come in, if that will help.

2              MS. COLLINS:  Okay.  So let --

3              MR. FOX:  No --

4              MS. COLLINS:  I appreciate it.

5              MR. FOX:  No.

6              THE COURT:  You're on the record.  You want to

7    broker a whole global --

8              MR. FOX:  Wait, wait, for the record, Your Honor,

9    make it clear, it was on my stipulation that I sent Friday

10   and to her this morning, the stipulation --

11             THE COURT:  So let's get back to the -- so the --

12             MS. COLLINS:  The charge is okay?

13             THE COURT:  The charge apparently is okay.  And

14   the statement she submitted is hearsay and won't be admitted.

15   And what's the third document?

16             MS. COLLINS:  Well, the determination, but --

17             THE COURT:  Right.

18             MS. COLLINS:  -- I figured that was --

19             THE COURT:  We're not going to allow that in.

20             MS. COLLINS:  Can't blame somebody for trying.

21             THE COURT:  No, you know, it's -- if he didn't

22   object, then . . .

23             MR. FOX:  I object.

24             (Bench conference concluded.)

25   ///

BY MS. COLLINS:

Q.    Okay, Carol.  Now, after you transferred to the
substitute department, you went on your convention; right?

A.    Right.

Q.    Okay.  How was that?

A.    It was a loving, beautiful experience.  I was -- seven
different countries was there representing, and the
experience, the faith-building opportunity that I had to be
with other brothers and sisters of the same faith around the
world was a life-changing experience.  So, therefore, with my
faith, it's been the only thing that's held me up, being able
to do that.  It was a once in a lifetime experience.  And I
still bonded with several of those that I met there while I
was there.

Q.    Okay.  Now, after you came back from your convention,
did there come a point in time when you felt like you needed
to take steps about what happened?

A.    Yes.  When I came back, I just thought about the
situation, and I felt as though, again, since I was HR, that
HR went against one of their own.  So with that being said, I
thought I need to go and talk to the EEOC department and see
how I felt that I was wronged having to make that choice
because I feel as though no one should have to make a choice
between their faith, family or illness.  So with that being
said, that's why I wanted to go to the EEOC and file this

1  charge.

2  Q.   Okay.  And the EEOC is a federal agency; right?

3  A.   Uh-huh.

4  Q.   Okay.  If you could turn to Exhibit No. 22 in the

5  binder.  It's your EEOC charge.

6           MS. COLLINS:  And, Your Honor, I'd like to move to

7  enter it into evidence.  I think we have a stipulation.

8           MR. FOX:  No objection.

9           THE COURT:  Without objection, Plaintiff's

10  Exhibit 22 is admitted.

11           (Plaintiff's Exhibit 22 received in evidence.)

12  BY MS. COLLINS:

13  Q.   Was this the document that you filed at the EEOC, Carol?

14  A.   Yes, it was.

15  Q.   And was this the date that you went and filed it, on

16  September 14, 2018?

17  A.   Yes, ma'am.

18  Q.   Now, after you filed this charge with the EEOC, did you

19  have any other contact with Metro Government, or when did you

20  start going back to work?

21  A.   Actually, while I was gone, I started receiving text

22  messages from Amber wanting to know if I will come back and

23  work in the Human Resources office.  And I was a little

24  puzzled about that because I was thinking Human Resources,

25  the same one that didn't want to work with me to leave for

1  the convention?  So I thought about it and I thought about
2  it, and I was like, well, let me go back, because I loved,
3  again, what I did.  So I figured, well, if I come back, maybe
4  they'll change their mind and say, okay, Carol, we're going
5  to go ahead and let you come back.  Again, that's why I chose
6  to do a transfer in my mind versus a resignation leaving the
7  district.  But I worked for three months when someone went on
8  medical leave, but at the end of that, that was it.
9  Q.    And tell me, who is Amber?
10 A.    Amber -- I think her title now is Executive Director of
11 Talent Acquisition, Temporary Placement, something like that.
12 She's over the substitutes and others in that area.
13 Q.    Okay.  And if you could turn to Exhibit No. 15 in your
14 binder.
15       MS. COLLINS:  And, Your Honor, I'd like to go
16 ahead and move to enter this into evidence.  This has been
17 stipulated to as well.
18       MR. FOX:  No objection.
19       THE COURT:  Without objection, Plaintiff's
20 Exhibit 15 is admitted.
21       (Plaintiff's Exhibit 15 received in evidence.)
22 BY MS. COLLINS:
23 Q.    And this person that wrote you, Gloria, who was she?
24 A.    She was one of the partners, the talent acquisition
25 partner, who worked with the hiring process of employees for

Metro Schools.

Q.    Okay.  And was she the one that you filled in for?

A.    Yes, I filled in for Gloria.

Q.    And the email at the top, was that just where you were letting your husband know?

A.    Uh-huh, letting him know that they were requesting me to come back to work.  So I was going to have to figure out how I was going to work that out.

Q.    Okay.  I'm going to switch gears a little bit.  Can you tell me about what your pay rate was when you had to resign?

A.    It was a little over, I think, $22 or something an hour.  And with that, I got everything, benefits and all, vacation, sick leave, everything with that.

Q.    Do you have any of that as a part-time employee?

A.    As a part-time employee, as a substitute, you get nothing but the hours that you work, and that's at a rate now of $12 an hour.

Q.    Has that rate of $12 an hour been increased at all?

A.    No, not even when they were talking about making the changes for teachers and whatnot.  No, it wasn't.  Mine wasn't changed.

Q.    How does being a substitute teacher compare to your job at the ERC?

A.    Well, don't take this wrong, but it's like exchanging the big kids for little kids because both of them need your

1 help, but after not doing that for 12 years, it was very eye
2 opening going back in the classroom.  But in order to have
3 employment till something else came along, that's what I did.
4 Q.   Was there a period of time when you, as a substitute
5 teacher, didn't have as much work to do?
6 A.   Much work to do in the classroom?
7 Q.   No, in the substitute department.
8 A.   Oh, yes.  Yes, during the pandemic, when it was virtual
9 school, they didn't have substitutes doing that.  So,
10 therefore, you depended on being in the classroom for your
11 employment.  When school was out during that virtual time,
12 you didn't have a job if you were still tied with Metro being
13 a substitute.
14 Q.   How long were they doing that virtual school thing with
15 Metro?
16 A.   Let's see, the pandemic started in 2020.  And what was
17 it the -- was it 2021?  This is 2022.  When they went back to
18 school.  So it was over a year.
19 Q.   So for about over a year -- for over a year your ability
20 to even pick up substitute shifts was impacted; is that fair
21 to say?
22 A.   Right.  And in the process of that -- I've been a
23 caregiver for a long time.  So I had to be very careful of,
24 when they started going back into school, whether or not I
25 could go and do that because of my aunt, who's since passed,

1  that I was taking care of.

2  Q.    Okay.  And when did your aunt pass?

3  A.    She passed August 22, 2021.  So it's been a year now.

4  Q.    As a substitute teacher, are you guaranteed hours?

5  A.    You're only guaranteed on the jobs you accept, but it's

6  nothing stated like every week, like if you were fully

7  employed, that you knew you had 40 hours a week.

8  Q.    Okay.  And you don't have benefits; right?

9  A.    No benefits, whatsoever.

10  Q.    Okay.

11  A.    When you don't work, you don't get paid.

12  Q.    Do you do anything else for income besides substitute

13  teaching?

14  A.    I recently started my business as a Mary Kay consultant,

15  another avenue which you get to help people, which I love.

16  Q.    Okay.  How long have you been doing Mary Kay?

17  A.    A year and a couple of months now.  So I started last

18  year, 2021.

19  Q.    Okay.  Since your transfer to the substitute department,

20  have you expressed a desire to go back to HR?

21  A.    Believe it or not, I often think about it, and I look on

22  the website all the time to see if they have anything out

23  there, but my heart's kind of crushed from it, you know, and

24  now I have a distrusting feeling as to what would happen to

25  me if I did go back.  And that's -- and that's just being

1  honest.  But I did love working with my co-workers, and I did
2  love what I did.
3  Q.   Why have you stayed with Metro in the substitute
4  department, rather than just leaving and going into the
5  private sector somewhere?
6  A.   Well, I planned to have retired from Metro.  So,
7  therefore, by me keeping tied with Metro when I come of age
8  or if there was another job or something that possibly will
9  come about, I will still be in the system.  And I just didn't
10 want to just up and break away because I had hopes that
11 perhaps I will get called back.  Again, I had more faith in
12 them than they had in me.
13 Q.   Carol, I'm going to just ask you a few questions about
14 how this has affected you emotionally.  Tell us a little bit
15 about that.
16 A.   Bouts of depression where you question yourself as to
17 was I so bad that you didn't want to work with me, you know.
18 Crying spells and whatnot that you would have.  And you try
19 to be professional and whatnot, but everybody's human.  And
20 when you've done something for so long, you know, it's like
21 it's become a part of you.  So to pretty much feel like --
22 and, again I'm just being honest -- feel like I was forced
23 out.
24           Now, they may say, well, you volunteered to do
25 this, but what other recourse would I have had, you know.

And, again, I wanted to keep my employment intact. You

either up and leave -- which again, as I state, three days

not being on the job is grounds for dismissal or job

abandonment. I didn't want to do any of that, again, because

I had hopes that I would get called back, pretty much like I

did. I got called back for Gloria. So it's -- it's been

hard. I had to get on some medication, you know. So -- I

wouldn't wish this on anybody.

Q. What kind of medication did you have to get on?

A. I had to get on blood pressure pills because of the

stress. Now, keep in mind, when I was working there, I

didn't have any of that, but later on, things changed for me.

Q. Are you still on blood pressure medication?

A. Uh-huh.

Q. And you hadn't been on that before you had to leave?

A. No, I had not.

Q. What about -- have you had any problems sleeping?

A. I can tell you, again, going through questioning

yourself about your job as to, again, what did I -- what did

I do so wrong, you know, and it was just a matter of my faith

of something that I wanted to do, you know, that I've upheld

all my life. And so, you know, you have sleepless nights

worrying and thinking about that. Of course, your finances,

you know, things of that nature. But my husband and I, we

work together to take care of things that we needed to have

1  done.  But, again, I'm human like anybody here, and I'm sure
2  everybody probably would have went through bouts of the same.
3  Q.   Do you miss your job?
4  A.   I especially miss helping people and working with the
5  people that I worked with because, true enough, it was hard
6  sometime, but we worked together as a team to get it done,
7  you know.  And so when you have that comradery like that, you
8  have your ups and downs just like family or anything else,
9  but we all worked together.  And I miss helping people.
10         And what's so funny is, right after I had to
11  leave, people were still calling me about questions and
12  whatnot, and I tried to look in there, you know, my email
13  that I still had, and I would send things over to the ERC,
14  you know, to help this person, that person.  That's just the
15  type of person I was.  I could have ignored those emails, but
16  I didn't because I knew people were counting -- depending on
17  somebody to help them.
18  Q.   Okay.  Carol, what has sustained you since you were
19  forced to leave your job?
20  A.   Say that again.
21  Q.   What has sustained you since you were forced to leave
22  your job?
23  A.   My faith, family and prayer.  It really has.
24  Q.   All right.
25  A.   So if you can't count on anything else, you know you got

1  your faith and your family.

2  Q.   Thank you.

3         MS. COLLINS:  Your Honor, if I could just have one

4  minute.

5  BY MS. COLLINS:

6  Q.   Carol, was it optional for you to go to this convention?

7  A.   Not for me it wasn't optional.  This was a once in a

8  lifetime opportunity that you don't get often, and then for

9  me to have been chosen representing my congregation to go, it

10  was not an option for me.

11         MS. COLLINS:  Thank you.

12                         CROSS-EXAMINATION

13  BY MR. FOX:

14  Q.   Ms. Barton, good afternoon.

15  A.   Good afternoon.

16  Q.   Now, I think I heard you mention that your husband's

17  name is Kenn?

18  A.   Yes, sir.

19  Q.   And could you in the white binder that's up there --

20  A.   The white or the blue?

21  Q.   I'm sorry, the binder that's been marked as Plaintiff's

22  Exhibits.

23  A.   Okay, it's still this one?

24  Q.   Yeah, that one in front of you.

25  A.   Uh-huh.

```
 1   Q.    Could you turn to what's been marked as Plaintiff's
 2   Exhibit 15.
 3   A.    15?
 4   Q.    Yes.
 5   A.    Okay, I'm still open to that one.
 6   Q.    Okay.  You're already open to it?
 7   A.    Uh-huh.  15?
 8   Q.    Yes, 15.
 9   A.    Uh-huh, 15.
10   Q.    At the top, is this an email from you to your husband?
11   A.    Uh-huh.
12   Q.    So it says Kenneth.Barton@MNPS.org; correct?
13   A.    Uh-huh.
14   Q.    So MNPS is Metro Nashville Public Schools; correct?
15   A.    Uh-huh.
16   Q.    All right.  So he still works for Metro Schools right
17   now; correct?
18   A.    Right.
19   Q.    And how long have you worked for Metro Schools now
20   total?
21   A.    Total all together now?  Oh, wow, let's see.  When I
22   left, it was 12, add four to that.  12 and 4, 16, that I've
23   been tied with Metro Schools.
24   Q.    And how long has your husband worked with Metro Schools?
25   A.    Oh, wow.  Was it December 2007, I think?
```

1  Q.    2007.  So 15 years or so?

2  A.    Uh-huh.

3  Q.    Okay.  And then can you please flip to what's been

4  marked in that same binder, Plaintiff's Exhibit 10.

