1              UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF TENNESSEE
2                 NASHVILLE DIVISION

3

CAROL BARTON                    )
4                               )
vs                              )    Case No. 3:20-cv-00118
5                               )
THE METROPOLITAN GOVERNMENT     )
6   OF NASHVILLE AND DAVIDSON   )
    COUNTY, TENNESSEE           )
7

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

9

10                   BEFORE THE HONORABLE

11        WILLIAM L. CAMPBELL, JR., DISTRICT JUDGE

12                 TRANSCRIPT OF PROCEEDINGS

13                    November 9, 2022

14                       Volume 2

15

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19

20

21

22

23  Patricia A. Jennings, RMR, CRR
    Official Court Reporter
24  719 Church Street, Suite 2300
    Nashville, TN 37203
25  patty_jennings@tnmd.uscourts.gov

```
 1   APPEARANCES:

 2   For the Plaintiff:        Heather M. Collins
                               Ashley S. Walter
 3                             HMC Civil Rights Law, PLLC
                               7000 Executive Center Drive
 4                             Suite 320
                               Brentwood, TN  37027
 5
     For the Defendant:        J. Brooks Fox
 6                             Kelli F. Woodward
                               Benjamin Andrew Puckett
 7                             Metropolitan Legal Department
                               P.O. Box 196300
 8                             Nashville, TN  37219

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

GOVERNMENT'S PROOF

DR. CHARLES BAUM
    Direct Examination by Ms. Walter................ 8
    Cross-Examination by Mr. Fox.................... 21
    Redirect Examination by Ms. Walter.............. 23

DEBORAH STORY
    Direct Examination by Ms. Walter................ 24
    Cross-Examination by Mr. Fox.................... 29
    Redirect Examination by Ms. Walter.............. 30

CRAIG OTT
    Direct Examination by Ms. Collins............... 32
    Cross-Examination by Mr. Fox.................... 37
    Redirect Examination by Ms. Collins............. 38

JESSICA EARNEST
    Direct Examination by Ms. Collins............... 39

DIEGO PEREZ ROMERO
    Direct Examination by Ms. Walter................ 44
    Cross-Examination by Mr. Fox.................... 47

CHRISTY OVERSTREET
    Direct Examination by Ms. Walter................ 52
    Cross-Examination by Mr. Puckett................ 57
    Redirect Examination by Ms. Walter.............. 60

KENN BARTON
    Direct Examination by Ms. Walter................ 62

DEFENDANT'S PROOF

JUDITH HAWKINS
    Direct Examination by Mr. Puckett............... 92
    Cross-Examination by Ms. Collins................ 96
    Redirect Examination by Mr. Puckett............. 101
    Recross-Examination by Ms. Collins............. 101

LISA FEW
    Direct Examination by Mr. Fox................... 102

## REBUTTAL PROOF

**CAROL BARTON**
    Direct Examination by Ms. Collins...............   112


Charge Conference.................................   118

1                    GOVERNMENT'S EXHIBITS

2    NUMBER             DESCRIPTION                    PAGE

3    19     Metro's Responses to Plaintiff's First    104
            Set of Interrogatories and Requests for
4           Production of Documents to Defendant

5    20     Updated Report                             13

6    23     2020 W-2                                   24

7    24     Summary of Report                           9

8    25     Stipulations                                7

9
                     DEFENDANT'S EXHIBITS
10
     NUMBER             DESCRIPTION                    PAGE
11
     1      Email 418/18, "Time off for religious     107
12          conference"

13   2      Letter/email Plaintiff's transfer/leaving 107
            ERC
14
     3      Photos from Sri Lanka Convention 2018     107
15

16

17

18

19

20

21

22

23

24

25

1          The above-styled cause came to be heard on

2    November 9, 2022, at 9:00 a.m., before the Honorable William

3    L. Campbell, Jr., District Judge, when the following

4    proceedings were had, to-wit:

5

6          THE COURT:  All right, good morning.  Welcome

7    back.  Are we ready with our next witness?

8          MS. WALTER:  Your Honor, we were going to go ahead

9    and read in the fact stipulations beforehand if that was

10    okay.

11          THE COURT:  Sure.  It's your horse to sell, so you

12    just read them in when you want to.  But we do have a witness

13    ready?

14          MS. WALTER:  Yes.

15          THE COURT:  We're ready to get our jury back in?

16          MS. WALTER:  Yes, Your Honor.

17          MS. COLLINS:  We have all the witnesses ready.

18          THE COURT:  Regardless of height.  Okay.

19          (The jury returned to the courtroom at 9:04 a.m.)

20          THE COURT:  Be seated, please.  All right, members

21    of the jury, welcome back.  Hope everyone had a good evening

22    and didn't have too much trouble getting back to us this

23    morning with the traffic.

24          I understand you intend to read some stipulations?

25          MS. WALTER:  Yes, Your Honor.

1          THE COURT:  The attorney for the plaintiff is

2    going to read some stipulations to you.  These are facts that

3    the parties agree on.  So there's no dispute about them, so

4    you can accept them as having been established for purposes

5    of this trial and for your deliberations.

6          Go ahead.

7          MS. WALTER:  All right.

8          Firstly, Carol Barton began her employment with

9    Metro in 2003 as a part-time employee and started as a

10   full-time employee in 2006.

11         Second, Carol Barton's final day of employment in

12   the Employee Resource Center was June 20, 2018.

13         Christy Overstreet's first day of employment

14   within the Employee Resource Center was July 13, 2018.

15         And then the parties have stipulated to

16   Dr. Charles Baum's qualifications as an economic expert.

17         Your Honor, I'd like to move the parties' fact

18   stipulations into evidence as Exhibit 25.

19         THE COURT:  25.

20         MR. FOX:  No objection.

21         THE COURT:  Without objection, Plaintiff's

22   Exhibit 25 is admitted.

23         (Plaintiff's Exhibit 25 received in evidence.)

24         THE COURT:  Okay, your next witness.

25         MS. WALTER:  The plaintiff would like to call

1 Dr. Charles Baum.

2          COURTROOM DEPUTY:  Raise your right hand, please.

3                    DR. CHARLES BAUM,

4 called as a witness, having been duly sworn, was examined and

5 testified as follows:

6          THE WITNESS:  I do.

7          COURTROOM DEPUTY:  State your full name for the

8 record, please, and spell your last.

9          THE WITNESS:  Charles Louis Baum II, B-A-U-M.

10                    DIRECT EXAMINATION

11 BY MS. WALTER:

12 Q.   All right, Dr. Baum, I'm going to read a brief statement

13 and then ask you to let me know if I've missed anything.

14          Dr. Charles Baum is a professor of economics and

15 finance at Middle Tennessee State University with a Ph.D. in

16 economics from the University of North Carolina, Chapel Hill,

17 and a Bachelor's degree in political science and economics

18 from Wake Forest.

19          Is that all correct?

20 A.   Yes.

21 Q.   All right.

22          MS. WALTER:  Your Honor, the parties have

23 stipulated to Dr. Baum's qualifications as an expert witness,

24 and I'd like to move for his testimony to be designated as

25 expert opinion in employee economic damages.

1          THE COURT:  Okay.  He will be so designated.

2    BY MS. WALTER:

3    Q.    All right, Dr. Baum, if you can turn to what is marked

4    as Exhibit 24 in the plaintiff's binder, which is the larger

5    binder.

6    A.    Okay, Exhibit 24?

7    Q.    Yes.

8    A.    Okay.  Oh, okay, there is one tab at the back.

9    Q.    It's hidden at the back.

10   A.    Okay.

11   Q.    All right.  Do you recognize this as a summary of the

12   report you created?

13   A.    Yes.

14   Q.    Okay.

15          MS. WALTER:  Your Honor, I'd like to move for

16   Exhibit 24 to be moved into evidence.

17          MR. FOX:  No objection.

18          THE COURT:  Okay.  So you're admitting the summary

19   that he's going to read into evidence?

20          MS. WALTER:  Yes, Your Honor.

21          THE COURT:  Okay.  But he's going to read it also?

22          MS. WALTER:  Yes, Your Honor.

23          THE COURT:  Okay.  No objection, then Exhibit 24

24   is admitted.

25          (Plaintiff's Exhibit 24 received in evidence.)

1  BY MS. WALTER:

2  Q.   All right, Dr. Baum, if you could read the summary that

3  is in Exhibit 24, please.

4  A.   Okay.  (As read):  I am Charles L. Baum II, Ph.D.,

5  professor of economics and finance at Middle Tennessee State

6  University.  I have a Ph.D. in economics from the University

7  of North Carolina at Chapel Hill and a B.A. in political

8  science and economics from Wake Forest University.  My

9  curriculum vitae is provided as Exhibit 22, on pages 14

10 through 34.

11          I prepared a report of economic damages in this

12 matter.  In this report, I provide an analysis of the

13 economic losses from lost earnings and lost employment

14 benefits for Carol Barton from Ms. Barton's demotion on or

15 around June 27, 2018, by the Metropolitan Government of

16 Nashville and Davidson County, Tennessee, Metro.

17          According to documents I have reviewed,

18 Ms. Barton's most recent salary at MNPS as a human resources

19 information systems specialist was $46,130.24 per year, for

20 the 2017-2018 academic year, from $22.17 per hour with

21 employment benefits valued at 19.99 percent of earnings.

22          According to the documents I have reviewed,

23 Ms. Barton's salary at MNPS as a substitute teacher is

24 $23,400 per year, for the 2018-2019 academic year, from

25 working 1,950 annual hours at $12 per hour.

1    According to documents I have reviewed, Ms. Barton
2  earned from MNPS $38,946.98 in 2018, $9,306 in 2019, $1,908
3  in 2020, $1,153.46 in 2021, and $2,085 in 2022 through June
4  the 10th of 2022.
5    According to documents I have reviewed, Ms. Barton
6  earned $633 from A-Z DME in 2021.
7    In this analysis, based on these assumptions, I
8  calculate the economic losses to Ms. Barton in the form of
9  lost earnings and lost employment benefits due to being
10 demoted to substitute teacher by MNPS on or around June 27th
11 of 2019.
12   The present value of the economic losses to
13 Ms. Barton due to being demoted by MNPS is calculated to
14 range from $234,087 to $378,921.  This economic loss
15 projection of the difference -- is a projection of the
16 difference in Ms. Barton's projected earnings and employment
17 benefits as a human resources information systems specialist
18 with MNPS and her actual and projected earnings and
19 employment benefits from being a substitute teacher with MNPS
20 after her demotion.
21   In a first scenario, shown in Table 1, the present
22 value of the economic losses from Ms. Barton's demotion by
23 Metro are estimated to be $234,087 after I subtract
24 Ms. Barton's estimated potential earnings as a substitute
25 teacher for Metro.  This accounts for $126,707 in back pay

1  and $107,380 in front pay.  I do not include

2  nongovernment-mandated employment benefits because Ms. Barton

3  is assumed to be employed on a part-time basis and is not

4  eligible for insurance and retirement benefits.

5         In a second scenario, shown in Table 2, the

6  present value of the economic losses from Ms. Barton's

7  demotion by Metro are estimated to be $378,921 after I

8  subtract Ms. Barton's actual earnings as a substitute teacher

9  for Metro.  This accounts for $200,258 in back pay and

10 $178,663 in front pay.  Otherwise, I make the same

11 assumptions and use the same methodology and rates as in my

12 first scenario.

13        In the third and fourth scenarios, shown in

14 Tables 3 and 4, I reflect the values of Table 1 and Table 2

15 excluding the projected value of insurance benefits.  And the

16 economic losses in these two tables are $221,716 and

17 $366,550, respectively.  The $221,716 value accounts for

18 $119,612 in back pay and $102,104 in front pay.  The $366,550

19 value accounts for $193,163 in back pay and $173,387 in front

20 pay.  Otherwise, I make the same assumptions and use the same

21 methodology and rates as in my first scenario.

22 Q.    Okay, thank you.  That's a lot of information.  So if

23 you could turn to Exhibit 20.

24 A.    Yes.

25 Q.    Do you recognize that document?

1   A.   Yes, this is my full report.

2   Q.   Okay.

3         MS. WALTER:  For the record, I just wanted to note

4   that in the summary where it states that it's Exhibit 22,

5   that is a typographical error.  It's Exhibit 20.

6         And, Your Honor, I'd like to move to enter

7   Exhibit 20 into evidence.

8         MR. FOX:  No objection.

9         THE COURT:  Without objection, Plaintiff's

10  Exhibit 20 is admitted.

11         (Plaintiff's Exhibit 20 received in evidence.)

12  BY MS. WALTER:

13  Q.   All right.  Dr. Baum, if you could turn to page 12 of

14  your report, please.

15  A.   Okay.

16  Q.   I'm going to show it on the screen here.  Okay, what is

17  this page of your report?

18  A.   This is a page that describes what each column contains

19  in my reports tables.  My report has four tables, and there

20  are columns in those tables.  And each of these numbered

21  points says what's in the columns in the tables.

22  Q.   Okay.  And if you could turn to page 8, please.  Is this

23  Table 1 that you referred to earlier in your summary?

24  A.   Yes.

25  Q.   Okay.  Could you walk me through what these columns mean

1   and how you came to your analysis?

2   A.   Yes.   Table 1 corresponds to Scenario 1, and I've got

3   four scenarios.   Each of the rows in the table corresponds to

4   a year.   This spans from 2018 through 2027.   The period that

5   goes through 2027 is Ms. Barton's projected work life, the

6   length of time that, as an economist, I project she would

7   have worked.   So the rows each correspond to a year.   You'll

8   actually notice that 2022 is actually on two rows.   Part of

9   it is in the past, about 11 months of it is in the past, and

10  about one month of it is in the future.   That's necessary

11  because the Court would want me to discount future values to

12  present value, and so it's important to separate between past

13  values and future values.

14          Now, going through the columns, column No. 1 shows

15  the year.   And maybe I should say that my intent here is to

16  calculate the difference in the value of what Ms. Barton

17  would have earned at Metro as a human resources information

18  specialist and what she earns from Metro as a substitute

19  teacher.   So I'm interested in calculating the difference in

20  her employment earnings and benefits.

21          Column No. 2 shows the growth rate where I project

22  over time these dollar amounts go up.   We're all familiar

23  with the fact that there's been inflation.   Wages go up over

24  time, just like prices do.   Column No. 2 is the growth rate

25  for wages over time.

1        Column No. 3 shows the amount that I project
2  Ms. Barton would have earned from Metro as a human resources
3  information systems specialist.  And there's an amount for
4  each year.  You'll notice that they gradually go up every
5  year with a little bit of inflation.
6        And then in column No. 4, I calculate employment
7  benefits.  And this is based on information Metro provided
8  where employment benefits are valued at a certain percent of
9  earnings.
10        In column No. 5, I show social security benefits.
11  This represents the employer's contribution to the Social
12  Security Administration on Ms. Barton's behalf.  Social
13  Security benefits are funded by Social Security taxes.
14  Sometimes we call them the payroll tax or the FICA tax.  The
15  employee pays half of it, and they see that come out of their
16  paycheck.  The employer also pays half of that tax, whether
17  we really see it or know it or not.  And so column No. 5
18  takes into account the amount that Metro would have paid to
19  Social Security on Ms. Barton's behalf, and she would have
20  ultimately received that in the form of benefits in the form
21  of retirement benefits.
22        So Ms. Barton's compensation from Metro comes from
23  Columns 3, 4 and 5.  It's her earnings, her employer benefits
24  and her government mandated benefits.  And then from that,
25  I'm going to subtract her compensation from Metro as a

substitute teacher. Her earnings as a substitute teacher are
reflected in column 6, and her employment benefits are in
column 7. This is the employer's contribution to Social
Security that I discussed earlier. It's just based on her
earnings as a substitute teacher, instead of her earnings as
a human resources information systems specialist.

And then the loss in column 8 is just the
difference in what I project she would have earned without
the demotion and what I project she has the potential to earn
with the demotion as a substitute teacher. In column No. 9,
I weight each future year for the probability that Ms. Barton
would have remained at Metro. We don't know for sure that
between the demotion and her retirement that she would have
remained at Metro. She probably would have, but there's some
chance she might have changed jobs and gone to work for a
different employer. And so I take that into account in
column 9. Column 9 is the probability -- it's a percent --
the probability that Ms. Barton would have stayed with Metro
all these years absent the demotion. And you'll notice that
they're somewhere between 0 and 100 percent.

So that in column 10, I calculate an adjusted
loss. This is just the loss that I've already described
weighted for the probability that Ms. Barton would have still
been employed for Metro. In column No. 11, I add interest on
the loss. Ms. Barton has been without the use of this money

for these years. And during that period of time, if she had had the money, she could have invested it and earned a small amount of interest. And so I take that into account in column 11. And then in column 12, it says "Total Loss." This is just the adjusted loss, plus that small amount of interest in column 11.

And then, as I mentioned earlier, the courts will expect me, as an economist, to discount future amounts to present value. And so columns 13, 14 and 15 are the inputs that economists use to take future amounts, like future losses, and to shrink them or discount them to present value. This process is based not only on the interest rate, which is in column 14, sometimes referred to as a discount rate, it's also based on time. The further out into the future a loss would have occurred, the more it is discounted. And so I keep track of the number of years into the future.

You'll notice for 2022 there's only a part of a year because 2022 is mostly over. It's November the 9th. And so that in column, let's see, 16, I take the total loss for the future years, and I shrink it or discount it to present value. So you'll notice those numbers getting smaller. And then in column No. 17, I just add up the numbers in column 18. It's a cumulative value, but it's kind of a running cumulative value. It's the total amount of the loss through a particular year.

1          And if you're interested in the total amount of
2    the loss through all the years, which is through 2027, then
3    that's the number in the bottom right-hand corner.  That's
4    the $234,087 figure.  And that was the number -- that's one
5    of the several numbers that I read to you just a minute ago.
6    When I was reading those numbers, they come from this table.
7    When I was reading those numbers, I was giving you the total
8    economic losses for a particular table.
9          And then right after that, I mentioned what part
10   was back pay and what part was front pay.  Here's what that
11   means in my table:  The back pay is just the part that's in
12   the pretrial portion, kind of in the top section, before the
13   trial date on November the 9th of 2022.  And the front pay is
14   just the future portion.  It's the amount from the last six
15   rows.  So if you add the back pay and the front pay together,
16   you should get the total amount.
17   Q.    Okay.  And just to make sure that I'm understanding
18   right, the portion where it says "Past," that's from the
19   date -- the on or around date of her demotion to present, and
20   then future is from present forward?
21   A.    Correct, to her projected retirement date.
22   Q.    Okay.  I'm going to show you Table 2.  I'm going to kind
23   of show them next to each other if I can.  The explanation
24   you just gave for the columns, is it the same for Table 1 as
25   it is for Table 2?

1   A.   It is.  You'll notice that the two tables are very, very
2   similar.  They have the same format, the same columns, the
3   same rows.  I just change one thing in Table 2.
4   Q.   Okay.  And what was the thing you changed in Table 2?
5   A.   In Table 2, what I deduct is not Ms. Barton's potential
6   earnings as a substitute teacher for Metro, what I subtract
7   is her actual earnings.  And let me make another comment or
8   two about that.  In Table No. 1, I am subtracting her
9   potential earnings, which is about $23,400 a year.  This is
10  what a substitute teacher for Metro could earn if they were a
11  substitute teacher all the school days and worked about
12  1900 hours a year.

13          That's Ms. Barton's potential replacement
14  earnings, but it just so happens that she didn't earn that
15  much.  We know how much she earned because we have
16  information from her tax records.  And as it turns out, she
17  did not earn that much.  There's some reasons for this.  One
18  is, right after the demotion was summer, and there's not as
19  much need for substitute teachers during the summer.  Then we
20  went through COVID, where there weren't as many classes being
21  held, and so not as many substitute teachers were being
22  hired.  So as it turns out, Ms. Barton did not earn $23,400
23  per year as a substitute teacher.  She earned amounts that
24  are really quite a bit less.

25          And so in Table No. 2, what I am looking at is the

difference in what she could have earned without the demotion and what she actually earned as a substitute teacher. The amounts are a little different because she didn't actually earn that much as a substitute teacher.

Q.    Okay. And what was the conclusion you came to as regards to the actual amount of her back pay damages?

A.    Yes. In Table No. 2, the total amount of the economic losses again is in the bottom right corner. It's that $378,921 figure. It goes up because I'm not subtracting as much. I'm not subtracting as much from the economic losses because Ms. Barton didn't earn as much as a substitute teacher. The back pay part is in the top panel. That is the $200,358 figure. Yes. And then the front pay is just the total amount from those bottom six rows.

Q.    Okay. And just to make sure I'm looking at this correctly, it's the -- it's this 200,258 at this corner?

A.    Correct. That's the back pay, the total losses, the $378,921 figure, and then the front pay would be the difference in the total loss subtracting out the back pay.

Q.    Okay. What documents did you review or rely on to come up with these figures?

A.    I had information from Ms. Barton's tax returns. The tax returns include W-2 forms that show how much you earn from employers, and I also had payroll records from Metro that described what Ms. Barton's annual salary was.

1  Q.   Okay.  If you could turn to page 35 of Exhibit 20.

2  A.   Okay.

3  Q.   Is this the portion of your report that actually has the

4  copies of those documents that you just referenced?

5  A.   Yes.

6  Q.   Okay.

7           MS. WALTER:  I don't have any other further

8  questions.

9                           CROSS-EXAMINATION

10 BY MR. FOX:

11 Q.   Dr. Baum, we know each other; correct?

12 A.   Yes.

13 Q.   Now, can you explain to the jury how we know each other?

14 A.   If you want me to.  We've been in court together before

15 on the same side before.

16 Q.   Right.  So there was an antitrust case; correct?

17 A.   Yes.

18 Q.   Against the Metropolitan Government?

19 A.   Yes.

20 Q.   And Metro and I hired you in that case?

21 A.   Yes.

22 Q.   Correct?  You remember that?  In fact, that case is

23 listed in your CV?

24 A.   Yes.

25 Q.   And, likewise, in this case, opposing counsel has hired

1  you in this case; correct?

2  A.    Yes.

3  Q.    All right.  And they are paying you to be here today;

4  correct?

5  A.    Yes.

6  Q.    Is there anything in your numbers -- any of the numbers

7  given to you that turn out to be inaccurate?

8  A.    Not that I know of, no.

9  Q.    Okay.  So there's no changes or adjustments you need to

10  make today of any of your calculations or any of the

11  background data that you were given?

12  A.    No.

13  Q.    And in your report, you mention certain assumptions that

14  you made, but one assumption is -- isn't it true that any of

15  these damages that you've calculated, for them to be payable

16  to Ms. Barton, there would first have to be a finding that

17  Metro did, indeed, demote Ms. Barton; correct?

18  A.    I understand that that's what the case is about.  And so

19  I project the difference in what her earnings would have been

20  without the demotion and what her earnings were as a

21  substitute teacher.

22  Q.    So it's assuming she was, indeed, demoted; correct?

23  A.    Yes.

24  Q.    Yeah.  And assuming that Metro is found guilty of

25  violating her religious rights in this case; correct?

1  A.   I assume that's what the case is about, but I'm not here

2  to testify about liability.  I think you're correct.  I think

3  the answer to your question is yes, but I'm here just to look

4  at the economic damages.

5  Q.   That just wasn't part of your analysis.  You just did

6  what they asked you to analyze; correct?

7  A.   Yes.

8  Q.   Okay.

9          MR. FOX:  That's all.  Thank you.

10                 REDIRECT EXAMINATION

11 BY MS. WALTER:

12 Q.   Dr. Baum, does the fact that you're being paid here

13 today change the math?

14 A.   No.  My task as an economist is not to be an advocate.

15 My task is to be objective and to make these calculations

16 using numbers in an objective fashion.

17 Q.   Math is math, numbers are numbers; is that right?

18 A.   Correct.  So my intent is to be objective.  My day job

19 is teaching economics at MTSU.  This is just something I do

20 on the side.

21 Q.   Okay.

22          MS. WALTER:  Your Honor, just as a matter of

23 course, we'd like to enter Exhibit 23 into evidence.  It's

24 one of Ms. Barton's W-2s, and it's been stipulated to.

25          MR. FOX:  No objection.

