UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CAROL BARTON                        )
                                    )
vs                                  )          Case No. 3:20-cv-00118
                                    )
THE METROPOLITAN GOVERNMENT         )
OF NASHVILLE AND DAVIDSON           )
COUNTY, TENNESSEE                   )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


BEFORE THE HONORABLE

WILLIAM L. CAMPBELL, JR., DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

November 10, 2022

Volume 3


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Patricia A. Jennings, RMR, CRR
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
patty_jennings@tnmd.uscourts.gov

APPEARANCES:

For the Plaintiff:          Heather M. Collins
                            Ashley S. Walter
                            HMC Civil Rights Law, PLLC
                            7000 Executive Center Drive
                            Suite 320
                            Brentwood, TN  37027

For the Defendant:          J. Brooks Fox
                            Kelli F. Woodward
                            Benjamin Andrew Puckett
                            Metropolitan Legal Department
                            P.O. Box 196300
                            Nashville, TN  37219

I N D E X

                                                              Page

Charge Conference Cont............................    4

CLOSING ARGUMENTS:
     By Ms. Collins................................   40
     By Mr. Fox...................................   57
     By Ms. Collins................................   68

Jury Charge.......................................   70

Verdict..........................................   92

1       The above-styled cause came to be heard on

2  November 10, 2022, at 10:00 a.m., before the Honorable

3  William L. Campbell, Jr., District Judge, when the following

4  proceedings were had, to-wit:

5

6       THE COURT:  All right, good morning.  You-all are

7  probably wondering when our 9:15 charge conference is going

8  to start.  Apologize for the delay.  We continued to try to

9  noodle on this and get to the right place, and in the midst

10 of that, our copy machine decided it needed a break.

11      All right, before we get to the substance of the

12 charge on the three substantive counts, we made a minor tweak

13 to the verdict form.  And that was we just simply emphasized

14 a couple of words in the guidepost instructions after

15 question three so that they understood that if they answered

16 "yes" to any of the first three, they should go to question

17 four.  If they answered "no" to all, then they need to sign

18 the verdict form, and that's the end of it.  So hopefully

19 that will be very clear to them, but no other substantive

20 changes to the verdict form.

21      In terms of the charge, there was an issue raised

22 yesterday about whether the first substantive jury charge,

23 which is for religious discrimination, should be in there.

24 I've gone back and looked at the history of the case.

25 Suffice it to say, a charge conference, especially after all

the proof is in, is probably not the ideal place to raise a
question about whether a claim is in the case or not.
There's been plenty of time to sort that out before we got to
trial.

The original complaint file does have a
paragraph 11 -- well, let me back up because we talked about
a couple of complaints. My understanding is that there was
really just one amended complaint. It was filed at two
different docket entries, something to do with Judge
Newbern's handling of the request to amend. And so it ended
up -- the same document ended up with two different docket
numbers, I think is what we figured out.

MR. FOX: That's right.

THE COURT: Yeah. So I'm going off of Docket 19,
which I think is the same as Docket 14, and I think that that
amendment was really as to a proper party and not necessarily
the substance of the claim.

Is that a fair summary of the amendment process?

MS. COLLINS: Yes, Your Honor.

THE COURT: Okay. Paragraph 11 references a
discriminatory policy. The heading of Count One is Religious
Discrimination. There was a motion to dismiss filed, but it
wasn't as to the merits of the claim. Then there was an
answer filed. And then there was subsequently a motion for
summary judgment that sought summary judgment against the

1   plaintiff on a failure to accommodate -- provide religious

2   accommodation and retaliation claim, but not as to a

3   discrimination claim.

4          The plaintiff, in response to that, pointed out

5   that there's also a religious discrimination claim.  The

6   defendant raised that issue -- or addressed that issue in the

7   reply, but there was no motion before the Court as to that

8   claim, nor was there one after.  Then the pretrial order that

9   supplants the pleadings did say that Metro -- that

10   Ms. Barton -- and this is in the theory of the case -- was

11   discriminated and retaliated against.  Then in the statement

12   of the issues, the plaintiff stated the issues for trial is

13   whether Metro discriminated against and failed to

14   accommodate.  That was filed jointly on October the 24th.

15   There was also around the same time a proposed jury

16   instruction by the plaintiff on a religious discrimination

17   claim that was distinct from its failure to accommodate

18   claim.

19          And so all along the way, there was no motion to

20   dismiss, there was no motion for summary judgment, there was

21   no motion for more definite statement.  This all could have

22   been cleaned up a long time ago.  And on top of that, I

23   understand that Metro exercised their discretion not to

24   depose the plaintiff.  It's your choice whether to depose

25   somebody or not, but certainly the nature of her claims could

1  have been fleshed out at a deposition.

2          So I think that charging the instruction --

3  charging the jury, rather, on a religious discrimination

4  claim, that while not -- perhaps not pleaded in great detail,

5  certainly satisfied the notice pleading requirements.  And

6  nobody's challenged that.  Nobody's asked for a more definite

7  statement or anything along those lines.  So I think we're

8  left with that claim in the case.

9          The instruction that we've given you is the

10 pattern instruction on a religious discrimination claim.  It

11 doesn't include all of the back and forth of the McDonnell

12 Douglas burden shifting because the Sixth Circuit has said

13 that's not what the jury is really tasked with doing as

14 clearly as what would be the case in summary judgment

15 briefing.  So we have included the pattern instruction, which

16 is the Federal Jury Pattern Instruction Section 171:20.  And

17 that's the 6th Edition.  We've combined a few sentences for

18 readability, but for the most part, that's the pattern

19 instruction that we intend to give on the religious

20 discrimination claim.

21          I understand that Metro has an objection to this

22 charge being given at all.  That objection is noted.  But as

23 far as the substance of the charge, it's right out of the

24 patterns.  And generally the patterns are viewed as proper

25 instructions, otherwise we wouldn't have them.

1    Any concerns with this pattern instruction on the

2    religious discrimination claim from the plaintiff?

3    MS. COLLINS:  No, Your Honor.

4    THE COURT:  All right.  From the defendant?

5    MR. PUCKETT:  Your Honor, Metro would take the

6    position that it's plaintiff's burden to prove intentional

7    discrimination throughout the trial.  So understanding that

8    we've sort of moved past that prima facie stage of summary

9    judgment, Metro would still prefer an instruction on

10   legitimate nondiscriminatory reasons and pretext given that

11   that is a part of the burden, and it's also Metro's right to

12   assert that as an affirmative defense.

13   THE COURT:  Well, the Sixth Circuit in *Beard*

14   *versus AAA of Michigan*, 593 Fed. App'x 447, a 2014 case --

15   this is reviewing a proposed jury instruction that was given

16   for abuse of discretion standard -- said (as read):  The

17   proposed instruction each referred to aspects of McDonnell

18   Douglas burden-shifting framework instructing the jury to

19   examine the employer's legitimate nondiscriminatory reasons

20   for pretext and informing the jury that a more favorable

21   treatment of a similarly-situated individual creates an

22   inference of discriminatory animus.  As the Court has

23   discussed, it is normally inappropriate to instruct the jury

24   on the McDonnell Douglas analysis.

25   Do you have a more recent authority where the

Sixth Circuit panel has said that the McDonnell Douglas
analysis should be part of an instruction?  I know you-all
didn't provide an instruction because you were sort of taking
the position that this wasn't even a claim, but do you have
anything contrary to *Beard*?

MR. PUCKETT:  You read my mind, Your Honor.  And,
no, we don't have any case that's contrary.

THE COURT:  Okay.  Other than the request for a
completely different instruction, the one in front of you,
are there any objections to the wording of that instruction
out of the patterns?

MR. PUCKETT:  Beyond Metro's request to include
those other instructions that -- no objections.

THE COURT:  All right, the Religious
Accommodation, the issue yesterday on this instruction was
the third element that was raised on the phrase "discharged
or disciplined."  And the case cited was the *Kemp* case, I
believe, which -- *Reed*.  Not *Kemp*, *Reed* -- which didn't quite
stand for such a clear proposition.  And there's been one
other court of appeals opinion that we found that relied on
it.  There have been district court opinions that relied on
it for the proposition that the element is, as Metro has
suggested, discharged or disciplined.  The *Reed* case itself
relied on *Tepper versus Potter*, which was a Sixth Circuit
2007 case, 505 F.3d 508, that looked at this issue.

*Tepper* is actually referred to more by subsequent courts than is *Reed*. And those courts have followed that, what they believe is the instruction and the standard given in *Tepper*, which is discharged or disciplined. It says (as read): The third prong of the prima facie case is whether *Tepper* can demonstrate that he has been discharged or disciplined. And then it goes on to talk about the Supreme Court opinion and *Ansonia Board of Education versus Philbrook*, 479 US 60, which is a 1986 case.

And so looking at those, I think that the instruction that we have come up with on that third element would be proper under existing Sixth Circuit law. So let me hear -- that's the reason for that change. I've kind of given you my thinking. The other change we made was adding more about the undue burden defense. We still shied away from the phrase de minimis, but I think we got the same concept in there, which is that Metro has proven that it was unable to allow Ms. Barton to attend a religious observance without undue hardship, and then instead of saying de minimis impact and then defining de minimis and then defining what de minimis isn't, we skipped those two middle steps and just went right to what is an undue hardship. And that's that extra small paragraph at the end of that instruction. That's how we got there.

So from the plaintiff, on this charge on Religious

1  Accommodation, are there any objections to the proposed

2  charge?

3          MS. COLLINS:  Yes, Your Honor.

4          THE COURT:  And what are those objections?

5          MS. COLLINS:  Under *Reed* -- *Reed* was a motion for

6  summary judgment case, that obviously you noted that those

7  were the prima facie elements.  The Supreme Court has said in

8  *Swierkiewicz versus Sorema*, 534 US 506, 2002, that the

9  precise requirements of a prima facie case can vary depending

10 on the context, and they were never intended to be rigid,

11 mechanized or ritualistic.  And that's exactly what they're

12 arguing in *Reed*.

13         Again, *Reed* was a summary judgment case.  And that

14 case did not specifically address whether it had to be

15 discipline or that it had to be a discharge.  The dissent

16 made that argument in *Reed*, and the majority noted that.  The

17 dissent contended that the case was the first in our circuit

18 to squarely present the question whether a plaintiff had to

19 satisfy the prima facie case for a religious accommodation

20 claim by showing an adverse action without showing discharge

21 or discipline.  And the majority said because we hold the

22 specific accommodation *Reed* challenges here does not rise to

23 the level of an adverse employment action, we are not

24 presented with the issue.

25         So this --

1    THE COURT:  What about *Tepper*, though?  Because

2  *Reed* relies on *Tepper*.

3    MS. COLLINS:  Well, again, I think that the facts

4  in *Tepper* fit that scenario, but if you go back to the

5  Supreme Court's instruction for a prima facie case, that it's

6  not supposed to be rigid or ritualistic -- which is what this

7  is when you're putting it in a box that it doesn't belong in,

8  and it preceded the *Burlington Northern* line of thought,

9  which also goes into the *Deleon* case that you mentioned

10  yesterday that does recognize that an adverse action can be

11  much broader.  It's not just a discipline.  It's not just a

12  discharge.  And so I think that this can be a confusing

13  instruction in that it is rigid.  It's more geared towards

14  summary judgment.  But it doesn't recognize the facts of this

15  case, which dealt with something different.

16    She was given a choice.  So it doesn't fall neatly

17  within the area of discipline.  It doesn't fall neatly within

18  the area of discharge.  It falls in this broader category of

19  adverse action.  And I think that that needs to be reflected

20  in the jury instruction to -- you know, even if we put in

21  there transfer, or something broader than just this narrow

22  definition of discipline or discharge.  I just think that

23  that's inappropriate.  I think the facts in *Tepper*, if I'm

24  not mistaken, and I don't have that in front of me, I think

25  that they did deal with a discharge.  I could be wrong, but I

think that that's what they did, that it did fit neatly
within that box.  This does not.

And so for that reason, I would object to *Reed*
being incorporated into the instruction because really it's
relying on an argument that was made in the dissent, and the
majority did not pick it up.  And, you know, sometimes when
cases come after that, they rely on language that is just not
appropriate to rely on, but it's not in this case.

Now -- do you want me to move on to the other
argument, or do you want to think about that?

THE COURT:  No, let's discuss that one.

MS. COLLINS:  And, Your Honor, there was a
subsequent Sixth Circuit case, it was an unreported case,
*Mitchell versus University Medical Center*, 2011 US App Lexus
26546, and it clarified *Reed* to mean that discipline must at
least rise to the level of an adverse employment action
element of a discrimination claim, which I think is
consistent with it being appropriate to instruct the jury on
the broader language.