5  A.    Okay.

6  Q.    And, I'm sorry, before -- sorry to be clunky, but before

7  we get to that one, let's go to Exhibit 11, the next tab.

8  And this is your letter dated June 7, 2018; correct?

9  A.    Correct.

10  Q.    That your attorney put on the board and has already been

11  published as Exhibit 11.  And there's a couple things I want

12  to highlight here.  Doesn't it say -- the first paragraph,

13  doesn't it say (as read):  It is with a heavy heart that I

14  submit this letter of transfer from the Human Resources

15  Department to the Substitute Department.

16        Correct?  Did I read that correctly?

17  A.    Correct.

18  Q.    And the next sentence, doesn't it say (as read):  This

19  decision -- and talking about your decision; correct?

20  A.    Correct.

21  Q.    (As read:)  This decision was not taken lightly, as I

22  totally understand the ERC -- and ERC is the Employment

23  Resource Center; correct?

24  A.    Correct.

25  Q.    (As read:) -- workload during the summer break, as I

1   have worked it for the past 12 years, period.

2           Did I read that correctly?

3   A.   Correct.

4   Q.   And now let's flip to what's been marked as Plaintiff's

5   Exhibit 13.  And here I just wanted to highlight this

6   sentence that begins with "Due."  Doesn't it say -- and,

7   again, these are your words.  (As read:)  Due to the fact the

8   summer is our busy time, I am not approved to go.  With that

9   being said, I have to take this once in a lifetime journey.

10          Is that correct?  Did I read that correctly?

11  A.   That's what it reads.

12  Q.   And then flip back to Exhibit 10, which has the email

13  from Ms. Harris back to you; correct?

14  A.   Correct.

15  Q.   Doesn't it say (as read):  Thank you, Carol.  These

16  dates are within the vacation freeze for all ERC staff and

17  will not be approved?

18          Did I read that correctly?

19  A.   That's what it states.

20  Q.   Now, we heard -- you were here at counsel table during

21  opening statement, and you heard your attorney in opening

22  statement mention termination, didn't you?  Where in this

23  binder of exhibits, or even the other binder, is there a

24  termination letter?

25  A.   I wasn't terminated, and she didn't say I was

1  terminated.

2  Q.    Okay.

3           MR. FOX:  Thank you.  That's all.

4           MS. COLLINS:  We don't have anything, Your Honor.

5           THE COURT:  You can step down, ma'am.

6           (Witness excused.)

7           MS. COLLINS:  Your Honor, we're just checking to

8  see if our next witness is out there.

9           Sorry, Your Honor, it went a little bit quicker

10 than we thought.  I can just take a witness out of order.  I

11 will go ahead and take Ms. Few.

12          COURTROOM DEPUTY:  Raise your right hand, please.

13                         LISA FEW,

14 called as a witness, having been duly sworn, was examined and

15 testified as follows:

16          THE WITNESS:  I do.

17          COURTROOM DEPUTY:  State your full name for the

18 record, please, and spell your last.

19          THE WITNESS:  Lisa Few, F-E-W.

20                    DIRECT EXAMINATION

21 BY MS. COLLINS:

22 Q.    Good afternoon, Ms. Few.

23 A.    Good afternoon.

24 Q.    I'm going to read a brief statement, and you just let me

25 know if I messed anything up.  Ms. Few -- Ms. Lisa Few has

1   been employed by Metro Schools since October 2003.  She's
2   been with -- she's been a manager in IT since 2020, and
3   before that, she was ERC Director of Business Services from
4   June 2014 to June 2020.
5   A.    Correct.
6   Q.    Okay.  And in 2018, you reported to Craig Ott, and you
7   were also Selina Harris's direct manager?
8   A.    That's correct.
9   Q.    Okay.  All right.
10          MS. COLLINS:  And, Your Honor, I don't think I
11  raised it earlier, but because she's still employed with
12  Metro Schools, I'd like to cross-examine her.
13          THE COURT:  You mean lead her?
14          MS. COLLINS:  Yes, as an adverse -- yes, lead her
15  as an adverse witness.
16          MR. FOX:  No objection.  I think that's allowed
17  under the rule.
18          THE COURT:  I agree.  Go ahead.
19  BY MS. COLLINS:
20  Q.    Okay.  Ms. Few, there's been a freeze policy -- the
21  freeze policy that we've talked about was only a verbal
22  policy; correct?
23  A.    It was a verbal policy, but it was also -- we had a
24  meeting with all of our staff members in person to let them
25  know, and then it was obviously expressed verbal in the

1  meeting, and then it was followed up by an email to all
2  staff.
3  Q.   Okay.  And it's not in the handbook; correct?
4  A.   It is not in the employee handbook, that's correct.
5  Q.   Okay.  And it's just a departmental policy?
6  A.   That is correct.
7  Q.   And generally the freeze is from June until August; is
8  that correct?
9  A.   Yes, mid-June through the first week in August.
10  Q.   And that policy was put into place for the first time in
11  2017; correct?
12  A.   That is correct.
13  Q.   Okay.  If you could turn to Exhibit No. 6 in the
14  Plaintiff's exhibit binder.
15         MS. COLLINS:  And, Your Honor, I'd like to go
16  ahead and move to admit this into evidence.  I believe it's
17  been stipulated to.
18         MR. FOX:  No objection.
19         THE COURT:  Without objection, Plaintiff's
20  Exhibit 6 is admitted.
21         (Plaintiff's Exhibit 6 received in evidence.)
22  BY MS. COLLINS:
23  Q.   Okay.  Ms. Few, you've seen this document before;
24  correct?
25  A.   I did.

1  Q.    And was this the first time that the policy was

2  implemented?

3  A.    So the first time the policy was implemented is in

4  2018 -- no, 2017, and then again in 2018.

5  Q.    Okay.  And 2017, that's the date of this email -- you

6  wrote the email; right?

7  A.    That's correct.

8  Q.    And January 5th, 2017?

9  A.    That's correct.

10  Q.    And on page 2 of this document, where it was first

11  mentioned -- it's down in bullet point No. 4.  It says

12  (as read):  We are going to have a very busy year with new

13  processes and new people.  For these reasons, vacation

14  requests will not be granted during our peak hiring season --

15  peak hiring time between June 12th and August 4th.  Please

16  plan accordingly.  I need everyone here and giving one

17  hundred percent.

18  A.    Yes.  And that -- again, this email was from 2017, and

19  we followed it up in 2018 with a similar email.

20  Q.    Okay.

21  A.    I believe the email evidently was not found, I guess,

22  from 2018, but this was -- this would have been the same

23  communication in 2018, similar to what we sent in 2017.

24  Q.    Right.  So there is no 2018 email?

25  A.    No, there's no 2018 email.  We couldn't locate it.  But

1  as you see, Selina sent it out on October -- let's see.

2  Q.   Well, sure, let's go to that.

3  A.   Yeah.

4  Q.   This is an email from Selina Harris?

5  A.   Yes.

6  Q.   On October 9, 2018?

7  A.   Yes.

8  Q.   Where she's explaining the ERC policy.  This is the

9  first time it was sent on January 5, 2017; right?

10 A.   Yeah.

11 Q.   And says this is the first initiation of the freeze?

12 A.   Uh-huh.

13 Q.   And she also said there was an agenda where dates were

14 reviewed.  We also don't have that agenda, do we?

15 A.   I'm not sure if you do or not.

16 Q.   Okay.

17 A.   But what the context around that is, from 2017, the same

18 time period, basically mid-June until after the start of

19 school.  So in 2018, it would have been mid-June to after the

20 start of school.  The dates just would have maybe been off a

21 day or two because of our payroll calendar.

22 Q.   Okay.  And this email explaining from Selina Harris to

23 Frank Young, Lisa Spencer, Deborah Story and Cory Harkey,

24 you're not on this email; right?

25 A.   I'm not.

1  Q.   Okay.  And this date, October 9, 2018, this was after
2  Ms. Barton had filed an EEOC charge.  We just went through
3  that; right?
4  A.   That would have been after, yes.
5  Q.   And when you initially sent out this email, you were
6  talking about that in paragraph 2, starts on page 1, that you
7  would be embarking on a new HR project that was anticipated
8  to begin in June, July, and in preparation, Selina and Lee
9  were going to be in training, and that they would be training
10 new staff in preparation for the summer workload.
11 A.   Yes.  And, again, that email was from 2017.  And that
12 project did not start on time.  It got delayed.
13 Q.   Right.  But all of these projects and trainings that
14 were gong on, that's what precipitated this new freeze that
15 was initiated in 2017?
16 A.   No, the workload precipitated it.
17 Q.   Okay.
18 A.   Didn't have anything to do with special projects or
19 anything.  It had to do with the workload in the ERC.
20 Q.   Does it say "workload" in paragraph 4?
21 A.   Let's see.  Well, again, this is from 2017.
22 Q.   Right.
23 A.   So it does say about our busy hiring season and the new
24 people that we had to train.
25 Q.   Does it say "workload"?

1  A.    Summer workload, yes.  In Section 2, it says "workload."

2  Q.    For paragraph 4 --

3  A.    (As read:)  In addition, Selina will be training new

4  staff in preparation for summer workload.

5  Q.    Right, but I'm talking about paragraph 4, where it talks

6  about, in particular, the new hiring freeze that's being

7  initiated in 2017.

8  A.    Well, it says (as read):  We're going to have a very

9  busy year with new processes and new people.

10          It doesn't specifically say the word "workload" in

11  4.

12  Q.    Now, when you started this freeze in 2017, employees

13  could make a request for time off; correct?

14  A.    They could, for a day or two here or there during the

15  freeze time, and we would consider it, yes.

16  Q.    But because the policy was not written, you don't have

17  anywhere that it was just for a day or two, do you?

18  A.    No.

19  Q.    And Ms. Harris had the authority to grant or deny a

20  request; correct?

21  A.    She had the first pass at it, and then if they wanted to

22  bring it to me, they could.  And then if they wanted to take

23  it above me, they could do that also.  But we made every

24  effort to accommodate during the freeze one to two days.

25  Q.    And you also admitted that you'd take a day off here and

1   there during the freeze; right?

2   A.   I think I might have.  I don't know for sure.  I might

3   have.

4   Q.   But you don't dispute your testimony if that's what you

5   previously testified to under oath, do you?

6   A.   No.

7   Q.   Okay.  And I think we've already covered this, but the

8   end of April through May was typically when transfers,

9   promotions and terminations and hiring started; right?

10  A.   Yeah.  The end of April started ramping up, uh-huh.

11  Q.   And you testified that if a request for time off was

12  made in the summer, then it was discussed with Craig Ott, who

13  would take it to Diane Story; right?

14  A.   Deborah Story.

15  Q.   Okay.  Sorry about that.  And that it was a collective

16  decision whether or not to grant or deny a time off request

17  in the summertime?

18  A.   Yes.

19  Q.   So when you said a collective decision whether to grant

20  or deny a time-off request in the summertime, it was your

21  contention that you, Mr. Ott and Ms. Story would make that

22  decision?

23  A.   Well, like I said, it would -- the direct report for the

24  ERC was Selina Harris.  They would take it to her first.  She

25  would either, you know, say it was okay or deny it.  And then

1  they could come to me.  And then I would either say, well,
2  let's talk about it or deny it.  And then if I denied it,
3  they could take it on up to Craig Ott and then ultimately
4  Deborah Story.
5  Q.   Okay.  And it was your recollection that there were very
6  few, if any, requests for vacations granted during the
7  summertime; right?
8  A.   That's correct.  From mid-June to that last -- that
9  first week in August.
10 Q.   Okay.  Now, if you could turn to a document that's been
11 marked as Exhibit No. 2.  This is Metro Nashville Public
12 Schools Employee Handbook.
13         MS. COLLINS:  I'd like to go ahead and move to
14 enter it into evidence.  It's been stipulated to.
15         MR. FOX:  No objection.
16         THE COURT:  Without objection, Plaintiff's
17 Exhibit 2 is admitted.
18         (Plaintiff's Exhibit 2 received in evidence.)
19 BY MS. COLLINS:
20 Q.   If you could turn to page 15 of the handbook.  This is
21 where it starts with Metro Schools' leave policies; right?
22 A.   Yes.
23 Q.   Okay.  Then if you could turn to page 22.  Metro's
24 handbook also has a religious holiday policy; right?
25 A.   That's correct.

1  Q.   And this is just -- this just provides for two days of
2  paid leave for a religious holiday; right?
3  A.   Right.
4  Q.   So if someone has a religious observance, they can put
5  in a request, and they'll be paid for that time; right?
6  A.   Correct.
7  Q.   But it's not a limitation on the amount of time that
8  they can take off --
9  A.   No.
10 Q.   -- for their religion, is it?
11 A.   No.
12 Q.   Okay.  And you considered the policy with respect to
13 religious holidays that's listed in the handbook as guidance?
14 A.   Just guidance, yes.
15 Q.   Okay.  But you also claim that you took everything into
16 consideration, right --
17 A.   That's correct.
18 Q.   -- when granting or denying a request?
19 A.   That's correct.
20 Q.   Okay.  And that policy that we just went over that
21 provides for two paid religious holidays was not a reason for
22 her -- for Ms. Carol Barton not being granted her request to
23 attend the special convention for her faith; right?
24 A.   No, it was not.
25 Q.   Okay.  And you acknowledge that Carol Barton was

1  regarded as a good worker?