```
 1                THE COURT:  Without objection then, Exhibit 23 is
 2    admitted.
 3                (Plaintiff's Exhibit 23 received in evidence.)
 4                MS. WALTER:  Thank you, Dr. Baum.
 5                THE COURT:  Anything else, Mr. Fox?
 6                MR. FOX:  No.
 7                THE COURT:  All right, Dr. Baum, you may step
 8    down.
 9                (Witness excused.)
10                THE COURT:  Next witness.
11                MS. WALTER:  Your Honor, plaintiff calls Deborah
12    Story.
13                COURTROOM DEPUTY:  Raise your right hand, please.
14                          DEBORAH STORY,
15    called as a witness, having been duly sworn, was examined and
16    testified as follows:
17                THE WITNESS:  Yes, I do.
18                COURTROOM DEPUTY:  State your full name for the
19    record, please, and spell your last.
20                THE WITNESS:  Deborah Ellis Story, S-T-O-R-Y.
21                        DIRECT EXAMINATION
22    BY MS. WALTER:
23    Q.   Good morning, Ms. Story.
24    A.   Good morning.
25    Q.   I'm going to read a brief statement and then ask you if
```

1  everything is correct.  Okay?

2  A.   Okay.

3  Q.   Deborah Story was employed by Metro Nashville Government

4  as the chief human resources officer during 2018 until

5  March 22, 2019.  Prior to her position as chief human

6  resources officer, she was the executive officer of Human

7  Resources.  She supervised Craig Ott, Selina Harris and Lisa

8  Few.  Ms. Story no longer works for Metro Nashville

9  Government.

10           Is that all correct?

11  A.   That is correct.  I did not directly supervise Lisa or

12  Selina.  They were under Mr. Ott.

13  Q.   Okay.  Were they in the chain of your supervision?

14  A.   Yes.

15  Q.   Okay.  All right.  During the summer of 2018, do you

16  contend that there was a rule limiting the ERC employees from

17  taking vacation during the summer?

18  A.   Yes.

19  Q.   Okay.  Is that rule written anywhere in policy?

20  A.   I can't recall, but it was pretty well understood.

21  Q.   Okay, but not written anywhere to your recollection?

22  A.   I'm sure it is somewhere, but I'm not -- I can't confirm

23  that.

24  Q.   Okay.  Did you know Carol Barton in 2018?

25  A.   Yes.

1  Q.    Okay.  Were you aware that she was a practicing
2  Jehovah's Witness?
3  A.    Yes.
4  Q.    Okay.  In the spring of 2018, were you aware that
5  Ms. Barton requested 12 days off for religious convention?
6  A.    I can't remember how many days, but I remember she did
7  request some time off, yeah.
8  Q.    Okay.  And was it your understanding that this had to do
9  with her faith?
10 A.    I had some understanding that -- yes.  Yes, I did.  Yes.
11 Q.    Okay.  And Ms. Harris and Ms. Story notified you of
12 Ms. Barton's request for time off to attend --
13 A.    Would you repeat that, please?  I don't hear very well.
14 So if you could speak a little louder.
15 Q.    Absolutely.
16 A.    Thank you.
17 Q.    Ms. Harris and Ms. Story, did they notify you that
18 Ms. Barton had requested time off to attend a religious
19 convention?
20             MR. FOX:  Objection.  I think --
21             THE WITNESS:  I'm not sure when --
22             MR. FOX:  I think counsel means not Ms. Story.
23             MS. WALTER:  Oh, sorry, Ms. Barton requested time
24 off.
25             THE COURT:  Ask the question again just so it's

1 clear for the record.

2          MS. WALTER:  Sure.

3 BY MS. WALTER:

4 Q.   In 2018, did Ms. Harris and Ms. Story notify you that

5 Ms. Barton requested time off?

6          MR. FOX:  Objection.

7          THE COURT:  I think --

8          MS. WALTER:  Oh, I'm so sorry.  Yeah, I see.

9          THE COURT:  Let's try it a third time.

10          MS. WALTER:  Third time's the charm.  I'll get

11 there.

12 BY MS. WALTER:

13 Q.   All right.  Did Ms. Harris and Ms. Few in 2018 notify

14 you of Ms. Barton's request for time off for a religious

15 convention?

16 A.   I was aware of the request.  I'm not sure when that

17 information was shared with me.

18 Q.   Okay.  Was it Ms. Few and Ms. Harris who notified you of

19 it?

20 A.   I don't remember if it was the two of them, either one

21 of them, or someone else.

22 Q.   Okay.  At the time that they notified -- that someone

23 notified you, did they tell you that the request had been

24 denied for Ms. Barton?

25 A.   I was aware that the request was denied, yes.

Q.    Isn't it true that when an employee makes a request for
a religious accommodation, the details of that request,
including the time off, is important to consider?
A.    Would you repeat the question again, please?
Q.    Sure.  Isn't it true that when an employee makes a
request for a religious accommodation that the details of the
request, including the number of days off and the time off,
is important to be considered?
A.    I'm not sure that it was presented as an accommodation.
I don't believe that word was ever used.  I don't recall that
word being used with me.
Q.    Okay.  So you don't recall if Ms. Few told you that
Ms. Barton had requested a religious accommodation?
A.    I was understood -- I understood that it was she was
requesting time off.  The word "accommodation" was never
used, that I can recall.
Q.    Okay.  In the event that an employee is requesting a
religious accommodation, isn't it true that it's important to
take into consideration the details of the request, including
the amount of days off and why they're taking -- needing the
time off?
A.    Yes.
Q.    Okay.  And it's important that the employee should be
heard out and given a chance to explain the details of the
request before a decision is made when they request an

1  accommodation?

2  A.   That should be, yes.

3  Q.   Okay.  You didn't make the decision to deny Ms. Barton's

4  accommodation request, did you?

5  A.   No.

6  Q.   Okay.  Did you have any conversations with Ms. Few or

7  Ms. Harris about Ms. Barton's request and the details of her

8  request?

9  A.   I don't recall.

10 Q.   They would have -- either Ms. Few or Ms. Harris would

11 have just told you what their decision was with regards to

12 the request?

13 A.   Either they would have or their supervisor.

14 Q.   Which would be Mr. Ott?

15 A.   Yes.

16 Q.   Okay.  Did Selina Harris ever speak with you about

17 trying to bring Carol Barton back to the ERC?

18 A.   Not that I can recall.

19         MS. WALTER:  I'm just going to check my notes.  I

20 don't have anymore questions.

21                    CROSS-EXAMINATION

22 BY MR. FOX:

23 Q.   Ms. Story, isn't it true that summertime is the busiest

24 time of the year?  That's the busiest season for the ERC?

25 A.   Correct.

Q.    Just as the school year is a busy time for the teachers,
and they take a break during the summer, the ERC is on --
their season is during the summer; correct?
A.    Correct.
Q.    And it was well-known in the ERC and the central office
that vacation time would be very limited -- any kind of leave
time would be very limited during the busy summer season;
correct?
A.    Correct.
Q.    In your position as -- in 2018, were you the chief human
resources officer?
A.    Yes.
Q.    Did you see anything that you felt like amounted to
discrimination based on Ms. Barton's religious beliefs?
A.    I did not see that, no.
Q.    Anything that amounted to some type of retaliation, like
trying to get back at her for making this request?
A.    I never -- I never saw that.
        MR. FOX:  Okay, thank you.  That's all.
                    REDIRECT EXAMINATION
BY MS. WALTER:
Q.    Ms. Story, isn't it -- even during busy seasons,
shouldn't -- is Metro still required to consider employees'
requests for religious accommodations?
A.    Would you repeat that again?

```
1   Q.   Sure.
2   A.   Okay.
3   Q.   Even during a busy season, Metro still has a requirement
4   to consider an employee's religious accommodation request?
5   A.   I would say yes.
6   Q.   Okay.  And just to confirm, you were no longer the chief
7   human resources officer on March 22nd of 2019; is that right?
8   A.   Correct.  That was my last day on payroll, March 22nd.
9   Q.   Okay.  When was your last day actually performing your
10  duties as chief human resources --
11  A.   I believe it was the 19th.
12  Q.   Okay.
13  A.   Uh-huh.
14           MS. WALTER:  All right, no further questions.
15           MR. FOX:  That's all.
16           THE WITNESS:  The 19th of March, uh-huh.
17           THE COURT:  You can step down, ma'am.
18           THE WITNESS:  Okay, thank you.
19           (Witness excused.)
20           MS. COLLINS:  Plaintiff calls Craig Ott.
21           COURTROOM DEPUTY:  Raise your right hand, please.
22                        CRAIG OTT,
23  called as a witness, having been duly sworn, was examined and
24  testified as follows:
25           THE WITNESS:  I do.
```

1          COURTROOM DEPUTY:  State your full name for the

2     record, please, and spell your last.

3          THE WITNESS:  Craig Steven Ott, O-T-T.

4                         DIRECT EXAMINATION

5     BY MS. COLLINS:

6     Q.    Good morning, Mr. Ott.  I'm going to read a brief

7     statement and just correct me if anything I say in the

8     statement is not accurate.

9          Mr. Ott, you were the executive director of HR

10    with Metro Schools in 2018.  You were employed in that

11    capacity from 2011 to 2019.  And you reported to Deborah

12    Story.

13    A.    That's correct.

14    Q.    Okay.  And, Mr. Ott, you knew Carol Barton when she

15    worked in the ERC; correct?

16    A.    I did.

17    Q.    And you knew that she was a good worker?

18    A.    She was.

19    Q.    And to your knowledge, she enjoyed working in the ERC?

20    A.    To my knowledge.

21    Q.    And you knew that she was a Jehovah's Witness?

22    A.    I did.

23    Q.    She was transparent in the workplace about her faith

24    practices?

25    A.    We didn't talk about that much.

1  Q.    Okay.  But she didn't try to hide that she was a
2  Jehovah's Witness?  You knew that?
3  A.    She did not.
4  Q.    Okay.  Lisa Few also reported to you in 2018; correct?
5  A.    That's correct.
6  Q.    And Lisa Few had authority to make recommendations to
7  you for hiring and firing decisions; right?
8  A.    That's correct.
9  Q.    And you were involved in transfers between departments
10 when they occurred; correct?
11 A.    Transfers within the school system or within HR?
12 Q.    No, within HR.
13 A.    Yes, I was.
14 Q.    Okay.  And Deborah Story approved the vacation freeze
15 policy that was in effect in the ERC?
16 A.    Not initially, but yes.
17 Q.    Who initially approved it?
18 A.    Probably June Keel.  She was in place before I got
19 there.
20 Q.    Okay.  And there were exceptions to the vacation freeze
21 policy when they -- and they made them when they could;
22 correct?
23 A.    When we could, that's correct.
24 Q.    Okay.  And Selina Harris was initially responsible for
25 considering exceptions; right?

1  A.    That would have been Lisa Few with Selina Harris.  I
2  mean, there was a chain of command.
3  Q.    Okay.  And that chain of command ultimately went up to
4  you; right?
5  A.    Ultimately went up to the Director of Human Resources,
6  whoever that was at the time or the -- yes.
7  Q.    Okay.  But you were above Ms. Few.  So it went up to
8  you, then ultimately Ms. Story, is what you're saying?
9  A.    Correct.
10  Q.    Okay.  And when it came to you, you made any decisions
11  based on Ms. Few or Ms. Harris's recommendations; correct?
12  A.    State that again.
13  Q.    When it came up to you, you made decisions based on
14  Ms. Few or Ms. Harris's recommendations; correct?
15  A.    If it came up to me, that's correct.
16  Q.    Okay.  And at that point, there would be consideration
17  made whether to honor the request to take the vacation or
18  time off during the black-out or freeze based on the time
19  frame; correct?
20  A.    Based on the amount of days requested, correct.
21  Q.    Okay.  And the closer you got to school, which started
22  on August 1st, the opportunity to take vacation or request an
23  exception was minimized?
24  A.    I wouldn't say that's correct.  I think it based -- it
25  was based on the entire policy that we had in place.

1  Q.    Okay.  But the closer it got to that first day of
2  school, the less chance there was that an exception would be
3  approved?
4  A.    I would say that would be correct.
5  Q.    Okay.  And you recall that Carol Barton made a request,
6  but you didn't have the specifics provided to you; correct?
7  A.    I don't recall that she made the request.
8  Q.    Were you provided -- but you were provided
9  information -- or were you provided information about her
10 request?
11 A.    Well, first of all, I don't even know what time frame
12 we're talking about.
13 Q.    Okay.  In 2018.
14 A.    Wow.  Yeah, I don't recall specifics.
15 Q.    Okay.  Well, you were not provided information that
16 Carol Barton's request off in 2018 was for a religious
17 convention, were you?
18 A.    You know, I know she made a couple of requests, but I'm
19 not sure which year.
20 Q.    Okay.  And you don't recall either Ms. Few or Ms. Harris
21 making you aware that Carol Barton requested to attend a
22 religious convention, do you?
23 A.    I don't.
24 Q.    Okay.  And if a request like that was brought up, it
25 should have been discussed with you; correct?

1  A.   If it wasn't already decided by either Lisa or Selina,
2  that's probably correct.
3  Q.   Okay.  And you do not know whether Carol was told that
4  she could either stay in her job or attend the convention?
5  A.   No, I don't recall that.
6  Q.   Okay.  And you did not talk with Carol Barton about her
7  request, did you?
8  A.   No.
9  Q.   And you do not know when the person who replaced Carol
10 Barton started working?
11 A.   I do not.
12 Q.   And you had no role in the decision to approve or deny
13 Carol Barton's request for religious accommodation, did you?
14 A.   No.
15 Q.   And you were not provided a copy of Carol Barton's
16 letter of transfer, were you?
17 A.   No.  No.
18 Q.   And you do not recall having any conversations with
19 Ms. Few or Ms. Harris about whether or not it would have been
20 an undue burden on the ERC to allow Carol to attend her
21 religious conference?
22 A.   In 2018?
23 Q.   Yes.
24 A.   I don't recall.
25 Q.   Okay.

1          MS. COLLINS:  That's all I have.  Thank you.

2          THE WITNESS:  Uh-huh.

3                    CROSS-EXAMINATION

4  BY MR. FOX:

5  Q.    Mr. Ott, isn't the summertime the very busiest time of

6  year for the ERC?

7  A.    Absolutely.  It's -- it's the worst time for the Human

8  Resources Department.

9  Q.    And had there been a time, if you recall, in 2016 where

10  there had been experiments to try to allow people to take a

11  week or so of leave and that experiment failed?

12  A.    We tried it, but you're right.  I mean, when you have

13  more than one person out of the office in that specific area,

14  it's very difficult for the HR office to function.

15  Q.    So then that's why this what we've been calling a

16  vacation freeze policy was put into place --

17  A.    Absolutely.

18  Q.    -- for the following summer?

19  A.    Again, the policy was in place before I even got there.

20  Q.    Right.  And it was well-known among the ERC employees,

21  wasn't it?

22  A.    It was.

23          MR. FOX:  Thank you.  That's all.

24  ///

25  ///

```
1                    REDIRECT EXAMINATION
2   BY MS. COLLINS:
3   Q.   When you say the policy was in place before you got
4   there, what time frame are you referring to?
5   A.   2000 -- before I started.
6   Q.   Which was?
7   A.   Let's see, I think I was there in 2011.  Yeah.
8   Q.   Okay.  Do you have a basis to dispute whether or not the
9   vacation policy was first instituted in 2017?
10  A.   No, I don't.
11  Q.   Okay.  But at any rate, this policy was never put in the
12  employee handbook, was it?
13  A.   Correct, because it was -- it was department specific to
14  HR because the HR Department within the school system is,
15  like I said, the busiest during the summertime.
16  Q.   And that policy was not reduced to writing within the HR
17  Department as some sort of departmental policy or mandate,
18  was it?
19  A.   No, it was not.
20             MS. COLLINS:  Okay.  Thank you.
21             THE WITNESS:  Yeah.
22             MR. FOX:  Nothing.
23             THE COURT:  All right, sir, you can step down.
24             THE WITNESS:  Thank you.
25             (Witness excused.)
```

```
 1            MS. WALTER:  Your Honor, we just need to check to
 2  see if the next witness is here.
 3            MS. COLLINS:  Your Honor, plaintiff calls Jessica
 4  Earnest.
 5            COURTROOM DEPUTY:  Raise your right hand, please.
 6                  JESSICA EARNEST,
 7  called as a witness, having been duly sworn, was examined and
 8  testified as follows:
 9            THE WITNESS:  I do.
10            COURTROOM DEPUTY:  State your full name for the
11  record, please, and spell your last.
12            THE WITNESS:  Jessica Dawn Earnest, E-A-R-N-E-S-T.
13                  DIRECT EXAMINATION
14  BY MS. COLLINS:
15  Q.   Good morning, Ms. Earnest.
16  A.   Good morning.
17  Q.   I'm going to read out a brief statement, and you just
18  correct me if I mess anything up.  Okay?
19  A.   Okay.
20  Q.   You worked for Metro Public Schools in the ERC, the
21  Employee Resource Center, from January 2017 to August 2018?
22  A.   Correct.
23  Q.   And you were in data entry and then later as a
24  specialist, and Selina Harris and Lisa Few were your
25  supervisors?
```

1  A.    Correct.

2  Q.    Okay.  And when you left Metro, you went into the

3  private sector?

4  A.    Uh-huh.

5  Q.    Okay.

6  A.    Yep, that's correct.

7  Q.    All right.  When you were at the ERC, you worked with

8  Carol Barton?

9  A.    I did.

10  Q.    Okay.  And you found Carol to be a competent worker?

11  A.    Yeah.

12  Q.    And Carol had mentioned to you her religious

13  affiliation; correct?

14  A.    She never -- I don't remember her ever, like, mentioning

15  exactly what her religious affiliation -- I do remember she

16  said to me at one point something about doing ministries, but

17  I never -- I never pushed it because it wasn't my business.

18  So . . .

19  Q.    Okay.  But you did previously testify that you knew

20  Carol had attended religious conferences; right?

21  A.    Yes, I knew she had attended religious conferences, but

22  again it wasn't my business.  So -- it was her time off, her

23  time off.

24  Q.    Okay.  You knew about the blackout period in the HR

25  Department; right?

1   A.   I did, yes.  That was told to me in my interview
2   process, and I agreed to it, and we all did.
3   Q.   You recall that the blackout period was from May to the
4   end of April to the last of August or early September;
5   correct?
6   A.   Correct, that's -- what I can recall, that sounds about
7   right.
8   Q.   Okay.  But you also knew that during that period you
9   could call out sick if you needed to?
10  A.   Call out sick, yes, but I never needed to.
11  Q.   Okay.  And you took days off in the summer during 2018;
12  correct?
13  A.   I -- if I did, I don't remember.  Sorry, that's been a
14  little bit ago, and I -- yeah.
15  Q.   Sure.  Sure.  Sure.  I'm just -- if you could turn to a
16  document that's in that binder right there.  It says
17  "Plaintiff's Exhibits."
18  A.   Yes.  Okay.
19  Q.   And it is Exhibit No. 18, or tab 18, in that book.
20  A.   Okay.
21  Q.   And if you could turn to -- they're just really
22  questions.  And it's No. 8.  And that is on page -- that is
23  on page -- well, there are no page numbers, but --
24  A.   Okay, you're asking for question -- the No. 8?
25  Q.   Yes.

A.   Is it the (as read):  Admit that employees of defendant
in the ERC Department with the schools -- department took
days off during the period of April 2017 until August 2017?
Q.   Yes.  Yes.
A.   Okay.
Q.   So this deals with 2017 --
A.   Okay.
Q.   -- when you worked in the ERC Department.  And these
were records that were obtained from Metro Public Schools.
Do you have any reason to dispute these records and the
numbers that are listed with your name?
A.   No, because, again, like I said, I -- this has been a
few years, that if this is what the system pulled, then that
must have been what was entered.
Q.   Sure.  Now, if you could also turn to question No. 3.
A.   Okay.
Q.   Goodness, this is confusing to me.  Sorry.  The lack of
page numbers has got me a little messed up here.  Let's do
this.  All right.  And these are your -- this is your time
from April of 2018.  You don't have any basis to dispute that
you took off 10.63 hours in April, do you?
A.   No.
Q.   Okay.  And then with question No. 4, this is May of
2018.  You don't have any reason to dispute that you took off
10.5 hours in the month of May 2018, do you?

1  A.    No.

2  Q.    And for question No. 5, which goes over into the next

3  page, you don't have any reason to dispute that you took off

4  13.75 hours in the month of June 2018, do you?

5  A.    No.

6  Q.    And then I think that that is all I have for you.  Just

7  one moment.

8  A.    Okay.

9  Q.    Let me check with my co-counsel.

10          MS. COLLINS:  That's all I have.

11          THE WITNESS:  All right, perfect.  Thank you.

12          MS. COLLINS:  Well, he's going to ask you some

13  questions.

14          THE WITNESS:  Oh, okay.  I'm sorry.

15          MS. COLLINS:  It's okay.

16          MR. FOX:  No, I'm not.  No questions.

17          MS. COLLINS:  Okay.

18          THE COURT:  Now you can step down, ma'am.

19          THE WITNESS:  All right.  Thank you.

20          (Witness excused.)

21          MR. FOX:  Sorry, Your Honor, trying to coordinate

22  the appearance of witnesses.

23          THE COURT:  Okay.

24          MS. WALTER:  Your Honor, we'd like to call Diego

25  Perez Romero.