And *Mitchell* goes on to clarify that we have
indicated that the discipline element of an accommodation
must at least rise to the level of an adverse employment
action element of a discrimination claim.  And they went on
to cite the various things, that it can include a significant
change in an employment status, such as hiring, firing,

1   failing to promote, reassignment with significantly different
2   responsibilities.
3        So we could use that language of "reassignment
4   with significantly different responsibilities" if you thought
5   it was appropriate to be more specific than just using the
6   broad term "adverse employment action."
7        THE COURT:  All right, defendant's response on
8   that particular phrase?
9        MR. PUCKETT:  Sure.  Your Honor, I think the
10  instruction is accurate, and the Court correctly noted that
11  *Tepper* really is the line.  *Reed* expanded on the logic.  The
12  *Reed* case quoting *Tepper* said (as read):  In this circuit,
13  it's settled that the analysis of any religious accommodation
14  case begins with the question of whether the employee has
15  established a prima facie case of religious discrimination.
16       That's at page 579.  It begins with the analysis
17  of whether there's been intentional discrimination and then
18  moves on to whether they've established a failure to
19  accommodate.  The last line of the case, again, extending the
20  logic of *Tepper* says (as read):  Because *Reed* has not shown
21  any materially adverse employment action, much less discharge
22  or discipline, his religious accommodation fails.
23       My colleague is correct to say that *Reed* doesn't
24  directly address whether or not this element continues, but
25  that's because they note the dissent, and they say, "Look, we

1   don't even have a materially adverse employment action here,

2   so we certainly can't have discharge or discipline." So it's

3   the first threshold that the plaintiff in *Reed* failed, not

4   the additional requirement for a failure to accommodate claim

5   of discharge or discipline.

6          THE COURT: What about her argument that elements

7   of claims are not to be rigid and instead should be malleable

8   to a particular case? And I think -- if I get this wrong,

9   I'm sure Ms. Collins will tell me, but I think her argument

10  is discharge and discipline are forms of adverse employment

11  actions, and that's really what the elements in an employment

12  case are aiming at. The use of those two words in this

13  particular context isn't required in every case if it's a

14  situation where you might not have something that technically

15  qualifies as a discharge or even possibly a discipline, it

16  could still be an adverse employment action. And so I think

17  her proposal is to have some phrase added to this last

18  element that would broaden it beyond discharge or discipline.

19         So what are your thoughts on that particular

20  request?

21         MR. PUCKETT: Sure. I think the malleability of

22  the elements is understandable, but at some point the

23  malleability threads the integrity of the law. And I think

24  the law here -- the accurate statement of the law here is

25  that it requires a discharge or discipline. So moving

outside of those bounds, it may seem rigid, but in the end, the law requires some black and white definition. And we can't flex our jury instructions to conform with plaintiff's proof so that she's got a case. I think the law must apply. And here, *Tepper* is the law, *Reed* is the law.

When we say that discharge or discipline is just sort of another word for materially adverse employment action, I think that doesn't fit particularly with *Reed's* analysis where they say that they're distinct, right. We haven't reached an adverse employment action, so we're not even going to analyze whether or not the plaintiff was discharged or disciplined. That implies that those are separate and distinct sort of theories. They're separate and distinct analyses. So one cannot be the other. I think discharge and discipline is narrower than materially adverse -- I apologize, I keep struggling with that phrase -- materially adverse.

I think the case law, in general, in these Title VII cases will show that materially adverse has pretty broad meanings that go, you know, beyond discharge or discipline. Discharge or discipline are phrases that are intentionally used and used again and again in the Sixth Circuit with regard to failure to accommodate cases, and they hold a narrower meaning than anything that's materially adverse.

1    I think a good example of that would be the *Deleon*
2  case, Your Honor, where that was an involuntary transfer.
3  That's not discharge or discipline, but the Court in that
4  case found that that was materially adverse.  That wouldn't
5  fit into failure to accommodate analysis, but it did work in
6  the *Deleon* case, which was a separate theory of intentional
7  discrimination.
8    THE COURT:  So, in other words, Ms. Collins's
9  argument as to some sort of adverse employment action is
10  really subsumed in the discrimination claim, even though we
11  don't really say that in that instruction because that just
12  looks at the decisions made, as opposed to -- well, no, we do
13  say adversely affected.
14    MR. PUCKETT:  Right.  And that's --
15    THE COURT:  I'm sorry, you're right.
16    MR. PUCKETT:  I'm sorry to interrupt.
17    THE COURT:  No, I'm correcting myself.  I missed
18  that.  And so your position is that *Reed* -- any distinction
19  made in the cases differentiates adverse employment action in
20  the discrimination context and carves out a narrower elements
21  for an accommodation claim?
22    MR. PUCKETT:  That's correct, Your Honor.
23    THE COURT:  Okay.  Well -- okay.  I'm going to
24  leave that element as it is.  And as I look further at
25  *Tepper* -- and it went on to talk about the *Ansonia Board of*

1 *Education* case. And it said (as read): However, more than

2 loss of pay is required to demonstrate discipline or

3 discharge. Then it quotes the *Ansonia Board* case. And the

4 conclusion was *Tepper* -- in this case, the facts related to

5 the payment for time he didn't work. (As read:) Said Tepper

6 is simply not being paid for the time he does not work. He

7 has not been disciplined or discharged.

8           I think *Tepper* was pretty clear that that was the

9 standard. Another panel may come along in this or some other

10 case and say that's not right, but I think right now that's

11 the authority to follow. So I'm going to keep that element

12 as it is.

13           Then on the undue burden, which we've tweaked a

14 bit, are there any objections to that handling of the undue

15 burden and trying to explain what that is and is not from the

16 plaintiff?

17           MS. COLLINS: Yes.

18           THE COURT: Okay, what's your objection?

19           MS. COLLINS: The language where it says

20 (as read): If the request were to cause anything more than

21 an insignificant trifling or negligible effect on the

22 employer's business, then it is considered an undue burden, I

23 think that that's a pretty steep hill to climb.

24           The language that *Trans World* last noted was that

25 it was related to cost. I don't believe that language was in

1   *Trans World*, but maybe that's where you got it from.

2         THE COURT:  No, I think we got it from -- we were

3   merging some proposed instructions on undue burden and

4   de minimis with the idea of avoiding inserting a phrase in,

5   i.e. de minimis, and then having to explain it and explain

6   what it wasn't.  That seemed to me to be unnecessary, that we

7   could get to the same point without all those steps.  And I

8   think that the authority cited by the defendant in its

9   pattern instructions on this --

10         MS. COLLINS:  Well, also, I don't think that

11   engaging in acts of speculation is enough to deny someone an

12   accommodation.  In *Arlington Transit Mix, Inc.*, 957 F.2d 2019,

13   I believe that was a Sixth Circuit case from -- I have to

14   look that up, what year it was, but the Sixth Circuit said

15   (as read):  After failing to pursue this or any other

16   reasonable accommodation, the company's in no position to

17   argue that it was unable to accommodate reasonably his

18   religious needs without an undue hardship on the conduct of

19   its business.

20         And what happened in that case was that the

21   company instituted a policy, and the policy effectively

22   roadblocked the accommodation that the employee had received

23   for a number of years.  And by doing so, that amounted to --

24   they said you can't argue that it would be an undue hardship

25   when you create the hardship.  So I think that the language

1  needs to be tweaked to be not so heavily weighted on the

2  employer side to not recognize the fact that if you create

3  the hardship, which is what happened in this case, it's

4  not -- it's not undue.  It's not an undue hardship because

5  you don't even get to that point when you -- when you create

6  that.

7           THE COURT:  But, I mean, if this is a correct

8  statement of the law, you still have that argument.  You can

9  still say to the jury, hopefully in the next hour or so, they

10 created this mess, I mean, I think is what you're basically

11 saying.  But isn't that a correct statement of what undue

12 hardship is?  And there's no dispute that that's a defense;

13 right?  It's a cognizable defense to this claim.

14          MS. COLLINS:  It's a defense.

15          THE COURT:  Right.

16          MS. COLLINS:  But if the jury latches onto this

17 very specific language, then it's a problem because it

18 doesn't address the argument that I would make -- it doesn't

19 specifically say in here -- and I know how -- I had this

20 experience with juries before, where they look at these

21 instructions, and they break them apart, and no matter what

22 argument I make, if I say that, you know, they created this

23 mess, so none of this matters, they're going to go back to

24 the instruction.  So whatever I argue won't matter if we

25 don't have some sort of instruction to counterbalance that.

1      THE COURT:  That's what I told them on Tuesday
2 morning, "If what they say on the law" -- and I'm about to
3 tell them again -- "conflicts with what I say about the law,
4 listen to me."
5      MS. COLLINS:  Exactly.
6      THE COURT:  And, I mean, that's why we give them
7 the instruction in the first place, so they have something to
8 anchor their deliberations on.
9      MS. COLLINS:  Right.  And that's why we need to
10 get the instruction correct.  And I think that, while this is
11 an isolation, it can be considered a correct statement of
12 law.  If you don't extend that to show that what's written
13 about in *Arlington*, that if an employer creates the problem,
14 or if they create the hardship, then they can't -- then it's
15 not a viable defense because that's exactly what *Arlington*
16 stated.
17      THE COURT:  Right, but in that case, if -- I
18 haven't read it, but taking your characterization of it, then
19 that -- the policy change seemed to have been aimed at a
20 particular accommodation that was already being given; right?
21      MS. COLLINS:  Yes.
22      THE COURT:  That's not what this case involves.  I
23 mean, nobody implemented the policy clairvoyantly to know
24 that Ms. Barton might get selected as a delegate to go to
25 Sri Lanka; right?

1    MS. COLLINS:  That is correct, but that doesn't

2 mean -- just because the first time that it came up with

3 Ms. Barton doesn't mean that it was a correct policy in the

4 first place.  I mean, it's like in the ADA context.  If you

5 have a hundred percent heal policy saying an employee has to

6 be a hundred percent healed before they come back to work,

7 you're going to exclude a whole swath of employees, and

8 you're going to totally miss the opportunity under the ADA to

9 engage in that reasonable accommodation conversation to

10 figure out whether or not they could work.  This is the same

11 premise in that, you know, they have a very exclusionary

12 policy, and who knows who it's going to affect until it comes

13 up.

14    THE COURT:  But, I mean, my point, though, is

15 you're arguing for expansion of this charge on the premise

16 that the policy was implemented for some purpose relating to

17 Ms. Barton's request for an accommodation.  And I just don't

18 think that's -- I mean, I think you certainly have facts in

19 the record where you can argue that it wouldn't have been an

20 undue hardship if they would have just engaged and done X, Y

21 or Z, they could have avoided this, and they didn't, they

22 didn't do anything, I mean, whatever you're going to argue.

23 My main concern is, is this a correct, complete and accurate

24 statement of, in particular, this defense.

25    MS. COLLINS:  No.  It doesn't clarify that it's

1   Metro's burden.

2           THE COURT:  Well, it says that Metro has proven.

3           MS. COLLINS:  No, down in the last paragraph is

4   what I'm referring to.  (As read:)  If an accommodation

5   request from an employee were to cause anything more than an

6   insignificant, trifling or negligible effect on the

7   employer's business, then it is considered an undue burden.

8           That's Metro's burden.

9           THE COURT:  Right.  Right above that, we've said

10  (as read):  Unless you determine that Metro has proven that

11  it was unable to allow Ms. Barton to attend a religious

12  observance without undue hardship on Metro's operations.

13          And the next sentence is just an explanation of

14  what is an undue hardship and what is it not.  (As read:)  If

15  an accommodation request from an employee were to cause

16  anything other than an insignificant, trifling or negligible

17  effect on an employer's business, then it's considered an

18  undue burden.

19          That's just defining what an undue burden is and

20  is not.

21          MS. COLLINS:  Sure.  Well --

22          THE COURT:  We've already said it's their burden.

23          MS. COLLINS:  Well, I think that it might be a

24  little bit clearer if undue hardship and undue burden -- if

25  there was consistent language.  If it said undue hardship up

1  at the top, and then it should say undue hardship in that

2  second paragraph.

3          MR. PUCKETT:  I was going to bring that up myself.

4          THE COURT:  That's fine.  I can change the last

5  one to just say hardship, and we're consistent in both

6  places.

7          Okay.  Anything else on this instruction?

8          MS. COLLINS:  I just would like to state for the

9  record we do object to the language of discipline or

10 discharge.

11         THE COURT:  Okay.

12         MR. PUCKETT:  Your Honor, we just agree with

13 everything you said, obviously, and a few things that

14 opposing counsel said.  I do think it's an undue burden, but

15 I think that's the burden.  And I do think it's an accurate

16 statement of law, which I agree with opposing counsel when

17 she said that.  So beyond that, I think the definition is

18 accurate.