2  A.    Yes.

3  Q.    And that was when she requested time off during that

4  time frame in 2018?

5  A.    Yes.

6  Q.    And she had been in her role in the ERC for longer than

7  either you or Ms. Harris; right?

8  A.    That is correct.  That's correct.

9  Q.    And in your time working with Carol Barton, you knew her

10 religion and her faith were important to her?

11 A.    I did.

12 Q.    And you did know that in previous years, Ms. Barton had

13 taken off to attend shorter religious conventions?

14 A.    I did.

15 Q.    And you also knew that she was a practicing Jehovah's

16 Witness?

17 A.    I did.

18 Q.    With respect to Carol Barton's request to attend the

19 religious conference in 2018, you first recall hearing about

20 it in April in that email from Carol?

21 A.    Uh-huh.

22 Q.    Okay.  And after Selina Harris initially denied the

23 request, she came to you and told you that she was going to

24 deny it; right?

25 A.    That's correct.

1  Q.   And at that time Selina's mind was already made up in

2  April, and you just agreed with it; right?

3  A.   I agreed with her decision.

4  Q.   And at your deposition, you were under the belief that

5  her request was for the latter part of June through August;

6  right?

7  A.   June 25th, I believe, through August the 11th, August --

8  I think.

9  Q.   Okay.  But it was actually July; right?

10  A.   July, yes.  I'm sorry.  July the 11th.  I'm sorry.

11  Yeah.

12  Q.   Okay.  And after Selina Harris initially denied Carol

13  Barton's request, Carol came and talked directly with you;

14  right?

15  A.   She did.

16  Q.   And you also denied the request to Carol directly?

17  A.   Yes.  And that was -- that was an extremely hard

18  decision because what Carol stated earlier is true.  We had

19  a -- we had a wonderful working relationship.  And I told

20  Carol that I was extremely sorry, that I had to uphold that

21  decision, and we didn't take it lightly.

22  Q.   Okay.  And Carol told you that she had been selected by

23  her church to attend that conference in Asia; right?

24  A.   Yes.

25  Q.   So you knew that the request was related to her faith

1  and being chosen as a delegate?

2  A.    I did.

3  Q.    And Carol asked you to reconsider, didn't she?

4  A.    We had a conversation.  She came into my office, and she

5  told me that, you know, she was just sorry that she -- she

6  felt like she needed to seek another job because she

7  wasn't -- we weren't going to approve that.  And I told her

8  that I was really extremely sorry that we couldn't.  You

9  know, I had other -- also other considerations to make as far

10 as my other staff members too.

11           You know, the workload was extremely heavy, and it

12 was -- it was a hard decision.  It didn't -- I didn't take it

13 lightly at all.  I felt really bad, but we couldn't -- we

14 just couldn't do it.

15 Q.    So you said no?

16 A.    Uh-huh.

17 Q.    And no other staff requested off for religious reasons

18 during that summer, did they?

19 A.    They did not.

20 Q.    But they did request off periodically for other reasons;

21 right?

22 A.    I think they might have took a day or two here or there

23 during that freeze, yes, but it was not -- it was not 12 days

24 requested, or 17 calendar days that would have been.

25 Q.    Isn't it true that one of those days was 4th of July?

1  A.   It is.

2  Q.   Okay.  And everybody had off the 4th of July; right?

3  A.   Except Selina and I.  We didn't.  We worked.

4  Q.   That's what being a manager is, though, isn't it?

5  A.   Yes, it is, but, you know, we -- we were -- kind of had

6  our backs against the wall.  So we had to -- we had to dig

7  in.  We worked many nights and weekends too.

8  Q.   In June, you found out that Carol had to leave her job,

9  so she could attend her trip; right?  That was the first time

10  you found out that she was leaving her job?

11  A.   When she turned in her resignation letter, resignation

12  from the ERC, which was actually a transfer letter to the sub

13  office.

14  Q.   And you don't recall having any conversations with Carol

15  about whether her trip could be shortened?

16  A.   I don't remember having those conversations with Carol,

17  but Carol never -- never said to me that it was an option

18  that it could be shortened either.  So, I mean, I thought it

19  was just, you know, it's from this time to this time.  The

20  trip starts here, and the trip ends here.  And that's -- we

21  never had a conversation about that.

22  Q.   Sure.  When you met with Carol Barton, there was not

23  discussion about if there were options, was there?

24  A.   There was not a discussion about the length of the trip,

25  no.

1  Q.   You didn't try to figure out a solution with Carol, did
2  you?
3  A.   No.  I told her that I really was going to miss her, and
4  that I wished that she would stay and, again, how bad I felt
5  about it.
6  Q.   And you also stated that you made Mr. Ott and Ms. Story
7  aware of Carol's request, and they agreed with the decision?
8  A.   Yes.  And I also encouraged Carol to go to Craig,
9  Mr. Ott.
10 Q.   And you didn't document any of those conversations
11 anywhere, did you?
12 A.   No.
13 Q.   Is that something that's important to do as someone
14 that's in HR, is to document things?
15 A.   I should have documented that, but at the same time,
16 like Carol said earlier, we had a close relationship.  You
17 know, we -- you know, we worked as a team.  We all felt like
18 we were a team.  So at the time, you know, I didn't document
19 that.
20 Q.   Did you document any of the conversations with Mr. Ott
21 or Ms. Story?
22 A.   No.
23 Q.   And you know as an HR professional that that's an
24 important thing to do, to document things; right?
25 A.   Yeah, sure.

1  Q.    So you were surprised when Carol decided to leave the
2  department because you thought she would reconsider her
3  request; right?
4  A.    I was surprised that she -- that she was going to
5  transfer to the sub office, yes, and leave her position,
6  yeah.
7  Q.    And her position was not replaced before she left, was
8  it?
9  A.    No.
10 Q.    And you did not consider pulling people from other
11 departments to help in Carol's absence, did you?
12 A.    No, because of the type of work it was.  I mean, you
13 couldn't -- you couldn't put a sub in that position, and you
14 couldn't bring anybody in from another department because it
15 was data specific.  I mean, you had to know the system.  You
16 had to know the data.  And it was payroll -- it was payroll
17 data and onboarding people.  So you had to know that job.
18 So, you know, it's probably -- it's probably a good eight
19 weeks of training just to get somebody up to speed to be able
20 to even do it.
21 Q.    Right.  To that point, it was a six to eight-week
22 training process to bring someone in the department, wasn't
23 it?
24 A.    Yes.
25 Q.    So whoever you brought into the ERC to replace Carol,

1  you knew that it was going to take six to eight weeks to get

2  them up to speed?

3  A.    Sure, uh-huh.

4  Q.    So there was no possible way mathematically, if you just

5  look at the calendar, that someone who was brought in could

6  be up to speed by the time --

7  A.    Well, it wasn't that simple.  I mean, we couldn't just

8  say, oh, you know, go to the applicant pool and pull somebody

9  in.  I mean, we had to get approval to fill a position, and

10 it's a whole big process that takes a while to get somebody

11 in.

12 Q.    Right.  So you knew all those things.  You knew that it

13 wasn't that simple.  You knew that it would be a six- to

14 eight-week training process.  And you knew that you would

15 have to go to this applicant training pool.  You knew that

16 you would have to take all these steps to get someone in

17 Carol's position, but yet you still didn't talk to Carol to

18 see, okay, let's see if we can find a middle ground, let's

19 see if we can figure this out, let's see if we can work

20 together?

21 A.    At that point, Carol had made her decision.  She had

22 made her decision to resign from the ERC.

23 Q.    But she was still in the substitute department; right?

24 A.    That's what her resignation letter said.  She was

25 resigning the ERC and moving to the sub department, which she

1 did.  She moved to the sub department, you know, I think

2 almost immediately.

3 Q.   And as a sub, she could work in the HR department;

4 right?

5 A.   They brought her back in the HR department, and I

6 believe they brought her in making the same money she was

7 making when she left the ERC, at least for several months.

8 Q.   And after Carol was forced to transfer out, you met with

9 an ERC investigator; right?

10 A.   I did.

11 Q.   Okay.  And you told that investigator that you and

12 Ms. Harris did most of Carol's work; correct?

13 A.   That's correct.

14 Q.   Okay.  So the work got done?

15 A.   Yes, by the ERC manager and the director of the

16 department.

17 Q.   And no teachers went unpaid, did they?

18 A.   To my knowledge, they did not.  Basically, if you don't

19 process all of these people, all these teachers, for the

20 start of school, and they don't get paid, you end up on the

21 news.  Not only do you end up on the news, but the poor

22 teachers don't get paid.  So, I mean, there's really not an

23 option to not get the work done.  It's whatever -- whatever

24 you have to do, pull nights, weekends, and a lot of -- a lot

25 of midnight oil, believe me.

Q.   Okay.  And when you met with that investigator, you were
informed that pay records that had been obtained indicated
that employees who held Carol's position only worked about
six hours overtime during a combined six-week time frame,
two-weeks before and two weeks after Carol could have
returned?

A.   Well, those payroll records, too, for those employees,
they earn comp time.  So also Selina Harris and myself did
most of the work because several of those individuals were
still new and hadn't been through a summer yet.  So . . .

Q.   And you were also told that Carol had alleged she was
not replaced until after she had returned.  And that was, in
fact, true; right?

A.   Uh-huh.

Q.   And Carol could have been back at work before her
replacement even started, couldn't she?

A.   Yes, but it didn't -- that wouldn't have -- that
wouldn't have solved the problem we had.  I mean, the work is
every day, all day long.  It's not just something you set
aside, and you come back and catch up.  That's not how it
works.  It's full on every day from mid-June all the way to
through the start of school.

Q.   Okay.  You were also informed that, according to pay
records, that others took vacation during the summer, during
that prohibited time period; right?

1  A.    They took a day here, two days there, yeah, uh-huh.

2  Q.    And you also told the EEOC investigator that you

3  couldn't do without Carol because she was the individual with

4  the most experience, and she was very productive; right?

5  A.    She was very productive.  She was a veteran of the

6  department.  Yes, we needed her there.

7  Q.    And you acknowledged to the investigator that Carol was

8  replaced by Christy Overstreet, who was transferred from

9  another department; right?

10  A.    That's correct.  And that was to my best recollection

11  then, which was two years ago, and the whole thing happened

12  four-and-a-half years ago.  So that was the best of my

13  recollection of who actually came in to replace.

14  Q.    Okay.  And, again, there were no teachers that were

15  unpaid that year; right?

16  A.    Well, like I said, that's not an option.  So I'm not

17  aware of any teachers that -- you know, you can kind of take

18  an example from this year.  I think there were teachers that

19  went unpaid, and it did make the news.  So we didn't make the

20  news.

21  Q.    There were teachers that were unpaid this year?

22  A.    Yes.

23  Q.    Do you wish you had Carol Barton there?

24  A.    I'm not in the HR department.

25  Q.    Probably would have been good to have her there,

1  wouldn't it?

2  A.   It would have been good to have us all there.

3            MS. COLLINS:  Thank you.

4            THE WITNESS:  Uh-huh.

5            THE COURT:  We're going to go ahead and take our

6  afternoon break before we do cross-examination.  We'll come

7  back at 20 after, members of the jury.  Again, please don't

8  discuss the case with each other or anyone else, do any

9  independent research.  Just enjoy the break, and we'll come

10 back at 20 after.

11           (The jury was excused from the courtroom at

12            2:06 p.m.)

13           THE COURT:  All right, we'll take 15.

14           (Recess taken from 2:07 to 2:24 p.m.)

15           THE COURT:  All right, we ready for

16 cross-examination?

17           MR. FOX:  Yes.

18           (The jury returned to the courtroom at 2:24 p.m.)

19           THE COURT:  Okay, be seated, please.  Before you

20 begin, Mr. Fox, I neglected to say at the beginning of the

21 trial, we had a few glitches with our monitors last trial.

22 If for some reason you can't see something displayed, either

23 look at your neighbor's, if you can see it, or let the court

24 security officer know, and we'll try to accommodate that.

25           Go ahead.

                    CROSS-EXAMINATION

1

2  BY MR. FOX:

3  Q.    Ms. Few, isn't it true, as we've heard, that the request

4  that Ms. Barton made was for 12 consecutive days?

5  A.    That's correct.

6  Q.    During the busiest time of the ERC's year?

7  A.    Yes.

8  Q.    Which was really 17 calendar days; correct?

9  A.    That's correct.

10 Q.    And isn't it true that that's important because the ERC

11 employees are sometimes called upon to work even on weekends;

12 correct?

13 A.    Yes, that's correct.

14 Q.    So this is a full 17 calendar days that she was asking

15 to be away from the ERC; correct?