```
 1              COURTROOM DEPUTY:  Raise your right hand, please.
 2                        DIEGO PEREZ ROMERO,
 3    called as a witness, having been duly sworn, was examined and
 4    testified as follows:
 5              THE WITNESS:  That's right.
 6              COURTROOM DEPUTY:  State your full name for the
 7    record, please, and spell your last.
 8              THE WITNESS:  Diego Perez, P-E-R-E-Z.
 9                        DIRECT EXAMINATION
10    BY MS. WALTER:
11    Q.    Good morning, Mr. Perez.  I'm going to read a short
12    statement and just let me know if anything is incorrect.
13    A.    Okay.
14    Q.    Okay.  Diego Perez was employed by Metro Nashville
15    Government from November 2017 until October 2019.  He
16    primarily worked at the Employee Resource Center as an ERC
17    clerk during the relevant time frame.  He was supervised by
18    Selina Harris.  Mr. Romero no longer works for Metro
19    Nashville Government.
20              Is that all right?
21    A.    Correct.
22    Q.    Okay.  All right, Mr. Perez, did you work with Carol
23    Barton?
24    A.    Yes.
25    Q.    Okay.  Was she a good co-worker to work with?
```

```
 1  A.    Yes.
 2  Q.    Was she good at her job?
 3  A.    Yes.
 4  Q.    Okay.  Were you aware when you worked with her that
 5  Ms. Barton is a Jehovah's Witness?
 6  A.    Yes.
 7  Q.    Okay.  During your employment in the ERC, was there a
 8  vacation freeze?
 9  A.    Yes.
10  Q.    Okay.  Was that written down anywhere?
11  A.    Like on a form that they give us?
12  Q.    In a policy or --
13  A.    Not that I know of.
14  Q.    Okay.  And when you were hired into the ERC in November
15  of 2017, were you notified of the vacation freeze at that
16  time?
17  A.    No.
18  Q.    Okay.  When were you first told that there might be a
19  vacation freeze?
20  A.    Before the summer of my first year from 2018, but I
21  don't remember when the exact time.  February I said will be
22  my guess.
23  Q.    Okay.  And what was your understanding of when the
24  freeze ran from?  When did it start and when did it end?
25  A.    The summertime, when the school is out, and before the
```

1    school start, like the summer time frame.

2    Q.    Would that be May to September?

3    A.    Yes.

4    Q.    Okay.  And you worked with Ms. Barton in the summer of

5    2018; is that right?

6    A.    That is correct.

7    Q.    Okay.  And were you still in the ERC in the summer of

8    2019?

9    A.    Yes.

10   Q.    Okay.  In your experience in both of those summers, was

11   the workload comparable?

12   A.    Yes.

13   Q.    One summer wasn't significantly more work than the

14   other?

15   A.    Not from my perspective, no.

16   Q.    Okay.  In both those summers, 2017 and 2019, did you

17   work with Ms. Harris?

18   A.    Yes.

19   Q.    Okay.  What about with Ms. Few?

20   A.    Yes.

21   Q.    Okay.

22   A.    Well, I believe Ms. Few was transferred sometime --

23   somewhere down the line, but I don't know the exact days,

24   though.

25   Q.    Okay.  Was Ms. Harris's workload between the summer of

1  2019 and the summer of 2018 -- was her workload any

2  different?

3  A.   I mean, I don't know how I would say about the same,

4  but -- I don't -- I'm not really sure.

5  Q.   Sure.  From your observation of working with her.

6  A.   I would think it would be about the same.

7  Q.   Okay.  And regardless of the summers, employees were

8  working some weekends and some evenings during both those

9  time frames?

10  A.   That's correct.

11  Q.   Okay.  And Ms. Barton's absence for a religious

12  convention during the summer of 2018 did not affect your

13  workload, did it?

14  A.   I will say no if you compare it with the next year.

15  Q.   Okay.

16        MS. WALTER:  All right, that's all I have.

17                    CROSS-EXAMINATION

18  BY MR. FOX:

19  Q.   Mr. Perez, good morning.

20  A.   Good morning.

21  Q.   I'm Brook Fox, and I represent the school system in this

22  case.  During this time frame, did you have any supervisory

23  responsibility at the ERC or any management responsibility at

24  the ERC?

25  A.   No.

```
 1  Q.   Did you ever work midnight or 1 in the morning with
 2  Ms. Harris or Ms. Few?
 3  A.   No.
 4             MR. FOX:  That's all.  Thank you.
 5             MS. WALTER:  I have no other questions.
 6             THE COURT:  Okay, sir, you can step down.
 7             (Witness excused.)
 8             MS. COLLINS:  Your Honor, can we take our
 9  mid-morning break a little bit early?  I think we're still
10  waiting on Ms. Overstreet.  She's on her way over.
11             THE COURT:  Sure.  Yes, we'll go ahead and take
12  our mid-morning break.  I mean, any forecast on how far away
13  she is?
14             MR. FOX:  About 20 minutes.
15             THE COURT:  Okay.  We'll plan on coming back at
16  10:30, give you a little extra long break, members of the
17  jury.  And hopefully we've got snacks in the back for you.  I
18  don't know how healthy they are, but they're back there,
19  nonetheless.  So we'll take our break, come back at 10:30.
20  Again, please don't discuss the case with each other or
21  anyone else.
22             (The jury was excused from the courtroom at
23              10:07 a.m.)
24             THE COURT:  Okay, be seated, please.  So we've
25  got -- you said Ms. Overstreet is on the way?
```

```
 1              MS. COLLINS:  Yes.  We just have Ms. Overstreet
 2  and Mr. Barton.  Mr. Barton is also on his way.  So he might
 3  be here in like ten minutes, but I guess I should have
 4  anticipated the warp speed again.  I never had a trial go so
 5  fast.
 6              THE COURT:  It's moving at a good pace, I'll say
 7  that.  Well, based on my scorecard, that looks like you got
 8  Ms. Overstreet, you got Mr. Barton.  Are Ms. Hawkins or
 9  Mr. Bosi going to be called?
10              MS. COLLINS:  No, we're not calling them.
11              THE COURT:  Okay.  So these are the last two
12  witnesses for your case?
13              MS. COLLINS:  Yes.
14              THE COURT:  All right.  Do we expect to be able to
15  finish those before lunch?
16              MS. COLLINS:  Oh, yeah.
17              THE COURT:  Okay.  So we could end up taking an
18  early lunch then and perhaps a long one because we've got to
19  continue to try to work on the jury instructions.
20              Any forecast on what the afternoon holds for
21  proof?  Because Ms. Overstreet is about to testify, and
22  you've already -- after she does, that will be three of your
23  four listed witnesses, although you may want to recall them
24  in your case, I understand that.
25              MR. FOX:  Right.  Right.  We may want to recall
```

```
1   them, but I think we could finish proof this afternoon.
2           THE COURT:  Okay.  All right.  So we may be able
3   to -- and then depending on what they put on, there may or
4   may not be some rebuttal.  I realize you don't know that
5   until you've heard the proof.  We may be able to do our
6   charge conference in the morning, have them come in a little
7   later, and then -- I mean, I think we're really just down to
8   a couple of charges that are going to be at issue, I think.
9           But we can get that taken care of and perhaps even
10  do closings tomorrow morning, maybe early afternoon.  My
11  concern is that with the long weekend, if they start
12  deliberating tomorrow -- I mean, they may render a verdict,
13  or they may not be able to and have to come back.  Then we're
14  talking about coming back Monday.  We can do that, but it's
15  not ideal because it's a three-day break in the middle of
16  deliberations.  But that's where we may find ourselves.
17  So . . .
18          Those are the things I'm thinking about, just to
19  be transparent with you-all, but that shouldn't impact the
20  proof you put on or the pace we go.  I'm just thinking out
21  loud so that we can also start thinking about timing of
22  closings and so forth.  So continue to think about it.  And
23  if we get through the proof today, then we'll see where we
24  find ourselves.  We may be able to get you a charge after
25  lunch, and we'll see -- may be able to wedge in the charge
```

1  conference today, depending on how much time you-all think
2  you need to look at it, but I think the issues are pretty
3  well crystalized at this point.  It's just a matter of having
4  the conference.
5            So we'll come back at 10:30 and see where we go.
6            (Recess taken from 10:13 a.m. to 10:38 a.m.)
7            THE COURT:  We have our witness?
8            MS. COLLINS:  She was going through security.
9  They saw her pull in the parking lot five minutes ago.
10           THE COURT:  Okay.
11           MS. COLLINS:  We're tracking her.  If we had
12  drones, we would really have a better idea, but we don't.
13           THE COURT:  Well, we'll just wait a minute and --
14           MS. COLLINS:  Yeah, Erica is going to bring her
15  straight in.
16           THE COURT:  Okay.  We'll all stare with bated
17  breath at the back door waiting.
18           (Short pause.)
19           THE COURT:  All right, let's go ahead and bring in
20  our jury.
21           (The jury returned to the courtroom at 10:41 a.m.)
22           THE COURT:  Okay, be seated, please.  All right,
23  next witness.
24           MS. WALTER:  Your Honor, the plaintiff calls
25  Christy Overstreet.

1          COURTROOM DEPUTY:  Raise your right hand, please.

2                    CHRISTY OVERSTREET,

3    called as a witness, having been duly sworn, was examined and

4    testified as follows:

5          THE WITNESS:  I do.

6          COURTROOM DEPUTY:  State your full name for the

7    record, please, and spell your last.

8          THE WITNESS:  Christy Annette Overstreet,

9    O-V-E-R-S-T-R-E-E-T.

10                    DIRECT EXAMINATION

11   BY MS. WALTER:

12   Q.   Good morning, Ms. Overstreet.  I'm going to read a brief

13   statement, and if there's anything incorrect, just let me

14   know.

15   A.   Okay.

16   Q.   Christy Overstreet has been employed by Metro Nashville

17   Government from early 2016.  On July 13, 2018, she began

18   working in the ERC as a clerk.  Her supervisor during the

19   summer of 2018 was Selina Harris.  Ms. Overstreet currently

20   works for Metro Nashville Government.

21   A.   That's correct.

22   Q.   Okay.  Where did you work prior to July 13, 2018, for

23   Metro Government?

24   A.   In the compensation office.

25   Q.   Okay.  And was there training -- did you require

1  training when you moved from that office into the ERC?

2  A.    Did I require -- did it require training?

3  Q.    When you moved over into the ERC, did you have to be

4  trained?

5  A.    There was a few things, but I already knew a lot of it

6  from where I was in the compensation office because the

7  compensation office and the ERC works real close together.

8  So I just jumped in and helped do what I knew I could do and

9  then got trained on the things that I didn't how to do yet.

10  Q.    Okay.  What were the things that you didn't know how to

11  do?

12  A.    Like enter in information because I just did the pay

13  side of it.  So I didn't do like all of the new hires,

14  rehires.  But I knew the gist of it, so it didn't take long

15  to -- I sat with somebody for like a day or two, and then I

16  started entering in people.

17  Q.    Okay.  So you had to learn how to enter all the new

18  paperwork; is that right?

19  A.    Yes.

20  Q.    Okay.  And you said it took just a few days to get you

21  trained?

22  A.    Yeah.  On that part, yeah.

23  Q.    On that part.  What were the other things that you had

24  to be trained on?

25  A.    Just the regular -- how you answer phones, how you

1  answer emails, because the email volume was like hundreds a
2  day, and just knowing like how to answer the emails.
3  Q.    Okay.  Did you have to learn the computer system?
4  A.    No, I already knew it.
5  Q.    Okay.  How long do you think it took?  Did it take a
6  couple weeks to get you fully trained?
7  A.    Yeah, about a week or two before I knew everything.
8  Q.    Okay.  If there's been testimony that it takes about six
9  to eight weeks or even six to eight months to train a new ERC
10 employee, would you have a reason to dispute that testimony?
11 A.    No.  Someone coming in that didn't know anything, it
12 would take a while just because there's so many moving
13 pieces, moving parts, that you have to do.
14 Q.    Okay.  But it took a couple -- a couple of weeks for you
15 to be trained?
16 A.    Uh-huh.
17 Q.    Okay.  And who trained you?  Was it your supervisor or
18 the other ERC employees?
19 A.    I sat with Selina a couple of times.  And then if I just
20 had questions, I would go to the other team members and ask.
21 Q.    Okay.  And were you trained by Judith Hawkins?
22 A.    I sat with her like maybe a couple times.
23 Q.    Okay.  What about Jared Bosi?
24 A.    Yes.
25 Q.    Okay.  So while they're trying to do all of their work

1  during the summer of 2018, they're also having to train you?
2  A.    Right.
3  Q.    Okay.  Is it fair to say that you weren't fully up to
4  speed until late August of 2018 or later?
5  A.    I mean, I can't really remember, it's been so long ago,
6  but I know I just jumped in there and helped wherever I could
7  because they were so -- so slammed.
8  Q.    Okay.  And there was -- there's been testimony that
9  there was a vacation freeze during the summers in the ERC.
10  Is that your understanding?
11  A.    Yeah.  Whenever I interviewed, that was the first thing
12  they told me before I accepted the job.
13  Q.    Okay.  Were you still able to take days off during the
14  freeze period?
15  A.    Like maybe if it was a day or two here and there, like
16  if I was sick, or my kids were sick.  I tried not to because
17  I knew it was going to put a burden on the other team
18  members, but, I mean, it's not like we were in jail or
19  anything, but you just couldn't take like a week or two
20  vacation.
21  Q.    Okay.  If you could take a look at -- in the large
22  binder, there's a tab marked 18.  Do you see where that's at?
23  A.    Uh-huh.
24  Q.    Okay.  And these have already been moved into evidence,
25  but if you will look at No. 7, question No. 7.  I think it's

1  page 5.

2  A.    Uh-huh.

3  Q.    Do you see that?

4  A.    I do.

5  Q.    I'll show it here as well.  All right.  And the numbers

6  here are information that's been provided by Metro, and it

7  reflects that you took off 43 hours during the month of

8  August 2018.

9          Do you have a reason to dispute that that's

10  correct?

11  A.    That's correct.

12  Q.    Okay.  All right.  And then did you work in the ERC

13  again in 2019?

14  A.    I did.  I stayed there until 2022.

15  Q.    Okay.  Were you able to take off time in 2019 as well?

16  A.    No.  My family and I, we always used to take vacation in

17  June, and we had to move it to August, when the busy season

18  was over.

19  Q.    Okay.  If you turn two more pages, it's question 9, but

20  it runs into the second page, if you'll take a look at that.

21  All right.  And, again, these are numbers based off of what

22  Metro has provided.  It reflects that you took off

23  68 hours -- 68.62 hours between April and the end of August.

24          Do you have a reason to dispute that those are

25  correct?

1  A.   That's correct.

2  Q.   Okay.  And is it your understanding that you did not

3  begin your job within the ERC until after Ms. Barton returned

4  to work, or returned from her trip?

5  A.   Did I start when she returned?

6  Q.   Let me rephrase that.  Are you familiar with Ms. Barton

7  taking off time during the summer of 2018?

8  A.   No.

9  Q.   Okay.  Let me just check my notes.  Did you ever work

10 with Ms. Barton?

11 A.   I did not.

12 Q.   Okay.

13            MS. WALTER:  No more questions.

14                       CROSS-EXAMINATION

15 BY MR. PUCKETT:

16 Q.   Hi, Ms. Overstreet.  I'm Ben Puckett representing the

17 Metro Government.  Just a couple quick questions for you.

18 A.   Okay.

19 Q.   The vacation freeze that we're talking about, that

20 lasted from the second week in June through the first week in

21 August; isn't that right?

22 A.   That's correct.

23 Q.   So those times that you were shown that you were taking

24 off time, it fell maybe before or after --

25 A.   Right, unless like --

1  Q.    -- that freeze?

2  A.    -- if somebody was sick, or if I was sick or something,

3  might have a day or two or half a day or something like that.

4  Q.    Right.  I think you said you had to reschedule a family

5  beach trip around this?

6  A.    Yes, I did.  We always had to go in August, instead of

7  June.

8  Q.    But you understood that the freeze was necessary;

9  correct?

10 A.    Yes, correct.

11 Q.    That time for the ERC, those couple of months, even --

12 even starting in April and maybe going through into August,

13 but specifically from June through the first week of August?

14 A.    Right, correct.

15 Q.    That was the busiest time for the ERC; is that right?

16 A.    Yeah, very busy.

17 Q.    Very busy.  And if the department fell behind, there was

18 no way -- there was no way to catch up, other than working

19 nights and weekends?

20 A.    Exactly.

21 Q.    So, for example, if you did want to take that family

22 beach trip, there was no way for you to just sort of let your

23 work stack up and catch up when you got back; isn't that

24 right?

25 A.    Oh, no, somebody would have to pick up my slack if I

```
 1  left.
 2  Q.   Somebody would have to pick it up.  I think you said you
 3  didn't want to take too much time off during that period
 4  because you would be a burden to your --
 5  A.   Exactly, yes.  Even if I was sick, I was like I kind of
 6  want to try to go in because I don't want to leave my work
 7  for somebody else to do because --
 8  Q.   Because that work's not --
 9  A.   -- so much --
10            (Reporter clarification.)
11            THE WITNESS:  I said I just -- I didn't even want
12  to take a sick leave if I didn't have to because I didn't
13  want to leave my work for someone else to have to do.
14            MR. PUCKETT:  And I apologize for stepping on the
15  end of the answer there.
16  BY MR. PUCKETT:
17  Q.   Because that work wasn't getting done if you weren't
18  doing it or if your co-workers weren't doing it?
19  A.   Right, exactly.
20  Q.   That's right.  Now, how was the ERC -- how was the
21  vacation freeze communicated to the employees at the ERC?
22  A.   I don't know about the first year that I started because
23  I came in in the middle of the freeze, but the next year it
24  was an email that --
25  Q.   It was an email.
```

1  A.    -- Selina sent out to let everybody know.

2  Q.    And Selina Harris had morning huddle meetings too; isn't

3  that right?

4  A.    Yes.

5  Q.    And she would be very clear about the times that were

6  sort of, you know, approaching a busy season?

7  A.    Right.  Like, the email was just like a general email

8  between this month and this month.  There could be like a

9  whole month, or it could be ten days.  We just knew whenever

10  we went to that morning huddle if we were going to have to

11  stay that day or not depending on how much came through like

12  the night before.

13  Q.    Yeah.  And so when that second week of August -- second

14  week of June came along through that first week in August,

15  the morning huddles were clear, and there was no confusion

16  about whether or not there was a vacation freeze?

17  A.    Oh, no, it was very clear.  Very clear.

18           MR. PUCKETT:  That's all I have.  Thank you,

19  Ms. Overstreet.

20           THE WITNESS:  Thank you.

21                     REDIRECT EXAMINATION

22  BY MS. WALTER:

23  Q.    Ms. Overstreet, you just testified that if you were

24  sick, you didn't want to take time off; right?

25  A.    Right.

1  Q.    But you could during the freeze?
2  A.    Yeah.  I mean, yeah, we wasn't in prison or anything.
3  So if you're sick, you're sick.  I was just saying that I
4  would hate to do it, but like if I had a fever, then, of
5  course, I'm not going to go in and get everybody sick
6  whenever there's work that has to be done.
7  Q.    Okay.  So you could take time off during the freeze for
8  a medical reason?
9  A.    Like if it was like a day or two.
10  Q.    If you were sick for a few days, you wouldn't be able to
11  take the time off?
12  A.    I mean, I wasn't sick for a few days, so I'm not sure.
13  I mean, I'm assuming we could, but it didn't happen to me.
14  Q.    Okay.  And you mentioned that you had to move a beach
15  trip --
16  A.    Uh-huh.
17  Q.    -- because of the freeze?
18  A.    Yes.
19  Q.    Was the beach trip for any sort of religious purpose
20  that you were going to take the time off?
21  A.    No, it was just a family beach trip.
22  Q.    Just a vacation?
23  A.    Uh-huh.
24  Q.    Okay.  How many years were you working in the ERC?
25  A.    From 2018 to March of 2022.