19         THE COURT:  All right, let's go to Retaliation.

20 This, too, is a pattern, at least the first part of it is, up

21 through the elements from 3(c) Federal Jury Practice

22 Instruction, Section 171.25.  The last paragraph concerning

23 explanation of the fourth element, which is really the but

24 for language you-all requested yesterday.  I don't know if we

25 fleshed it out as much as you were requesting, but -- and

 1   that's based on *Bostock versus Clayton County, Georgia*,
 2   140 Supreme Court 1731, which is a 2020 case.
 3          All right, any objections to this Retaliation
 4   instruction?
 5          MS. COLLINS:  Yes, Your Honor, just that we'd
 6   request that the "but for" be fleshed out consistent with
 7   *Bostock*.
 8          THE COURT:  Go ahead.
 9          MR. PUCKETT:  Your Honor, I think this instruction
10   is consistent with *Bostock*.  There certainly could be more
11   words, but I'm not sure that the point of this instruction
12   and *Bostock* are different in any way.
13          THE COURT:  What is it you think we should add to
14   this, Ms. Collins?
15          MS. COLLINS:  In plaintiff's proposed set --
16          THE COURT:  Okay, hold on, let me get to that --
17          MS. COLLINS:  Sure.
18          THE COURT:  -- because I've got 38 binders up
19   here.
20          MS. COLLINS:  Understandable.
21          THE COURT:  Plaintiff's proposed instructions on
22   Retaliation?
23          MS. COLLINS:  Yes, Your Honor.
24          THE COURT:  Okay.  Go ahead.
25          MS. COLLINS:  Is that probably just the last

clause of the last sentence, the "but for" standard, which simply means that a defendant cannot avoid liability just by citing some other factor that contributed to the decision. That was taken from *Bostock*.

THE COURT: So you want to just add beginning with a "but for" standard on that last sentence of your proposed instruction through the end of the sentence?

MS. COLLINS: Yes.

THE COURT: Any concern from Metro on that?

MR. PUCKETT: From our perspective, Your Honor, that's covered in the first sentence here, Ms. Barton does not have to prove that unlawful -- I'm sorry. Maybe that wording needs to be shuffled a little bit, in any event.

THE COURT: I mean, what if we just add --

MR. PUCKETT: You need not find that the only reason for -- that was the only reason for Metro's decision.

THE COURT: I'm going to include that last sentence. I think it's -- I mean, it is a little extra language. I think it gives the jury a little bit more clarification if they're not quite sure what the "but for" standard is. So what we'll add to this is -- at the end of this instruction, it ends with "a religious accommodation, period." We're going to add: A, quote, but for, closed quote, standard simply means a defendant cannot avoid liability just by citing some other factor that contributed

1 to its decision, period, and that will end that instruction.

2 That also may give them a little more clarity, but

3 also may short-circuit some questions. We had an employment

4 case a couple of weeks ago where we got a lot of questions

5 about what words mean in instructions. It was an ADA case,

6 which has some pretty unique terms that are used, but -- so I

7 will add that.

8 All right, any other -- so those are the three

9 substantive instructions. Any other objections to the

10 instruction before we go print a clean copy, other than the

11 objections that have been noted by both sides? Those are

12 preserved.

13 MS. COLLINS: No, not from the plaintiff,

14 Your Honor.

15 MR. PUCKETT: Your Honor, we do have one

16 suggestion for the Retaliation instruction. And I think

17 there may be some grammatical stuff we can clean up. I've

18 taken an amateur's turn at drafting these jury instructions,

19 so I know that they're crafted and shuffled, and sometimes

20 the words get a little broken apart. So the sentence I was

21 just trying to read, neither my brain isn't working

22 correctly, but it's the bottom paragraph on page 6.

23 (As read:) For the fourth element, Ms. Barton

24 does not have to prove that unlawful retaliation you need not

25 find that the only reason --

1    THE COURT:  Yeah.  No, that's a typo.

2    MR. PUCKETT:  Yeah.  In No. 4, it says "The

3  Metro."  I think maybe we just drop the "The."

4    THE COURT:  Right.

5    MR. PUCKETT:  This is nitpicky stuff, Your Honor.

6    THE COURT:  No, that's fair.  We can have a

7  million sets of eyes on these, and there will still be typos

8  that we don't catch.  So . . .

9    MR. PUCKETT:  The last one, Your Honor, is an

10  objection.  I think the Sixth Circuit is not clear on this

11  law.  So I think -- we've raised this point before in summary

12  judgment and I think in our Rule 50, but with regard to that

13  first element, the request for religious accommodation, the

14  law that supports a request for accommodation being a

15  protected activity is ADA specific.  The Eighth Circuit has

16  addressed Title VII requests for accommodation, specifically

17  in the oppositional clause retaliation context.  We think

18  that court has the right of it, Your Honor.

19    We think that in order to maintain an oppositional

20  class retaliation claim, there must be some opposition.  And

21  so inserting the words that we have in our proposed jury

22  instructions that plaintiff opposed an activity made illegal

23  by Title VII is more accurate to what an oppositional clause

24  retaliation claim consists of.

25    THE COURT:  And we looked at that.  The statute,

1  which is 42 USC Section 2000e-3(a) -- not necessarily the --

2  says (as read):  Title VII prohibits discrimination in the

3  workplace and also prohibits an employer from taking any

4  retaliatory action against an employee because the employee,

5  one -- I'm inserting the numbering, but this is how I read

6  it -- one, has asserted rights, or two, made complaints under

7  those laws.

8          So, I mean, there's the -- I don't think it's all

9  oppositional conduct.  And I think you can get into pretty

10  theoretical discussions.  Religious accommodation cases are a

11  little bit unique in the sense of Title VII, I think every

12  other protected category is more of an immutable trait, you

13  know, race, gender, that sort of thing.  Religion, of course,

14  would be harder to say that about.  I guess you could in some

15  circumstances, but for the most part -- and I think that's

16  why sometimes there's a little bit of different treatment of

17  that because it's more belief conduct related -- things that

18  are protected, as opposed to immutable characteristics.

19          Your objection is noted, but I think this is a

20  correct statement, at least based on that pattern

21  instruction.

22          All right, anything else?

23          MR. PUCKETT:  Moment to confer, Your Honor?

24          THE COURT:  Yes.

25          MR. PUCKETT:  Nothing else.

 1    THE COURT:  Okay.  All right, if you'll give us
 2  ten minutes, we're going to try to get you clean instructions
 3  for you to have if you care to use them in closings, and
 4  we'll come back at top of the hour.
 5    Yes, sir.
 6    MR. PUCKETT:  A quick point.  We did want to take
 7  a moment to renew our Rule 50.  We can do that now or
 8  whenever you're --
 9    THE COURT:  No, go ahead.
10    MR. PUCKETT:  You want me to move to the podium?
11    THE COURT:  No, just state what you need to say.
12    MR. PUCKETT:  Only a few brief additions just
13  addressing some of the cases that Your Honor included.  So we
14  would like to incorporate by reference all the argument that
15  we previously made.
16    With regard to the *Deleon* case, as I said, I
17  looked into that case, Your Honor.  This is in a failure to
18  accommodate context.  And I think where we came down on the
19  jury instruction may also form our motion for a directed
20  verdict.  The *Deleon* case, again, was not a failure to
21  accommodate case.  That Court found that an involuntary
22  transfer was materially adverse.  It wasn't addressed in the
23  majority opinion, but in the dissent, I believe it was Judge
24  Sutton said that a voluntary transfer -- sort of by
25  comparison, a voluntary transfer is not materially adverse.

1    So under that reasoning, even under *Deleon*, we

2   don't -- we haven't reached a materially adverse action in

3   that transfer that was taken on voluntarily by Ms. Barton.

4    Now, I understand her argument that she felt as if

5   she had no other choice, but that may be an intrinsic

6   feeling, rather than -- the Court in *Deleon* said that the

7   plaintiff was instructed show up Monday -- you know,

8   essentially, show up Monday here at the office in your new

9   position, or you don't have a job. Those aren't the facts we

10  have here. So we haven't even reached the materially adverse

11  level yet.

12   And then, of course, where we came down on the

13  *Reed* and the *Tepper* case is that failure to accommodate

14  requires more, requires discharge or discipline. We

15  certainly don't have those facts. I don't think plaintiff

16  even testified that she was discharged or disciplined.

17   So renewing the previous argument on failure to

18  accommodate, incorporating the case law that Your Honor

19  cited, we would move for a directed verdict on that.

20   THE COURT: Okay.

21   MR. PUCKETT: With regard to retaliation, we had

22  an opportunity to look at the *Veith* case, the *Veith v. Tyson*

23  *Fresh Meats* case. This was Judge Richardson's. And I think

24  Your Honor said he sort of wound that back or he backed off

25  of his position that a retaliation claim can't be just a sort

of repackaging of a failure to accommodate, but specifically
in the *Veith* case, what Judge Richardson found was it was
distinguishable from his *Wyatt* opinion, where the plaintiff
was saying these same actions that represent a failure to
accommodate also represent retaliation.  There, the Court
found you can't -- you can't have it both ways.  It's either
one or the other.

In the *Veith* case, the plaintiff there was
terminated after making a request for accommodation.  The
Court found that the failure to accommodate -- the denial of
the accommodation represented a failure to accommodate.  The
termination was the retaliation.  So there were two distinct
acts that could be attributed to -- one, to failure to
accommodate, the other to retaliation.

So just to distinguish *Veith* from *Wyatt* and renew
that argument we made based on *Wyatt*, that here the facts are
the same.  Metro's decision not to allow the leave is the
same materially adverse -- or, I'm sorry, the same decision
that plaintiff relies on for both, failure to accommodate and
for retaliation.  That's just a repackaging.  That's what the
Court in *Wyatt* said you can't do.

THE COURT:  Okay.

MR. PUCKETT:  And, of course, as to the third
claim, I'm not sure we directly addressed it in our initial
motion, but we would again state that -- understanding

Your Honor's already ruled on this, but we'd again state that
the complaint didn't have a distinct disparate treatment
claim.  We were under no notice.  It wasn't addressed
directly in our motion for summary judgment because defendant
wasn't on notice that it was actually a claim.

   THE COURT:  But you didn't take her deposition.

   MR. PUCKETT:  We did not take her deposition.

   THE COURT:  Okay.  That's where you lose me.  You
had the chance to put the plaintiff under oath and say "Tell
me everything you know" -- I can't think of a single case
when I was in private practice where I didn't take a
deposition because that's your opportunity to figure out what
their claim is and box them in, if you can.  But go ahead.
That's just my personal preference.

   MR. PUCKETT:  Understood, Your Honor.  I think
that concludes my argument on the third claim, but we just
did want to make that note.

   THE COURT:  I understand.

   MR. PUCKETT:  Thank you, Your Honor.

   THE COURT:  All right.  What are the distinct
events here, Ms. Collins, that he's raised the issue of --

   MS. COLLINS:  Sure.  I feel like we've already
plowed the discipline ground pretty well.  I disagree.  He
just highlighted why we should expand that language and
explain it further, which I, in an odd sort of way,

appreciate.  As far as *Wyatt*, they keep relying on *Wyatt* and

Judge Richardson's opinion.  That opinion was overturned by

the Sixth Circuit and reversed.  So --

THE COURT:  On the grounds of that he got it

wrong?

MS. COLLINS:  Yes.  Yes.  And -- yes.  Yes.

THE COURT:  *Wyatt* was just, what, a year ago?

MS. COLLINS:  It was reversed.

THE COURT:  No, *Wyatt* was the earlier case.  I'm

sorry.

MS. COLLINS:  Yes.  It was reversed by the Sixth

Circuit.

THE COURT:  Well, maybe Judge Richardson learned

something from his reversal.

MS. COLLINS:  I'm sure that he did because when he

ruled on *Veith*, which was my client, and when I briefed

that -- so I'm quite familiar with the facts -- he did note

both of the things, the failure to accommodate, as well as

the termination, were adverse employment actions.  And so I

think -- I don't want to guess what Judge Richardson -- but

he probably learned something from *Wyatt*, and I think that

that's why he came down the way he did in *Veith*.

And so it certainly is an adverse employment

action to consider the request for accommodation.  It's not,

you know, rolling it in or whatever.

1          THE COURT:  But is there evidence in the record

2    that you're pointing to, to say there's more than one event

3    here?

4          MS. COLLINS:  Yes.

5          THE COURT:  If so, can you tell me what that is?

6    We've already talked about the EEOC charge that I'm a little

7    skeptical of because that really wasn't mentioned in

8    anything, but . . .

9          MS. COLLINS:  He mentioned -- I didn't write it

10   down.  I was too busy listening.  He referred to that she

11   made the decision to leave, neglecting the fact that prior to

12   that, the supervisor -- I believe it was Ms. Few, wasn't

13   it? -- the manager of the department said, "Well, maybe you

14   should look for other jobs."  So she's the one that initially

15   said, "Hey, your request, Ms. Harris has already denied it,

16   why don't you start looking for other jobs."  She was doing

17   what she was told.  So I think that that definitely plays

18   into the whole scenario.  That preceded her just -- you know,

19   they want to characterize it as her just making a choice to

20   voluntarily leave.  That wasn't the case at all.  There was a

21   lot of stuff that preceded that.

22          So I think that you could also consider that what

23   I raised earlier in that this vacation freeze policy does not

24   apply to Title VII.  You can't freeze someone's Title VII

25   rights.  And that's essentially what they're trying to argue.