16 A.    That is correct.

17 Q.    And isn't it true that she wasn't terminated; correct?

18 A.    She was not.

19 Q.    And isn't it true that she wasn't disciplined?

20 A.    She was not.

21 Q.    Over any of these events at all?

22 A.    No.

23 Q.    And opposing counsel asked you about documenting your

24 conversation.  But isn't it true that as a manager or

25 director, you don't document every single conversation you

1  have with someone; correct?

2  A.    No, you couldn't possibly document every single

3  conversation you have with someone, no.

4  Q.    And these conversations you had with her, they weren't

5  disciplinary conversations, were they?

6  A.    No, they were not.

7  Q.    Or anything of that nature; correct?

8  A.    No, they are not?

9  Q.    And isn't it true that she had it worked out before she

10  even left that she was going to transfer to the substitute

11  office and come back and make the same pay; correct?

12  A.    It did state in her letter of transfer that she was

13  transferring to the sub office, yes.

14  Q.    Right.  Come back making $22 an hour?

15  A.    She did.

16  Q.    And isn't it true that she made that same $22 an hour

17  even working at the sub office for several months after that

18  even; correct?

19  A.    Yes.

20  Q.    After she came back.

21  A.    And, you know, our subs make $12 an hour, not 22, but

22  she went into the sub office making 22.

23  Q.    And isn't it true -- you heard opposing counsel,

24  Ms. Collins, ask you questions about, well, the work got

25  done, but it got done because you and Selina got it done;

1  correct?

2  A.    That is correct.

3  Q.    And isn't it true you're a salaried employee?

4  A.    Yes, as well as Selina. So we don't -- you know, we

5  don't get overtime or comp time or anything like that as a

6  salaried employee, just that's -- you just do the work and

7  work as late as you need to or as often as you need to, to

8  get it done.

9  Q.    Isn't it true that you and Ms. Harris got it done by

10  working nights and weekends?

11  A.    That is correct. We worked many nights, many weekends,

12  sometimes 1, 2:00 in the morning, to make sure that the

13  teachers were all processed.

14  Q.    And you had mentioned before on direct examination that

15  it was sometimes midnight, but you literally mean -- you said

16  something about burning the midnight oil.

17  A.    Yes.

18  Q.    But literally you mean working till midnight or 1 in the

19  morning; correct?

20  A.    1, 2:00 in the morning, yes, uh-huh. Shedding some

21  tears, too.

22  Q.    And you knew before she -- as she made this request, as

23  Ms. Barton made this request, you knew this was going to put

24  a burden on co-workers to have to get this work done;

25  correct?

A.   Oh, yes, uh-huh.  It was definitely going to cause a
hardship for the department.

Q.   And isn't it true that she was never given some kind of
ultimatum?

A.   She was not.

Q.   And, if anything, it was the other way around.  She
basically said "Give me these 17 calendar days off for this
religious convention or else I'm going to have to transfer to
the" --

         MS. COLLINS:  Objection to form, Your Honor.
That's leading, and that's not covered in the direct
examination.

         THE COURT:  Well, he's allowed to lead.  It's
cross-examination.  And I think it's close enough to the
topics of direct, so I'll allow it.

         THE WITNESS:  Could you repeat that?  I'm sorry.

         MR. FOX:  I'm not sure I can repeat it.  Could I
have that read back, Your Honor?

         THE COURT:  Yes.  The court reporter will read it
back, please.

         (Last question read.)

         THE WITNESS:  Yes.

BY MR. FOX:

Q.   And isn't it true that the decision here to deny her
leave request had nothing to do -- wasn't based on her

1 religious faith; correct?

2 A.   No, it was not.

3 Q.   It wasn't anything of a discriminatory nature, was it?

4 A.   No.

5 Q.   And wasn't it true it had nothing to do with any form of

6 retaliation against her?

7            MS. COLLINS:  Objection to form, Your Honor.

8            THE WITNESS:  Absolutely not.

9            MS. COLLINS:  This goes to the ultimate issue in

10 the case, and it calls for a legal opinion.

11            THE COURT:  Well, the jury will be charged as to

12 what they're asked to decide, and this witness can provide

13 her view of it, but it's not -- it's something the jury will

14 be asked to decide, not this particular witness, but I'll

15 allow her to give her view of it, and that's as far as it

16 goes.

17            MR. FOX:  Okay, thank you.  That's all I have.

18                    REDIRECT EXAMINATION

19 BY MS. COLLINS:

20 Q.   It was only when Carol came back to work in the HR

21 department that she was paid her rate as an HR professional,

22 right, for that short period of time?

23 A.   I don't know the dates, but when she -- when she

24 transferred to the sub office, she continued making her same

25 rate of pay.  I don't -- I think it was three or four months.

1  I'm not exactly sure of the dates.

2  Q.   Right.  It was when she was covering for another

3  employee's FMLA, wasn't it?

4  A.   I'm not sure.

5  Q.   Okay.  You wouldn't dispute that if that was Carol's

6  recollection, would you, that it was just for that short

7  period of time?

8  A.   If Carol says it, I wouldn't dispute it, no.

9  Q.   Okay.  Do you have hard feelings about having to cover

10  during that period?

11  A.   No, I don't have hard feelings, no.

12  Q.   And you working till 1 or 2 in the morning, that wasn't

13  all Carol's fault, was it?

14  A.   Well, Carol's absence was -- definitely contributed a

15  lot to that because she was a veteran of the department, and

16  she knew everything that needed to be done and when it needed

17  to be done, you know, time frames and all the work load and

18  every aspect of it.  So we had other staff members that

19  hadn't been through a summer yet.  So, yes, I would say a lot

20  of the work we did was directly related to her absence.

21  Q.   Okay.  And Carol would not have -- this wouldn't have

22  come up -- we wouldn't be here today if you wouldn't have

23  denied that request for accommodation, would we?

24  A.   We wouldn't be in court today if I had let her go.  I

25  don't imagine she would have filed a lawsuit if she -- if she

1  had been approved to go.

2           MS. COLLINS:  Thank you.

3           THE WITNESS:  Uh-huh.

4           MR. FOX:  Nothing further.

5           THE COURT:  You can step down, ma'am.

6           THE WITNESS:  Thank you.

7           (Witness excused.)

8           THE COURT:  Okay, next witness.

9           MS. WALTER:  Your Honor, the plaintiff calls

10 George Tucker as the next witness.

11          COURTROOM DEPUTY:  Raise your right hand, please.

12                    GEORGE TUCKER,

13 called as a witness, having been duly sworn, was examined and

14 testified as follows:

15          THE WITNESS:  I do.

16          COURTROOM DEPUTY:  State your full name for the

17 record, please, and spell your last.

18          THE WITNESS:  George William Tucker, T-U-C-K-E-R.

19                  DIRECT EXAMINATION

20 BY MS. WALTER:

21 Q.   All right, Mr. Tucker, I'm going to read a short

22 statement, then I'll ask you if it's correct afterwards.

23 George Tucker, you're an elder of the body of elders at the

24 North Congregation of Jehovah's Witnesses Kingdom Hall where

25 Ms. Barton is a congregant and has been for decades, and

1  you've been an elder for over 30 years.

2          Is the statement that I just read correct?

3  A.    Yes.

4  Q.    All right.  What does it mean to be an elder?

5  A.    It's -- it's a position of servant, but -- you're more

6  of a leader in the congregation, but you serve in the

7  congregation as an elder.

8  Q.    Okay.  Would it require you to have significant

9  knowledge about how the Kingdom Hall works?

10  A.    Yes.  Yes, you would have.

11  Q.    Okay.  And I think I already covered, but are you

12  familiar with Ms. Barton?

13  A.    Oh, yeah, yeah.

14  Q.    How long have you known Carol?

15  A.    Probably 30 years, something like that.

16  Q.    Is she pretty involved in the Kingdom Hall?

17  A.    Oh, yeah, very diligent.

18  Q.    From your experience, what has she done in the Kingdom

19  Hall?

20  A.    What does she do?

21  Q.    Uh-huh.  Yes.

22  A.    Oh, she's a full-time servant -- that's what we call a

23  pioneer -- in the congregation.  She's involved in the

24  ministry school that we have there, and also she goes in the

25  ministry and teach.  That's one thing that we do.  We spend a

1  lot of time doing that and being a full-time servant.  That

2  means that she does it on a regular basis at a high degree.

3  And she's also involved in many of the things that we do with

4  assemblies, helping out and volunteering in certain areas and

5  things of this nature.  So it's a lot of little things that

6  she does.

7  Q.    Okay.  Are there particular gatherings called special

8  conventions within the Jehovah's Witness practice of faith?

9  A.    Yes.  Yes.

10  Q.    Okay.  And what are these special conventions?

11  A.    Special conventions are more like international

12  conventions where you get to go, and you may go to another

13  country, and you will meet with the friends there, as well as

14  take in the spiritual program that's provided.  We have

15  regional conventions, which are more local, but in other

16  states and things of this nature, and we have circuit

17  assemblies, but all of these provide information that we use

18  in our ministry, as well as in our life.

19  Q.    Okay.  And are these conventions essential to the

20  practice of a Jehovah's Witness within their faith?

21  A.    Yes.

22  Q.    And how so?

23  A.    Well, this is where we get extra information that helps

24  us -- extra and regular information to help us to learn more

25  about the scriptures, more about God, and also how we can

govern our lives in the organization and learning more about
the Bible.  So it's a lot of instruction given by experienced
elders in other congregations.

Q.    Okay.  And is there a way that an international special
convention is different from a regional special convention?

A.    The program itself is basically the same.  However, at
international conventions, special conventions, you get to
meet the friends from other countries.  And from there you
get experiences and things that they went through, which
helps build your faith more.  And so it's something that all
like to do and apply for, but not all get to go because
there's a financial commitment that you have to make and
things of this nature.

        So you put in the application for it.  And if you
are confirmed to go or selected to go, then you pretty much
really put in a lot to try to go there because you learn so
much, and you bring that information back to the friends at
the local congregation, which is good experiences for
everyone.

Q.    Okay.  And it's my understanding that there's something
called a Bethel.  What is that?

A.    That's where the headquarters of Jehovah's Witnesses in
the United States is.  And you go -- that's where we get a
lot of our information from.  That's the headquarters of
where we get all information on the ministry, where we work,

how we work and things of this nature, and we get deeper
understanding of the Bible.  And they're the ones that set up
the conventions and things of this nature.
Q.   Okay.  As an elder, are you involved in the selection of
local congregants for these international special
conventions?
A.   Yes, local congregants, yes, and then we submit the
application, and then it goes through another process of
selection.
Q.   Okay.  Would you have been involved in the selection of
Ms. Barton to be sent to the headquarters of whether she
could go to the international convention in 2018?
A.   Yes.
Q.   Okay.  What's the process for the elders in determining
how you select which congregants to, I guess, nominate to
headquarters to go?
A.   Basically, we look at their spiritual condition.  When
we mean spiritual condition, how they are involved in the
congregation because, of course, you want someone that -- that
maybe not to have problems.  We know they're going to have
problems going overseas and things of this nature, but -- so
we look at individuals that are fit to handle something like
that.  And a lot of times it's individuals that's been in the
organization for many years, although some that have been
there for short years may go, but a lot of times they've been

1    in the organization for many years and pioneers.  Those are

2    the ones that are in full-time service.  All these give --

3    not only do they receive information, they also give it as an

4    encouragement.

5              See, other areas in the country, those

6    nationalities, they come to that convention, and then they

7    look to seek encouragement from individuals that come from

8    the United States and all this.  So you want to go through

9    the process to make sure an individual is really able to

10   handle the situation in the right way.

11   Q.    Does a lot of prayer and discussion go into deciding

12   who's selected to be sent to headquarters to ultimately be

13   chosen?

14   A.    Yes, because it's the body of elders that are involved

15   in doing that.

16   Q.    Okay.  Is attendance to the special conventions a

17   requirement of the faith to participate in?

18   A.    Yes, it's a requirement, but not mandatory.  It's a

19   requirement because that's part of your spiritual growth,

20   going to these assemblies, because, like I said, you're

21   getting information that helps you to be a better servant of

22   God.  Now, we know that there may be situations a person

23   can't make it because of health reasons, extreme health

24   reasons, or something like that, so that's why it's not

25   mandatory, but it's a strong requirement to be there.

1  Q.   Okay.  When a congregant is attending an international
2  convention, is it part of the requirements of the convention
3  to understand and learn the local culture where it takes
4  place?
5  A.   Yes, but it's not a requirement to understand that, but
6  that's what you'll do when you go there, of course, when
7  you're talking to other conventioneers there.  They're from
8  another country.  You learn about it.  And sometimes you work
9  with them in a ministry out there.  So you learn some of the
10 things of that area so that when you're working in the
11 ministry there, that you're able to talk to the local people
12 there.
13 Q.   Okay.  Have you ever been a delegate to the
14 international convention?
15 A.   Yes.
16 Q.   Okay.  And as a delegate to an international convention,
17 what were your responsibilities when you returned to your
18 local Kingdom Hall?
19 A.   Sharing the information with others.  Often when we come
20 from a convention, especially like that, or even a regional
21 convention, we have reviews.  We have a time for reviews so
22 that everyone can get involved in discussing the things that
23 they learned.  And this is done in an organized manner.  The
24 elders would ask questions to the congregation, and they
25 would raise their hand and talk about some of the experiences

that they learned or some of the subject matters that are
going on.  All the conventions we do that and especially in
the regional convention and the internationals.