```
1   Q.    March of 2022.  During your employment in the ERC, did
2   any employees take off time for medical leave or sick time
3   during the summers?
4   A.    Not that I'm aware of.
5   Q.    You don't remember any co-workers?
6   A.    Uh-uh.  It's been a long -- long time ago.
7   Q.    Okay.
8             MS. WALTER:  No more questions.
9             MR. PUCKETT:  Nothing further, Your Honor.
10            THE COURT:  Ma'am, you can step down.
11            (Witness excused.)
12            MS. WALTER:  Your Honor, the plaintiff calls Kenn
13  Barton.
14            COURTROOM DEPUTY:  Raise your right hand, please.
15                      KENN BARTON,
16  called as a witness, having been duly sworn, was examined and
17  testified as follows:
18            THE WITNESS:  I do.
19            COURTROOM DEPUTY:  State your full name for the
20  record, please, and spell your last.
21            THE WITNESS:  Kenneth Gomez Barton, B-A-R-T-O-N.
22                   DIRECT EXAMINATION
23  BY MS. WALTER:
24  Q.    Good morning, Kenn.  I'm going to read just a brief
25  statement, and let me know if anything I say is wrong.
```

        1          Kenn Barton is Carol Barton's husband of 38 years,
        2    and he has been an employee of Metro Government since 2007.
        3          Is that all right?
        4    A.    That's correct.
        5    Q.    Okay.  Kenn, how did you and Carol meet?
        6    A.    We met at her home congregation Kingdom Hall of
        7    Jehovah's Witnesses.  We met when we were both 16.  And my
        8    aunt actually took me to her Kingdom Hall, and there we
        9    became friends.  And then after that, six years later, with
       10    the parents' permission, we got married.
       11    Q.    And during that time, I think Carol testified that you
       12    guys would go out skating; is that right?
       13    A.    Yeah.  She enjoyed roller skating.  Not something that I
       14    caught onto, but she liked roller skating and was good at it.
       15    So yeah.
       16    Q.    All right, I'm going to jump a little ahead to the
       17    2017-2018 time frame.  There's been testimony that Carol
       18    applied to be a delegate for the 2018 special convention.
       19          Do you recall that?
       20    A.    Yes.  Yes, I do.  As the conventions are presented to
       21    all of the witnesses, that was the one that she was eagerly
       22    wanting to attend.  So, yes, it was a Sri Lanka convention.
       23    Q.    Okay.  What was Carol like during the application
       24    process?
       25    A.    Well, she was enthused because many people -- I mean,

1  many of Jehovah's Witnesses apply for those, but the criteria
2  is critiqued because they want to send someone that could
3  offer that deep encouragement to the people, as well as
4  support, and then share in their common faith.  Yeah, so she
5  was really enthusiastic about applying.
6  Q.   And she was ultimately selected for the 2018 convention
7  to Sri Lanka?
8  A.   Yes.
9  Q.   What was she like when she found out she was selected?
10 A.   It was -- it was great.  She was wonderfully enthused.
11 She was encouraged for the fact that she would be able to
12 meet this different culture, understand their faith related
13 to being one of Jehovah's Witnesses.  So she was, as I would
14 say, on the top of the moon being excited about it.
15 Q.   Is participation in a convention like a calling?
16 A.   Yes.  If you are accepted, it's one of those things
17 where it's a part of your faith, just like becoming baptized.
18 It's a calling.  It's a privilege to be selected.  It's
19 also -- as I would say, it draws you closer in a spiritual
20 relationship with your faith and with God.
21 Q.   What was Carol like when she went to notify her employer
22 of needing time off?
23 A.   Well, there was a little -- there was a lot of anxiety,
24 a lot of uneasiness because we didn't really know whether it
25 would be approved.  And so she was -- I'd say anxiety,

1  anxious.  She was just different because she didn't know what
2  challenge was -- this was going to create.
3  Q.   What was Carol like prior to having to transfer to the
4  substitute department?
5  A.   She enjoyed what she did.  She loved helping people
6  navigate certain HR issues that pertained to her -- her
7  department.  She was happy.  Every day she enjoyed.  She
8  would get phone calls from people, or if we saw people out,
9  she would -- they would say, "Hey, can I call you?  Can I ask
10 you a question?"  You know, as long as it was nothing
11 confidential in nature, she -- she enjoyed it.
12 Q.   During the spring of 2018 and summer of 2018, was there
13 a time that it became clear that Carol's request was going to
14 be denied for time off?
15 A.   Yeah, it was my -- as we discussed, as we prayed about
16 it, I asked her, I encouraged her, say, "Hey, we need to let
17 them know as soon as possible.  This is a great privilege for
18 you.  So we want to be sure we're following the path of
19 informing them so that dialogue can be established."  So
20 doing that, we thought or we discussed and we prayed, hey,
21 hopefully this will be successful, but the outcome was
22 different.  And that kind of changed her demeanor all
23 together.
24 Q.   When you say it changed her demeanor, what do you mean
25 by that?

A.    Well, that level of enthusiasm of being accepted, then the level of I have to make a decision on going, then I have to make a decision on what it will be like to become a sub. So going from being in an office, helping individuals, going to the classroom.  Now, again, she still wanted to help the students the best possible in that environment, but that was kind of a transition for her, which caused that anxiety and nervousness and uncertainty.

Q.    Is Carol a pretty positive person?

A.    Yes.  Yes, she is.

Q.    Did that change during this time frame?

A.    Her positive feelings were still there.  She was just trying to process her steps, the step of going to a class room, the step of the situation that had occurred on not being able to attend, the situation that occurred as she went through the process of trying to work with the department to get that.  So as she went along, she processed those steps, and as she did, you know, it changed.  It changed her.

Q.    I think you testified that Carol was stressed.  What did that look like?

A.    Not being able to sleep at times.  Certainly, we had discussions.  There were moments where we would go walking and just talk through the situations.  I always let her know that, you know, talking is a good way to process those feelings.  She would have her down moments.  She would have

1  her moments of being silent.  She would have her moments
2  of -- we would discuss what's wrong with me, what did I do,
3  what's, you know -- did I -- you know, did I do anything?
4  And then, of course, we prayed together all the time, each
5  and every day.  So things of that nature.
6  Q.   When you say there were down moments, what did those
7  look like to you?
8  A.   Well, sometimes a little isolation, you know, being in a
9  home, you know, we would sit together, watch movies or
10  whatever, and it would just be moments that I would just view
11  her and see that she was kind of in a depressed or down
12  state.  Even our children would come by and say, "Hey,
13  what's -- is mom okay?"  And I would go, "Well, mom's just
14  processing some things.  So she may need her space," you
15  know.
16  Q.   When Carol requested -- when Carol put in a letter of
17  transfer, how did she appear during that decision?
18  A.   Again, that process of nervousness, anxiety, emotional
19  kind of roller coaster, that was all there because she was
20  going into uncertain territory, you know.  Not that she
21  didn't try to take as much positive energy that she could,
22  but the point was it was uncertain, you know.
23  Q.   At some point in time, Carol was requested to come back
24  and work within the HR Department on a temporary basis.  From
25  your perspective, did that have any effect on her that you

1  could see?

2  A.    No.  I think, again, she processed being positive about

3  the situation and not -- trying not to let that cloud

4  continue to follow her through the things that she was -- was

5  ahead of her.  So at that point I just said -- you know, we

6  prayed about it.  I said, "Hey, follow -- follow your heart,

7  and we'll leave it in our creator's hands to bless us through

8  it."

9  Q.    As a result of Carol's transfer, has there been an

10 effect on finances?

11 A.    Yes.  We, trying to build our relationship of being

12 married, we would take a couple vacations a year.  Carol, she

13 likes cruises.  I like going to the beach.  So we've had to

14 adjust and cut down our travel because of budgets, and we

15 would do things locally that would cause less expense.  So,

16 yeah, we had to adjust that avenue of our life.

17 Q.    Were conventions part of that?

18 A.    Yes.  Number one is we always plan for our conventions.

19 So that was always first priority.  So we would budget for

20 those, three a year, and we would always have fun set aside.

21 And then whatever we had left after other obligations, we

22 will work from there.

23 Q.    After being married for 38 years, does time together

24 matter for Ms. Barton that you can tell?

25 A.    Yes.  Yes, it matters a great deal.  We support each

1  other.  The chemistry -- you know, a lot of people say 50/50,

2  but, no, it's not 50/50.  It's 100/100 because you both want

3  to give what you can.  Certainly, that's what we've done

4  through this situation.

5  Q.   Was there any effect on Ms. Barton's mood or health

6  throughout the process in the summer of 2018?

7  A.   Well, to me, not getting sleep, feeling anxiety and

8  depression, those are warning signs.  Again, I'm not a

9  doctor, but these are warning signs.  You've got to take care

10  of yourself, and sleep is important.  So we discussed kind of

11  better developing our doctors' visits and putting questions

12  before the doctor.  How is the blood pressure?  How is these

13  various levels of health?  And that was a concern.

14          So we stepped up going to the doctor because we

15  wanted to be sure we could, you know, curb that, or if we saw

16  a warning sign because of stress, anxiety, we could cut

17  that -- we could try to handle it.

18  Q.   Was there a health effect from the stress and anxiety?

19  A.   Well, her blood pressure did increase, and the doctor

20  suggested blood pressure medicine to -- in a preventative

21  way, and we would just monitor it.  We would go every three

22  months to make sure it stayed within reasonable levels from

23  that standpoint.

24  Q.   After being married for 38 years, what is your

25  observation of the role that Carol's faith plays in her life?

A.   As when we met, even at a young age, we talked about our
faith.  And my wife's faith has been strengthening, not only
for me, but for her, and it plays a number one role in her
doing things, how she views people, how she views life.  So
it's a number one priority.  And that's what has helped us as
a couple continue as long as we have.

          MS. WALTER:  Okay.  I don't have any other
questions.

          MR. FOX:  No questions, Your Honor.

          THE COURT:  You can step down, sir.

          MS. COLLINS:  Your Honor, plaintiff rests.

          THE COURT:  Okay.

          MR. FOX:  Your Honor, we have a motion to make
under Rule 50.

          THE COURT:  Okay.  Members of the jury, we're
going -- well, let me back up and say trials are very fluid
things, and sometimes they move slower, and sometimes they
move faster.  This one happens to be moving a little bit
faster than I think anybody anticipated.  That's not to say
that we won't slow down again, but for now we're ready to
take a break.  We're going to go ahead and do the lunch break
because it's going to be a fairly long lunch break because we
have to deal with some other things, and we'll get you back
in here.

          We'll plan on coming back at -- we'll do 12:45.

1    That will give you a little over an hour and a half to go

2    find something to eat and maybe enjoy a pretty day, but just

3    be ready to start back at 12:45.  If it's going to be much

4    past that, we'll certainly send word, so you're not wondering

5    why you're sitting back there cooling your jets.  So . . .

6            Hope everybody enjoys lunch.  Again, please don't

7    discuss the case with each other or anyone else, do any

8    independent research on anything related to the case, just

9    put it out of your mind and enjoy your lunch and perhaps a

10   pretty fall day.

11           (The jury was excused from the courtroom at

12            11:11 a.m.)

13           THE COURT:  Be seated, please.  All right, you

14   have a motion to make, Mr. Fox?

15           MR. FOX:  Yes, Your Honor.  As I understand it,

16   the plaintiff has two claims in this case, a failure to

17   accommodate a religious belief or religious request and

18   retaliation.  For the prima facie case -- the primary case

19   from the Sixth Circuit is *Reed versus International Union*.

20   It's at 569 F.3d 576.  And there it talks about the prima

21   facie case for a failure to accommodate case like this.

22           And the primary element that I want to hone in on

23   is she has to establish through the proof that she was

24   discharged or disciplined for failing to comply with the

25   conflicting employment requirement.  Here, there has been

1  insufficient proof -- no proof that there was actually a
2  discharge.  I actually asked Ms. Barton "Show me the
3  termination letter."  And she said, "I wasn't terminated."
4  There's no discharge or discipline.  We heard proof through
5  Ms. Few that there was no disciplinary action taken.  There
6  has been a lack of evidence from the plaintiff's evidence,
7  the plaintiff's documentation and testimony, that there was
8  any discipline involved.

9         In summary judgment, there was some mention of
10 like a constructive discharge, but that's something that has
11 to be very specifically alleged in the complaint.  And the
12 amended complaint in this case is at Docket No. 14.  There's
13 been no allegation of constructive discharge.  I did a
14 control F of the PDF just to make doubly sure this morning.
15 There's no allegation -- the words "constructive discharge"
16 don't appear anywhere in the complaint, and she hasn't put on
17 any sufficient proof to establish that things were so
18 unbearable she had to leave anyway.

19        But the point of the matter is, under that *Reed*
20 case, she has to show that the government took some action
21 against her, and just denying of the accommodation itself is
22 not sufficient.  It can't be all rolled into one.  She has to
23 show some independent action from the employer that a
24 discharge or discipline took place, and she hasn't proved
25 that.

1        And then next, even if she were to have proved

2   that, Your Honor, it switches the burden to -- she has to

3   counter our defense, essentially, that there's a hardship

4   upon the employer.  There's been insufficient proof to

5   counter the concept that there was undue hardship upon the

6   employer.  The proof that came out in her case was that there

7   was more than de minimis, which has been defined by the

8   Sixth Circuit as if it puts any kind of strain on co-workers,

9   then that's an undue hardship.  An employer should not have

10   to dump other work upon co-workers or even management, like

11   Ms. Few and Ms. Harris.  We've heard that multiple times,

12   about how they had to pick up her work, which is data entry,

13   and they would have had to -- ahead of time, they would have

14   had to have done that, and that's why they denied the

15   request.  And we know the proof is in the pudding that when

16   she did actually leave, they did actually have to work nights

17   and weekends to do her work, not just their work, but also

18   her work.  An employer is not supposed to be put in that

19   situation under Sixth Circuit law because that's more than a

20   de minimis hardship.  It's an undue hardship.

21        And for those reasons, her failure to accommodate

22   claim should fail and shouldn't even be sent to the jury.

23   There should be a directed verdict here by Your Honor that

24   the Metropolitan Government wins that point.

25        The next claim is her retaliation claim.  And

1  retaliation, there's some case law that was cited as
2  authority for our -- in our jury instructions that we
3  submitted.  One case, in fact, is from the Middle District, a
4  Judge Richardson case.  It talks about how the retaliation
5  can't be the same set of events that gave rise to the failure
6  to accommodate.  Like, you can't just say, "Oh, they failed
7  to accommodate my request" and say, "Well, that's failure to
8  accommodate," and also turn right around and say, "Oh, and
9  that same thing, that was also retaliation."  That's not how
10 these kinds of retaliation claims work.
11          Instead, she has to show that she engaged in
12 specific protected activity under Title VII in opposition and
13 show that she was in opposition to the -- that she complained
14 or did something in opposition to the policy, not just ask
15 for leave, and then it was denied.  That's not sufficient.
16 And then thereafter, you have to show -- she has to show,
17 this is her burden, that the employer took some type of
18 materially adverse action against her.  And, of course, we
19 all know post-*Burlington Northern*.  It no longer has to be as
20 severe as a demotion or a dismissal or a dock in pay, but she
21 hasn't identified here what the opposition was, what she did
22 in opposition, and then what it was that was done in adverse
23 employment action because of that.
24          And that's the next element, is because of.  It
25 has to be a but-for causal connection to that protected

1    activity that she claims to have engaged in.  She hasn't
2    proved any of those points.  And let me just cite a case --
3    just for the record, I have a case in front of you,
4    Your Honor, that we've referred to.  In summary judgment, we
5    cited this, but, for instance, *Kenney*, K-E-N-N-E-Y, *versus*
6    *Aspen Tech*.  And that's 965 F.3d 443.  And specifically I
7    cite a pinpoint cite at page 448.  That's a Sixth Circuit
8    case from 2020.
9             And I know you're well familiar with the elements
10   of retaliation, so I don't want to belabor that, but there's
11   just been insufficient proof, like I said, that were
12   protected activity, in opposition, you know, in the
13   employer's face confronting a particular policy and then
14   opposing it and then something done because of a but-for
15   causal connection in retaliation.
16            So for all those reasons, we feel like the case --
17   that case shouldn't go to the jury either, and that there
18   should be a directed verdict instead.
19            THE COURT:  Okay, thank you.
20            MR. FOX:  Thank you.
21            MS. COLLINS:  Your Honor, we believe that there
22   are enough facts in dispute for a reasonable jury to
23   determine whether or not her -- both her discrimination
24   claims based on the failure to accommodate, as well as
25   retaliation, should go to them.  The standard is whether or

1   not a reasonable jury could find in favor of the plaintiff,

2   and there have been sufficient facts presented over the past

3   two days to establish that.

4           With respect to the first claim of discrimination,

5   it was mentioned in the prima facie case.  We're beyond the

6   prima facie stage.  We're now at trial.  And so really it's

7   the ultimate issue.  Did the denial of accommodation cause

8   her to be forced out of the department and given the choice

9   that she was given?  There were facts presented that she was

10  given the choice, and she had no other choice.  She could

11  either stay in her job, or she could not go to the

12  convention.  Her accommodation was not discussed at all.  It

13  was just no.  And so that resulted in an ultimatum.  And that

14  ultimatum led to her being forced out of the department.

15          So whether that's characterized as a constructive

16  discharge, that's up to the jury to determine that that was,

17  in fact, an adverse action.  So there have been more than

18  enough facts presented, including -- if you'll just bear with

19  me, Your Honor.

20          THE COURT:  Well, on the constructive discharge, I

21  don't -- has there been a proposed instruction on that?

22  Because that's got a very specific thing that we're asking

23  the jury to decide, and I don't believe we've got -- either

24  side has proposed an instruction on constructive discharge.

25  I know it might have been discussed at summary judgment, but

1  we're well beyond that now.

2        MS. COLLINS:  Yes.

3        THE COURT:  So to the issue of -- succinctly put,

4  an adverse employment action that counsel raised, if it's not

5  constructive discharge, what is the jury going to be asked to

6  find there?

7        MS. COLLINS:  The transfer was the adverse

8  employment action, the forced transfer.  And with that

9  transfer came a loss of benefits, a loss of pay, and a loss

10 of status.  She went from a full-time employee to a part-time

11 employee.  That transfer -- yes, she's still with Metro

12 Government, so I don't think it would technically give rise

13 to a constructive discharge instruction, but the transfer is

14 an adverse action under the law.

15       THE COURT:  Okay.

16       MS. COLLINS:  The forced transfer.

17       THE COURT:  What about the issue he raised with

18 the undue burden on Metro that an accommodation would pose?

19       MS. COLLINS:  Well, that she took -- Ms. Barton

20 offered evidence to show that other employees took similar or

21 more time off than her in the ERC department.  There was

22 disputed evidence as to what the time frame was for the

23 freeze.  We had some witnesses today testify that it was from

24 April to the end of August.  We had some that had the narrow

25 time frame of April -- or June until August.  But either way,

1    I think it's up to the jury to determine those disputed

2    issues of fact, which time frame it was, because irrespective

3    of whether it was June to August or if it was April to the

4    end of August, the comparator evidence shows that other

5    people took time off just as much, if not more, but also that

6    people took off for FMLA, and they considered the request.

7              There was also testimony that they did not

8    consider the request of Carol Barton contrary to the law.

9    They just said no.  So there was no even discussion as to

10   whether or not it would be an undue burden.  And today,

11   Mr. Ott testified that there was not discussion as to whether

12   or not it would be an undue burden.

13             THE COURT:  Okay.  All right, what about the issue

14   of -- what's the retaliation -- what's the proof on

15   retaliation separate from the failure to accommodate?

16             MS. COLLINS:  Separate from the failure to

17   accommodate, the proof is that she filed an EEOC charge.  She

18   filed it pretty quickly after she left.  I believe the

19   specific date was September 8th, if I'm recalling correctly,

20   thereabout that time frame.  But that was also in the time

21   frame where she was going back and filling in part-time for

22   Metro.  She also testified that she had filled in for other

23   positions, and she hadn't gotten any.  And I believe, if I'm

24   not mistaken, Carol also testified that she felt like that

25   she was being blackballed or blacklisted.