So that was another form of discrimination that certainly is
underlying this whole thing that went on because they're
relying on something and using it in a discriminatory way,
the same way in *Abercrombie* that they used their policy that
you couldn't wear head coverings that had the effect before
it even happened of excluding people of a certain religious
persuasion that wore things on their head.  So I think it's
the same sort of scenario here, and -- I think I've pretty
much hit all the points that I can think of.

THE COURT:  Okay.  Well, a lot of the arguments
are -- there's a few new ones raised, but a lot of them are
restating the arguments raised on the original Rule 50
motion, and for the same reasons, I will just incorporate my
ruling on those as to the same arguments.

In terms of the *Deleon* and the other cases about
needing to be distinct actions, I think there's sufficient
evidence that a jury could reasonably find that there were --
because there was a series of events.  I don't know how
counsel will package those in her closing, but I think there
are enough facts there where one could say, well, this was --
even if you think the law is or should be that they're
distinct events that have to be the basis for distinct
claims, and it can't all be one or different legal theories
arising out of the same event, I think there are sufficient
facts here in the chain of events with the request for leave,

the denial, testimony about perhaps transferring or looking

for another job, that, in and of itself, could be I guess

argued as retaliation, and the denial of the claim -- or the

request for vacation time could be the failure to reasonably

accommodate.  So I think a reasonable jury could segregate

those and find that there's different bases for the claims,

even if the law is such that that is what's required, and

that's not entirely clear to me.

So for those reasons, I'll deny the motion.

All right.  Are we ready to close the case?

MS. COLLINS:  Yep.

THE COURT:  Are you-all ready?

MR. FOX:  Yes.

THE COURT:  All right.  Okay, what I plan to do is

we'll get a clean copy of the final charge to you.  My plan

is -- you-all said ballpark half an hour a side on closings,

maybe a little less than that, although lawyers sometimes

underestimate how long they talk.  If possible, I'd like to

roll right into the charge from closings.  If we get the

sense people are needing a break, we'll certainly take one,

but the charge will probably take about 25 to 30 minutes for

me to give.  That way we can get them back there, probably

order them some lunch.  Angie can get the exhibits gathered

and back to her.  And that way they'll have the whole

afternoon to deliberate, as opposed to breaking it up and

1  having lunch and then coming back and doing the charge.  I

2  think I'd rather just get it to them, and I think they'd

3  probably prefer that since they've been waiting here for

4  almost two hours.  So that's the plan.

5          MS. COLLINS:  Sure.  Are we going to have the

6  charge for the closing?

7          THE COURT:  Yeah, we're going to -- yeah, that's

8  why we're going to take a break right now for us to get you

9  that.

10          MS. COLLINS:  Okay, great.

11          THE COURT:  Do you want to reserve any time for a

12  rebuttal on closing?

13          MS. COLLINS:  Sure.  Couple of minutes.

14          THE COURT:  Okay.  All right.  I never quite know

15  what lawyers mean by a couple or a few.

16          MS. COLLINS:  Let's say three.

17          THE COURT:  How many questions or minutes are in a

18  few or a couple?  They say "I just got a couple of questions

19  for you," and then --

20          MS. COLLINS:  I always think a couple is two, and

21  several is three.

22          THE COURT:  All right.

23          MS. COLLINS:  So let's say several, meaning three.

24          THE COURT:  Okay.  I'm sure Ms. Barton and Ms. Few

25  are sitting there the last part of yesterday and today

thinking this is how the sausage is made, and it's not a very
fun process to watch, but, nonetheless, our charge will be
what it will be, and if somebody has issues with it, I'm sure
that they can raise that.

By the way, once I give the charge, right before I
dismiss them, I will call -- you-all both have done this
before -- I'll call one lawyer up a side, ask them if there's
any objection to the charge given. You can just reassert
your objections without going into them in detail. They'll
be preserved. Mainly what I'm asking for there is did I read
it wrong. And I've had that happen where it says
"plaintiff," and I said "defendant." And that's a pretty
important thing to correct. So if you catch that, that's the
time to raise that, and then I'll clarify with the jury.

All right, let's plan on coming back at 11:15.
We'll get you, as quickly as we can, the instruction.

(Recess taken from 11:00 a.m. to 11:22 a.m.)

THE COURT: All right, we ready for closings?

MS. COLLINS: Ready.

(The jury returned to the courtroom at 11:24 a.m.)

THE COURT: All right, be seated, please. Members
of the jury, welcome back. I do apologize for the
significant delay this morning. I can assure you we were
making the best use of that time, but I also realize that
you-all sat back in that room for a couple of hours.

Hopefully, you had the stuff you needed in terms of snacks,
drinks and that sort of thing, but I apologize. We try to be
respectful of your time, and sometimes things are just
unavoidable. So . . .

Now that we got you back in here, we're going to
hear closing arguments from counsel, and then I'll give you
your instruction, and then you'll be ready to deliberate.

We'll begin with the plaintiff.

MS. COLLINS: All right, good morning, everyone.
Well, I guess technically it's a little bit more like
afternoon. Thank you, again, for waiting, and I just want to
go over a few things, and then you'll get the case. In a
moment, you're going to go to the jury room. You're going to
deliberate, and you'll have three tasks.

The first is to answer the questions on the
verdict form. And I'm going to go through that. Second,
you're going to make sure everyone else in the room follows
the law that the judge gives you. And finally, you'll be
able to talk about the case. And you'll have the opportunity
to explain to each other why you think the way you do about
each question that's going to be presented.

So I'm going to go through just a few ways to
think about those things, but you-all saw the evidence
throughout the case. In some instances, you saw it multiple
times. So I'm not going to put all those things back up on

the screen.  You'll have them with you back in the jury room,
and you'll be able to go through them again if you want to.
So I'm not going to make you look at them.  But what I will
do is I'm going to go through some of the information, and
I'm going to go through the jury instructions to give you
food for thought to take back with you.

So the first claim that you're going to hear about
in the jury instruction is the claim under Title VII titled
Discrimination.  And all you have to determine to decide that
claim is whether her religious -- Ms. Barton's religious
observance was a motivating factor in her transfer, meaning
if her religious observance played any factor that motivated
the decision.  It doesn't have to be the sole factor.  It
doesn't have to be the primary factor.  It's whether or not
it was a factor.

So I'm going to take you to that in the jury
instruction, and you'll find that at page 4 through 5 on the
jury instruction.  And the Court has explained it here.  And
it explains the different aspects of that, in particular, the
part that I just went through.  This is the standard that you
look at, whether or not it was a motivating part in the
decision in her move.  And so you'll have that to consider
back there.

And some of the things that I think that you can
think about when you go back there and you consider that

aspect is the testimony by Ms. Harris.  Ms. Harris testified
that she treated Carol the same as someone taking a vacation
to Florida, that she didn't even consider accommodation
because of the vacation freeze.  Ladies and gentlemen, those
two words are the most problematic words in this entire case,
vacation freeze.

They assumed that what Carol was asking for was a
vacation.  They made the wrong assumption.  Carol was not
asking for a vacation.  Carol was doing something that was
protected by law.  Title VII doesn't protect vacations.
Title VII protects your right to engage in your religion the
way you need to.  And that's what's at issue, not a vacation
freeze.  So they kept saying all along this is -- she
couldn't go.  It's a vacation freeze.  It's a vacation
freeze.  Carol wasn't going on a vacation.  Carol was
upholding her faith obligations.  And because they missed
that from the get-go, that's where they messed up.

So I think it was telling when Ms. Harris also
acknowledged she didn't even know, she didn't even know that
she was supposed to consider Carol's request as a religious
accommodation.  She didn't know that.  She was in HR.  Carol
knew.  Carol knew her rights.  She had been doing it every
single year for 12 years.  She knew.  Her supervisor didn't
know.  It's also telling that Carol had been there longer
than everybody else.  Carol knew.

They talked a lot about, well -- a couple
witnesses said, "Well, I delayed a vacation. I didn't go on
vacation during the summertime." You can't delay your
religion. You can't delay your religious rights. Certain
things under certain religions fall under certain days. You
can't just go back if you're Jewish and say, "Hey, can you
move this holiday because it's inconvenient for my employer?"
You can't go back because you're Muslim and say, "Hey, can
you move this because it's inconvenient for my employer?"
You can't go back because you're a Seventh Day Adventist and
say, "Hey, can you move this?" You can't go back in many
religions and just say, "Hey, I need you to move these
things." Vacations can be moved. Religious observances
cannot be moved. And that's what Carol was dealing with.
But they acted like they minimized her religion. And they
acted like it was a vacation. It wasn't.

She also admitted -- and I believe this was
Ms. Few who admitted this. That's what I have in my notes.
She agreed that we would not be here today if they had
approved the religious accommodation. That is one
hundred percent true. We wouldn't be here today. Carol
would still be working in HR, in the job that she loved, and
she would still be doing a great job.

So you ask, why was this vacation freeze not in
the handbook? That's a great question. We heard many

excuses for that. The only real evidence we saw of that was that one piece of paper. We did hear evidence that there were supposedly emails, there were supposedly other memos, there were supposedly other documents. We didn't see any of those. And the absence of evidence is something that you can consider because I would hope that my government would be in the habit of preserving evidence.

Carol filed her EEOC charge, which you-all saw. I believe that was at Exhibit 22. She filed her EEOC charge within two months. And all she wanted was someone else not to suffer the same fate that she suffered. All she wanted was someone else to not be faced with the impossible choice that she was faced with. So they knew within months, hey, if you have all this evidence to show that this was a completely untenable situation, that this policy overrode your handbook, that this policy overrode everything else, show it to us. But they didn't have any of that.

There was also evidence and testimony that other people had exceptions to the vacation freeze. They mentioned FMLA and medical, two things covered under federal law. Why didn't they recognize her federal rights? She had the same federal rights as someone who needed to take medical leave. She had the same federal rights as someone who needed an ADA accommodation in the workplace. She had the same rights, and they treated her differently. They de-minimized her religion

and said basically it doesn't matter, said no.  They should
have given her religion the same consideration that it's due,
that federal law requires.  They didn't.

So I'm going to go back to some of the principles
that I discussed at the beginning.  An employer has a
responsibility to be fair and not discriminate.  Metro
failed.  An employer, especially HR, should know better.
They failed at that.  To have an HR person who supervises
other people, who's responsible for other people's careers,
livelihoods, at the end game, their retirement, to not know
the law, to not know the responsibility, huge failure.
That's a huge failure on their part.

One of the other principles that it's -- it makes
sense if you can do something for one employee, you can do it
for another.  That's not what happened with Carol.  She went
to them and got "No."  They talked to other people.  They
apparently talked to the person that she filled in for after
she had already had to transfer out to the substitute
department.  That lady got to take leave.  And Carol even
came back after she was shoved out to continue to help out
the HR Department.  They didn't treat her the same.  And
fundamentally that's what this is about, is different
treatment.

So you can also look at Exhibit No. 7 and Exhibit
No. 18.  Those are the hours that showed the time off other

employees took.  It showed that it wasn't this strict, strict
policy where nobody ever took any time off.  And it showed
cumulatively that some people took off more.  Now, it is a
little confusing because there was different testimony from
each of the Metro witnesses.  The co-workers seemed like they
had an understanding that the policy was from April to the
end of August, maybe even the first of September.  That was
Ms. Earnest that testified that way.  That was Ms. Hawkins
that testified that way.  That was Mr. Perez that testified
that way.  And that was Ms. Barton that testified that way.
The supervisors, Ms. Few and Ms. Harris, they tried to say,
nope, it was just this little narrow time frame from that one
and only email from 2017 that even exist -- that even shows
that there's some kind of freeze in place.  That's it.

So one of your jobs as the jury, you're the judges
of credibility, and part of that is assessing who has the
most to gain, who seemed defensive, who seemed argumentive.
That's an issue for you guys, to remember how everybody came
across on the witness stand.  And one of the things that you
can take into consideration is do they still work for Metro.
That's, you know, a very relevant question.

The one witness, Ms. Earnest, who no longer works
for Metro, we called her as a witness, asked her about the
timing of the vacation freeze.  She gave testimony.  That was
the one witness they didn't cross-examine, the one witness

1  they didn't have any questions for.  So those are things you
2  can consider.

3          So even though Carol notified them -- so how else
4  do you know this is discrimination?  Even though Carol
5  notified them in January, they did nothing.  They confirmed
6  they did nothing.  April, did nothing.  Continued to do
7  nothing until she had her back up against a wall, and she had
8  to put in her letter of transfer.  So this is an important
9  issue because they're going to say, "Well" -- and you heard
10 it.  You heard the word over and over and over -- "it was a
11 hardship.  It was a hardship on us.  We worked all these
12 hours, stayed late, worked weekends."

13         Well, first of all, you're complaining about a
14 problem you created.  She told you in January what was going
15 on.  The minute she had her dates, she told you.  You
16 continued to put it on the back burner.  You continued to
17 treat her like somebody who's going on a beach trip to
18 Florida, and you continued to ignore her.  You didn't take
19 any mitigating steps.  You didn't do anything.  But you're
20 going to continue to point the finger at Carol Barton and
21 say, "Well, Carol, this is all your fault.  You shouldn't
22 have done that.  You shouldn't have gone and met the
23 obligations of your faith," and then compared it to a beach
24 trip.