Q.   Okay.  And I think you spoke about this, but you had
talked about how attendance to the conventions is not
mandatory in the circumstances of where someone has a medical
issue that they can't attend, but otherwise it is a
requirement of the faith to participate in these conventions;
is that right?

A.   Yes, yes, according to scriptures that we go by.

Q.   Okay.

          MS. WALTER:  All right, I'm just going to confer
real quick, and I think that's it.  That's it.  That's all I
have.

          MR. FOX:  No questions.

          THE COURT:  You can step down, sir.

          (Witness excused.)

          MS. COLLINS:  Your Honor, our next witness is
Selina Harris.

          THE COURT:  Okay.

          COURTROOM DEPUTY:  Raise your right hand, please.

                    SELINA HARRIS,

called as a witness, having been duly sworn, was examined and
testified as follows:

          THE WITNESS:  Yes, ma'am.

1          COURTROOM DEPUTY:  State your full name for the

2    record, please, and spell your last.

3          THE WITNESS:  Selina Ann Harris, H-A-R-R-I-S.

4                    DIRECT EXAMINATION

5    BY MS. COLLINS:

6    Q.   Ms. Harris, I'm going to read a brief statement, and you

7    just let me know if I got anything wrong.  You were the

8    manager of the ERC for Metro Schools from May 2015 to

9    September 2019, and from 2019 to present, you're at Metro HR;

10   right?

11   A.   That's correct.

12   Q.   And while you were at the ERC, you supervised Carol

13   Barton; is that correct?

14   A.   Yes, ma'am.

15   Q.   Okay.  When Ms. Barton worked at the ERC, she was a good

16   worker, and she was punctual; right?

17   A.   Yes, ma'am.

18   Q.   If you could turn to Exhibit No. 1 in the plaintiff's

19   exhibit binder.  Yes, ma'am, that's the right one.  This is

20   the job description for the Assistant HR.

21          MS. COLLINS:  And, Your Honor, I'd like to go

22   ahead and move to enter this into evidence.  This has been

23   stipulated to.

24          MR. FOX:  No objection.

25          THE COURT:  Without objection, Plaintiff's

1 Exhibit 1 is admitted.

2      (Plaintiff's Exhibit 1 received in evidence.)

3 BY MS. COLLINS:

4 Q.   This was the job description for Carol Barton's job;

5 right?

6 A.   Yes, ma'am.

7 Q.   And in this job description, nowhere does it list that

8 there's a restriction for only being able to take off during

9 certain months, does it?

10 A.   That's correct, no, ma'am.

11 Q.   Okay.  And all other personnel with the same job

12 description as Carol had the same duties, and tasks were

13 divided up among the teams; right?

14 A.   Yes, ma'am.

15 Q.   Okay.  And in the ERC, in the group that Carol worked

16 with, there was a team of five; right?

17 A.   I believe at that time.  It's been so long ago, but I

18 believe that's correct.

19 Q.   Okay.  And if someone called out, they could call in a

20 substitute or an employee from the fingerprint department or

21 fingerprint office?

22 A.   We had a substitute that was full-time in the

23 fingerprint office, but she did not do ERC duties.  She was

24 in the background office as a permanent substitute for those

25 duties.

1  Q.    Okay.  And she could come and fill in for the ERC if you
2  needed her to; right?
3  A.    For the data entry portion, no, ma'am.  She hadn't been
4  trained for that portion.
5  Q.    But she filled in for other job duties, like answering
6  the phones and meeting people up front that came in and
7  submitted information, and so then when she would come in and
8  fill in, in those -- do those job duties, it would take a
9  little bit of the load off of the other people in the
10 department; is that sort of how it worked?
11 A.    Only for the receptionist area lunch coverage that the
12 ERC staff was required to cover.  So that would only help in
13 what they assisted with for the lunch hour coverage for each
14 day.
15 Q.    Okay.  Well, they also dealt with that not just during
16 lunch hour; right?
17 A.    They only covered for the ERC desk for lunch hour
18 coverage.  We had a permanent substitute that was a
19 receptionist area as well.
20 Q.    Okay.  But this person from the fingerprint department,
21 that was sort of under the ERC umbrella; right?
22 A.    Correct, but they were background office duties.
23 Q.    And you also testified that that substitute would step
24 in when someone was out; correct?
25 A.    She would in the background office, but not in the ERC,

1  only in the receptionist area.

2  Q.  And if somebody was out in the ERC department, the work

3  was just reallocated; correct?

4  A.  Correct, yes, ma'am.

5  Q.  Okay.  And that was no matter what time of year it was?

6  A.  Correct, yes, ma'am.

7  Q.  It's pretty much like any job?  If somebody was out,

8  then other people would fill in and --

9  A.  Yes, ma'am.

10  Q.  -- do the work?  And that included you?

11  A.  Yes, ma'am.

12  Q.  And you recalled that in January 2017 the employees were

13  advised they would not be able to take vacation during a

14  certain time period; right?

15  A.  Yes, ma'am.  That was the first year it was implemented.

16  Q.  Okay.  And that vacation freeze policy, as we've come to

17  call it, it was not formally adopted as a policy; right?  It

18  was just a departmental . . .

19  A.  Yes, ma'am, it was a departmental policy.

20  Q.  Okay.  And if an employee were to be hired or fired, the

21  director and executive director had to approve that decision;

22  right?

23  A.  Correct, yes, ma'am.

24  Q.  If you issued a reprimand, it had to be approved by the

25  director and executive director; right?

1  A.    Yes, ma'am.

2  Q.    And you don't recall when Carol first came to you about

3  going to her convention for her faith as a delegate, do you?

4  A.    Carol came to me the first time after I disclosed the

5  vacation freeze dates in 20 -- for the next coming -- for

6  that summer, in 2018.  At the time she approached me, she did

7  not have the dates, and she was -- she advised me she was

8  going to get the dates for the trip.

9  Q.    Okay.  Was that in January?

10  A.    Yes, ma'am.

11  Q.    Of 2018?

12  A.    Yes, ma'am.

13  Q.    And you said that after you disclosed the vacation leave

14  dates --

15  A.    No, the vacation freeze dates for 2018, yes, ma'am.

16  Q.    Okay.  Did you document that in 2018?

17  A.    I'm not sure.  I don't have any of those management

18  notes from when I done that role, and I've been out of it for

19  quite some time.  And I don't recall if I did or I didn't.

20  Q.    Well, as an HR manager, would it be important to

21  preserve things like that, management notes?

22  A.    Yes, ma'am.  I just -- I did not keep any of them when I

23  transferred from MNPS to Metro Government.

24  Q.    Okay.  But you didn't transfer until 2019; right?

25  A.    That's correct.

1  Q.   And that was after Carol Barton had filed her EEOC

2  charge; right?

3  A.   That's correct.

4  Q.   So by the time you left your position as an ERC manager,

5  you knew that Carol had already filed that EEOC charge and

6  had filed this complaint, but did you still have those

7  management notes when you left your job?

8  A.   I left all of that, that was property of MNPS, at MNPS.

9  I didn't take anything with me.

10  Q.   Okay.

11  A.   If it would have been documented, it would have been on

12  our MNPS computer.  That's where I made all my notes, through

13  Microsoft Word.

14  Q.   Okay.  You knew that Carol had previously been approved

15  to attend two-day conventions in June of each year; right?

16  A.   Correct.

17  Q.   And you knew that Carol's faith-based activities were

18  important to her, didn't you?

19  A.   Yes, ma'am.

20  Q.   And you knew when Carol first came to you that Carol

21  told you she would be gone to another country for 12 days;

22  right?

23  A.   Yes, ma'am.

24  Q.   And you didn't document that conversation either, did

25  you?

1  A.    I don't recall if I did or not.  Any of that would have
2  been in what was left with MNPS.
3  Q.    Okay.  But you do recall telling Carol that her request
4  would not be approved due to a freeze, and that she would
5  have to talk to Ms. Few; right?
6  A.    I do.  She formally emailed me the dates of the trip,
7  yes, ma'am.
8  Q.    And you knew specifically that Carol was requesting off
9  to attend a religious convention as a delegate; right?
10  A.    Yes, ma'am.
11  Q.    Okay.  And we've already been through this, but that
12  was -- this is a document that's already been marked as
13  Exhibit No. 10 and published to the jury in the trial of this
14  matter.  And this was the email that she had sent you in
15  April of 2018 laying everything out; right?
16  A.    Yes, ma'am.
17  Q.    And this is -- now, where it says it would not be
18  approved, that was the next day; right?
19  A.    Correct.
20  Q.    And as far as this goes, you don't deny that Carol
21  talked with you in January of 2018; right?
22  A.    No, ma'am.
23  Q.    And after she spoke with you in January of 2018, you
24  didn't take any steps to make sure the department was staffed
25  in the event she requested off during the freeze period, did

1  you?

2  A.   I didn't have the ability to.  It would have required

3  for a budget or seeking approval for a permanent substitute.

4  I did not take any of those steps in between, no, ma'am.

5  Q.   Okay.  So at that point in January, you knew that she

6  was requesting time off to attend a religious convention, you

7  just didn't know when it was going to be, but you did know

8  that in prior years, she had gone to conventions every June?

9  A.   Yes, for two days.  Yes, ma'am.

10  Q.   But you do admit that you could have cross-trained

11  between the fingerprint department and the ERC; right?

12  A.   If budget would have permitted for a substitute.

13  Q.   And you admit that prior to Carol taking off in June,

14  that the substitute -- the full-time substitute you referred

15  to had been brought on, and they were cross-trained?

16  A.   They were not cross-trained for the background.  She was

17  trained for the background office because we had an

18  employee -- full-time employee in that office that was on

19  FMLA.  So she was covering the workload for that employee.

20  Q.   During the summer of 2018?

21  A.   Yes, ma'am.

22  Q.   And the fingerprint department's covered by that

23  vacation freeze policy; isn't it?

24  A.   Yes, ma'am.

25  Q.   So you had another employee under the ERC umbrella who

1  was taking FMLA; right?

2  A.    Yes, ma'am, for a medical issue.  It was approved

3  through a different division, not myself.

4  Q.    Would you have denied her?

5  A.    I wouldn't have had the ability to.  It follows

6  different federal guidelines.

7  Q.    How is a request for accommodation different than that?

8  A.    They apply through the benefits division, and we're told

9  that it's approved by those guidelines.

10  Q.    Both of them -- a request for a religious accommodation

11  and a request for medical leave, they're both under two

12  different federal laws; right?

13  A.    I'm not aware if they are.  I know that religion was

14  based under the discretion of a manager.  FMLA was a medical

15  federal leave.  I'm not aware if there's a religious federal

16  leave.  I just followed those guidelines for FMLA that were

17  directed by our benefits office, but I'm not aware of a

18  religious federal.

19  Q.    Well, as an HR manager, is part of your job to know the

20  laws that applied to employees to protect their jobs and

21  protect them from discrimination?

22  A.    Yes, ma'am.  And I did according to our handbook.  That

23  was the only thing I had to go by as far as what was approved

24  or denied or how we made decisions.

25  Q.    Okay, but the vacation freeze policy is not in the

1  handbook, is it?

2  A.   No, ma'am.  It states that it's up to the manager for

3  the department at their discretion.

4  Q.   Okay.  But as the manager of the department, and in your

5  discretion, is it your testimony here today that you didn't

6  know that there was a federal law that should have provided

7  for an accommodation on the basis of religion?

8  A.   I did not know there was a federal law requirement.  I

9  knew that I couldn't approve it due to the workload that we

10  had.

11  Q.   Okay.  So you didn't consider Carol's rights under the

12  law?

13  A.   No, I considered her rights.  I wasn't aware that we had

14  to give 12 days for religious holiday.  I went by everything

15  that was applied by a manager, which was the handbook of MNPS.

16  Q.   Now, going back to the employee in the fingerprint

17  department, the substitute, her name was Michelle Marshal;

18  right?

19  A.   Yes, ma'am.

20  Q.   And she was not brought on specifically to cover for the

21  employee who was on medical leave, was she?

22  A.   Yes, she was brought on at the time for the background

23  office.  That was what she was solely trained in, was the

24  background office.

25  Q.   Right.  She was brought on to the background office, but

1  she wasn't brought just to cover for the employee who was on

2  medical leave, was she?

3  A.    At the time we hired her, that was the reason for her

4  being brought in, was to cover the FTE and the background

5  office.

6  Q.    Okay.  The person that she was covering for that was on

7  medical leave, she was allowed to come back; right?

8  A.    Yes, ma'am.

9  Q.    And that was even though she took her leave during the

10  freeze; correct?

11  A.    Yes, ma'am.

12  Q.    And that employee who was on medical leave was not

13  replaced while she was on leave, was she?

14  A.    No, ma'am.

15  Q.    And that employee wasn't required to transfer out of the

16  fingerprint department because she couldn't work during the

17  summertime, was she?

18  A.    No, ma'am.

19  Q.    So after Carol submitted her request in April, she also

20  went into KRONOS, your HR system; right?

21  A.    Yes, ma'am.

22  Q.    Because that's the formal way that employees are

23  supposed to make time-off requests?

24  A.    Yes, ma'am.

25  Q.    And then when she goes in and puts in the KRONOS system

1  that she's taking -- that she's requesting off, you then go

2  in and approve it or deny it; right?