```
 1          THE COURT:  Well -- okay.  So you're saying that
 2   that -- her job opportunities in Metro post-EEOC charge serve
 3   as the basis for the retaliation?
 4          MS. COLLINS:  Not the independent basis.  I think
 5   that it's one of the bases.  I do believe that her requesting
 6   an accommodation is considered protected conduct under the
 7   law, and that, in and of itself, gives rise to a retaliation
 8   claim.
 9          THE COURT:  Right, but I think his point -- I
10   think he cited this Kenney -- I'm going to go back and look
11   at the cases, but while we're all here, this Kenney versus
12   Aspen case that counsel suggests stands for the proposition
13   that there has to be some independent factual basis for
14   retaliation that is distinct from just the failure to
15   accommodate.
16          So if the failure to accommodate claim is she's
17   asked for an accommodation to attend a religious conference,
18   and they failed to make that accommodation, okay, that goes
19   in the first claim.  The retaliation -- if Mr. Fox's summary
20   of Kenney versus Aspen is correct, then there needs to be
21   something else.  And you've said the EEOC.
22          MS. COLLINS:  Yes.
23          THE COURT:  Okay.  And so is that pretty much what
24   the jury is going to be asked to decide on both of these
25   claims?
```

1           MS. COLLINS:  Yes.  I think that, you know, there

2    was a case cited *Abdi Mohamed versus 1st Class Staffing, LLC*,

3    286 F.Supp.3d 884, Southern District of Ohio, 2017.  I

4    realize it's not a Sixth Circuit case.  But it said the

5    assertion of a right to a religious accommodation at work is

6    protected conduct.  I'm not familiar with *Kenney*.  So I'm

7    going to do the same thing you're going to do during the

8    break and look it up, but -- I can't speak to that case.

9           THE COURT:  And what was the -- you mentioned

10   something Judge Richardson did.  Was that summary judgment

11   or -- because I think counsel is right, the Sixth Circuit

12   seems to be pretty clear that the traditional *McDonnell*

13   *Douglas* type of burden shifting analysis is utilized for

14   summary judgment, but not necessarily for trial because that

15   is the ultimate issue put to the jury.

16           What was Judge Richardson's --

17           MR. FOX:  I have that case cite.  I don't know --

18   I don't have the posture here of that in front of me, but

19   it's *Wyatt versus Nissan*.  It's 2019 Westlaw 6682197.  It's

20   at 2019 decision.

21           THE COURT:  Knowing Judge Richardson, I'm sure

22   it's very succinct.

23           MS. COLLINS:  It's probably 50 pages, with 48

24   footnotes.  So it might take a minute to get through it.

25           MR. FOX:  Yes, and that's the one more

```
 1   specifically where it said that retaliation can't arise out
 2   of the -- doesn't arise out of the same series of events as
 3   the failure to accommodate.
 4            THE COURT:  Got it.
 5            MS. COLLINS:  But was it a Title VII case or was
 6   it an ADA or religious accommodation case?
 7            MR. FOX:  Yeah, I believe --
 8            MS. COLLINS:  Because that would make a
 9   difference.
10            MR. FOX:  I believe it was an ADA case.
11            THE COURT:  Okay.
12            MS. COLLINS:  Was it a failure to accommodate
13   case?
14            MR. FOX:  Failure to accommodate.
15            MS. COLLINS:  I'm sorry, I don't mean to be --
16            MR. FOX:  Yes.
17            MS. COLLINS:  Sorry.  I'm just taking over your
18   job.  Sorry.
19            THE COURT:  You-all let me know when you're done.
20   I'll be here.  Okay.  So I'm going to read these cases while
21   we eat lunch, but any additional argument to make?
22            MS. COLLINS:  I don't think so.  I think we
23   covered all the points.
24            THE COURT:  Okay.  Anything else, Mr. Fox?
25            MR. FOX:  Your Honor, just that Ms. Collins said
```

1   that there was some conflict in testimony this morning, but

2   there was only Jessica Earnest who bought into the idea it

3   was April, but even she said "I believe," you know, something

4   to that effect.  She said, "It's been a long time."  The

5   proof that was pretty clear and not rebutted was that the

6   freeze was from mid-June to August.  But even so, it's been

7   unrebutted in this case that it was the busiest time of the

8   year, and that this request was going to put upon some burden

9   upon co-workers.  That alone is sufficient hardship to mean

10  that there's no claim here for failure to accommodate.

11          THE COURT:  Let me perhaps put it slightly

12  differently, so I make sure I understand your argument.  And

13  that is, regardless of the beginning or end of the freeze

14  period, whether it's April to September or a shorter period,

15  the requested time off by Ms. Barton, without question, falls

16  in the middle of that?

17          MR. FOX:  That's right.

18          THE COURT:  However you bracket it?

19          MR. FOX:  Right.

20          THE COURT:  And that that was the absolute busiest

21  time?

22          MR. FOX:  Yes.

23          THE COURT:  Okay.

24          MR. FOX:  Yes.  And that was made clear to her.

25  And I believe just about everyone has testified that that was

1   absolutely the busiest time.

2          THE COURT:  Okay.  All right, I'm going to need

3   to -- I'll take the motion under advisement.  I need to take

4   a look at these cases.  I think part of it, too, could be

5   impacted by how the jury instructions shake out.  I know that

6   there was a difference in a couple of the instructions that

7   we're taking a look at and trying to settle on the right

8   instruction.

9          Regardless of -- just in the interest of

10  efficiency and using time well, we're going to try to get a

11  draft charge out to you just so that you can be looking at

12  that.  I'll still give you a ruling on the motion.  I need to

13  go look at these cases.  I'm not forecasting a ruling on the

14  motion now, but just in the interest of efficiency, in the

15  interest of making sure we make good use of the jurors' time,

16  we'll try to get you a copy of the charge, and then we'll

17  just see if we can wedge in a charge conference if we get to

18  that point today, or we need to do it tomorrow, again, just

19  talking -- planning in the event one or more of the issues go

20  to the jury.

21         MR. FOX:  Your Honor, may I make one more point?

22         THE COURT:  Yes.

23         MR. FOX:  In rebuttal to what Ms. Collins just

24  argued, I want to point out something, that I believe I heard

25  her say that the retaliation claim to a certain extent

extends from the charge that came in September 2018 as being the protected activity, but that's completely different than what she has in the plaintiff's theory in the pretrial order. In the pretrial order, she says that Metro's actions violated Barton's rights under Title VII that prohibited Metro from discriminating against her on the basis of her religion and retaliating against her because she requested a religious accommodation.

It says nothing in her theory anywhere in the pretrial order about retaliating against her for having filed an EEOC charge. And I think it's an important point.

MS. COLLINS: Well, the local rules of the Court say that my pretrial theory is supposed to be succinct and concise. It's not a complaint. I don't have to lay out every single fact or basis for a claim. It's supposed to be a paragraph long. So I was just following the local rules of the court.

THE COURT: No, I understand that. The pretrial order also says, though, the pleadings in the case are amended to conform to the pretrial order, and this final order shall supplant the pleadings. I'll take a look at that issue separately. I mean, the point of that, as I understand it -- and that's been around forever, since I was practicing. There's always that boilerplate language in all the pretrial orders. The point of that is so that it's crystal clear what

1   claims and defenses are being tried so that you don't wedge
2   in some new claim that's never been litigated, or that if
3   you're going to drop claims or defenses, that would be an
4   opportune time to do it so that the parties know what the
5   claims and defenses are and the Court knows what the trial
6   will be about.  But I will take a look at that as well.  And
7   it's a fair point Mr. Fox raises.
8             I don't want to put you-all on too tight a tether
9   just because you probably need to go eat some lunch as well.
10  What I'll have -- does Angie have a number for each side, a
11  phone number for each side?  If not, give her one.  And if we
12  get the jury charge, we'll just let you know, and you can
13  come back.
14            What did I tell the jury, 12:45?
15            MR. FOX:  12:45.
16            THE COURT:  Let's plan on coming back in at 12:20.
17  And it may be -- I don't know if we'll need 25 minutes, but
18  that way, just in case we do, we don't keep our jurors
19  waiting any longer than we have to.  And so we'll see
20  everybody back here at 12:20.
21            (Recess taken from 11:35 a.m. to 12:35 p.m.)
22            THE COURT:  All right, defendant has made a motion
23  under Rule 50 for a judgment as a matter of law on both
24  claims, both the -- well, on the claims that were mentioned,
25  which is discrimination -- or failure to provide reasonable

accommodation and retaliation. And this will get to the
issue of the jury charge that we're going to have to deal
with at some other time.

Are there two or three theories that the plaintiff
puts forward as to liability?

MS. COLLINS: Three.

THE COURT: Okay. There's discrimination,
religious discrimination, there's failure to accommodate,
there's retaliation?

MS. COLLINS: Yes.

THE COURT: Okay. All right. Under
Rule 50(a)(1), if a party's been fully heard on an issue
during a jury trial, and the Court finds that a reasonable
jury would not have a legally sufficient evidentiary basis to
find for the party on that issue, the Court may resolve the
issue against the party or grant a motion for judgment as a
matter of law against the party on a claim or a defense that,
under controlling law, can be maintained or defeated only
with a favorable finding on that issue.

It also goes on to say that under Rule 50(b), if
the Court does not grant a motion for judgment as a matter of
law under Rule 50(a), the Court is considered to have
submitted the action to the jury subject to the Court's later
deciding the legal issues raised on a motion no later than
28 days after entry of judgment.

1    I will note that my Practice and Procedure Manual,

2    which I realize people probably don't study very carefully,

3    does contemplate a circumstance where if there's an expected

4    Rule 50 motion -- if a party can anticipate the motion, it

5    should give the Court advance notice no later than the

6    pretrial conference and file a brief in support of the

7    motion, otherwise, it will be heard on an oral motion and

8    argument.  In many cases, a ruling will be delayed until

9    after a jury verdict.

10    So the reason I mention that is, it doesn't really

11    change anything for this case, but if there's clear

12    anticipation that such a motion will be filed, it's -- the

13    reason I have that in my Practice and Procedure Manual is it

14    just gives the parties and the Court more time to deal with

15    different arguments and theories, recognizing that at the

16    pretrial conference you haven't heard any of the actual

17    evidence yet.

18    All right, as to the grounds for the motion, one

19    argument raised by the defendant was that there's no proof of

20    an adverse employment action.  The Sixth Circuit stated in

21    *Deleon versus Kalamazoo County Road Commission*, 739 F.3d 914,

22    at page 919 -- it's a 2014 case.  It says (as read):  Even

23    still our circuit has not foreclosed the possibility that a

24    transfer not rising to the level of constructive discharge

25    might, nonetheless, constitute a tangible employment action.

1          I think there was testimony presented to the jury
2   that in the conversations early on with Ms. Harris and also a
3   conversation that Ms. Barton relayed that she had with
4   Ms. Few was that there was -- it was pretty much a take it or
5   leave it scenario that would have necessitated a transfer if
6   she chose to stay employed by Metro.  Given that ruling in
7   the *Deleon* opinion that I've just cited, a transfer can
8   constitute a tangible employment action.  I think it was
9   contemplated that that might be one of the outcomes of the
10  request for leave that they were denying.
11          So I don't know that the fact that she wasn't
12  terminated or disciplined is dispositive on the issue.  I
13  think a jury can find from that testimony there would be a
14  legally sufficient evidentiary basis to satisfy that element
15  of the failure to accommodate claim.
16          In terms of the undue burden, that one is a little
17  bit troubling to me in terms of the proof, but I think that a
18  reasonable jury would have a legally sufficient evidentiary
19  basis on the -- based on the evidence that in the initial
20  conversations in the months leading up to the time period at
21  issue -- the vacation request time period, rather, that there
22  were really no discussions had to whether or not there were
23  other things that could be done to alleviate an undue burden.
24  I don't think there's any question that having a person
25  outside the ERC for a period of time during the busy time

placed a burden.  The evidence, though, I think a jury could conclude that that undue burden could have been avoided with further discussion and the accommodation that the plaintiff claims should have been made.

So that's the basis for denying the Rule 50 motion on the failure to accommodate claim.

In terms of the retaliation claim, in *AC ex rel. JC versus Shelby County Board of Education*, 711 F.3d 687, Sixth Circuit case from 2013 -- this was an ADA case on accommodation -- said, quote (as read):  Both this circuit and other circuits agree that requests for accommodation are protected acts.

And then there's other cases that the Sixth Circuit has followed that same reasoning, including *Hurtt versus International Services, Inc.*, 627 F.App'x 414, a 2015 case out of the Sixth Circuit, and then other district courts have followed suit.

In terms of Judge Richardson's opinion on this issue that they have to be distinct acts, I think the request for accommodation clearly under Sixth Circuit law can be a protected act.  Judge Richardson's opinion in the *Wyatt v Nissan* case, 2019, was relying on some cases out of New York that I think are somewhat questionable in their reasoning, with all due respect to those courts.  Judge Richardson then sort of walked back that position a little bit, as I read it.

/

1    And I obviously have not had time to read these in great
2    detail, but just last spring, in *Veith versus Tyson Fresh*
3    *Meat*, which is a case I know you're familiar with,
4    Ms. Collins, because it was your case, I think he
5    distinguished *Wyatt* and kind of explained why, such that I
6    don't think that he's taking a firm stance that there has to
7    be really distinct concrete acts to constitute a basis for an
8    accommodation claim versus a retaliation claim.  And given
9    that a request for accommodation is considered to be a
10   protected act under clear Sixth Circuit authority, I think
11   that the argument that the request for a -- the failure to
12   comply -- failure to provide a reasonable accommodation is
13   one distinct basis for a claim, and there has to be some
14   other act.
15           I don't know that the EEOC -- post-EEOC conduct
16   that we talked about before lunch break is consistent with
17   the pleadings in this case, neither the original complaint,
18   nor the pretrial order, but I also think that under the
19   Sixth Circuit authority that it's not required that you have
20   to segregate out separate acts in order to serve as the basis
21   for a reasonable accommodation claim and then turn around and
22   have a retaliation claim.
23           There's also a series of events here that I think
24   the jury could conclude reasonably that once the request is
25   made and told no and then other efforts are made and

1 continued to take no, that might itself constitute

2 retaliation, even after the reasonable accommodation was

3 denied.

4 So on that basis, I'll deny the motion on the

5 retaliation claim, keeping in mind that, as I cited at the

6 beginning of this, under Rule 50(b), there's ample

7 opportunity for the parties to raise these issues again,

8 should they so choose, once we have a verdict from the jury.

9 All right, we're about ready to have our jury back

10 in. The jury instructions, we're still noodling a little bit

11 on three of them, which are the three substantive ones. No

12 surprise there. I'm going to try to get those to you here in

13 the next few minutes. I need to go check on something before

14 we bring the jury back in, and then we'll get those to you.

15 And then -- I don't want to hamstring your ability to take a

16 good look at these instructions, so I'm not going to force a

17 charge conference today, depending on when we get done, but

18 if you look at them, and you're ready to do it, we can do it

19 today, depending on how long you-all take. You may take the

20 rest of the afternoon, and a charge conference is certainly

21 not going to happen today.

22 I have a fairly hard stop around 4 today, and then

23 we're going to have to start a little later in the morning,

24 but we'll wedge that in when we can. Hopefully, I'll get

25 you-all copies to look at, and you can let me know whether

1  you think you're ready to go forward with a charge conference
2  or whether you want the evening to think about it and come
3  back with your ears pinned back on jury charge issues.
4          Okay?  Clear as mud?  All right, let me take a
5  couple minutes to go check on something, and then we'll get
6  our jury back in, and we'll proceed.
7          (Recess taken from 12:47 p.m. to 12:51 p.m.)
8          (The jury returned to the courtroom at 12:52 p.m.)
9          THE COURT:  All right, be seated, please.  All
10 right, defendant's first witness.
11         MR. PUCKETT:  Your Honor, defense would like to
12 call Ms. Judith Hawkins to the stand.
13         COURTROOM DEPUTY:  Raise your right hand, please.
14              JUDITH HAWKINS,
15 called as a witness, having been duly sworn, was examined and
16 testified as follows:
17         THE WITNESS:  Yes.
18         COURTROOM DEPUTY:  State your full name for the
19 record, please, and spell your last.
20         THE WITNESS:  Judith Marie Hawkins, H-A-W-K-I-N-S.
21              DIRECT EXAMINATION
22 BY MR. PUCKETT:
23 Q.    Good afternoon, Ms. Hawkins.
24 A.    Hi.
25 Q.    I'm going to read a quick bio, and you just correct me

1  if I say anything wrong, okay.

2          Judith Hawkins, you are currently the employee

3  benefits lead specialist in the employee benefits department

4  of Metro Schools.  You worked in the Employee Resource Center

5  as a clerk from December 2016 to January 2019.  You have been

6  with Metro for 14 years.  Approximately 11 of those years

7  were spent in HR.

8  A.    Yes.

9  Q.    Did there come a point in time where you became aware of

10  the vacation freeze at the ERC?

11  A.    Yes.

12  Q.    When did that -- when did you become aware of that?

13  A.    I became aware of that when I was approached to take a

14  position in the ERC, but I actually knew prior to that

15  because our department that I worked in previously had a

16  close relationship with that department.  So we already knew

17  that there was a freeze.

18  Q.    Okay.  And to your understanding, what did that vacation

19  freeze entail?

20  A.    It entailed us not taking vacation during a certain

21  point in time due to an increase in our work flow.

22  Q.    Okay.  Do you recall the period of time that was the

23  sort of busy season at ERC?

24  A.    The busy season was during the summer months.

25  Q.    Okay.  Were there any important life events that you had

1  to plan around the freeze?

2  A.    I did.   In 2017, I actually had to move a surgery back

3  so that way it wouldn't interfere with our summer months

4  because I knew they needed me.   And then in 2018, I actually

5  moved my wedding back so that way I would be there during the

6  summer months of 2018.

7  Q.    Can you describe what life was like in the ERC during

8  those summer months?

9  A.    Very hectic.   The workload was a lot.   We were needed a

10  lot.   It was a lot of new hires, transfers, terminations, and

11  an abundance of other things that we had to do during the

12  summer that was very time sensitive.

13  Q.    And you said it was time sensitive.   Can you describe

14  why it was so important to get the work done?

15  A.    It was very important because that would allow our

16  teachers to be paid in time, our teachers to be paid

17  properly.   And if we had terminations during a summer, we had

18  to make sure those were termed in a proper amount of time so

19  that they would not receive pay.

20  Q.    So if you were to take time off during that period --

21  let me rephrase.

22          Could you take a large amount of time off, say 5,

23  10, 12 days off during that period of time?

24  A.    No.

25  Q.    Okay.   Why not?

1  A.    It would be, you know, a hardship on the team, actually,

2  just because we needed every person in their seats working

3  constantly just to ensure that the work was completed in

4  time.

5  Q.    You said you actually became aware of the freeze even

6  before you started at ERC?

7  A.    Yes.

8  Q.    But when you were with the ERC, how was that vacation

9  freeze or leave blackout period -- how was that communicated

10  to the staff?

11  A.    From my recollection, it was sent out by email way in

12  advance, and then we would have daily morning huddles, as you

13  would call them, and our manager at the time would relay the

14  day's work and what we had to do.  So there was a freeze, but

15  then there was a go time.  So . . .

16  Q.    Were you ever confused about when the freeze was on and

17  when it wasn't?

18  A.    No.

19  Q.    Okay.  Were you aware of anyone else at the ERC who was

20  confused about the timing of the vacation freeze?

21  A.    No, not that I'm aware.

22  Q.    Can you think back to the summer of 2018.  Did you or

23  any of your co-workers, or even of your supervisors,

24  Ms. Selina Harris or Ms. Lisa Few -- as a result of

25  Ms. Barton not being in her position, were any of those

1  folks -- did they have to work extra?

2  A.   I know Lisa Few and Selina Harris took on the majority

3  of that workload.  The rest of it was disbursed among the

4  rest of us.

5  Q.   And when you say that workload, you mean the work that

6  would have been done by Ms. Barton?

7  A.   Yes.

8          MR. PUCKETT:  I don't have anything further.

9                    CROSS-EXAMINATION

10 BY MS. COLLINS:

11 Q.   Good afternoon, Ms. Hawkins.

12 A.   Hi.

13 Q.   When your deposition was taken, you thought that the

14 vacation freeze was between April and the end of August;

15 correct?

16 A.   That was the time that was relayed to me during our

17 deposition.

18 Q.   What do you mean by that?

19 A.   I believe you guys were the ones that told us that the

20 time was from between April and August during our deposition.

21 Q.   Okay.  Would it help you to review your deposition just

22 to make sure?

23 A.   Sure.  I do agree that it happened between April and

24 August, roughly.

25 Q.   And I have it turned to page 14 of your deposition.  And

1  down on line 6 -- well, preceding that on page 13, the
2  question was asked (as read):  And what was your
3  understanding?  Did the dates change year to year?  Answer:
4  I don't recall the exact dates, so I can't say if they
5  changed from year to year.  From what I can recall, I know
6  that the normal time that we could not take off was a certain
7  month to a certain month.
8              Is that correct?
9  A.   What line are you reading from?  I'm so sorry.
10 Q.   Sure.  It was the bottom of page 13 to page 14, the top
11 of page 14.
12 A.   Like, line 25?
13 Q.   Uh-huh.
14 A.   Okay.
15 Q.   Okay.  Did I read that correctly?
16 A.   You read it correctly.
17 Q.   Okay.  And the next question I asked was (as read):
18 Okay.  Do you recall those months?
19              And what was your answer on lines 7 through 8?
20 A.   On line 8?
21 Q.   Yes, lines 7 and 8.
22 A.   (As read:)  It was -- from what I can remember, it was
23 between April and August.
24 Q.   And then my next question was (as read):  And when you
25 say to August, would that be through the month of August or

1  up until the beginning of August?

2          And your response was, answer (as read):  Again, I

3  don't have the exact dates.

4          And my question was (as read):  Sure.

5          That's not really a question.  But your answer was

6  (as read):  From what I can remember, I believe it was

7  through the end of August.

8          Did I read that accurately?

9  A.    You read it.

10  Q.    Okay.  So does that help refresh your recollection that

11  your testimony back on April 6, 2021, was that it was from

12  April to the end of August?

13  A.    I think I answered I believe it was to the end of

14  August.  That's not -- yeah.  So I don't know for sure it was

15  through the end of August.

16  Q.    Okay.  And you also testified that to code something as

17  vacation time, you had to take off the whole or half day;

18  right?

19  A.    What I thought we had to do.  I'm not certain.

20  Q.    Okay.

21  A.    I thought we had to do that, but it's been a long time

22  ago, so I can't remember.

23  Q.    Sure.  Sure.  But you do recall that if you were out

24  sick during a freeze, you were allowed to use other paid

25  leave and code it differently if you needed to?

1  A.    Oh, yeah.

2  Q.    Okay.  And you were not required to have an

3  accommodation to take extra time off during the freeze for a

4  medical condition; correct?

5  A.    No.  I didn't need one.  No.

6  Q.    And if you needed time off during the freeze for a

7  doctor's appointment, you could take it?

8  A.    Yes.

9  Q.    Okay.  And just a moment ago, your attorney asked if --

10  he asked you about if you couldn't take some time off during

11  the freeze, and you mentioned a surgery.  Was that an

12  elective surgery?

13  A.    No, it wasn't elective.  No.

14  Q.    Did you fill out FMLA paperwork for it?

15  A.    I don't remember.

16  Q.    Was the FMLA paperwork denied?

17  A.    I don't remember if FMLA was involved.  I can't

18  remember.

19  Q.    Did you ever go to your supervisor and discuss specifics

20  as to potentially needing to take off for surgery during the

21  summertime?

22  A.    I believe I sent her an email.  I believe.  I can't

23  remember.

24  Q.    Okay.  So you can't remember whether or not you

25  discussed specifics with your supervisor?

A.   When you say "specifics," what do you mean?  I'm sorry.

Q.   Like, "I'm going to need to take off from this day to this day.  Would that be okay?"

A.   I believe I probably put that in writing and sent it to my manager for approval.

Q.   Okay.

A.   I think.

Q.   But sitting here today, you're just not sure?

A.   I would think that I would have put that in writing.  I feel like I did.

Q.   Okay, but I'm asking you a little bit different question.  Do you have a specific recollection that you engaged with your supervisor as to whether or not you could take very specific days off for surgery?

A.   I don't recall if I had a specific conversation with my manager.

Q.   Okay.  Okay.

A.   I just don't remember.

Q.   And when you were talking about taking off a certain amount of days, did you ever request a religious accommodation when you worked for Metro Schools?

A.   Have I ever asked for -- no.

Q.   Okay.

            MS. COLLINS:  That's all I have.  Thank you.

            MR. PUCKETT:  Very brief redirect, Your Honor.

1                    REDIRECT EXAMINATION
2    BY MR. PUCKETT:
3    Q.   Ms. Hawkins, do you still have your deposition in front
4    of you?
5    A.   I do.
6    Q.   On page 14, would you do me a favor and read the lines
7    starting at 16 to 19.
8    A.   I believe this was a question.  It says (as read):
9    Okay.  And this is just to clarify.  Was it the beginning of
10   April or the end of April that it would start?  Answer:  I
11   don't recall the exact dates.  Question:  Okay.
12   Q.   That's okay.  I just needed up to 19.
13   A.   Oh, okay.  Sorry.
14            MR. PUCKETT:  Thank you.  That's all I have.
15            MS. COLLINS:  Actually, Your Honor, if I could
16   just finish that excerpt.
17                    RECROSS-EXAMINATION
18   BY MS. COLLINS:
19   Q.   Where I said "Okay," and we established that wasn't
20   technically a question, your answer was (as read):  I just
21   know it was between those months, but the exact dates are
22   not -- I don't recall those exact dates.
23            Was that the rest of your testimony?
24   A.   That's what's here, yes.
25            MS. COLLINS:  Okay.  Thank you.