25         That's a mess they created.  With all due respect,

that's a mess they created.  And they can't turn the tables
on Carol and say, "Well, it's a hardship."  I own a business.
I know how that goes.  Anybody who's a manager knows how that
goes.  People put in their vacation requests, and managers
step up.  They don't throw their employees under the bus and
violate a federal law at the same time.  That's what
happened.

          So they made the choice to be short-handed rather
than bring your most experienced and knowledgeable person
back to the office and have her get up to speed, which, by
the way, brings us to the testimony of Christy Overstreet.
And there's also a stipulation to this effect, which you'll
have back in the back.  Ms. Overstreet started after Carol
would have been back.  So the logical conclusion to that is
why would you keep Carol out of work?  Why would you not just
bring back your person, who, by their own admission, was the
most knowledgeable, experienced person, there longer than
both of the supervisors, who could have hit the ground
running her day back.  Carol probably would have worked
through the weekend and done everything she could, got five
times the amount of work that Ms. Overstreet was still
training.

          So, again, they're complaining about this supposed
hardship that they created.  They created that by not knowing
the law, by calling it a vacation, by bringing in somebody

who had to be trained, who they then had to take other people
out of their work duties, train Ms. Overstreet, and then
they're surprised they're working late at night and on the
weekends. Well, of course you are. Of course you are. Kind
of happens when you break the law. But there are downstream
effects.

So those are things that you can consider. You
can also look at Exhibit No. 10, Carol's email with the
calendars. She laid it out for them. She did her usual
thorough job laying it out. I'll be back by this date. This
is the exact date I'll be back, well before they hired
Ms. Overstreet. So they knew exactly what was going on.
They knew the deal. Didn't talk to her. So that's one of
the things that you can consider. It was their choice that
created the hardship, not Carol's. Carol was just enforcing
her rights.

Again, back to the principles. We talked about
where other employees took time off, and we also know that
vacation is not protected by Title VII. The religious
observance in this case is. So there's just one conclusion
to that first claim of discrimination.

Now we're going to move on to the accommodation
claim. And this is where the Court's going to instruct you
on whether or not someone holds a sincere religious belief.
I don't think there's any doubt about that, but Carol talked

about how important her faith has been, not just as a Johnny come lately, her whole life. Kenn talked about that too. Several of the witnesses, several of the other employees acknowledged that they knew what Carol's faith was because she was very open about it. They knew that she had taken off other years. So, of course, this was a sincerely held belief. Metro was aware of the conflict. That's what I just went over a moment ago. They knew about the conflict in January. They just didn't do anything.

Ms. Barton was discharged or disciplined for failing to comply with the conflicting employment requirement. She's not in her job. So it meets that element. She was pushed out. And that satisfies the element. All of this is explained to you as far as the accommodation claim. One of the issues that I do want to touch on, it states (as read): If an accommodation request from an employee were to cause anything more than an insignificant, trifling, or negligible effect on the employer's business, then it is considered an undue hardship.

Now, it's important to note this is Metro's burden to show that undue hardship. What they can't do is what I was talking about a moment ago, is say, "Hey, looky here, we met this. It was insignificant and trifling to us to deal with Carol Barton's request." But when you create the mess, you can't rely on that. And that's what happened. They

created this mess.  And so for them to say, "Oh, God, it was awful, hardship, hardship, hardship.  I had to work late.  I was away from my family.  I worked long hours" -- again, January she told them.  April, she gave them specific dates, gave them the calendars, let them know she would do everything she could to work it out.  So this doesn't apply here.  The elements have been met.

So then we go to the retaliation claim.  And that's next.  And I just want to go back to the accommodation claim.  There are a couple of exhibits that I think apply to that.  Exhibit No. 10.  In her letter, she specifically mentions accommodation.  So to the extent they try to argue "We didn't know this is religion, we didn't know this is a religious accommodation under the law," accommodation is, as I'm sure you can tell, a unique word.  It's a unique word under federal law when you're dealing with an employee asserting rights.  That word, in and of itself, in an email from an HR person to HR managers should have been a huge red flag.  It should have been a call to action to the employer.  It was zero.  So that is important to consider in that context.

Then we go to the retaliation claim, which is the third claim in the case.  We know that Ms. Barton made her request.  We've already been through that.  Exhibit No. 10 lays it out pretty clearly.  The testimony, there was no

dispute that she came in January and talked to her
supervisors.

Number 2:  Metro knew that Ms. Barton made that
request.  Of course they did.  Ms. Barton kept her emails,
thank goodness.  So she had that, and she could explain that.
So they knew that she made that request.  Thereafter, Metro
did not return her to the ERC.  We know that happened.

And then No. 4, because she made a request for
religious accommodation.  We know that's the reason why
because in her transfer letter, she says "This is the reason
why I have to transfer.  My request was denied."  So I think
that that's pretty clear, doesn't require a lot of
explanation one way or the other.

We also know that when we're talking about
retaliation, you're talking about a lot of things that
happened.  She wasn't allowed back to her job.  She came back
and worked for that period of time in HR after she filed her
EEOC charge, how she lost hope after that because she felt
like they were ignoring her.  We know -- one of the things
that we do know is both Judith and Jessica testified that
they're no longer in the department.  They transferred out of
the department.

So that begs the question -- I bring that up
because that begs the question -- there obviously have been
open spots in the ERC since Carol Barton left.  If this were

1  all just a bunch of nothing, why wouldn't you bring back your

2  most valuable employee, who they all said was the most

3  knowledgeable?  Why wouldn't you do that?  Retaliation is

4  why.  Because sometimes the most obvious answer is the

5  answer.  She was still in the sub department.  She was still

6  plugging away.  And they knew she was.  They knew that she

7  wanted to come back.

8          So we're going to talk just briefly about the

9  evidence that shows Metro got it wrong in their defenses.  We

10 talked about the hardship.  You can't blame Carol for your

11 bad choices.  They created this hardship.  So, you know, that

12 is a very important consideration when they're trying to say

13 that they've met their burden to show that it would have been

14 an undue hardship.  They haven't met it because they created

15 the hardship.  And it's easy to say that it's a hardship when

16 you don't even know your obligations under the law, when

17 you're not following the law from the get-go.

18         So it is important.  A vacation freeze is not a

19 freeze on someone's civil rights.  It's not a freeze on

20 someone's religious rights.  You can't make up a policy

21 internally that supersedes federal law.  That's the bottom

22 line.  And then package it as a vacation freeze and continue

23 to de-minimize someone's religion because that's what that

24 is.  They say, "Well, the FMLA is different.  Medical leave

25 is different."  Is it?  It's not.  Like I explained earlier,

1  two federal laws.  Supposed to protect employees.  Didn't.

2  Didn't protect Carol.  They also try to turn it around and

3  say "Carol gave us the ultimatum."  They ignored testimony

4  that Ms. Few was the first one to suggest she go to another

5  department.  What's Carol supposed to do?  The manager of the

6  department is basically saying get out.  That was Carol's

7  testimony, and I remember it because she said "I about fell

8  out when she said that."  I would have too.  It's incredible

9  that she would have said that.

10      But then blame Carol again for doing what she had

11 to do and what her rights were.  So I'm going to touch

12 briefly on the harms and losses.

13      Judge, am I okay for time?

14      THE COURT:  You're approaching your 30 minutes.

15 So I would keep it succinct.

16      MS. COLLINS:  I will.  All right, the harms and

17 losses in the case, compensatory.  The judge will read you

18 instruction about compensatory damages, and you take into

19 account -- you balance the harms for inconvenience, for

20 mental anguish, loss of enjoyment of life.  You take into

21 account the little things.  Sadness she experienced, blood

22 pressure, loss of trust and hope, the inconvenience.  She was

23 in a regular full-time job where she didn't worry about

24 benefits.  She didn't worry about retirement.  She had a

25 stable job with government.  It's about the most stable job

1 typically there is.

2         Now she's in a position where she basically has to
3 pick up shifts. She has to check her phone or her email
4 every day to see if she's going to work, to see if somebody's
5 asked her to be a substitute. That's inconvenient. She left
6 from a job that was a permanent job where she went into her
7 office every day. Now she's going around to different
8 schools, different kids of all ages, making about half what
9 she made, $12 an hour. I would say that is the definition of
10 inconvenient.

11         And I also want to just ask you to look at Exhibit
12 No. 15 again. That's the email where Carol memorialized that
13 she was going back to work and help her co-worker in the HR
14 Department and fill in for her when she was in FMLA, when she
15 was on FMLA. I think having to swallow your pride and come
16 back to hope that they would return you and do the right
17 thing, that meets the definition of inconvenience.

18         You also can consider how her husband Kenn's
19 testimony -- the sadness that he witnessed, how her kids
20 noticed her change in demeanor, and how it was hard to get
21 out of bed. And I'm going to go briefly through the verdict
22 form.

23         We went through the elements of the case. This is
24 what the verdict form is going to look like. Do you find
25 that Metro discriminated against Ms. Barton? Yes. Do you

1    find that Metro failed to accommodate Ms. Barton's religious

2    observance?  Yes.  Do you find that Metro retaliated against

3    Ms. Barton in violation of Title VII?  Yes.

4           The next page, what amount of compensatory damages

5    should be awarded to Ms. Barton?  I'm asking you to fill in

6    $350,000, but that's up to you-all.  That's the part -- now

7    that you-all finally get to talk about the facts of the case,

8    you fill that in to what you feel is appropriate.

9           So ladies and gentlemen, thank you for your time.

10   At the beginning of the case, I told you large employers,

11   especially big cities, like Metro Government, have a

12   responsibility to know the law, not discriminate against

13   people like Carol Barton when they make reasonable requests

14   to adhere to their faith.  They have a responsibility to find

15   out the facts, to not make decisions based on fear and make

16   the wrong choice, which is what they did.

17          In this case, we've shown you that there's

18   evidence Metro violated this fundamental responsibility to a

19   hard working, loyal and seasoned employee.  When it did, it

20   violated her civil rights to practice her religion by forcing

21   her to make an impossible choice, her job over her faith.

22   Because they did this, we ask you to return a verdict in

23   Ms. Barton's favor and award her full and complete damages

24   associated with their violations in an amount of no less than

25   $350,000.

1     Thank you so much for your time.

2     MR. FOX:  Ladies and gentlemen of the jury, the

3  plaintiff and the plaintiff's attorneys are trying to make

4  something much larger out of this issue than it really is.

5  It is really quite simple.  Like I said in my opening

6  statement, it was really pretty simple.  Everyone knew that

7  this was the busiest time of the year for the ERC, and the

8  ERC, the Employment Resource Center, has about five, six or

9  so employees.  There were a couple of employees, Ms. Earnest

10  and Ms. Hawkins especially, who said, well, the busy time was

11  April and maybe even September, but they were saying, I don't

12  know, I guess.  You may have written that down during the

13  time that they were saying, I don't remember for sure, it was

14  about this time, but if you listen to the testimony of the

15  managers, the ones who make the decisions about leave time,

16  Lisa Few and Ms. Harris, they both pinned down and they

17  showed -- and we showed that -- we had explained this to

18  opposing side as far back as March of 2021 that the freeze

19  itself -- the leave, vacation freeze itself was mid-June

20  until the beginning of the next school year, beginning of

21  August.

22     But even so, there's no rebuttal, there's been no

23  dispute here, whatsoever, that the leave time that Ms. Barton

24  was asking for was right smack in the middle.  It overlapped

25  June, over the July 4th holiday and into July.  It was 17

calendar days in a row.  There's been -- I think everyone's

in agreement, even Ms. Barton, that's the very busiest time

of the year.  And the reason I said Ms. Barton even is

because you might recall in Exhibits 11 and 13, where her --

her own statements where she specifically talks about how "It

is with a heavy heart that I submit this letter of transfer

from the Human Resources Department to the Substitute

Department.  The decision was not taken lightly, as I totally

understand the ERC workload during the summer break, as I

have worked it for the past 12 years."  So there, keep in

mind, those are her words.  She acknowledged, she knew this

was the busiest time of the year.

        And even here, this letter of June 2018, she says

"Due to the fact that the summer is our busy time, I am not

approved to go.  With that being said, I have to take this

once in a lifetime journey."  So I'm honing in on "due to the

fact that the summer is our busy time, I'm not approved to

go."  So keep in mind, this is before all the lawyers got

involved, before there was a lawsuit, before there was any

testimony, before there was a trial, back in June 2018, these

are her words, and you'll see that she knew that this was the

busy time of the year, and the reason her leave was denied

was because it's the busy time of the year.

        That's what she said.  It wasn't motivated because

of her religion or anything like that.  It was a simple

denial because they said, "Carol, this is our busiest time of
the year. You know that. We have this vacation freeze in
place." And by the way, vacation freeze is what they call
it, but as you heard the testimony, it was just a blackout on
leave period time during that season because that's the
busiest time of the year for the ERC, mid-June to the
beginning of August.