3  A.   Yes, ma'am.

4  Q.   Okay.  And you did that.  You went in the KRONOS system,

5  and you denied her request; correct?

6  A.   Yes, ma'am.

7  Q.   Okay.  If you could turn to Exhibit No. 3 in that binder

8  up there.  Do you recognize that document?

9  A.   Yes, ma'am.

10         MS. COLLINS:  Your Honor, I'd like to move to

11  enter Exhibit No. 3 into evidence.  It's been stipulated to.

12         MR. FOX:  No objection.

13         THE COURT:  Without objection, Plaintiff's

14  Exhibit 3 is admitted.

15         (Plaintiff's Exhibit 3 received in evidence.)

16  BY MS. COLLINS:

17  Q.   Were these the requests that Carol made for the

18  religious convention on the first page?  I know it's a little

19  hard to read.

20  A.   Yes, ma'am.

21  Q.   Okay.  And if you have a screen, I've zoomed it -- on

22  that screen.  And down at the -- on the left side over here

23  in this column, it shows that you refused the request; right?

24  A.   Yes, ma'am.  That's -- once it's denied, that's what the

25  system will reflect.

1  Q.   All right.  And if you go to the second page, it was the
2  same thing, refused for those; right?
3  A.   Yes, ma'am.
4  Q.   Okay.  So all of the requests that she made were
5  refused?
6  A.   Yes, ma'am.
7  Q.   And this shows that you denied her request the very next
8  day; right?
9  A.   Yes, ma'am.
10 Q.   You didn't -- at the time that you denied her request,
11 you didn't speak with Ms. Few; right?
12 A.   No, ma'am.
13 Q.   But you did know that Carol went to speak with her;
14 right?
15 A.   Yes.  That was the directive I gave her once I denied
16 the request.
17 Q.   Okay.  And it was your understanding that Ms. Few also
18 denied Carol's request; correct?
19 A.   Yes, ma'am.
20 Q.   And then after you spoke with Carol again, she said she
21 was going to have to go on her trip; correct?
22 A.   Yes, ma'am.
23 Q.   And she said that the reason she was going to have to do
24 that is because it was important to her faith; right?
25 A.   Yes, ma'am.

1  Q.    And, in fact, you knew that Carol said this was a once

2  in a lifetime opportunity for her to go to this convention;

3  right?

4  A.    Yes, ma'am.

5  Q.    And you had no more conversations with Carol after this

6  about her trip, did you?

7  A.    No, ma'am.

8  Q.    So April goes by, May goes by.  No conversations?

9  A.    No, ma'am.

10 Q.    From January to April, did you discuss any sort of

11 specifics as to like how can we get this worked out, how long

12 is it going to be, anything like that?

13 A.    No, just because it wouldn't -- there was no way I could

14 accommodate with the volume that we had.  It's -- with the

15 position that she has, it's about a six- to eight-month

16 training period for someone to get them up to speed.  So I

17 did not take any further conversations with her.

18 Q.    Six to eight months?

19 A.    Yes.

20 Q.    Okay.  So you knew when you denied Carol's request that

21 you thought that it would take six to eight months to replace

22 her.  If you knew that it was going to take that long to get

23 someone up to speed on the systems to be able to function,

24 why not just let Carol come back?

25 A.    I didn't have a budgetary right.  I did ask, and it

1  wasn't in the budget.  We already had a full-time substitute.
2  Q.   No, no, no --
3  A.   If it would have been in a different time frame, I would
4  have approved it for her.
5  Q.   Right.  And I apologize if I didn't word that question
6  well.  But if you knew that it was going to take so long to
7  get someone up to speed, you knew that Carol was taking off
8  two weeks, and you couldn't have someone up to speed in time,
9  right, before Carol came back, why not just let Carol come
10 back into her job -- because her job had already been
11 approved.  That wasn't a budget issue, was it?  Her job was
12 there.  So why not just let her come back and do her job?
13 A.   Someone that was just as seasoned as Carol came to me
14 with the same request.  She wanted to take a week off with
15 her family and go to Florida.  I couldn't approve that for
16 that same reason because I couldn't be five days without that
17 employee.  And the same -- I had brand new staff of all new
18 employees.  Carol was my most seasoned veteran that I had.
19         And I attempted -- before we put the vacation
20 freeze policy in place, I had five seasoned employees, that I
21 allowed them all to take a vacation that summer in 2016, and
22 we were there until midnight, 10:00, trying to get the work
23 done once I allowed each one of them a week.  So seeing how
24 that had put a strain and even -- I mean, it just wasn't
25 possible.  And the same employee that came to me, I denied

1  her five days off with her family, she transferred to another

2  department.  It was just -- I was trying to make it to be not

3  an impartial manager.  It was a policy that was put in place

4  for our department, and I made them all follow it, that I

5  managed.

6  Q.   Going to Florida is not protected by Title VII, is it?

7  A.   No, I understand that.  I was just explaining.

8  Q.   Right.  And her trip to Florida was not meeting a tenet

9  of her faith that you knew of, was it?

10  A.   I understand that, yes, ma'am.

11  Q.   Okay.  So her going to Florida was not protected conduct

12  under the law, was it?

13  A.   No, ma'am.

14  Q.   Okay.  And the first time that you recall speaking with

15  Ms. Few about this was after Carol had spoken with her;

16  right?

17  A.   Correct.

18  Q.   Okay.  So after Carol told you the trip was important to

19  her, she sent you that letter of transfer?

20  A.   Correct.

21  Q.   And you were not surprised that she transferred out,

22  were you?

23  A.   No, because she -- she had expressed to me that if the

24  trip was not approved, she would have to do what she needed

25  to do.  So I was not surprised to get her letter, no, ma'am.

1  Q.    And you knew as far as her doing what she needed to do,

2  that was meeting the obligations of her religion; right?

3  A.    Yes, ma'am.

4  Q.    And so the reason she requested that transfer was

5  because her request for accommodation was denied?

6  A.    Yes, ma'am.

7  Q.    And you accepted her letter of resignation from the ERC?

8  A.    I did, yes, ma'am.

9  Q.    When Carol submitted her letter of transfer, she told

10  you she was going to be back before the school year started,

11  hadn't she?

12  A.    Yes, ma'am.

13  Q.    And after receiving Carol's letter, you then posted her

14  position?

15  A.    No, ma'am, that's not true.  The position that was

16  posted prior to Carol leaving was for disciplinary action

17  with another employee.  Her position wasn't posted until much

18  later on.

19  Q.    Sure.  If you could turn to Exhibit No. 12 for me,

20  please.

21        MS. COLLINS:  Your Honor, I'd like to move to

22  enter this into evidence.  This has been stipulated to,

23  Exhibit 12.

24        MR. FOX:  No objection.

25        THE COURT:  Without objection, Plaintiff's

1  Exhibit 12 is admitted.

2           (Plaintiff's Exhibit 12 received in evidence.)

3  BY MS. COLLINS:

4  Q.   This is an email that you sent to Craig Ott and Lisa

5  Spencer and Lisa Few; right?

6  A.   Correct.

7  Q.   This was on June 11, 2018?

8  A.   Right, yes, ma'am.

9  Q.   And you say (as read):  I've accepted Carol's

10 resignation as of today.  We need to post this position

11 immediately to hire as soon as possible.

12 A.   Yes, ma'am.

13 Q.   So it was not until Carol submitted her letter on

14 June 11th that you posted the position; right?

15 A.   Yes, ma'am.

16 Q.   Okay.  And this is the request, and it was a replacement

17 position?

18 A.   Correct.

19 Q.   And you specifically note that it was replacing Carol

20 Barton's position?

21 A.   Yes, ma'am.

22 Q.   So you submitted the request on June 11, 2018, for a

23 position that you knew would take -- I think you said six to

24 eight months to get someone up to speed?

25 A.   Yes, ma'am.

1  Q.    And Carol would have been back well before whoever was

2  hired in the position and received that training for six to

3  eight months; right?

4  A.    Correct.

5  Q.    Okay.  And you testified that this was an executive

6  management decision, meaning Ms. Story and Mr. Ott made the

7  decision to replace Carol, rather than letting her return to

8  her position after the religious convention; right?

9  A.    It was their final decision.  So once I received

10 confirmation it wasn't approved on that level, yes, it was my

11 responsibility to put in the job vacancy after that.

12 Q.    Okay.  And you felt that if you would have allowed Carol

13 to take time off, it would have opened the door for other

14 people to request time off; right?

15 A.    No, I was just making a fair management decision.  It

16 didn't have anything to do with that.  It was just trying to

17 be the same fairness across every bit of the staff that I

18 managed according to the policy that I set forth.

19 Q.    Okay.  It's that unwritten policy?

20 A.    I'm sorry?

21 Q.    It's that unwritten policy?

22 A.    It's the department policy, yes, ma'am.

23 Q.    That's not written down anywhere?

24 A.    The vacation freeze?

25 Q.    Yes.

A.   Yes, ma'am, it's an adopted policy of the ERC.  Yes,
ma'am.
Q.   Okay.  And there was no special consideration made in
light of the fact that Carol made her request as a religious
accommodation; right?
A.   No, ma'am, just because it couldn't be accommodated per
the workload.
Q.   Okay.  So you didn't draw a distinction between the fact
that hers was a religious accommodation versus just a regular
vacation request?
A.   No, ma'am.
Q.   Other employees that were in the ERC took off during the
summer; correct?
A.   Prior to the vacation freeze, yes.
Q.   Okay.  But I thought the vacation freeze was during the
summer.
A.   It is.  It starts the second week of June and goes
through the first week -- most of the time it's mid-June
through the first week of August.
Q.   Okay.  These dates of this vacation freeze, are they
written down anywhere?
A.   They're determined each year according to the data entry
and the payroll calendar for MNPS for the first paycheck of
the school year to make sure that every new hire or transfer
is paid accordingly on the first check.

1  Q.  Okay.  Those dates that you just gave us, the second

2 week of June through the first week of August, is that

3 written down anywhere?

4  A.  No, they're determined by the payroll calendar and the

5 upcoming school year.

6  Q.  Where did you get that from?  Is that just your

7 recollection?

8  A.  That's just my rec -- I know the second week of June

9 through the first week of August through looking through

10 court documents was for 2018.

11  Q.  Okay.  All right.  Other employees that were in the ERC

12 did take some time off during that second week of June to the

13 first week of August; right?

14  A.  If they did, it was for sick time or maybe if they had a

15 doctor's appointment, but no vacation time.

16  Q.  Okay.  And you're certain about that?

17  A.  Yes, I feel pretty certain about that.  It's been a long

18 time, but yes.

19  Q.  Okay.  And if the documents that were provided by Metro

20 Government state something differently, would you have any

21 basis to dispute that?

22  A.  I would because they can -- a person can only take off

23 with the accruals that they have.  So if they have a sick day

24 that they're taking, and they only have vacation time, they

25 submit vacation time, and I approve it so they don't have to

1  go without pay, but . . .

2  Q.   So they do take time off?

3  A.   For sick time or a sick day, a planned doctor's

4  appointment.  That did happen, yes.

5  Q.   Okay.  If you could turn to Exhibit No. 4 in that binder

6  up there.

7           MS. COLLINS:  And, Your Honor, I'd like to go

8  ahead and move to enter Exhibit No. 4 into evidence.  It's

9  been stipulated to.

10          MR. FOX:  No objection.

11          THE COURT:  Without objection, Plaintiff's

12  Exhibit 4 is admitted.

13          (Plaintiff's Exhibit 4 received in evidence.)

14  BY MS. COLLINS:

15  Q.   And these are just some of the records that Metro

16  provided us during this case.  And even if we go down here

17  starting in May, this is Jared Bosi.  He was in the ERC

18  department; right?

19  A.   Yes, ma'am.

20  Q.   He shows a vacation day --

21  A.   No, that's a vacation partial.  It's 1.5 hours.

22  Q.   Okay.  All right.  And he also got holiday pay.  That

23  was for --

24  A.   Which one are we looking at?  I'm sorry.

25  Q.   Is that for Memorial Day?

1  A.    Yes, ma'am.

2  Q.    Okay.  So he didn't have to work that day, but he got

3  paid for it; right?

4           MR. FOX:  Your Honor, she's off the screen.  The

5  document just needs to be put on the screen.  Thank you.

6           MS. COLLINS:  Sorry about that.

7  BY MS. COLLINS:

8  Q.    Is that right?

9  A.    Yes, that's correct.

10  Q.    Okay.  And so he took a sick day here on 6/21; right?

11  A.    Correct.

12  Q.    And when it says "Comp Used" --

13  A.    Yeah, that's when he must have had to leave for almost

14  an hour for that day because that's why it's .75.

15  Q.    Okay.  But he was able to leave work and use some of his

16  comp time?

17  A.    Yes.

18  Q.    Okay.  He got holiday pay for July 4th.  So that means

19  he didn't work on July 4th; right?

20  A.    Correct.

21  Q.    Same thing going through August?

22  A.    I can't see what you're looking at.  I'm sorry.

23  Q.    Sorry about that.  On page 2, he used some more comp

24  time; is that right?