```
 1            THE COURT:  Okay, ma'am, you can step down.
 2            (Witness excused.)
 3            MR. FOX:  Your Honor, our next witness, we'd like
 4   to call Lisa Few back to the stand.
 5            THE COURT:  Okay.
 6            COURTROOM DEPUTY:  The Court reminds the witness
 7   you're still under oath.
 8            THE WITNESS:  Yes, ma'am.
 9                         LISA FEW,
10   called as a witness, having been previously duly sworn, was
11   examined and testified as follows:
12                    DIRECT EXAMINATION
13   BY MR. FOX:
14   Q.   Ms. Few --
15   A.   Yes.
16   Q.   -- in your testimony yesterday, you talked about the
17   work -- I believe you used the phrase ramped up, started
18   ramping up in April?
19   A.   Yes, it started ramping up in April because --
20   basically, the end of school is end of May, as everybody
21   knows.  So in April, teachers, they start -- you know, if
22   they want to transfer out of the school, then they start
23   looking at other opportunities and talking to recruiters, and
24   then we start getting paperwork in.  So it all starts ramping
25   up in April.
```

1          But then April -- you know, it just keeps ramping
2    up.  So April and then May and then June, boy, you're just
3    really -- you're just really hit because everybody now is out
4    of school, they've made up their mind, and here comes all the
5    paperwork.
6    Q.   What's the difference between that work ramping up and
7    the vacation freeze being put into place for the summer
8    months?
9    A.   So the ramping up, like I said, you know, it starts in
10   April.  So we start seeing -- you know, seeing the workload
11   increase in April.  So we -- you know, we still allowed
12   vacation time and covered for everybody during that ramp-up
13   period, but when it got so busy and everything started coming
14   into us in June, mid-June through the first week of school,
15   which is the first week of August, that's when we had to put
16   the vacation freeze in because we couldn't have anybody out
17   of the office to -- because this work had to get done.  So
18   that was the difference.
19   Q.   Was that described to the ERC employees at the time?
20   A.   Yes.
21   Q.   All right.  And then I want to -- I want to draw your
22   attention to Plaintiff's Exhibit 19.  Can you flip to what's
23   been tabbed there as 19?
24   A.   Yes.
25   Q.   And what is that?

A.    That is Metro's Responses to Plaintiff's First Set of
Interrogations and Requests for Documents.

Q.    Interrogatories?

A.    Uh-huh, yes.

Q.    And could you flip to -- let's see.

        MS. COLLINS:  Do we need -- it's being published
to the jury.

        THE COURT:  Is this --

        MR. FOX:  If there's no --

        THE COURT:  Thank you.

        MR. FOX:  This is a stipulated exhibit,
Plaintiff's Exhibit No. 19.  If there's no objection now, I
would like to tender this as --

        THE COURT:  Okay.  Any objection?

        MS. COLLINS:  No.

        THE COURT:  All right.  Exhibit 19 is admitted.
You can publish it.

        MR. FOX:  Thank you for that, Your Honor.

        (Plaintiff's Exhibit 19 received in evidence.)

BY MR. FOX:

Q.    Okay, let's see here.  12, doesn't it here talk about in
the response -- and this is Metro's response -- (as read):
600-plus newly hired employees are onboarded successfully.
An additional 800-plus employees are accurately transferred
to new positions.

1          Am I reading that correctly?

2   A.   Yes, that's correct.

3   Q.   And then over on the next page (as read):  The rush to

4   staff school begins in April of each year with a rapid spike

5   in volume between June and August.

6          Right?

7   A.   That's correct.

8   Q.   Am I reading that correctly?

9   A.   Yes, that's correct.

10  Q.   And then for No. 13, does it also talk about the ERC

11  undergoes its peak hiring season beginning in mid-June?

12  A.   That's correct.

13  Q.   And what's the date on this that we sent that to

14  opposing side, opposing counsel?

15  A.   March 17, '21.

16  Q.   So a year and a half ago; correct?

17  A.   Yes.

18  Q.   And that's consistent with what accurately took place on

19  the ground in 2018?

20  A.   That's correct.

21  Q.   And as I, sorry, again, clumsily put this back together,

22  let me ask you this:  We heard testimony yesterday that the

23  request for this religious convention came to your attention?

24  A.   Yes.

25  Q.   And you spoke to Ms. Barton about it?

1 A.   Yes.

2 Q.   All right.  And was it clear at the time that she made

3 the request -- did you understand that this was for a

4 religious convention?

5 A.   Yes, I did.

6 Q.   Right.  And based on the circumstances that were then

7 present at the time, mid-June -- the dates of her request,

8 June, July, was there any way that this could have been

9 accommodated?

10 A.   No, there was just no way.  Like I said before, it

11 was -- you know, I felt really bad that we couldn't let her

12 go, but because of the hardship that it would put on all of

13 the ERC staff, including myself and my supervisor, it just

14 wasn't feasible.

15 Q.   And that's you and Selina we've heard a lot about?

16 A.   That's correct, Selina, uh-huh.

17         MR. FOX:  That's all.  Thank you.

18         MS. COLLINS:  Your Honor, we don't have anything.

19         THE COURT:  You can step down, ma'am.

20         MR. FOX:  Your Honor, the last thing for

21 defendant's proof -- so much of it came in yesterday really

22 through plaintiff's case-in-chief, but is also the blue

23 binder of exhibits.  If there's no objection, I don't believe

24 there is one because these were stipulated to, I'd like to

25 tender these, what's been marked as Defendant's Exhibits 1, 2

1  and 3, into evidence.

2          THE COURT:  All right, 1, 2 and 3.

3          MS. COLLINS:  They have been stipulated to.

4  Exhibit No. 3 has not been published to the jury or shown to

5  them.  So I don't know really how that works.

6          THE COURT:  Well, I mean, if there's no --

7          MS. COLLINS:  Nobody's talked about it.

8          THE COURT:  Right.  Then I'm not sure what they

9  can make of it if they don't know what it is, but is there

10  any objection to the request that Defendant's Exhibits 1, 2

11  and 3 be admitted into evidence?

12          MS. COLLINS:  No objection.

13          THE COURT:  Okay.  Then those will be admitted.

14          (Defendant's Exhibits 1, 2 and 3 received in

15           evidence.)

16          MR. FOX:  And, Your Honor, may I confer with my

17  team for just a second?

18          THE COURT:  Yes.

19          MR. FOX:  Your Honor, the defense rests.

20          THE COURT:  Okay.  Let me have counsel approach,

21  please.

22          (Bench conference outside the hearing of the

23           jury:)

24          THE COURT:  All right, a few things.  One, do we

25  expect any rebuttal proof?

1          MS. COLLINS:  No.

2          THE COURT:  Okay.  So what I'm going to do is cut

3   the jury loose for today and have them come back at 9:30

4   tomorrow.  My hope, given that it's only 1:15, we should be

5   able to get our charge conference in today.

6          MS. COLLINS:  Yes.

7          THE COURT:  I'll give you plenty of time to look

8   at the instructions before we get back together, but I think

9   we can do that and get the charge in the can so that we can

10  begin closings at 9:30 or so.  I'm going to have them come in

11  a little late.  And then should be able to give it to them by

12  lunch.

13         How long do you expect your closings are going to

14  take on this?

15         MS. COLLINS:  I mean, 20, 30 minutes, about like

16  the opening.

17         THE COURT:  About an hour in total for closings?

18         MR. FOX:  Uh-huh.

19         THE COURT:  We should be able to give this to them

20  by lunch, and we may be able to get a verdict tomorrow.  Then

21  if not, we'll have to come back Monday.

22         I do have one question about this last exhibit

23  that was admitted, these photos.  There hasn't been anybody

24  that's talked about them.  Are they going to be -- I mean,

25  how are those part of the case, I guess, photos that haven't

1  been shown to the jury, and somebody has testified what they

2  are?  I'm just a little concerned that they're photos that

3  are given no context.  I haven't looked at the photos.  So --

4          MS. COLLINS:  I mean, one option is, is I could

5  bring Carol up to talk about them, but, I mean, I can --

6          THE COURT:  I just don't want them to be used in a

7  way that, in closings, for example, that -- we've already

8  closed the proof.  You know, there's nobody who can say,

9  well, wait a minute, you know, because we haven't had any

10 testimony about them to where there might be rebuttal or

11 cross-examination or something like that.  That's my concern.

12         MS. COLLINS:  Yeah, I think that's -- I do have

13 that concern.  I think it would just make sense to have a

14 rebuttal, call Carol up and ask her what they are.  I can do

15 that, or can I have a take-back?  I already said I wasn't

16 going to do rebuttal.

17         THE COURT:  Part of it is, is I'm not sure what

18 the evidentiary value of the photos are because nobody's

19 talked about them.  And usually it's very obvious, an email

20 or something like that.

21         But your thoughts on these exhibits?

22         MR. FOX:  Yes, Your Honor.  I haven't thought all

23 this through because they're stipulated to, they're

24 stipulated exhibits, but --

25         THE COURT:  Right.

1          MR. FOX:  -- primarily it's to show that this was

2   a religious convention, wasn't -- it wasn't, say, by contrast

3   that, you know, a mission trip to Haiti to dig wells or

4   something like that.  I just wanted to dispel that notion,

5   that this was a religious convention.  And so that we're

6   trying to say -- that's spelled out in the photos so that

7   this is not something that the employer is obligated to

8   accommodate under federal law.

9          THE COURT:  A conference.  You're drawing a

10  distinction between a conference versus mission work?

11         MR. FOX:  She used the word "convention," and the

12  wording on the documentation itself says "convention."  So --

13         THE COURT:  I don't think I've got a copy of your

14  exhibits up here, otherwise, I would have looked at them.  Go

15  grab a copy and let me take a look at what we're talking

16  about.  Is this five photographs?

17         MS. COLLINS:  I mean, it's kind of confusing

18  because the first one is --

19         THE COURT:  Looks like a conference to me.  I

20  mean, I guess my concern -- was there some argument at some

21  point in the case that this was just a big party, and it

22  wasn't really a legitimate religious convention?  I mean, is

23  that still going to be presented to the jury, that this

24  wasn't a legitimate convention, conference, gathering for

25  religious purposes, whatever label we want to put on it?  Do

you see what I'm -- because looking at the photos and if
somebody is going to argue them, I'm going to tell them your
argument is not evidence, but there's no real context for an
exhibit that's in that -- I want to just be careful about
that because evidence that comes in is at least talked about.
So that's the reason I wanted to do this before we let them
go in case there's something we need to do with that before
we kick them out of the building for the day.

MR. FOX:  Yeah, I mean, it's part of our
defendant's theory that -- we're not trying to debate the
pillars of her faith or anything like that, but, however,
there was a large social aspect to this trip around the --
halfway around the world as well.

THE COURT:  Which I think they've testified to
that.

MR. FOX:  Yeah.  Well, these pictures speak a
thousand words, a thousand witnesses I didn't have to put on
because --

THE COURT:  Right.

MR. FOX:  Yeah.

MS. COLLINS:  That being the case, we do need to
call her as a rebuttal.

THE COURT:  Okay.  Let's do that so that -- and
you can question her about it.

MR. FOX:  Okay.

1          THE COURT:  I just was hesitant to have exhibits

2    thrown in front of the jury that nobody has talked about, and

3    they won't know what to make of that.  So let's do that.

4          (Bench conference concluded.)

5          THE COURT:  All right.  Ms. Collins, I guess you

6    want to have a brief -- put on brief rebuttal proof to the

7    defendant's evidence?

8          MS. COLLINS:  Yes, Your Honor.  We're going to

9    recall Ms. Barton to the stand.

10          COURTROOM DEPUTY:  The Court reminds the witness

11    you're still under oath.

12          THE WITNESS:  Yes, ma'am.

13                    CAROL BARTON,

14    called as a witness, having been previously duly sworn, was

15    examined and testified as follows:

16                 DIRECT EXAMINATION

17    BY MS. COLLINS:

18    Q.   Hi again, Carol.  If you could turn to tab No. 3 in the

19    defendant's exhibit binder.  Now, I'm just going to go

20    through these starting with the first page.

21    A.   Okay.

22    Q.   Okay.  Carol, can you tell me what this is?

23    A.   Yes, this was a photo I extracted from one of our fellow

24    members and posted it.  If you recall -- some may, some may

25    not -- in April of 2019, there was a bombing there.  And one

1  of them happened to be the hotel we stayed at when we were
2  there for our convention, and it mentioned three churches.  A
3  lot of times in the news, they say churches.  They don't say
4  Kingdom Halls.  So my mind and heart was with our brothers
5  and sisters there in Sri Lanka, and that's why this picture
6  was posted.
7  Q.   Okay.  And the date on that picture, was that when you
8  posted that?
9  A.   Uh-huh.
10 Q.   Was that right around the time of that bombing?
11 A.   Uh-huh.
12 Q.   Okay.  And this other picture?
13 A.   This is a fellow sister in the faith.  She was from
14 Korea.  And this was during the intermission time when we
15 were doing our fellowship, and I just took a picture with
16 her.
17 Q.   Okay.  And when you say "intermission time," between
18 what?
19 A.   Between our sessions.  You go to the bathroom.  You eat
20 lunch.  And this was during a break period.
21 Q.   Okay.  And those are the sessions that you were
22 describing yesterday that consisted of --
23 A.   It was an all-day session that we were there.  And, of
24 course, like we took a break here at lunchtime, we had a
25 break then as well.

1  Q.    Well, what did -- but the sessions in particular, what
2  did those consist of?
3  A.    Faith-based Bible lectures, interviews from different
4  delegates.  We had speakers worldwide from different Bethel
5  locations.  And as been mentioned, it was an interchange of
6  encouragement, Bible information that encouraged us, and we
7  were able to bring back and share with our congregation.
8  Q.    Okay.  And then the next picture?
9  A.    The next picture, this is us in the lobby.  The night
10 before we were leaving as an end, they had a special dinner
11 for us.  And that's some of the -- that's my sister-in-law
12 and one of the brothers that was there.
13 Q.    Okay.
14 A.    And it's just a memory picture like anybody else would
15 take at an event.
16 Q.    Okay.  Is that you right there in the middle?
17 A.    Uh-huh.
18 Q.    Okay.  And this picture?
19 A.    And the last one, these were some of the brothers and
20 sisters that put on a show for us that evening.  Of course,
21 going to another country, you're going to learn about their
22 culture.  They talked about how Jehovah's Witnesses were
23 started there, and there was a lot of interviews from
24 different people.  Again, this is part of the interchange of
25 encouragement.  Just like anybody, you go to special temples

1  and whatnot, you learn about cultures there, this is what
2  this was.  This was the last night before we were leaving.
3  Q.    Okay.  And the next one?
4  A.    As it states here, it's an elevator selfie, all of us in
5  the elevator, and the young man in the front, he was taking a
6  picture of us.
7  Q.    Okay.  And that's you right there?
8  A.    Uh-huh, that's me in the back.
9  Q.    So even though this was a religious convention, and
10 you-all were all there for a very specific purpose, you still
11 had a good time; right?
12 A.    We enjoyed the fellowship, building up and encouraging
13 one another.
14 Q.    And you've done many other things throughout the course
15 of your faith journey where you also had a good time?
16 A.    Yes.  I've been able to go on other -- not necessarily
17 like that one in Sri Lanka, but in my faith, I've got to do a
18 lot of different things.  I've helped with our disaster work
19 in different places around the United States and whatnot.  So
20 being an active Jehovah's Witness, you get to participate in
21 doing a lot of events.  Every now and then, like this
22 particular one, this was a special event, and I was happy to
23 be selected to be a part of it, a once in a lifetime event.
24         And another thing I want to say about this here,
25 this was the first time ever a convention was held in

1  Sri Lanka.  So that was another big deal, too, about it.

2  Q.    Okay.

3           MS. COLLINS:  All right.  Thank you, Carol.

4           MR. FOX:  No further questions.  Thank you.

5           THE COURT:  You can step down, ma'am.

6           (Witness excused.)

7           THE COURT:  All right, members of the jury, you've

8  now heard all the proof in the case.  Just to forecast the

9  rest of the trial, as I mentioned earlier today, trials can

10  go in fits and starts.  This one has moved at a very fast

11  pace, and we've still got some other things to do before we

12  wrap the trial up with you.  So we're going to take the

13  afternoon and do that and let you go for the day.

14           You really should get a head start on our traffic

15  today if we get you out of here at 1:30, at least I hope.

16  We're going to have you come back at 9:30 tomorrow, instead

17  of nine.  We're going to start a little bit later.  And I

18  expect what will happen is we'll hear the closing arguments

19  from counsel, and then I will give you your instructions, and

20  then you'll begin your deliberations hopefully by around

21  lunchtime.

22           I know we told you on the first day four to

23  five days, and that was a good guess, but it's moved faster

24  than that.  So you will be allowed to then talk about the

25  case and be encouraged to talk about the case with each other

during your deliberations.  Not there yet, so I still have to
give you this standard instruction that you're already tired
of hearing after just a day and a half, which is please don't
talk about the case with each other or anyone else, do any
independent research about any matters touching on this case,
until you start deliberating tomorrow, and then you'll have
the evidence, and you'll have each other to talk to, and
you'll begin your deliberation, but until then, just please
put it out of your mind.

        Appreciate your flexibility.  And we'll get you on
out of here and let you enjoy the rest of the nice day.  Have
a good evening.

        (The jury was excused from the courtroom at
         1:29 p.m.)

        THE COURT:  All right, be seated, please.

        Have you-all found places just to camp out in the
building here and all that?  Have you-all divided up our
witness rooms evenly and all that?

        MR. FOX:  Yes.

        THE COURT:  Okay.  If you could just hang out
either in here or back there, when we have the jury charge
draft ready, we will bring you a copy.  And then just let us
know when you think you're ready to do the charge conference.
Again, I've got to stop at about 4:00.  I'm hopeful that we
can get through it all by then, but I want to make sure

you-all have plenty of time to take a look at what the
current draft looks like, and then we'll have our conference
if you're ready and then get that put to bed so that you can,
if you choose, use the verdict form and the jury instructions
as you prepare your closing arguments.  So . . .

Just hang tight and I'll get either Angie or
Eileen to bring you a draft, and then I'll be back there
waiting for you to tell me when you're ready to do the charge
conference.  Okay?

(Recess taken from 1:31 to 3:00 p.m.)

THE COURT:  All right, we've given out a -- we
neglected to give you a copy of the verdict form earlier.
It's fairly short and sweet, but I'll give you a minute to
take a look at that.  But I did want to go ahead and try to
get through any issues with the jury charge this afternoon.

Let's start with the charge, and I'm just going to
go by some headings, and I'm going to start turning pages
until you tell me to stop.

So the Introduction and Jurors' Duties, any issues
from the plaintiff on those two sections?

MS. COLLINS:  No.

THE COURT:  Anything from the --

MR. FOX:  Nothing from the defense.

THE COURT:  All right.  Then we get to Burden of
Proof.  Anything on that section from the plaintiff.

1          MS. COLLINS:  No.

2          THE COURT:  And the defendant?

3          MR. FOX:  Nothing from the defendant.

4          THE COURT:  Okay.  Now, Substantive Law begins

5  with an introductory -- we'll just take this in subparts

6  because there's likely to be a little more to talk about.

7  That first paragraph on page 4 of the current draft begins

8  with "In this case" down to before the first subheading.

9          Any changes or issues with that section from the

10 plaintiff?

11         MS. COLLINS:  No.

12         THE COURT:  Defendant?

13         MR. FOX:  Well, Your Honor, I need to back up a

14 page to the bottom of page 3.  The last paragraph at the

15 bottom says "Ms. Barton claims that Metro discriminated

16 against her because of her religion, comma, refused to

17 accommodate her religious observation, comma, and retaliated

18 against her in violation of Title VII."

19         So we take issue with there being three individual

20 claims in this case.  We briefed this in summary judgment,

21 and Your Honor landed with a memorandum opinion that

22 identified two claims, failure to accommodate and

23 retaliation.  And this is specifically addressed -- the fact

24 that the religious discrimination claim was not in this case

25 was specifically briefed, and Your Honor didn't address that

1 issue head on, but you decided in your memorandum opinion in

2 March of this year that this case was about really just

3 accommodation and retaliation.  And it's nowhere to be found

4 in their amended complaint any kind of disparate treatment,

5 discrimination.

6        That's the only other theory we could think of

7 that this might be, Your Honor, for religious discrimination,

8 would be some type of disparate treatment, but there's no

9 facts alleged that she was -- that there were these other

10 comparators who were outside the protected class and that who

11 were treated more favorably than she was.  There's no

12 alligation of that.  So we've been traveling along now for a

13 couple of years without thinking we're going to have to look

14 at comparators and really defend some people being treated

15 perhaps more favorably than she, so would go the allegation.

16        And then also legitimate nondiscriminatory reason

17 comes into play and also pretext.  And that's getting a

18 little far ahead, but those instructions would need to be

19 there too.

20        THE COURT:  Yeah, but the Sixth Circuit has

21 clearly said the burden shifting process is for summary

22 judgment purposes and not for trial.  We don't ask the jury

23 to do that back and forth because the ultimate issue is -- I

24 mean, there it's have they presented -- is there sufficient

25 evidence, are there undisputed facts such that the claim