And so that was Carol Barton's own understanding
of it. Everyone understood that that was the busiest time of
the year. That's what this case is about, is that that's
just not something that an employer should have to
accommodate, that it was required to accommodate under
federal law.

And Ms. Collins just a moment ago showed you some
of the instructions, and the Judge will instruct you in a few
minutes about hardship. And she showed you in this -- like I
said, the judge will instruct you as well in a few minutes --
(as read): If an accommodation request from an employee were
to cause anything more than an insignificant trifling or
negligible effect on the employer's business, then it is
considered an undue hardship.

And you heard the testimony multiple times. You
know, lawyers kind of get criticized, why do they say the
same thing over and over and over. Well, it's because we
wanted you to hear it from multiple witnesses that this -- we

1  knew in advance, as the request is being made -- Selina

2  Harris and Lisa Few both knew -- that for you to make this --

3  take this leave, Carol, we're going to have to disburse your

4  work among everyone else and us, and we just can't do that to

5  everybody.  We can't put that kind of burden.  And the

6  federal law does not require that everyone else in the

7  office, the other five or so employees, plus the managers,

8  all must take on that burden.  That's considered more than

9  trifling.  That's more than negligible.  That's a significant

10 burden on everyone to have to take on that work.  There's

11 nothing in the federal law that requires that.

12           I want to hit on a couple of points that

13 Ms. Collins made.  She referred to her transfer.  And that's

14 true.  The accurate way to refer to it is it was her idea, it

15 was Ms. Barton's idea, it was her transfer.  This might be a

16 different case if for some reason an employer didn't like a

17 request and transferred the plaintiff away, it was the

18 employer transferring someone.  That's not what happened, as

19 you saw -- heard the testimony and saw the exhibits here.

20 Ms. Barton decided I'm going to go on this, it was a

21 voluntary decision on her part.  You heard her and her

22 husband both say that she applied for this leave, she applied

23 for this to become a delegate, that she wanted to.  There

24 were other conferences that had come available, but this one

25 was in Sri Lanka, and that's why she wanted to go to it.

That was what she was doing because she wanted to go on that.

And then -- but it was right in the middle of the heavy time for the summer for the ERC, and she was going to be 17 calendar days.  The leave was denied, and she decided she wanted to go on it anyway.  So that's why she transferred to the substitute office.  They referred to an ultimatum. Ask yourself when you go back and look at these exhibits, look at what -- her words at the time, June 2018, or even back January and April 2018, any of her emails.  Where does it say anything about an ultimatum?  Where does it say anything -- words to that effect?  It's not there.  Instead, she says things like she -- that she voluntarily wants to transfer.  "I want you to be aware that next Wednesday June 20th, at noon, will be my last day in the HR Department."  That's Exhibit 13.  Exhibit 11, again, "It is with a heavy heart that I submit this letter of transfer from the Human Resources Department to the Substitute Department." It was her decision.

And you heard testimony from Ms. Few, Lisa Few, say, "Carol, we don't want you to go."  And to this day, she's still a valuable employee.  She's still -- she and her husband are both employed with the school system.  There was never any kind of hard feelings here.  It was just strictly a matter of we couldn't afford this time off.  It's not something that the employer is required to accommodate.  It

was going to put such a burden on the co-workers and the
management.

Now, Ms. Collins, a few moments ago, was critical
of the management at ERC because they didn't consider her
religious request, that they just lumped it all together with
a vacation request.  Well, that defeats her case here, the
religious discrimination.  It must be some decision that
Metro made because of her religious observance, because of
her religion, that that's why we made the decision.  And
you've heard Ms. Collins say that they didn't consider --
well, that's right, it wasn't any kind of motivating factor
in what was done here.  It wasn't because of her religion.
It was because of the heavy workload, and she was going to be
off so long.  That's why they made that decision to deny her
request.

Ms. Collins wants to also try to convince you
that, well, there was this decision to transfer her.  She
sort of implicitly says it was Metro's decision.  It has to
be the employer's decision to do something, but as I just hit
on just a few moments ago, it was her decision to voluntarily
leave.  Also, Ms. Collins is critical because we treat
medical issues differently.  It's like we -- we heard the
testimony.  That's just apples and oranges.  It's completely
different.  A medical issue is completely different, handled
by a completely different set of rules and regulations, and

something to be handled through the benefits office.

You know, if someone has cancer treatment or something, and they need to be out several weeks, that's just completely different than voluntarily applying to be a delegate to go to this event in Sri Lanka. And we're not doubting any kind of religious faith on behalf of Ms. Barton at all. That has nothing to do with it. It's just as an employer, we have to treat -- medical issues are just completely different.

Then there's this issue about something about why wouldn't we let her come back. She could have come back at any time. In fact, the proof was, when she left -- as soon as she did come back to the substitute office, she immediately worked for HR filling in, making the same rate of pay, $22 an hour -- and that's in the evidence, in the proof -- filling in for someone who was out on medical leave. She came right back to HR. She could have come back at any time. In fact, Ms. Collins even said obviously there were open spots in ERC, and that's true. You've heard about the huge turnover. It's a lot of work, and it's heavy work. And so there is heavy turnover.

Ms. Barton, like I said, is still in -- is still a Metro employee. She's still here. If there's all these open spots, where's the proof that, hey, here's an open spot in the ERC, I applied for it, and I was denied it. I

interviewed for it, and I was denied it. There's no proof
like that. The only thing you've heard from her is her own
belief that, well, they didn't want me back. That's not
proof of anything. What would be proof -- this might be a
different case if she said, yeah, here are these positions
with the ERC. I applied for them, and then I interviewed
with Ms. Few, or interviewed with the manager there, and they
denied me. That would be proof of some type of not allowing
her to come back. She could come back at any time. You even
heard Ms. Few say, "Carol, I don't want you to go." There
was no ill will. She's a 12-year veteran employee. She was
good at this job. We did not want her to go. She could have
come back. She could have come back at any time.

So to run through the instructions that you'll get
in a few minutes again. For religious discrimination,
it's -- like Ms. Collins said, it's intentional
discrimination, where they intended to discriminate against
her because of her religion, because of her religion. That's
not what happened here.

Religious accommodation, if I can line it up
correctly. Religious accommodation. For this one, failure
to accommodate, she has to show that she was discharged or
disciplined. You might recall, I specifically asked
Ms. Barton on the stand "Where's the termination letter in
all this?" And she said, "Oh, it was not because I wasn't

1  terminated."

2         Discipline.  There's no proof of discipline.  In

3  fact, we asked Ms. Few about that.  Was there any discipline

4  over this?  Was there any kind of write-up or reprimand or

5  any form of discipline?  No, there's no discipline at all.

6  So that claim fails there as well.

7         Even if she had shown something like that, which,

8  of course, she didn't, then the burden shifts back to Metro

9  to show, well, the reason we took this action is because it

10  was going to cause an undue hardship, it was anything more

11  than insignificant, trifling or negligible effect on the

12  office.

13         And then, again, retaliation is this heading C.

14  Primarily what I want to draw your attention to is that Metro

15  did not return Ms. Barton to the ERC, and Metro decided not

16  to return Ms. Barton to the ERC.  Those facts aren't in

17  evidence.  That did not happen.  Like I said before, for her

18  just to say, well, I kind of felt blackballed, or I felt like

19  they wouldn't want me back, that's not proof of anything.  To

20  prove something like this, you would have the applications

21  because, just as Ms. Collins said, obviously there were open

22  spots available.  Ms. Barton to prove this would show, look,

23  yeah, there were these open spots.  Here is my application.

24  I applied for it.  I interviewed.  They considered me, and I

25  didn't get any of these positions.  I've tried again and

again and again.  That's just not the case.  And like I said,
as soon as she came back from Sri Lanka, she worked right in
HR again.  HR is the umbrella over the ERC.  She worked in HR
again anyway.  She could have come back at any time if she
had just applied for one of those positions.

So when you go back and deliberate, imagine
yourself being the manager over this small office, five, six
employees, where it's well-known that there's a busy season.
The school teachers' busy season is during the school year.
They have a break during the summer.  ERC, it's flipped
around.  They have maybe a little bit more of a break where
they can take extended times off during the school year, but
their busy season is in the summer.  Ms. Barton's time off
was right in the middle of summer.  So imagine if you're the
manager, and you've got this office of five or six employees.
What would you do?  Of course you would say "That's going to
put us in such a bind for you to be off 17 days.  You know
this is the policy.  Please don't -- please don't do this.
We can't allow you to be off for 17 consecutive days, 12
business days.  We can't give this 12 business day leave
right in the middle of our busiest time."

It's up to you all.  Don't let this be the
standard that the federal government is telling employers
here that that's the standard, that this must be
accommodated, this has to be accommodated under federal law.

1  That's just not the law.  Don't let that be the standard.

2       And because of that, then Dr. Baum's report you
3  may disregard.  I like Dr. Baum a lot.  Like I said, I've
4  worked with him on another case.  I hired him in another
5  case.  He's fantastic at what he does.  But he wasn't asked
6  to do what you're doing.  He wasn't asked to look at federal
7  law.  I asked him that, and he says, "Yeah, that's not my --
8  that wasn't what I was asked to do."  He just looked at the
9  numbers, you know, in case -- in the event that, as
10 Ms. Collins wants to argue, if she wins, well, then these
11 numbers would apply, but you may disregard that because this
12 is not the standard.  This is not -- there's nothing here
13 that we did that was a violation of federal law.

14      So on the verdict form, like I said, they're
15 trying to break this into three claims.  It all arises out of
16 the same claim.  Please check "No," "No," "No," and sign it
17 and submit it to the court officer.

18      This is not the standard under federal law.  This
19 was Lisa Few, Selina Harris working with a small office.
20 This is absolutely within their right to deny this extended
21 leave time for whatever purpose because it was during the --
22 right in the hottest -- busiest time of the year, and it
23 would have put such a burden on their fellow employees and
24 also on the managers themselves.  And we know that to be true
25 because when she quit the ERC and went on to the extended

1  religious convention anyway in Sri Lanka, the proof is in the
2  pudding.  They did have to step up.  They did have to work
3  nights and weekends.  And not just midnight -- while
4  weekends, but also midnight, 1 or 2 in the morning.  That's
5  just not the standard.  The employer should not have to be
6  required under federal law to do that.
7          Thank you.
8          MS. COLLINS:  With respect to Dr. Baum's
9  testimony, the Court will instruct you in this back pay
10 instruction, that was put into evidence because the Court
11 says "I will."  That means the judge.  So Dr. Baum testified
12 for the judge.  So he will deny -- he will consider that
13 issue of pay.  That's what that means.  It's not that his
14 testimony doesn't matter, because it does.  It's important.
15 And when you-all check those three boxes that discrimination
16 occurred, the judge will definitely use Dr. Baum's testimony.
17         There are a few things that I wanted to touch on
18 that I think were incorrect statements.  I felt like just a
19 moment ago Metro continues to ignore federal law.  They
20 continued to urge you as a jury to put yourself in the place
21 of deciding how federal law should be applied the same way
22 they did.  And that's ignoring it.  And that's wrong.
23         So what we're asking you to do is read these jury
24 instructions that the Court is going to give you and follow
25 the law.  Follow the law.  That's all we're asking you to do.

We also acknowledge, yes, it was a busy time of year.  Carol
acknowledged that.  That's in the emails.  That's why she
started this process in January, started the process in
January, and they did nothing.  It was telling when he said
"We can't put that kind of burden on everyone."  That word
"can't" is telling.  Can't or won't?

They didn't want to do their job.  They didn't
want to follow federal law, and they didn't want to take the
steps that were necessary to make sure the workload was
covered.  And then they complained about it at the end of the
day.  That's what happened.  So . . .

He also pointed out those two words "discipline"
and "discharge."  Carol's not in her job anymore.  I don't
know how much more clear that definition is, but not being in
your job anymore meets that definition.  They also complain
that her not being back in the ERC is her fault.  She's in
the sub department.  The very definition of that department
is to bring people like Carol in to where they're needed.
They did that once.  They knew they could do it again.  They
knew they've been able to do it like that the whole time.
They haven't done it.  That's why she went to the sub
department.  She testified about that.  She went there in the
hopes that they would pick her up, that they would bring her
back to HR.  That is retaliation, ladies and gentlemen.

They also say that the actions that they took were

1  not because of religion.  Ladies and gentlemen, that's why

2  we're here today.  Carol Barton's religion is the reason why

3  we're here today.  Title VII says that she could do what she

4  did and not be ignored, not be told no out of hand and then

5  blame her to this day for their violation of the law.

6              Ladies and gentlemen, thank you for your time.  We

7  ask you to return a verdict in favor of the plaintiff.  Thank

8  you.

9              THE COURT:  All right, members of the jury, you've

10 now heard all the evidence in the case, as well as the

11 closing arguments.  Now it is time for me to instruct you

12 about the law that you must follow in deciding this case.