25  A.    That's correct.

Q.    Okay.  Same thing here, August 16th, he used some more
comp time?

A.    That's correct, an hour.87.

Q.    At the end of August, he had a vacation, used vacation
time; right?

A.    That would have been for sick or something of that
nature, and he would have been out of accruals because there
was no vacation approved for anyone.

Q.    Okay.  All right.  Same thing.  This is another
employee, Judith Atchley.  She was another employee there in
the ERC; right?

A.    That's correct.

Q.    And if we just go down here, she used a vacation day in
April?

A.    I can't see where you're at.

Q.    Some vacation time in April here at the bottom; right?

A.    Yeah, that was a half a day.

Q.    And then above that, she used eight hours of vacation
time; right?

A.    Correct.

Q.    On April 12th.  And then if we go through here, she used
another vacation day on May 10th?

A.    That's correct, but the freeze wasn't implemented at
that time.

Q.    Oh, okay.  She also used vacation pay on May 24th;

1  right?

2  A.    Yes.  The freeze wasn't implemented at that time.

3  Q.    Okay.  Holiday pay on June 7th?

4  A.    That's correct.

5  Q.    She used some comp time also on June 7th?

6  A.    That's correct.

7  Q.    And you go down, she had a sick day that she was allowed

8  on June 21st?

9  A.    That's correct.

10  Q.    Looks like she used some vacation pay on June 21st?

11  A.    That's correct.

12  Q.    Okay.  She got some holiday pay for July 4th?

13  A.    That's correct.

14  Q.    July 5th, she was out sick?

15  A.    That's correct.

16  Q.    She used some comp time also on July 5th; right?

17  A.    That's correct.  If you'll see where there -- that will

18  give an explanation of the -- when they're running out of

19  accruals.  If you notice on the 5th, she used 5.75 of sick,

20  2.25 of comp to make up a whole eight-hour day because she

21  was out of accruals.

22  Q.    Then again on July 19th?

23  A.    Yes, that's a half a day.

24  Q.    Used some vacation time.  What is this comp time here on

25  August 2nd?

A.    Yes, that's -- each pay period when they work over in that budget year, we were not approved to pay overtime.  So they received comp time for all of the hours that they had to work over.  So if they were out of their accruals, or if they wanted to use their -- actually, the rule was they had to use their comp time first.

Q.    Okay.  And in August, she used some sick time on August 16th again; right?

A.    That's correct.

Q.    And on August 30th, she used some personal leave time?

A.    That's correct.

Q.    And some comp time.  And then on September 3rd, she got some holiday pay again; right?

A.    That's correct.

Q.    So the things that we just went through does demonstrate that at least two employees took some time off; right?

A.    Yes, a few maybe a day at a time, yes, ma'am.

Q.    Okay.  Now, we went through this document during your deposition.  If you could turn to Exhibit No. 18.

       MS. COLLINS:  And, Your Honor, I'd like to move to enter this into evidence.  These are defendant's response to request for admissions, and it's been stipulated to.

       MR. FOX:  No objection.

       THE COURT:  Without objection, Plaintiff's Exhibit 18 is admitted.

1            (Plaintiff's Exhibit 18 received in evidence.)

2   BY MS. COLLINS:

3   Q.    Okay.  And in this document, Metro was asked to admit --

4   this is on page 2 of the document -- that employees of

5   defendant in the ERC department took days off in April 2018?

6   A.    Yes, ma'am.  The freeze wasn't implemented at that time.

7   Q.    Okay.  And just the reason so you know why I'm asking

8   about April is because there's been some conflicting

9   testimony that it was implemented in April.  So I'm going to

10  cover April as well.  Okay?

11  A.    Okay.

12  Q.    In this April time frame, Metro admits that, yes,

13  members of the ERC took time off in April, and then it lists

14  out the hours that people took?

15  A.    Yes, ma'am.

16  Q.    Carol took off some time.  Jared Bosi took off some

17  time.  Jessica Earnest took off some time.  You took off a

18  couple of days.  Judith Hawkins took off 24.5 hours.  Christy

19  Overstreet took off .88 hours.  Mr. Romero took off 21.5.

20  And Hilary Stanley took off 12 hours.  Right?

21  A.    Yes, ma'am.

22  Q.    And you don't have a basis to dispute that, do you?

23  A.    No, ma'am.

24  Q.    Okay.  And then if we go through to May 2018, more

25  people took time off?

1    A.    Yes, ma'am.

2    Q.    And Metro admits that?

3    A.    Yes, ma'am.

4    Q.    Carol took off 2.5.  Jared took off 1.5.  Jessica

5    Earnest took off 10.5.  You took off 16 hours again.  Judith

6    took off 18.75.  Diego took off .38.  And Hillary took off

7    16.

8    A.    Yes, ma'am.  We were all taking time off in preparation

9    for the freeze.

10   Q.    Okay.  Then we go to June.  And in June, it shows the

11   dates that Carol took off there at the end of the month.

12   Jared took off some time.  Jessica Earnest took off some

13   time.  Judith took off 15.88.  Christy took off 8.8.  And

14   Diego took off 8.  Right?

15   A.    That's correct, which . . .

16   Q.    Okay.  And then we go to July of 2018.  And Metro was

17   asked (as read):  Admit that employees of the defendant in

18   the ERC department took off days within the month of

19   July 2018.

20            Answer (as read):  Yes.  Christy Overstreet,

21   8 hours; Judith Hawkins .5; Jessica 4.5.

22   A.    That's correct.

23   Q.    Then we go to August of 2018, more time off, 2.62, 16,

24   1.5, 43?

25   A.    Yes.  Christy's time off, though, would have been after

1  the vacation freeze ended.

2  Q.   Okay.  And you don't have any reason to dispute these

3  numbers that Metro provided?

4  A.   No, ma'am.

5  Q.   Okay.  And in this chart, this was September -- this was

6  2017, the prior year, when there was another freeze in place?

7  A.   Yes, ma'am.

8  Q.   This is April to August.  It also goes through all the

9  days employees took off?

10  A.   Yes, ma'am.

11  Q.   Carol, 39.38; Jessica, 51.22.

12  A.   That's correct.

13  Q.   Toniesha, 44.12.

14  A.   But may I include that a lot of these days that are

15  disclosed in here the vacation freeze wasn't implemented if

16  it's past the first week in August.  So these 24 hours for

17  Jessica Earnest would have been after the vacation freeze.

18  Q.   Okay.  Selina, you took off 24 in 2017 during that time

19  period, and Hilary took off 51.5 during that time period;

20  correct?

21  A.   That's correct.  They were prior to the freeze.  My time

22  off was, yes, ma'am.

23  Q.   Okay.  And then we go to 2019.  Metro also admits that

24  people in the ERC took time off.  Olivia took off 32.37.  You

25  took off 36.4.

A.   May I note that only .37 of Olivia's hours were in the
vacation freeze?  The others were before or after --
Q.   Sure.  And I appreciate that, but, again, we've had
conflicting testimony as to what the exact time period was of
the freeze.
          MR. FOX:  Objection.
          THE COURT:  What's the conflicting testimony?  I
haven't heard it yet.
          MS. COLLINS:  It was started in April.
          THE COURT:  What testimony in this trial are you
talking about?
          MS. COLLINS:  Ms. Few's testimony.
          MR. FOX:  I don't remember -- I don't recall her
saying the freeze began in April.
          THE COURT:  I don't either.
          MS. COLLINS:  Okay.  I'm pretty sure that it was
in there, but maybe not.
          THE COURT:  You can ask Patty for a transcript at
the end of the day and look into that.
          MS. COLLINS:  I will.  Thank you.
BY MS. COLLINS:
Q.   Okay.  We're going back through this.  And that
Ms. Hawkins took off 28 hours.  Ms. MacDonald took off
43.5 hours.  And Ms. Overstreet took off 68.62.
A.   That's correct, but all of this time frame is not during

1  the freeze.

2  Q.    Okay.  Okay.

3         MR. FOX:  Your Honor, could we have the witness

4  speak up a little louder, please.  We're having trouble

5  hearing.

6         THE COURT:  Yeah, if you wouldn't mind sliding

7  that microphone a little closer, ma'am.

8         THE WITNESS:  Sorry.

9         THE COURT:  You're soft spoken, so we want

10  everybody to hear you.

11         THE WITNESS:  Sorry.

12  BY MS. COLLINS:

13  Q.    Okay.  So you acknowledge that during months in the

14  summer of 2018 that people took time off; right?

15  A.    That's correct.

16  Q.    Okay.  And Ms. Barton was not the first employee the ERC

17  lost due to the policy?

18  A.    No, ma'am.

19  Q.    Okay.  And the ERC also lost Mary Carter the prior year;

20  right?

21  A.    Yes, ma'am.  That's the employee I was referring to with

22  the Florida trip.

23  Q.    With the vacation, the family vacation?

24  A.    Yes, ma'am.

25  Q.    Okay.  And you agree that had Ms. Barton requested the

1  same two weeks off for a medical procedure, it would have
2  been granted; right?
3  A.    I'm unaware.  I would have directed her to the benefits
4  office to file FMLA.
5  Q.    Okay.  No employee of Metro Schools -- no Metro School
6  employee's paperwork was left unprocessed during the summer
7  of 2018, was it?
8  A.    Due to me not seeing my family and working many, many
9  hours overnight, yes, they were not.
10 Q.    Okay.
11        MS. COLLINS:  Your Honor, if I could just have a
12 moment to review my notes.  That's all I have, Your Honor.
13        THE COURT:  Okay.
14                 CROSS-EXAMINATION
15 BY MR. FOX:
16 Q.    Now, Ms. Harris, isn't it true that the vacation freeze,
17 sort of blackout period, if you will, was mid-June through
18 the beginning of the school year, to the beginning of the
19 school year in 2018; correct?
20 A.    That's correct.
21 Q.    And that's when things were really very busy; correct?
22 A.    Yes.  We would have hundreds upon hundreds of transfers
23 and hundreds upon hundreds of new hires to process through
24 both the background office and through the ERC for data
25 entry.

1  Q.    Okay.  Now, try to speak directly into the microphone.

2  A.    Sorry.

3  Q.    Maybe it's just my hearing.  I'm having a little bit of

4  difficulty hearing you.

5  A.    Okay.

6  Q.    So well over a thousand transfers and new hires that

7  were being processed; correct?

8  A.    Yes, sir.

9  Q.    And do you recall how many employees were in the ERC in

10  2018?

11  A.    It was four or five.  I can't remember exactly.

12  Q.    And for all the time numbers, allotments, that opposing

13  counsel just asked you about in, let's see, Exhibit 4 -- do

14  you have that still in front of you, Plaintiff's Exhibit 4?

15  A.    I do.

16  Q.    Isn't it true that those are in terms of hours; correct?

17  A.    That's correct.

18  Q.    So if you see something like 5, that's --

19  A.    A little over a half day.  .5 is half of an hour.

20  Q.    Half an hour.  .5 is half an hour.  Five would be a

21  little bit over half a day; correct?

22  A.    Correct.

23  Q.    Right.  And isn't it true that what Ms. Barton was

24  asking for, again, was 12 consecutive days?

25  A.    Yes, it was 12 consecutive business days, but to us it

1 would have been 17 calendar days, which mattered to the ERC

2 employees during that time frame because depending on

3 workload we would have to work weekends, if necessary.

4 Q.    Right.  So even Ms. Barton might be called upon to work

5 a weekend, if necessary; correct?

6 A.    Correct.

7 Q.    So it put an additional strain on the office that she

8 was gone, not just 12 consecutive business days, but 17

9 consecutive calendar days; correct?

10 A.    Correct.

11 Q.    Over half a month; correct?

12 A.    Correct.

13 Q.    And for all the leave time that opposing counsel just

14 asked you about, all that time amounted to no more than two,

15 three business days at the most; correct?

16 A.    Correct.

17 Q.    And the times that were in April or further in August

18 that she asked you about weren't even in the vacation freeze

19 time period, were they?

20 A.    That's correct.

21 Q.    And she drew your attention to what's been marked as

22 Exhibit 12, and I will as well.  That's when you made a

23 request for an exception from the hiring freeze; correct?

24 A.    Correct, because we were on a hiring freeze at that time

25 due to budget resources.

1  Q.   Right.  And that's over your head.  That's budgetary

2  issues; right?

3  A.   Correct.

4  Q.   And you made the request for an exception from the

5  hiring freeze to fill that position right after Ms. Barton

6  resigned, correct, and went to the substitute office?

7  A.   That's correct.

8  Q.   And you did that so that immediately you could work on

9  trying to fill that slot; correct?

10  A.   Correct.

11  Q.   And when she came to you -- I want to pin down some of

12  these dates.  Let me draw your attention to what's been

13  marked as Plaintiff's Exhibit 9 in that same binder.  We've

14  heard testimony that she came to you January 2018.

15  A.   That's correct.

16  Q.   All right.  And do you see --

17          THE COURT:  Has this been admitted?

18          MR. FOX:  Yes, it has.

19          THE COURT:  9 has?

20          MS. COLLINS:  Oh, this one hasn't.

21          MR. FOX:  Oh, I'm sorry.  My apologies.  This is

22  plaintiff's exhibit.  It's been stipulated to.

23          MS. COLLINS:  Yeah, no objection.

24          THE COURT:  I think you're talking about 10, but

25  if you want to admit 9, I'm happy to do it.  I'm just saying

1  it hasn't been admitted yet.