```
 1    fails, or whatever the argument may be on summary judgment --
 2    and we'll have to pull the case.
 3              MR. FOX:  Well, just any discrimination case I've
 4    ever been involved in where there's jury instructions, we
 5    always have a section about -- some instruction about
 6    legitimate nondiscriminatory reason --
 7              THE COURT:  Oh, I'm not saying -- I'm not saying
 8    that there's not an instruction on it.  What I'm saying is
 9    it's not as clean of a back and forth --
10              MR. FOX:  That's right.
11              THE COURT:  -- thought process as you would have
12    at summary judgment.
13              MR. FOX:  That's right.  And I agree with that.
14    And partly it's because the plaintiff has to put on their
15    proof first --
16              THE COURT:  Right.
17              MR. FOX:  -- and then the defense goes second, so
18    we don't have . . .
19              THE COURT:  Right.  All right, let me just get to
20    the -- the most recent complaint, which I believe is the one
21    that was filed on April the 10th of 2020, Count One is
22    Violation of Title VII - Religious Discrimination, comma,
23    Failure to Accommodate.
24              MR. FOX:  I'm sorry, what date did you say,
25    Your Honor?
```

```
1              THE COURT:  April the 10th.  Is that the most
2    recent complaint?
3              MR. FOX:  Of '21?
4              MS. COLLINS:  It's ECF 14.
5              THE COURT:  19.
6              MS. COLLINS:  Is it 19?
7              MR. FOX:  I have 14.  March 13, 2020, ECF 14.
8              THE COURT:  What's Docket No. 19 on CM/ECF?
9              MR. FOX:  I don't have all the Pacer in front of
10   me, Your Honor.  I'm sorry.
11             THE COURT:  Angie, can you pull that up?  Because
12   I looked at this over lunch when we were dealing with the
13   Rule 50 motion to make sure I was looking at the right
14   operative complaint, and the one that I found was Docket
15   Entry 19, which was actually filed before the date you just
16   listed.  So it's particularly confusing.
17             MS. COLLINS:  Yeah, that's -- looks like we
18   amended it a couple of times.  But, yeah, that was the last
19   one.
20             THE COURT:  I mean, it does kind of strain --
21   takes a bit of a strain reading -- you might have put the
22   heading on there, Religious Discrimination, but the
23   allegations themselves point to accommodation.
24             MS. COLLINS:  Well, this was also raised in our
25   opposition for summary judgment, that Metro failed to analyze
```

1  or argue that the discrimination claim should be dismissed.

2          MR. FOX:  Right, and in the Judge's -- in

3  Your Honor's memorandum of March of this year, it was just a

4  memorandum about failure to accommodate and retaliation,

5  period.

6          THE COURT:  But was I asked to -- well, I don't

7  have your briefings in front of me.  I have the order.  Is it

8  fair to say that the argument from Metro at summary judgment

9  was "We understand the claims to be two, accommodation,

10  retaliation," and then was the argument in response to that,

11  "Oh, but there's another"?

12          MS. COLLINS:  Yes.

13          THE COURT:  Okay.  So there was a -- because the

14  pretrial order -- let's go back to that because that

15  supplants the pleadings.  So was discriminated and retaliated

16  against.

17          MR. FOX:  Failure to accommodate is a form of

18  discrimination.

19          THE COURT:  Right.  But is the theory something

20  distinct from that, Ms. Collins, or is the discrimination

21  based on the failure to accommodate alone, or is there some

22  other theory that you're riding there?

23          MS. COLLINS:  No, it's both.  In the plaintiff's

24  statement of the issues, we had whether Metro discriminated

25  against and failed to accommodate Barton's religion and

1    retaliated against her in violation of Title VII.
2              THE COURT:  Right.
3              MS. COLLINS:  And then whether she could prove
4    damages.  So it's the liability on those three things and the
5    damages portion.  Did that answer your question?
6              THE COURT:  It does.
7              MR. FOX:  But it's two numbers.  One is
8    discrimination in the form of failure to accommodate.  Two --
9              THE COURT:  And retaliation.
10             MR. FOX:  Oh, and retaliation, yeah.  I mean, they
11   can't invent a claim out of the pretrial order.
12             THE COURT:  No.
13             MR. FOX:  It's to preserve what they've already
14   alleged.
15             THE COURT:  Right, but, I mean, I think -- I mean,
16   there's certainly a heading in the operative complaint titled
17   Religious Discrimination, comma, Failure to Accommodate.  I
18   don't know if that means the failure to accommodate is
19   putting a finer point on it, or if those are distinct
20   theories.  But that's just a heading.  The paragraphs
21   underneath it, the first -- paragraph 17 talks about a
22   request for accommodation; paragraph 18 talks about refusal
23   to accommodate; 19 talks about accommodation twice; 20 is
24   aimed, I guess, at the undue hardship defense; 21 is
25   accommodate; and then 22 is just your causation paragraph.

 1          Where could one find in those allegations a
 2    discrimination based on religion claim that's distinct
 3    from -- I'm not saying the acts underlying it have to be
 4    distinct.  We dealt with that a few hours ago.  But where
 5    could one reasonably conclude and be put on notice that
 6    there's this other claim baked into that, that is distinct
 7    from accommodation?  And at the end of the day, practically,
 8    is that really what you've put on proof to prove, or is it
 9    more the accommodation claim?
10          MS. COLLINS:  Well, I think practically speaking
11    it's more about the accommodation claim.  I think technically
12    speaking it's two different things.  And so --
13          THE COURT:  But what's the proof we've got of
14    discrimination that's distinct from the accommodation claim?
15    Because we got to charge the jury on -- they have to have
16    something in the record from which to conclude that you
17    either win or you lose.  I mean, this reminds me a little bit
18    of a pretrial conference I had a long time ago with
19    Judge Higgins right before he left the bench.
20          Did you ever have much with Judge Higgins?
21          MR. FOX:  No, I did not.
22          THE COURT:  Did you?
23          MS. COLLINS:  No, but I've heard about him.
24          THE COURT:  I had very few things.  I won't say
25    that I'm that old because you-all know I'm not, at least I

1    hope you think I'm not.  But we had a multi-count complaint,

2    and, you know, he fussed at the lawyers, but he liked to fuss

3    at lawyers, and, you know, he made the comment, look, at some

4    point you just have to convince the jury why you win and why

5    the other side doesn't win, depending on which side of it it

6    is, and you can really do yourself a disservice by clouding

7    too many things in there that the jury can't really grab

8    ahold of what it is you're asking them to do.

9              It's your case.  That didn't necessarily stop me

10   from doing it going forward when I was practicing law because

11   you're risk adverse, and you don't know what claims are going

12   to really have the most merit when you actually get to trial,

13   but, I mean, do we need -- I guess the ultimate question is

14   do we need a separate instruction and also a separate

15   question on the verdict form of just discrimination when it

16   seems to me that the meat of the case is an accommodation

17   claim, at least as to the proof that I heard?

18             MS. COLLINS:  I think that the answer to that may

19   be -- from a legal perspective, now that I think about it,

20   might be no, as much as I hate to admit it.  Kind of seems

21   like I was reading a case the other night that said you can't

22   have a separate accommodation and discrimination claim.

23   So -- because it's folded into the same thing.

24             THE COURT:  You mean if -- like I can understand a

25   situation -- and it's not the facts of this case, so don't

hear that.  I'm just thinking in terms of hypothetically --
where somebody says "I need to be accommodated" -- let's just
take it out of the religious thing, and let's use ADA because
that's a fairly close parallel.  "I need an accommodation
for" -- let's say it's a case where the person needed an
accommodation to be able to sit a certain part of the time
while he did his job in a factory, okay.  And they said,
"Absolutely not, can't accommodate you."

Then after that, every time somebody went by them,
they did something that was aimed at that disability.  There
was continuing separate conduct that was more discriminatory
in nature.  They had already made the decision on the
accommodation.  It's more discriminatory in nature.  You
know, "How you holding up there," you know, whatever nickname
they may give him, whatever it is.  Then I can see that those
two theories could be pulled apart and be separate.

Does that make sense?

MS. COLLINS:  Yes.

THE COURT:  You know, whereas here, I think the
operative events, at least as I understand the proof, is -- I
mean, there's operative events and then there's the result of
those events in terms of employment actions, but as I
understand it is several conversations about the requested
leave for the stated reason that Ms. Barton gave of attending
this conference in Sri Lanka and the denial of that leave.

1  Now, there's some other things in there too, I'm not

2  oversimplifying it, but the theory in terms of the

3  distinction between retaliation and discrimination -- not

4  retaliation, accommodation and discrimination seem to kind of

5  merge there.

6           And I'm not sure the complaint really fleshes out

7  much of a meaningful difference, either in Count Two or in

8  the factual basis, which was a pretty simple -- it all

9  relates to her attending this and -- well, I mean, it even

10 says there's an allegation -- I don't know how much of this

11 is part of your trial theory, Ms. Collins, but there's an

12 allegation of discriminatory policy does not examine requests

13 for religious accommodation on a case by case basis, but

14 rather one that is limited to two days.  That's as far as I

15 can -- that's about the best I can find in this complaint

16 that would distinguish it from accommodation, but . . .

17           MR. FOX:  That would be a disparate impact claim,

18 perhaps.

19           THE COURT:  Right.

20           MR. FOX:  Which requires statistical analysis.

21           THE COURT:  Right.  And it's not a

22 discrimination -- just straight up traditional

23 discrimination.

24           But back to the jury instructions, which I think

25 is what started the concern legitimately that we're

1    instructing the jury on a claim that Metro contends is really

2    not in the case.

3          MS. COLLINS:  I mean, I thought it was pretty

4    clear in the pretrial order that it was in this, and I

5    thought that's what we were litigating all along.  And that

6    was, in fact, acknowledged when defendant submitted a

7    separate statement of the issues that acknowledged that there

8    was -- you know, they contended that there was not a

9    disparate treatment, religious discrimination claim.  And so

10   that, to me, was an acknowledgement that there were three

11   claims, they understood that we asserted there are three

12   claims.  We've asserted there are three claims from the

13   summary judgment briefing to this point.

14          The problem I see with just relying on the

15   accommodation claim in and of itself is that the

16   accommodation claim involves that undue hardship element that

17   is not present in a traditional discrimination analysis.  So

18   I think that, while the easy answer would seem to be let's

19   eliminate the discrimination claim and just stick with the

20   accommodation claim, it's a viable claim.  It was viably

21   pled.  They didn't move to dismiss it.  They didn't move for

22   clarification as to what it was.  It was addressed at summary

23   judgment briefing.  It was ignored at summary judgment

24   briefing.  And they acknowledge that we're still contending

25   that at this stage.  So I don't really know like where to

1 fall on that because they are two very different analyses.

2 　　　　　THE COURT:  What was Ms. Barton asked about her

3 claims in her deposition?

4 　　　　　MR. FOX:  I didn't depose her.

5 　　　　　THE COURT:  Oh, did not depose her.  Okay.  That

6 might have been one place to clear it up.

7 　　　　　MR. FOX:  There's no clarification, Your Honor.

8 The EEOC charge doesn't say anything about disparate

9 treatment.  The complaint, as you just went through,

10 Your Honor, talks about failure to accommodate only.  The

11 fact that they -- if there's any disparate treatment there at

12 all, it would have been subject to a *Twombly* motion.  There's

13 just no disparate treatment there.

14 　　　　　And then any time they tried to raise it -- when

15 they tried to raise it in response to our summary judgment,

16 we addressed it there.  And they tried to raise it in this

17 pretrial order, and we've addressed it here.  It's just never

18 been a part of this case, otherwise, we would have put proof

19 on differently and maybe engaged in discovery a little bit

20 differently about similarly situated comparators and who was

21 treated less favorably or more favorably, what evidence there

22 was of pretext and that kind of thing.

23 　　　　　MS. COLLINS:  Well, I mean, I believe it's

24 splitting hairs.  I mean, her EEOC charge, which was drafted

25 by the EEOC, says "I believe I've been discriminated against

1   because of my religion in violation of Title VII," period.
2   So . . .
3           THE COURT:  Right, but I think his point is how is
4   the discrimination -- is the violation of Title VII a failure
5   to accommodate theory or a discrimination theory?
6           MS. COLLINS:  Well, I think it's both, but now I'm
7   confused.
8           THE COURT:  Well, we have a 2015 Supreme Court
9   case that acknowledges, at least in theory, a disparate
10  impact claim can be based on a failure to accommodate, but I
11  don't have that case in front of me, and I'm not sure if that
12  was the theory or whether the Court was asked to decide
13  whether you could have both theories.
14          MS. COLLINS:  *Abercrombie*?  *EEOC versus*
15  *Abercrombie*?
16          THE COURT:  Is that the *Abercrombie*?  Yeah, then
17  maybe I do have that.
18          MR. FOX:  You said disparate impact.  Do you mean
19  disparate treatment?
20          THE COURT:  Yes, that's what I meant.  Yeah.
21  Yeah, this is not an impact case, right.  I mean, there's a
22  fair point raised that -- I mean, I realize at summary
23  judgment the issue was raised by the plaintiff, and then I
24  guess in some way your reply addressed it?
25          MR. FOX:  Yes.

```
 1          THE COURT:  And we just didn't address it at all
 2   in the order?
 3          MR. FOX:  Right, only just by having two headings.
 4          THE COURT:  Right, but didn't --
 5          MR. FOX:  Take it on head on.
 6          THE COURT:  -- take on whether or not there is
 7   that claim --
 8          MR. FOX:  Right.
 9          THE COURT:  -- and if so, whether it survives and
10   all that.  Because I guess it wasn't the subject of the
11   original motion.  It came up in subsequent briefing on that
12   motion, so we were probably a little bit focused on what
13   relief that the motion seeks, as opposed to what's brought up
14   later.
15          What is the religious discrimination -- what proof
16   in this trial could the jury use to conclude that there was
17   religious discrimination different from the proof that would
18   prove the reasonable accommodation?
19          MS. COLLINS:  Because if they had the policy that
20   said -- I mean, it's -- like *Abercrombie*, they had the policy
21   that said you can have two days, two paid days.  That was
22   somewhat conflated into meaning two days, not just two paid
23   days.  And so by them having this policy that they conflated
24   into two days, they --
25          THE COURT:  Are you talking about the handbook
```

1  part where it talks about religious days?

2          MS. COLLINS:  Yeah, uh-huh.

3          THE COURT:  But I don't think that's why they

4  denied her leave, was it was religious days.

5          MS. COLLINS:  But they had granted it in the past

6  when it was just two days.  They had said in the past, if

7  it's just two days, then that's okay.  There was testimony at

8  trial that in June she had gone off to her regional

9  conventions, her summer conventions, that were not

10 international conventions and longer because -- in part,

11 because there was this policy in place that paid for -- that

12 allowed for two paid religious holidays.  And so that

13 testimony was in evidence.  They allowed it previously.  And

14 then when she asked for more time, it's just no, shut the

15 door.

16         And so I think it's a lot like the policy in

17 *Abercrombie*, which involved, if I'm not mistaken, a head

18 scarf.  And they said that, you know, she couldn't wear the

19 head scarf at work, but it had the effect of discriminating

20 against someone.  So the Court in that case said that it

21 wasn't a disparate impact situation, even though it was a

22 policy, but it had an individual effect.  And so in this

23 case, I think that there was this policy, which we touched on

24 a little bit, which allowed her to take the vacation in prior

25 years, even during the summertime, even during the freeze,

1    and so that would amount to discrimination, just religious
2    discrimination, separate and apart from -- separate and apart
3    from the accommodation.  That's -- just reading *Abercrombie*,
4    I think that . . .
5            THE COURT:  Well, I think -- I mean, the parts
6    that I've looked at, particularly *Abercrombie* --
7            MS. COLLINS:  I was on page -- I'm sorry.  I was
8    on page -- well --
9            THE COURT:  I'm at the very end of the majority
10   opinion.  It was written by Justice Scalia.
11           MS. COLLINS:  Yes.
12           THE COURT:  It looks like the arguments presented
13   were -- says (as read):  *Abercrombie* argues in the
14   alternative that a claim based on a failure to accommodate an
15   applicant's religious practice must be raised as a disparate
16   impact claim, not a disparate treatment, we think not.
17           So I think they were trying to get -- the Court
18   was trying to get its head around which form of
19   discrimination does this fall under.  Is it disparate impact
20   or disparate treatment.  And then at the very end, he says
21   (as read):  Title VII requires otherwise neutral policies to
22   give way to the need for an accommodation.
23           I think this was a neutral policy that they were
24   trying to enforce.  But you're asserting a disparate
25   treatment claim; correct?

```
 1            MS. COLLINS:  Yes.

 2            THE COURT:  Okay.

 3            MS. COLLINS:  Disparate treatment, failure to

 4    accommodate and retaliation.  Three.

 5            THE COURT:  All right, let me come back to that

 6    because we've got other instructions I want to get through,

 7    and we're getting shorter on time.

 8            All right, let's go to the Religious Accommodation

 9    instruction.  For the plaintiff?

10            MS. COLLINS:  Oh, were you asking me?

11            THE COURT:  Uh-huh.

12            MS. COLLINS:  For the Religious Accommodation, the

13    only concerns that I had was subparagraph 2, where it says

14    Ms. Barton informed Metro about the conflict.  I'm not sure

15    that pursuant to *Abercrombie* that she has to have informed

16    them.  If they knew about it generally, then that satisfies

17    the inquiry.