13             I will start by explaining your duties as jurors;

14             Then, I will explain certain principles of law;

15             Then, I will explain certain general rules that

16 apply in every civil case;

17             And last, I will explain the rules that you must

18 follow during your deliberations in the jury room and the

19 possible verdicts you may return.

20             Please listen carefully.

21             You have two main duties as jurors.  The first is

22 to decide what the facts are from the evidence that you saw

23 and heard here in court.  Deciding what the facts are is your

24 job, not mine, and nothing that I have said or done during

25 this trial was meant to influence your decision about the

1  facts in any way.

2        Your second duty is to take the law that I give
3  you and apply it to the facts.  It is my job to instruct you
4  about the law, and you are bound by the oath you took at the
5  beginning of the trial to follow the instructions that I give
6  you, even if you personally disagree with them.  This
7  includes the instructions I gave you before and during the
8  trial and these instructions.  All the instructions are
9  important, and you should consider them together as a whole.

10       The parties have talked about the law during their
11 arguments, but if what they said is different from what I
12 say, you must follow what I say.  What I say about the law
13 controls.

14       Perform these duties fairly.  Do not let any bias,
15 sympathy or prejudice that you may feel toward one side or
16 the other influence your decision in any way.

17       The term "preponderance of the evidence" means the
18 amount of evidence that causes you to conclude that an
19 allegation is probably true.  To prove an allegation by a
20 preponderance of the evidence, a party must convince you that
21 the allegation is more likely true than not true.

22       Preponderance of the evidence means, simply, the
23 greater weight of the evidence.  It may be helpful to
24 envision a set of balancing scales.  If you find that the
25 evidence on a particular issue is equally balanced, that

1   issue has not been proven by a preponderance of the evidence,

2   and the party having the burden of proving that issue has

3   failed.  On the other hand, if you find that the evidence on

4   a particular issue tips the scales, be it ever so slightly,

5   in favor of the party with the burden of proof, then that

6   element will have been proved by a preponderance of the

7   evidence.

8           In determining whether any fact in issue has been

9   proved by a preponderance of the evidence, you may consider

10  the testimony of all the witnesses, regardless of who may

11  have called them, and all the exhibits received in evidence,

12  regardless of who may have produced them.

13          In this case, Ms. Barton brings three claims under

14  Title VII of the Civil Rights Act of 1964, which will be

15  referred to in these instructions as Title VII.

16          Ms. Barton claims that Metro discriminated against

17  her because of her religion, refused to accommodate her

18  religious observance, and retaliated against her in violation

19  of Title VII.  Metro denies that Ms. Barton was discriminated

20  or retaliated against in any way.

21          Title VII prohibits employers from discriminating

22  against an employee in the terms and conditions of employment

23  because of an employee's race, color, religion, sex, or

24  national origin.  Title VII requires employers to make

25  reasonable accommodations for the religious observances of

their employees, short of incurring an undue hardship.
Title VII also prohibits employers from retaliating against
an employee for engaging in activity protected by Title VII.

I will now instruct you more fully on the issues
you must address in this case.

Ms. Barton claims that she was adversely affected
in her status as an employee of Metro because of her
religious observance.  Specifically, Ms. Barton claims that
she was forced to transfer to a job with lesser pay and
benefits by Metro because of her religious observance.  Metro
denies that Ms. Barton was discriminated against in any way.

For Ms. Barton to prevail on this claim against
Metro, Ms. Barton must prove by a preponderance of the
evidence that her religious observance was a motivating
factor in Metro's decision.

In showing that her religion was a motivating
factor in Metro's decision, Ms. Barton is not required to
prove that her religious observance was the sole motivation
or even the primary motivation for Metro's decision.
Ms. Barton need only prove that her religious observance
played a motivating role in Metro's decision, even though
other factors may have motivated Metro.

Ms. Barton claims that Metro failed to accommodate
her religious observance, in violation of Title VII.  Metro
claims that Ms. Barton's requested religious accommodation

would have imposed an undue hardship on Metro's operations.

For Ms. Barton to prevail on this claim against Metro, she must prove each of the following elements by a preponderance of the evidence:

One, that Ms. Barton holds a sincere religious belief that conflicts with an employment requirement;

Two, Metro was aware of the conflict; and

Three, Ms. Barton was discharged or disciplined for failing to comply with the conflicting employment requirement.

If you determine that Ms. Barton has proven each of these elements by a preponderance of the evidence, then you must find for Ms. Barton on this claim unless you determine that Metro has proved that it was unable to allow Ms. Barton to attend her religious observance without undue hardship on Metro's operations.

If an accommodation request from an employee were to cause anything more than an insignificant, trifling, or negligible effect on the employer's business, then it is considered an undue hardship.

Ms. Barton claims that Metro retaliated against her because she made a request for a religious accommodation. Metro denies that it retaliated against Ms. Barton. For Ms. Barton to prevail on her retaliation claim, she must prove each of the following elements by a preponderance of

the evidence:

One, Ms. Barton made a request for a religious accommodation;

Two, Metro knew that Ms. Barton made a request for a religious accommodation;

Three, thereafter Metro did not return Ms. Barton to the ERC; and

Four, Metro decided not to return Ms. Barton to the ERC because she made a request for a religious accommodation.

For the fourth element, you need not find that the only reason for Metro's decision was Ms. Barton's request for a religious accommodation, but you must find that Metro's decision to not return Ms. Barton to the ERC would not have occurred in the absence of, or but for, Ms. Barton's having -- Ms. Barton's having made a request for a religious accommodation. A "but for" standard simply means a defendant cannot avoid liability just by citing some other reason that contributed to its decision.

If you find that Metro violated Ms. Barton's rights under Title VII, then you must determine an amount that is fair compensation for Ms. Barton. These damages are called compensatory damages. You may award compensatory damages only for damages and losses that Ms. Barton proves were caused by Metro's illegal conduct.

1    The damages you award must be fair compensation,

2  no more and no less.  You may award damages for any future

3  pecuniary losses or any emotional pain, suffering,

4  inconvenience, mental anguish, loss of enjoyment of life or

5  other nonpecuniary losses Ms. Barton experienced or will

6  experience as a consequence of Metro's discriminatory or

7  retaliatory conduct.  No evidence of the monetary value of

8  such intangible things, such as pain and suffering, has been,

9  or need be, introduced into evidence.  There is no exact

10  standard for fixing the compensation to be awarded for these

11  elements of damage.  Any award that you make should be fair

12  in light of the evidence presented at trial.

13    In determining the amount of any damages that you

14  decide to award, you should be guided by common sense.  You

15  must use sound judgment in fixing an award of damages drawing

16  reasonable inferences from the facts in evidence.  You may

17  not award damages based on sympathy, speculation or

18  guesswork.  On the other hand, the law does not require that

19  Ms. Barton prove the amount of her losses with mathematical

20  precision, but only that -- with as much definiteness and

21  accuracy as circumstances permit.

22    If you find that Metro violated Ms. Barton's

23  rights under Title VII, I will determine separately whether

24  Ms. Barton is entitled to any back pay to compensate her for

25  any wages she may have lost because of Metro's actions.  If I

1  find that Ms. Barton is entitled to back pay, I will also

2  determine the amount of any such back pay.  If you decide to

3  award Ms. Barton compensatory damages, you must not include

4  any amount of back pay in the amount you award as

5  compensatory damages.

6         You must make your decision based on the evidence

7  that you saw and heard here in court.  Do not let rumors,

8  suspicions or anything else that you may have seen or heard

9  outside the Court influence your decision in any way.

10        The evidence in this case includes only what the

11  witnesses said while they were testifying under oath, the

12  exhibits I've allowed into evidence, and any facts to which

13  the lawyers have agreed or stipulated.

14        Nothing else is evidence.  My legal rulings are

15  not evidence.  My comments and questions are not evidence.

16  The opening and closing statements are not evidence.

17  Questions asked by lawyers of witnesses are not evidence.

18        During the trial, I did not let you hear the

19  answers to some of the questions that were asked.  You must

20  completely ignore those questions.  Do not even think about

21  them.  Do not speculate about what a witness might have said.

22  They are not evidence, and you are bound by your oath not to

23  let them influence your decision in any way.

24        You should use your common sense in weighing the

25  evidence.  Consider it in light of your everyday experience

with people and events and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you're free to reach that conclusion.

I now want to discuss the terms "direct evidence" and "circumstantial evidence."

Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact.  If a witness testified that he saw it raining outside, and you believed him, that would be direct evidence that it was raining.

Circumstantial evidence is simply a chain of circumstances that indirectly proves a fact.  If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that will be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence.  The law makes no distinction between the weight that you should give to either one.  Neither does the law say that one is in any better evidence than the other.  You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

For the limited purpose for which any evidence has

been received, you may give it such weight as you feel it deserves.  You may not, however, use such evidence for any other purposes not specifically mentioned.

The parties have agreed or stipulated that certain facts are true.  Therefore, you must accept these facts as proven.

The plaintiff has submitted information through "requests for admissions."  A request for admission is a written statement of fact submitted by one party prior to the trial to the opposing party.  You should treat the facts admitted in these statements as having been proven for the purposes of this case.

During the course of the trial, you have heard reference made to the word "interrogatory."  An interrogatory is a written question that must be answered under oath in writing.  You are to consider interrogatories and their answers as if the questions had been asked and answered in court.

Now, I have said that you must consider all of the evidence.  This does not mean, however, that you must accept all the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given to that witness's testimony.  In weighing the testimony of a witness, you should consider the circumstances under which

each witness has testified.  Consider the witness's manner of
testifying and the opportunity to observe or acquire
knowledge concerning the facts about which the witness
testified.  Consider the witness's candor, fairness and
intelligence to the extent to which the witness has been
supported or contradicted by other credible evidence.
Consider also any relationship which the witness may have to
the plaintiff or the defendant; how the witness might be
affected by the verdict; and the extent to which, if at all,
each witness is either supported or contradicted by other
evidence in the case.  You may, in short, accept or reject
the testimony of any witness in whole or in part.

        Also, the weight of the evidence is not
necessarily determined by the number of witnesses testifying
to the existence or nonexistence of any fact.  You may find
that the testimony of a small number of witnesses as to any
fact is more credible than the testimony of a larger number
of witnesses to the contrary.

        A witness may be discredited or impeached by
contradictory evidence, by a showing that the witness
testified falsely concerning a material matter, or by
evidence that at some other time the witness has said or done
something, or has failed to say or do something, which is
inconsistent with the witness's present testimony.

        If you believe that any witness has been so

impeached, then it is your exclusive province to give the
testimony of that witness such credibility or weight, if any,
that you may think it deserves.

Discrepancies in a witness's testimony or between
his testimony and that of others do not necessarily mean that
the witness should be discredited.  Failure of recollection
is a common experience, and innocent mis-recollection is not
uncommon.  It is also possible that two persons witnessing an
incident or a transaction may see or hear it differently.
Whether a discrepancy pertains to a fact of importance or
only a trivial detail should be considered in weighing its
significance.

Usually, witnesses are not permitted to testify as
to opinions or conclusions.  However, a witness who has
scientific and technical or other specialized knowledge,
skill, experience, training, or education may be permitted to
give testimony in the form of an opinion.  Those witnesses
are often referred to as expert witnesses.

You should determine the weight that should be
given to each expert's opinion and resolve conflicts in the
testimony of different expert witnesses.  You should
consider:

The education, qualifications, and experience of
the witnesses; the credibility of the witnesses; the facts
relied upon by the witnesses to support the opinion; and the

reasoning used by witnesses to arrive at the opinion.

You should consider each expert and give it the weight, if any, that you think it deserves.  You're not required to accept the opinion of any expert.

The law does not require a party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue in this trial.  Nor does the law require any party to produce as exhibits all papers and things mentioned in the evidence in this case.

You must not consider as evidence any statements of counsel made during the trial.

As to any question to which an objection was sustained, you must not speculate about the answer -- what the answer might have been or on the reason for the objection, and you must assume that the answer would be of no value to you in your deliberations.

You must not consider for any purpose any offer of evidence that was rejected, or any evidence that has been stricken out by the Court; such matter is to be treated as though you had never known it.

You must never speculate to be true any insinuation suggested by a question asked a witness.  A question is not evidence and may be considered only as it supplies meaning to the answer.

1    The lawyers objected to some of the things that
2  were said or done during the trial.  Do not hold that against
3  either side.  They have a duty to object whenever they think
4  that something is not permitted by the rules of evidence.
5  Those rules are designed to make sure that both sides receive
6  a fair trial.  Do not interpret my rulings on their
7  objections as any indication of how I think the case should
8  be decided.  My rulings were based on the rules of evidence,
9  not on how I feel about the case.  Remember that your
10  decision must be based only on the evidence that you saw and
11  heard here in court.

12    Remember also that any statements, objections or
13  arguments made by the lawyers are not evidence in the case.
14  Lawyers try to point out those things that are most
15  significant or most helpful to their side of the case, and in
16  so doing, to call your attention to certain facts or
17  inferences that might otherwise escape your notice.  In the
18  final analysis, however, it is your own recollection and
19  interpretation of the evidence that controls in the case.