2              MS. COLLINS:  Yeah, they're generally the same.

3              MR. FOX:  They're generally the same.  I see.

4  Well, it's been stipulated to, so --

5              THE COURT:  Okay.  And no objection to 9 coming

6  in?

7              MS. COLLINS:  Oh, no.  It was our exhibit.

8              THE COURT:  Okay.  All right.  I figured not,

9  but --

10              MR. FOX:  Thank you for that, Your Honor.

11              THE COURT:  -- worth asking.  So Exhibit 9 is

12  admitted.

13              MR. FOX:  Thank you for that, Your Honor.

14              (Plaintiff's Exhibit 9 received in evidence.)

15  BY MR. FOX:

16  Q.   As I clumsily get to this.  So this is Exhibit 9, a lot

17  of the same language as in Exhibit 10 that was just talked

18  about, but it mentions -- this is your language -- this is

19  her language, I'm sorry, to you; correct?

20  A.   Correct.

21  Q.   It starts off with (as read):  Selina, this email is to

22  confirm the conversation in January 2018"?

23  A.   That's correct.

24  Q.   Okay.  And isn't it true that what prompted her to meet

25  with you and have a conversation is because she got the

1   reminder about the vacation freeze in January 2018; correct?

2   A.    That's correct.

3   Q.    She had just gotten that, and that's why she went and

4   had a conversation with you?

5   A.    That's correct.

6   Q.    Right.  So originally -- let's start with 2016.  2016,

7   you had experimented with having a week-long leave time for

8   each person, vacation, or whatever you want to call it, for

9   whatever person -- for whatever personal reason, and that

10  experiment failed, didn't it?

11  A.    Yes.

12  Q.    Because it really put a bind on everybody.  The entire

13  office had trouble getting that work done; correct?

14  A.    Yes.  And that was with a team of all seasoned

15  employees.

16  Q.    Right.  So then 2017 is when that first vacation freeze

17  policy went into place, where you could only take one, two,

18  maybe three, business days and that's it; correct?

19  A.    Correct.

20  Q.    And then that same vacation freeze policy then,

21  fast-forward 2018, was also put into place, and you reminded

22  the crew about that in January 2018; correct?

23  A.    Correct.  And when it was first implemented in 2017, I

24  approved for a religious convention for Ms. Barton that year.

25  Q.    But she went to a religious convention that year;

1  correct?
2  A.   That was a couple days long, yeah.
3  Q.   Right, just two days long or so.  And it certainly
4  wasn't 12 days long, which is what she was requesting in
5  2018; correct?
6  A.   Correct.
7  Q.   In fact, no one else had ever asked for 12-day long
8  leave time at all during this busy time of the year; correct?
9  A.   Correct.
10 Q.   This is the first such request you had ever gotten;
11 correct?
12 A.   Correct.
13 Q.   Opposing counsel asked you a few questions about medical
14 leave, but that's really comparing apples to oranges;
15 correct?
16 A.   Yes.
17 Q.   It's two different things?
18 A.   It's not at my decision or liberty to approve that.
19 It's handled through the benefits division.
20 Q.   Right.  Family Medical Leave Act leave, FMLA leave, is
21 handled by a separate set of rules and regulations, isn't it?
22 A.   Correct.
23 Q.   And it's handled by the benefits office, isn't it?
24 A.   Correct.
25 Q.   Completely different?

1  A.   Correct.

2  Q.   And while we're talking about leave, could you please

3  flip to what's been marked as Plaintiff's Exhibit 3.  It

4  looks like this on the front page.  Do you see that?

5  A.   I can.

6  Q.   Okay.  Do you see page 2?  Do you see this, that some of

7  the leave she was requesting for here, at least a couple

8  days, was bereavement leave?

9  A.   That's correct.

10  Q.   So part of this request, this 12 days she's asked for,

11  at least two of those days was bereavement leave?

12  A.   Correct.

13  Q.   And she hadn't had a death in the family, had she?

14  A.   No, ma'am.  I'm sorry, no, sir.

15  Q.   So the request could have been denied for that reason

16  alone, couldn't it?

17  A.   Correct.

18  Q.   Do you have any idea why she included bereavement leave

19  in that request?

20  A.   I do not.

21  Q.   And isn't it true when she made this request to you, she

22  had already had it arranged that she was -- if you said no to

23  the request, she was going to take it anyway and just slide

24  over into the substitute office?

25  A.   That was what her letter stated.  I wasn't aware of

1  that, other than the conversation she just told me she was

2  going on the trip, and if she couldn't go, she was going to

3  have to do what she needed to do.  That was the only

4  conversation.

5  Q.   Right.  So if she had made the choice -- she wasn't

6  terminated; correct?

7  A.   Correct.

8  Q.   In fact, she wasn't disciplined over this; correct?

9  A.   No, sir.

10  Q.   She's still an MNPS employee; correct?

11  A.   Correct.

12  Q.   And, in fact, to get the work done -- well, before she

13  left, you knew that it wasn't something that the ERC could

14  accommodate; correct?

15  A.   Correct.

16  Q.   Because it would put a strain on all the co-workers,

17  correct, to get that work done; correct?

18  A.   Correct.

19  Q.   And, in fact, we know -- there's no guesswork, that when

20  she left, you and Lisa Few especially, two salaried

21  employees, had to work some nights and weekends to get that

22  work done; right?

23  A.   Yes.

24  Q.   And it was work you wouldn't have normally done because

25  a lot of it was data entry; correct?

1  A.    Correct.

2  Q.    And that was Carol Barton's work; correct?

3  A.    Correct.

4  Q.    And isn't it true she was never given some type of

5  ultimatum; instead, you just denied the leave request?

6  A.    Correct.

7            MR. FOX:  Okay, that's all I have.  Thank you,

8  Your Honor.

9            MS. COLLINS:  I don't have anything, Your Honor.

10            THE COURT:  Okay, you can step down, ma'am.

11            THE WITNESS:  Thank you.

12            (Witness excused.)

13            THE COURT:  Ms. Collins, is it safe to assume you

14  don't have a 17-minute witness that we can get in before we

15  call it a day?

16            MS. COLLINS:  I don't even know if we have a

17  witness.  So, yes, that is safe to assume.

18            THE COURT:  All right.  Well, then we will go

19  ahead and break for the day, members of the jury, a little

20  bit early.  Maybe you can get a head start on some of our

21  lovely traffic, but it looks like it's a pretty day out

22  there.  So . . .

23            Again, please don't discuss the case with anybody,

24  each other, anybody outside this courtroom.  Please don't do

25  any independent investigation about the case or the parties

1 or anything touching on this case. I'm sure you-all have

2 plenty going on in your lives that you can occupy yourselves

3 with, other than this lawsuit, until we get back together

4 tomorrow morning. We'll plan on starting at 9 in the

5 morning. So please be here a few minutes early, so we can

6 try to get you in here and going at 9:00 with the next

7 witness, who I assume will be here at 9:00. But with that, I

8 hope everyone has a good evening.

9                  (The jury was excused from the courtroom at

10                  3:44 p.m.)

11                  THE COURT: Okay, be seated, please.

12                  I rarely say this on day one of a civil trial, but

13 we're moving at a good pace. So I don't know if that sort of

14 changes your forecast on -- you've got a number of other

15 witnesses to call, I know, but if that changes your forecast

16 on the timing. What I'm particularly focused on with Friday

17 being a holiday is when we can do our charge conference. I

18 had initially thought perhaps come in Monday morning, let the

19 jury come in a little later Monday, and then that would put

20 the jury charge to bed, I hope, but we may be moving faster

21 than anybody expected.

22                  So what are your thoughts on what tomorrow looks

23 like and whether we need to revisit that timing?

24                  MS. COLLINS: Your Honor, I'm pretty sure we can

25 close our evidence tomorrow.

1    THE COURT:  Okay.

2    MS. COLLINS:  We only have a couple more

3 witnesses, and they are very short.  I think the longest

4 one --

5    THE COURT:  You mean their testimony is very

6 short?  Sorry, I had to do that.

7    MS. COLLINS:  That's not fair this late in the

8 day.  Yes, testimony will be short.  I don't know, a couple

9 of them might be short.  But I think that it won't last long.

10 I think Dr. Baum, his testimony will be the longest.  And

11 after that, it's just a couple more that are going to just

12 move pretty quickly.

13    THE COURT:  All right.  What are your thoughts on

14 how long you may need?  Because, I mean, I'm starting to

15 wonder whether we could do the charge conference Thursday

16 morning, although I need to consult my brain trust and see if

17 we're going to be ready with a set of jury instructions by

18 Thursday morning.  Eileen says we are.  So that means we are.

19    Your thoughts?

20    MR. FOX:  It seems like there's a chance that all

21 the proof could be put on tomorrow, and then even if there's

22 a little bit that needs to still be put on Thursday, that we

23 could still plan on a charge conference maybe at the

24 midmorning break, or however you want to do it, on Thursday.

25    THE COURT:  I mean, because another thing I'm

concerned about is -- or I guess one option would be,
whenever we finish Thursday, we finish, have them come back
Monday -- and we can do the charge conference and get that in
the can, so you-all have the jury charge over the weekend,
and then come back Monday, close and give it to them maybe
late morning would be an option.  I don't want to do the
charge and then come back -- I mean, I don't want to do
closings and then come back and do the charge after a long
weekend.  I think that's too much of a break for them to keep
it all in their heads.

So let's just see where we find ourselves this
time tomorrow.  We'll try our best to have a copy of the jury
charge ready to hand out, so you-all can look at it.  You-all
both have been through my charge conference process before.
It can sometimes take a little while, but sometimes it
doesn't.  I try to be as efficient as I can on that, but we've
got to have it, and we've got to make sure that any issues
with the jury charge are addressed, objections preserved and
so forth, before we give it to the jury.  So . . .

I appreciate the pace.  Usually, it's the other
way -- it's usually like, all right, we're moving at a slow
pace here, guys.  What are we going to do to pick it up, but
that's not the case here.  So that's great.

All right, we'll plan on starting at 9.  And we'll
just kind of keep checking in throughout tomorrow on what the

1  expected proof is that remains, and then we'll be flexible,

2  but I think it's probably unlikely, given the holiday, that

3  we'll give it to the jury before the close of business

4  Friday.  I mean, I guess -- I mean, Thursday.  I guess it's

5  possible, but I'm hesitant to do that.  But we'll see.  We'll

6  just stay flexible.

7          Anything else?

8          MR. FOX:  No, Your Honor.

9          MS. COLLINS:  The stipulations about Dr. Baum --

10  what was it, Ashley?  Say it.

11          MS. WALTER:  I was just wondering about the

12  procedure tomorrow.  We've already stipulated that he's --

13  his qualifications as an expert.  So I just wanted to make

14  sure --

15          THE COURT:  Right.

16          MS. WALTER:  -- he's going to be reading --

17  whether I still need to move for him to be considered an

18  expert, since we agreed that he's . . .

19          THE COURT:  As he's about to testify, it is

20  cleaner if you just say "Pursuant to the stipulation, we're

21  requesting that Dr. Baum be allowed to testify as an expert

22  witness and give opinion testimony about" and fill in the

23  blank.

24          MS. WALTER:  Okay.

25          THE COURT:  So that it's clear, if somebody asks

1  the Sixth Circuit to grade my work, what he was testifying

2  about, what his expertise was about.  I think that's

3  important to be clear.  Just as an expert witness.  Well,

4  about what?  So . . .

5          MS. WALTER:  Okay.

6          THE COURT:  The other thing is -- have you-all

7  read your stipulations in yet?

8          MS. COLLINS:  No.

9          THE COURT:  Probably a good idea to do that at

10 some point.

11         MS. COLLINS:  I had it on my list.

12         THE COURT:  I see people do it at the beginning or

13 the end, typically.

14         MS. COLLINS:  Okay.

15         THE COURT:  So, I mean, before you close your

16 proof, if you'll just get up and read those, and we'll have a

17 copy that will go back with them as an exhibit.  And then --

18 because otherwise we expect them to take pretty copious

19 notes.  There's not a lot here in terms of stipulations, but

20 it's just easier to have that in front of them.

21         MS. WALTER:  Okay.  Thank you, Your Honor.

22         THE COURT:  All right.  Everybody have a good

23 evening.

24

25         (Proceedings adjourned at 3:50 p.m.)

1          <u>REPORTER'S CERTIFICATE</u>

2          I, Patricia A. Jennings, Official Court Reporter

3    for the United States District Court for the Middle District

4    of Tennessee, with offices at Nashville, do hereby certify:

5          That I reported on the Stenograph machine the

6    proceedings held in open court on November 8, 2022, in the

7    matter of CAROL BARTON vs. METROPOLITAN GOVERNMENT OF

8    NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,

9    Case No. 3:20-cv-00118; that said proceedings in connection

10   with the hearing were reduced to typewritten form by me; and

11   that the foregoing transcript (pages 1 through 153) is a true

12   and accurate record of said proceedings.

13          This the 3rd day of January, 2023.

14

15

16

17

18                      <u>/s/ Patricia A. Jennings</u>
                        Patricia A. Jennings, RMR, CRR
19                      Official Court Reporter

20

21

22

23

24

25