18            THE COURT:  Is there any dispute on this element?

19            MR. FOX:  No, I don't believe so.

20            THE COURT:  I mean, what if it said "Metro was

21    aware of the conflict"?  It doesn't matter whether she told

22    them, or they knew for some other reason.  I mean, I don't

23    think there's a dispute in the proof that they had no idea

24    what she was wanting these days off for.  I think it was

25    pretty clear to them what she wanted the days off for; right?
```

```
 1              MS. COLLINS:  Yeah.
 2              THE COURT:  So can we just modify that element
 3    that we're asking the jury to decide to just say "Metro was
 4    aware of the conflict"?
 5              MS. COLLINS:  Yes, that makes sense.
 6              THE COURT:  Is that okay with you, Mr. Fox?
 7              MR. FOX:  Yes, Your Honor.
 8              THE COURT:  All right.
 9              MS. COLLINS:  And then in 3, element 3,
10    Ms. Barton -- I think it would be more accurate to say "was
11    subjected to an adverse action for failing to comply with the
12    conflicting employment requirement."
13              MR. FOX:  No, Your Honor.  That *Reed* case from the
14    Sixth Circuit is very clear.
15              THE COURT:  All right.
16              MS. COLLINS:  The what case?
17              MR. FOX:  *Reed*, R-E-E-D.
18              MS. COLLINS:  Clear about what?
19              MR. FOX:  That part of a prima facie case is to
20    show that the employer discharged the employee or
21    disciplined, that there was no proof of discipline.  I mean,
22    theory, there's no theory of discipline.
23              MS. COLLINS:  I think pursuant to the case law
24    that the Court cited at the judgment as a matter of law then
25    that is prevailing authority.  What is the cite on *Reed*?
```

1    THE COURT:  You're talking about the *Deleon* case I

2  cited earlier?

3    MS. COLLINS:  Uh-huh.  Yes, Your Honor.

4    THE COURT:  Let me try to find that.  Hold on.

5  *Reed* was when, what year?

6    MR. FOX:  2009.

7    THE COURT:  I think *Deleon* was -- here it is.

8    MS. COLLINS:  2009, that predated *Burlington*

9  *Northern*, which clarified, and it gave an expanded definition

10  of what an adverse employment action was.

11    MR. FOX:  We're not talking about retaliation

12  here.  This is discrimination.

13    MS. COLLINS:  Well, it --

14    THE COURT:  This is accommodation.

15    MS. COLLINS:  No, but it dealt with what an

16  adverse action is.  And that's what that is -- that's what

17  you're saying, where it has "Ms. Barton was discharged."

18    MR. FOX:  I think *Burlington Northern* was 2008,

19  anyway.  I don't think that was --

20    THE COURT:  Well, we've got *Deleon v Kalamazoo*

21  *County*, 2014, Sixth Circuit, and they do cite the *Burlington*

22  *Northern* case.

23    MS. COLLINS:  What was the full cite on *Reed*?

24    THE COURT:  It's 569 F.3d 576.

25    In *Deleon*, they talk about the *Burlington Northern*

1  opinion, and they say -- this is 930 -- I'm sorry, 739 F.3d
2  914, 2014 case out of the Sixth Circuit.
3        MS. COLLINS:  I'm sorry, I didn't -- what was the
4  Reed cite again?
5        MR. FOX:  569 F.3d 576.
6        MS. COLLINS:  Okay.
7        MR. FOX:  2009.
8        THE COURT:  I mean, I'm not sure that this -- as
9  we drafted it, now that I look at it, that discharge is the
10 correct term.  In *Deleon*, the Supreme Court addressed the
11 issue at length in *Burlington Northern*.  (As read:)  As in
12 the instant case, the matter involved a transfer from one
13 employment unit to another without a change of salary, title
14 or work hours.  The Court held -- this is quoting *Burlington*
15 *Northern* -- held that, quote, whether a particular
16 reassignment is materially adverse depends on the
17 circumstances of the particular case and should be judged
18 from the perspective of a reasonable person in the
19 plaintiff's position considering all the circumstances,
20 closed quote.  We have held that a transfer may classify as
21 an adverse employment action where it constitutes a
22 constructive discharge.
23        Which isn't the case here.
24        (As read:)  In order for an employee to be
25 constructively discharged, the working conditions must be

1  objectively intolerable to a reasonable person.

2         Again, I don't understand the facts would support

3  that here.

4         Then it says (as read):  Even still, our circuit

5  has not foreclosed the possibility that a transfer not rising

6  to the level of constructive discharge might, nonetheless,

7  constitute a tangible employment action.

8         And it says (as read):  At a minimum, the employee

9  must be able to show a quantitative or qualitative change in

10 the terms and conditions of employment.

11        So I don't know that we have to go all the way to

12 the word "discharge" there.

13        MR. FOX:  Your Honor, and that's a failure to

14 accommodate case?  Because religious failure to accommodate

15 is very specific --

16        THE COURT:  No, I understand.  This was an ADEA

17 case and a Title VII case.  Let me see what the Title VII

18 claim was.  Yeah, says (as read):  Earlier in that case,

19 generally, discrimination claims under Title VII and the ADEA

20 are analyzed using the same framework.

21        This was -- he was reassigned to a different

22 position, and then it was apparently a much more difficult

23 physically demanding position.  He brings claims for race

24 discrimination, Hispanic male, national origin, and age.  You

25 also have an equal protection claim, which --

```
 1              MR. FOX:  Obviously, the Sixth Circuit has etched
 2    out a separate area of law for religious failure to
 3    accommodate, and that's what that *Reed* case talks about.  And
 4    that's why there has to be a discharge or discipline.  In
 5    fact, there's been some source of controversy, I think, at
 6    the Sixth Circuit because some judges sort of say, well --
 7    I'm not sure I personally agree, but that's what the law is,
 8    there's got to be a discharge or discipline for religious
 9    failure to accommodate.  And that's -- like I said, the *Reed*
10    case says it most clearly.
11              THE COURT:  I imagine if one was to shepardize or
12    I guess key site *Reed*, one would be able to find that progeny
13    of cases where the judges, perhaps begrudgingly, followed
14    *Reed*?
15              MR. FOX:  Yes, other panels of the Sixth Circuit,
16    as I recall.  I'm asking my colleague to help me with that.
17              Yeah, and there's a dispute also ongoing at the
18    Sixth Circuit about level of hardship, whether de minimis or
19    not.  I know we're not there yet, but . . .
20              THE COURT:  Right.  But isn't the discharge or
21    discipline just putting a finer point on the concept of an
22    adverse employment action?
23              MR. FOX:  Well, it's not a -- certainly not a
24    post-*Burlington Northern* retaliation type of standard.  It's
25    not just any adverse employment action that might fall under
```

retaliation context. Instead, the courts have used the
phrase "discharge or discipline" to delineate how religious
accommodation cases are different. I mean, we don't -- like
I said before, it's like mixing apples and oranges. We don't
want to get, you know, a medical or ADA issue using the same
standard as a religious issue.

THE COURT: All right, so let me make sure I -- so
the issue with this instruction is element 3, and then you've
got an issue with the de minimis -- what we tried to do there
was quote from -- was that the statute, Eileen? Yeah, the
definition of religion -- I tried to avoid the term
de minimis just because we then would have to explain it to
the jury, and I felt like that having that last paragraph
under Religious Accommodation explain that Metro has the
burden of proving that it was unable to allow her to do that
without undue hardship to operations, which I think is taken
right out of the definition of religion, and not get into
"without a more than de minimis impact," and then you got to
define "de minimis," and just kind of cut straight to what
the issue is, which is undue hardship.

MR. FOX: I object to that, Your Honor. I think
the law right now in Sixth Circuit is pretty clear that it's
got to be something more than de minimis. That phrase is
used repeatedly, and it's why we offered a definition of
de minimis, because the case law talks about even hardship

1  upon co-workers or having to have them take on

2  responsibilities is considered more than de minimis hardship.

3  I'm afraid this is going to leave the jury to conclude that

4  undue hardship is placing something hefty upon the employer

5  when it's not.

6          THE COURT:  All right.  Ms. Collins, your thoughts

7  on that objection on the last sentence of the Religious

8  Accommodation instruction?

9          MS. COLLINS:  I mean, I think that the Supreme

10  Court in *Trans World Airlines* said that de minimis -- it said

11  de minimis cost.  And so if you got into what de minimis

12  means, you would have to put de minimis cost.  And then you

13  could go down a rabbit hole for all the converging cases that

14  got into that.  I know it's one of the most controversial

15  areas right now.  I was actually surprised the Supreme Court

16  didn't accept cert on it last year when it had two cases

17  before it that dealt with the issue, but I think that it

18  would be problematic if you -- if you said "de minimis

19  hardship," and you didn't say "de minimis cost," then -- I

20  mean, you're just opening up the door to a world of

21  confusion.  So -- I see where just undue hardship is the

22  safer route to go because that's what the statute says.

23          MR. FOX:  I'm okay with saying "de minimis cost"

24  so long as I get to argue before the jury that that's the law

25  of the Sixth Circuit, is that it has to be something more

```
 1  than -- I mean, even de minimis cost means that we don't have
 2  to accommodate the request.  And that the burden upon
 3  co-workers is more than de minimis.
 4          MS. COLLINS:  Well, and that's been the criticism
 5  about that terminology, is that it goes outside what the
 6  statute says.
 7          MR. FOX:  I agree, but -- I mean, we could debate
 8  this, but cert denied means that's the law in Sixth Circuit.
 9          THE COURT:  You guys should be on a CLE panel and
10  hash this out.  All right, I'm going to take a further look
11  at that too.  We're obviously not going to get all of our
12  instructions done today, but let's see what else we can get
13  done.
14          So right now for -- I'm looking at the entire
15  instruction as to religious discrimination, whether it goes
16  in or not.  We left some blanks there because we were trying
17  to fashion a description, and I was hoping that perhaps the
18  two of you-all could get together and figure out what to fill
19  in that blank.  Maybe that's a little too optimistic.  But in
20  the event that we give the instruction on religious
21  discrimination -- the objection has been raised that it
22  should not be given at all, and as I said, I'm going to look
23  at that, and I may take it out.  But if we did give it, what
24  are the objections to the one that's currently drafted?
25          Let's start with the plaintiff.  We got to fill in
```

 1   those two blanks, but . . .

 2           MR. FOX:  Yes, Your Honor, we haven't had any

 3   language proposed from the plaintiff.

 4           THE COURT:  Okay.  Do you have any language that

 5   you think is an appropriate succinct description of -- to

 6   complete the sentence was a motivating factor in Metro's

 7   decision blank -- to deny her leave?  To -- we started

 8   tinkering with it, and then thought let's let you-all take a

 9   shot at it.

10           MR. FOX:  Your Honor, while she's going to address

11   that, can I address something on the same charge -- on the

12   same heading?

13           THE COURT:  Yes.

14           MR. FOX:  Even if religious discrimination was

15   going to be in the charge, it would also need to break out

16   the elements that member of protected class, qualified for

17   position, adverse employment action, similarly situated

18   co-workers outside the protected class were treated more

19   favorably, and then a definition of what legitimate

20   nondiscriminatory reason is, and the definition of what a

21   pretext is.

22           THE COURT:  Well, in other words, what you're

23   saying is if we give it, we have to basically go back --

24   according to Metro, go back to the drawing board on this

25   instruction?

```
1            MR. FOX:  Yes, I mean, a full just boilerplate
2  language about what a disparate treatment discrimination
3  claim entails, and that should be put to the jury.
4            THE COURT:  And the elements and so forth.
5            MR. FOX:  Yes.
6            THE COURT:  Okay.  Did you come up with anything
7  to fill in that blank?
8            MS. COLLINS:  In Metro's decision to require a
9  transfer -- to require her to transfer.
10           MR. FOX:  I'm sorry.  I didn't realize it was my
11 turn.  There's just no proof that was put on that we required
12 her to transfer, other than her own subjective belief that
13 she felt that need.  There's no -- it's just not what the
14 case is about.
15           THE COURT:  I was kind of hoping for a fairly
16 neutral description of the decision.
17           MS. COLLINS:  Well, then it would just be a factor
18 in Metro's decision, period.
19           THE COURT:  Well, we thought about that, but
20 then -- I mean, that's what we had, and then we thought,
21 well, we'll give them a chance to put a little more meat on
22 the bone, but I'm fine if we just put decision.  You can
23 argue in your closing what you think the proof shows the
24 decision is and why it matters.
25           MS. COLLINS:  Yeah.
```

1          THE COURT:  What do you think about that?

2          MR. FOX:  Absolutely not, Your Honor.  We object

3     to that.  I think the fact that they can't fill in this blank

4     is very telling.  Essentially what it is, it's overlapping

5     with the failure to accommodate with a -- I think the

6     instinct is to fill in there something about the decision to

7     deny the request, but we all know that that's overlapping of

8     the failure to accommodate claim, it's the same thing because

9     we already have that discrimination charge.  That is

10    discrimination.  That is a charge that's already there.  So

11    that's just very telling that this Religious Discrimination

12    under subtitle A is just not a separate discrete act.  So we

13    object to that.

14         THE COURT:  Okay.  All right.  So we'll leave that

15    one alone then.  I was hoping we might make progress there.

16    So on the Religious -- I'm sorry, the Religious Accommodation

17    charge, we've got one agreed upon change to the second

18    element.  The third one I'm looking at because the objection

19    by Metro is that it has to say either disciplined or --

20    discharged or disciplined under Sixth Circuit authority and

21    the request from Metro to flesh out de minimis more

22    consistent with how the Sixth Circuit has interpreted the

23    statute.

24         MR. FOX:  Yes.  And, Your Honor, Metro filed a set

25    of proposed jury instructions --

1        THE COURT:  Right.

2        MR. FOX:  -- where we set forth some proposed

3  definitions.  And even if Your Honor wants to not use that,

4  at least the authority -- we've cited the authority at the

5  bottom of each one of those.

6        THE COURT:  Right.

7        MR. FOX:  Okay.

8        THE COURT:  All right, this is probably a pipe

9  dream, but how does the Retaliation charge look?

10        MS. COLLINS:  I don't know that we need the first

11  element.  I think it's subsumed in the second and third and

12  fourth.  So that should be one, two, three elements, not

13  four, but -- and I think that there should be just a little

14  bit more explanation as to what "but-for" means consistent

15  with *Bostock versus Clayton county*.

16        THE COURT:  And your objections -- any to the

17  Retaliation charge?

18        MR. FOX:  Your Honor, we're actually pretty close

19  on it.  I want to reiterate -- and maybe this ship has

20  sailed, but I want to reiterate our objection to No. 1.  I

21  haven't had a chance to look at the case law yet that you

22  have cited earlier around lunchtime about that request for

23  religious accommodation, in and of itself, is protected

24  activity that you could sue on later for retaliation, but

25  I --

1          THE COURT:  I don't know if I would quite put it

2    that way, but that it is, itself, protected activity, I think

3    is what --

4          MR. FOX:  I had understood the case law, when I

5    read it, that it could be true if it was coupled with kind of

6    in your face opposition to employer about a policy of the

7    employer, you know, direct opposition.  That's my

8    understanding, but I would -- I need -- maybe perhaps

9    overnight I can take a look at this, and I could come back

10   around if that case law -- if we agree with it, then it may

11   be that we could agree to that wording, but everything else

12   is fine.  I do agree with opposing counsel that maybe there

13   should be a definition of "but-for" causation.

14         THE COURT:  What are your thoughts on her

15   suggestion that we can merge the first and second elements?

16         MR. FOX:  We object to that, Your Honor, because

17   we feel like, until I look at this case law and know for sure

18   and form an opinion on it, that No. 1 should be opposition to

19   a policy or procedure of the government that you feel as

20   though is violative of Title VII.  I always felt like that

21   should be element 1.  And then No. 2, Metro was aware that

22   the opposition had been made, then et cetera, et cetera.

23   But, like I said, I just need to study it.  If I could have

24   overnight, maybe we could come in first thing in the morning,

25   I could agree to that and waive my objection.

1          THE COURT:  Unfortunately, I think the earliest I
2    can start is maybe 9, 9:15.  But we will take a look at maybe
3    fleshing out a little bit more on the "but-for."  It seems
4    like you-all agree that more there could be helpful to the
5    jury.
6          MS. COLLINS:  Yes.  And we proposed some language
7    in our set of jury instructions that was taken from *Bostock*.
8          THE COURT:  We'll look at that.  All right.  So we
9    didn't make a whole lot of progress on our three substantive
10   instructions.  Are there any objections to the Compensatory
11   Damages instruction from the plaintiff?
12         MS. COLLINS:  No.  These are the same ones you've
13   used before; right?
14         THE COURT:  I believe so, yeah.
15         MS. COLLINS:  Okay.
16         THE COURT:  And what about from Metro?
17         MR. FOX:  No, Your Honor.
18         THE COURT:  And the Back Pay, we're basically just
19   telling them don't concern yourself with that, but I
20   understand that plaintiff needs to put on their proof for
21   that.  So if we get to that, then we'll deal with that
22   separately.  We're just instructing the jury not to concern
23   themselves with it.
24         And then the General Rules after that, any
25   objections to those, typos, requested changes, so forth?

1          MS. COLLINS:  No.

2          THE COURT:  It's pretty boilerplate stuff.

3          MR. FOX:  From the defense, no, Your Honor.

4          THE COURT:  All right.  Well, we're kind of back

5    where we started an hour ago, which is what are we going to

6    do with our three substantive instructions.  I'm going to

7    take a look at it, in particular, just so that you know what

8    we're going to be taking a look at:

9          One is whether the instruction should be given at

10   all on the Religious Discrimination claim for all the reasons

11   both sides have stated.  I won't go back through those.  Then

12   there are some issues with the wording of the reasonable --

13   or the Religious Accommodation claim, particularly that

14   element, that final element, and then more on the de minimis.

15   And then Metro wants to take a look at some of the issues on

16   retaliation, whether those elements are correctly stated.

17   And then there's the "but-for" fleshing out, that we'll look

18   at your instruction and try to figure out a way to

19   incorporate that into the instructions.

20         So I think those are the four or five pins that

21   we've left in this thing to come back to.  Let's try to shoot

22   for -- we're going to have to keep our jury waiting a little

23   bit tomorrow.  I can just -- I know that's going to happen.

24   I'm going to try to be succinct and clear on where I come

25   down on the first claim, because I need to look back at the

1   complaint, the pretrial order, the summary judgment briefing,
2   all that.  But as far as the other two claims -- and then
3   what instruction you would want should it go to the jury, we
4   hadn't even really unpacked that one yet.  And then we'll
5   look at the other two instructions.
6           And try to be as prepared with exactly what you
7   want when we start in the morning as you can be so that we
8   can make some progress.  And then when we're ready for the
9   jury, we'll be ready for them, but not until we are, not
10  until we get this instruction done.
11          Yes, sir?
12          MR. FOX:  And, Your Honor, at some point I need to
13  renew my Rule 50 motion before the case is sent to the jury.
14          THE COURT:  Right.
15          MR. FOX:  I don't want to belabor all the points.
16  Would I be able to do that first thing tomorrow morning?
17          THE COURT:  Sure, you can.
18          MR. FOX:  Okay.
19          THE COURT:  I mean, if you want to say a whole lot
20  more than "For the same reasons that I stated earlier," you
21  can flesh that out.  That may bog us down a little bit if you
22  raise some new issues, but it's your right to make the
23  motion.  I'm already seven minutes late for a meeting that
24  I'm supposed to be in.  So we will just add that to the pins
25  we've put in things this afternoon.

1          MR. FOX:  We appreciate your time, Your Honor.

2          MS. COLLINS:  Your Honor, can I bring up one thing

3     because I know -- on the verdict form, it just leaves off a

4     line for back pay.  It just has compensatory damages.

5          THE COURT:  Right, because I just have an

6     instruction in here that says the judge -- if they find for

7     liability, then the judge will award back pay.  That was the

8     instruction we just looked at.

9          MS. COLLINS:  What now?  It had two different --

10     it had Back Pay and Compensatory.

11          THE COURT:  And Back Pay said "You don't need to

12     worry about this, Jury.  You don't need to concern yourself

13     with it."  There's proof in the record for back pay, but the

14     jury is not asked to award the back pay piece of compensatory

15     damages I think under controlling authority.  We may have

16     done it differently before, but I've been converted, I guess.

17          MS. COLLINS:  I didn't really get that.

18          THE COURT:  We'll have to pull the case because

19     we've been looking at this other stuff.  I don't have it

20     committed to memory, but in a pretty recent employment

21     case -- and the lawyers agreed, that back pay would be

22     awarded -- the amount of back pay would be decided by the

23     Court as a remedy and not as -- if they find liability on

24     whatever theories they're presented with, then, of course,

25     you're going to be able to argue for back pay.  And then

1  that's up to me to decide the back pay amount.

2          MS. COLLINS:  I see what you're saying.

3          THE COURT:  And I think we had that issue come up

4  in that other case, didn't we?

5          MR. FOX:  Yes.

6          THE COURT:  Where they awarded it, and that was

7  wrong.

8          MR. FOX:  They awarded zero.

9          THE COURT:  Oh, they awarded zero, and we probably

10 shouldn't have even given it to them.  Is that my memory --

11         MR. FOX:  Yeah.  And we probably shouldn't discuss

12 it, Your Honor, without opposing counsel here because it's --

13         THE COURT:  That's true.

14         MR. FOX:  -- it's an ongoing case.

15         THE COURT:  That's a fair point.  That's a fair

16 point.  I'm just trying to remember the sequence of events.

17         MR. FOX:  Right.

18         MS. COLLINS:  No, I know what you're talking

19 about.  You're talking about the statutory language of

20 Title VII.

21         THE COURT:  Perhaps.  I just know that we had a

22 case last time that both lawyers agreed said the jury can

23 decide the liability, and if they find liability, then the

24 judge then steps in and does back pay.

25         MS. COLLINS:  Okay.

1            THE COURT:  And if it was done differently in

2    other cases, then it was done differently, but -- any other

3    concerns from the plaintiff on the verdict form?

4            MS. COLLINS:  No, Your Honor.

5            THE COURT:  What about from the defendant?

6            MR. FOX:  No, Your Honor.

7            THE COURT:  All right, we got at least something

8    in the can.  Just take a look at it in the morning.  If you

9    discover something with the verdict form that's problematic,

10   I'll hear you out, but --

11           MR. FOX:  It would just be the elimination of the

12   discrimination --

13           THE COURT:  Oh, sure.  If I don't charge them on

14   that count, I'm not going to give them a question to answer.

15           MR. FOX:  Right.

16           THE COURT:  All right, everybody have a good

17   evening.

18

19           (Proceedings adjourned at 4:10 p.m.)

20

21

22

23

24

25

1        <u>REPORTER'S CERTIFICATE</u>

2        I, Patricia A. Jennings, Official Court Reporter

3   for the United States District Court for the Middle District

4   of Tennessee, with offices at Nashville, do hereby certify:

5        That I reported on the Stenograph machine the

6   proceedings held in open court on November 9, 2022, in the

7   matter of CAROL BARTON vs. METROPOLITAN GOVERNMENT OF

8   NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,

9   Case No. 3:20-cv-00118; that said proceedings in connection

10  with the hearing were reduced to typewritten form by me; and

11  that the foregoing transcript (pages 1 through 154) is a true

12  and accurate record of said proceedings.

13        This the 3rd day of January, 2023.

14

15

16

17

18                      /s/ Patricia A. Jennings
                        Patricia A. Jennings, RMR, CRR
19                      Official Court Reporter

20

21

22

23

24

25