20    This case should be considered and decided by you
21  as an action between persons of equal standing in the
22  community, of equal worth, and holding the same or similar
23  stations in life.  A governmental entity, like Metro, is
24  entitled to the same fair trial at your hands as a private
25  individual such as Ms. Barton.

1    That concludes the part of my instructions

2 explaining the rules for considering the testimony and

3 evidence.  Let me finish up by explaining some things about

4 your deliberations in the jury room and your possible

5 verdicts.

6    The first thing that you should do in the jury

7 room is choose someone to be your foreperson.  You may select

8 the foreperson in any fair and reasonable way.  The

9 foreperson shall preside over your deliberations and speak

10 for the jury in the courtroom when you've reached your

11 verdict.  The case should not be decided simply on what the

12 foreperson wants.  You must each exercise your independent

13 judgment.  The foreperson's opinion carries no more weight

14 than any other juror's opinion.

15    Once you start deliberating, do not talk to the

16 court security officer, or to me, or to anyone else except

17 each other about the case.  If you have any questions or

18 messages, the foreperson must write them down on a piece of

19 paper, sign them, and give them to the court security

20 officer.  The court security officer will give them to me,

21 and I will respond as soon as I can.  I may have to talk to

22 the lawyers about what you've asked, so it may take me some

23 time to get back to you.  Any questions or messages normally

24 should be sent to me through your foreperson and must be in

25 writing.

1      One more thing about messages.  Do not ever write
2 down or tell anyone how you stand on your votes.  That should
3 stay secret until you are finished.
4      Remember that you must make your decision based
5 only on the evidence that you saw and heard here in court.
6 You may consider the exhibits admitted into evidence.  Do not
7 try to gather any information about the case on your own
8 while you are deliberating.
9      For example, do not do any internet searches about
10 the case, do not conduct any experiments inside or outside of
11 the jury room, do not consult any books to help you with your
12 deliberations, and do not conduct any independent research,
13 reading, or investigation about the case.  You will be
14 permitted to take with you any notes you may have taken
15 during the course of the trial.
16      During your deliberations, you must not
17 communicate with or provide any information to anyone by any
18 means outside -- I'm sorry, about this case.  You may not use
19 any electronic device or media, such as a smartphone,
20 computer, the internet, or any text or instant messaging
21 service, any internet chat room, blog, or any social media
22 website such as Facebook, YouTube, or Twitter, to communicate
23 to anyone any information about this case or to conduct any
24 research about this case until the Court accepts your
25 verdict.  In other words, you cannot talk to anyone,

correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.

Make your decision based only on the evidence that you saw and heard here in the Court.

Your verdict, whether it is for the plaintiff or for the defendant, must be unanimous. In other words, every one of you must agree on the verdict.

After you reach a verdict, and it is announced in the courtroom, I will ask each of you if it is, in fact, your verdict. This is to make sure the verdict is, in fact, unanimous.

I now want to explain the verdict form to you. You will be provided one copy for use in your deliberations. The foreperson should complete and sign the verdict form when you reach your verdict.

Certain questions have instructions written before or after them. It is very important to follow these instructions carefully. These instructions tell you which questions must be answered, or skipped, based on your answers to previous questions. Please carefully read and follow the instructions on the verdict form.

Please remember the Court has no opinion on how you should decide the case.

I will now read the verdict form to you.

The verdict form contains a number of questions.

Question 1:  Do you find that Metro discriminated against Ms. Barton in violation of Title VII?

There's a blank for you to check "Yes" and a blank for you to check "No."

Question 2:  Do you find that Metro failed to accommodate Ms. Barton's religious observance in violation of Title VII?

Again, there's a blank for "Yes" and a blank for "No."

Question 3:  Do you find that Metro retaliated against Ms. Barton in violation of Title VII?

There's a blank for "Yes" and a blank for "No."

And there's an instruction.

If you answered "Yes" to questions 1, 2, or 3, proceed to question 4.  If you answered "No" to all the above questions, skip the remaining question and have the foreperson sign and date the form.

Question 4:  What amount of compensatory damages should be awarded to Ms. Barton?

There's a blank for you to write in the amount of damages.

Then there's an instruction to please sign and date this form and return it to the Court.  And there's a blank for the jury foreperson to sign the form and a separate

1  blank for the foreperson to date the form.

2        Now that you have all -- now that all the evidence
3  is in and the arguments are completed, you are free to talk
4  about the case in the jury room.  In fact, it is your duty to
5  talk about -- talk with each other about the evidence and to
6  make every reasonable effort you can to reach a unanimous
7  agreement.  Talk with each other, listen carefully and
8  respectfully to each other's views, and keep an open mind as
9  you listen to what your fellow jurors have to say.  Try your
10 best to work out your differences.  Do not hesitate to change
11 your mind if you're convinced that other jurors are right and
12 that your original position was wrong.

13       But do not ever change your mind just because the
14 other jurors see things differently, or just to get the case
15 over with.  In the end, your vote must be exactly that, your
16 own vote.  It is important for you to reach unanimous
17 agreement, but only if you can do so honestly and in good
18 conscience.

19       No one will be allowed to hear your discussions in
20 the jury room, and no record will be made of what you say.
21 So you should all feel free to speak your minds.

22       Listen carefully to what the other jurors have to
23 say, and then decide for yourself if the plaintiffs -- if the
24 plaintiff has proved her claim against the defendant.

25       Let me finish by repeating something I said to you

earlier. Nothing that I have said or done during the trial
was meant to influence your decision in any way. You decide
for yourselves whether or not Ms. Barton has proved her
claims against Metro.

If I could have counsel approach, please.

(Bench conference outside the hearing of the
jury:)

THE COURT: All right, I've now read the charge.
Other than objections raised in the charge conference, which
are preserved, are there any other objections to the charge
I've just given from the plaintiff?

MS. COLLINS: No. I noted three mistakes, but
they were all synonyms. Do you want me to let you know which
ones they were?

THE COURT: Sure.

MS. COLLINS: On page 5, you said "Played a
motivating role," rather than part. That's a synonym. You
asked.

THE COURT: No, I'm laughing at myself because I
can sit and see a word right on the page in front of me and
say something different. It happens. Okay, I think -- I'm
not going to correct that. There's also a typo after that.

MS. COLLINS: Okay. It's a synonym. Page 7, "By
citing some other factor." You said, "Reason." I think they
mean the same.

1     THE COURT:  Okay.

2     MS. COLLINS:  And this is minor again.  Page 12,

3 instead of "as," you said "that."

4     THE COURT:  Which one?

5     MS. COLLINS:  At the very bottom of the page, the

6 third sentence.  Means the same.

7     THE COURT:  So I said "that"?  Okay.

8     MS. COLLINS:  That was it.  Everything else

9 is . . .

10     THE COURT:  All right.  Those are all synonyms,

11 so --

12     MS. COLLINS:  Well, you left out a "now," but

13 that . . .

14     THE COURT:  Okay.

15     MS. COLLINS:  Sorry.

16     THE COURT:  No, I'm glad you're reading carefully.

17 I don't think that those would require me to go back and

18 clarify.

19     MS. COLLINS:  No.

20     THE COURT:  I think that the meaning is the same.

21 Any objections from Metro?

22     MR. FOX:  No objections from Metro.

23     THE COURT:  Okay.  Thank you.

24     (Bench conference concluded.)

25     THE COURT:  All right.  Thank you for your service

as jurors.  We'll gather the exhibits and deliver them to
you.  You may begin deliberating once you have all the
exhibits.

You should take the time needed to deliberate
fully.  And please remember that you should deliberate only
when each juror is present.  Also, if you're deliberating as
we approach 4:30, we will reach out to see -- to you to see
if you would like to take a break for the day or continue
your deliberations.

Please leave your copy of the jury charge and the
verdict form on your seat.  We will have a copy back there
for you, one copy.  And you can step back to the jury room,
and the Court will be in recess for the purpose of jury
deliberations.

You can take your notes with you, just not the
charge and the verdict form.

(The jury was excused from the courtroom at
 12:49 p.m.)

THE COURT:  All right, be seated, please.  Please
just have a number -- Jill's pinch-hitting for Angie right
now, but have a number with us.  Try to be on about at least
a 10- or 15-minute tether.  You don't have to stay in the
building if you don't want to, but -- you-all have both heard
this joke before, but as Todd Campbell used to say, now is
not the time to go check your dry cleaning in Green Hills.

1   So just stay fairly close.  You may have places to go and

2   park while we're waiting that aren't in the building, and

3   that's perfectly fine, but just try to be able to be back in

4   that sort of timeframe in case we get a question or a

5   verdict.

6          And so we'll just wait, and we'll let you know if

7   and when we hear something.

8          (Recess taken from 12:53 p.m. to 1:45 p.m.)

9          THE COURT:  All right, we received a note from the

10  jury saying they've reached a unanimous verdict.  So we'll

11  bring them in and hear what that verdict is.

12         (The jury returned to the courtroom at 1:48 p.m.)

13         THE COURT:  All right, be seated, please.  Members

14  of the jury, I understand that you-all have reached a

15  verdict.  Is that the case?  And, ████████, are you the

16  foreperson?

17         JUROR:  I am.

18         THE COURT:  All right, if you'll hand the verdict

19  form to our court security officer, please.

20         All right, I'll now read the verdict form in Carol

21  Barton, plaintiff, versus Metropolitan Government of

22  Nashville and Davidson County, defendant, Case No. 3:20-cv-118.

23         The verdict form is as follows:

24         Question 1:  Do you find that Metro discriminated

25  against Ms. Barton in violation of Title VII?

1          Answer:  No.

2          Question 2:  Do you find that Metro failed to

3  accommodate Ms. Barton's religious observations in violation

4  of Title VII?

5          Answer:  No.

6          Question 3:  Do you find that Metro retaliated

7  against Ms. Barton in violation of Title VII?

8          Answer:  No.

9          The jury followed my instructions and did not

10  complete question 4 in light of their answers to questions 1,

11  2, and 3.

12          If I could have our court security officer publish

13  this to the attorneys, I will individually question the

14  jurors.

15          All right, I'm going to ask each of you if the

16  verdict I just read is, in fact, your individual verdict as

17  well.

18          ██████████?

19          JUROR:  Yes.

20          THE COURT:  ████████?

21          JUROR:  Yes.

22          THE COURT:  ████████████?

23          JUROR:  Yes.

24          THE COURT:  █████████?

25          JUROR:  Yes.

```
1        THE COURT:  ██████████?
2        JUROR:  Yes.
3        THE COURT:  ████████?
4        JUROR:  Yes.
5        THE COURT:  █████████?
6        JUROR:  Yes.
7        THE COURT:  And ██████████?
8        JUROR:  Yes.
```

THE COURT:  All right, having polled the jury, I find that the verdict is, in fact, unanimous.

Is there any reason from counsel that we cannot dismiss this jury in this case from plaintiff?

MS. COLLINS:  No, Your Honor.

THE COURT:  And Mr. Fox?

MR. FOX:  No, Your Honor.

THE COURT:  All right.  Members of the jury, again I want to thank you for your service.  We moved the trial faster than we had hoped, but you-all were attentive and were here when you needed to be here, and for that, we're grateful.  As I said on the first day, if we didn't have people like you show up for jury duty, we wouldn't have the right that we all enjoy to jury trials.  So, again, thank you.

If you could return to the jury room, where you've been deliberating and just hang tight for a few minutes,

1   we'll get you on your way as soon as possible.  Thank you.

2              (The jury was excused from the courtroom at

3              1:51 p.m.)

4              THE COURT:  All right, are there any matters I

5   need to address before we adjourn the trial?

6              MS. COLLINS:  Plaintiff will be filing a motion

7   for judgment as a matter of law.

8              THE COURT:  Okay.

9              MR. FOX:  Nothing at this moment from Metro.

10             THE COURT:  All right.  Well, then everyone have a

11  good rest of the day and a good long weekend.

12

13             (Proceedings concluded at 1:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1           REPORTER'S CERTIFICATE

2           I, Patricia A. Jennings, Official Court Reporter

3   for the United States District Court for the Middle District

4   of Tennessee, with offices at Nashville, do hereby certify:

5           That I reported on the Stenograph machine the

6   proceedings held in open court on November 10, 2022, in the

7   matter of CAROL BARTON vs. METROPOLITAN GOVERNMENT OF

8   NASHVILLE AND DAVIDSON COUNTY, TENNESSEE,

9   Case No. 3:20-cv-00118; that said proceedings in connection

10  with the hearing were reduced to typewritten form by me; and

11  that the foregoing transcript (pages 1 through 95) is a true

12  and accurate record of said proceedings.

13          This the 3rd day of January, 2023.

14

15

16

17

18                  /s/ Patricia A. Jennings
                    Patricia A. Jennings, RMR, CRR
19                  Official Court Reporter

20

21

22

23

24

25